# EXHIBIT A

JUDGMENT OF THE GENERAL COURT (Second Chamber)

28 June 2019 (*)

(EU trade mark — Invalidity proceedings — EU three-dimensional mark — Shape of a guitar body — Absolute ground for refusal — Distinctive character — Article 52(1)(a) of Regulation (EC) No 207/2009 (now Article 59(2)(a) of Regulation (EU) 2017/1001) — Distinctive character acquired through use — Article 52(2) of Regulation No 207/2009 (now Article 59(2) of Regulation 2017/1001))

In Case T-340/18,

**Gibson Brands, Inc.**, established in Nashville, Tennessee (United States), represented initially by K. Hughes, Solicitor, A. Renck and C. Stöber, and subsequently by A. Renck and C. Stöber, lawyers,

applicant,

v

**European Union Intellectual Property Office (EUIPO)**, represented by P. Sipos and H. O'Neill, acting as Agents,

defendant,

the other party to the proceedings before the Board of Appeal of EUIPO, intervening before the General Court, being

**Hans-Peter Wilfer**, residing in Markeneukirchen (Germany), represented by O. Nilgen and A. Kockläuner, lawyers,

ACTION brought against the decision of the Second Board of Appeal of EUIPO of 8 March 2018 (Case R 415/2017-2), relating to invalidity proceedings between Mr Wilfer and Gibson Brands,

THE GENERAL COURT (Second Chamber),

composed of M. Prek, President, F. Schalin (Rapporteur) and M.J. Costeira, Judges,

Registrar: I. Dragan, Administrator,

having regard to the application lodged at the Court Registry on 31 May 2018,

having regard to the response of EUIPO lodged at the Court Registry on 6 September 2018,

having regard to the response of the intervener lodged at the Court Registry on 30 August 2018,

further to the hearing on 11 April 2019,

gives the following

**Judgment**

**Background to the dispute**

1   On 16 June 2010, the applicant, Gibson Brands, Inc., filed an application for registration of a European Union trade mark with the European Union Intellectual Property Office (EUIPO) pursuant to Council Regulation (EC) No 207/2009 of 26 February 2009 on the European Union trade mark (OJ 2009 L 78, p. 1), as amended (replaced by Regulation (EU) 2017/1001 of the European Parliament and of the Council of 14 June 2017 on the European Union trade mark (OJ 2017 L 154, p. 1)).

2   Registration as a mark was sought for the following three-dimensional sign:



3   The goods and services in respect of which registration was sought are, following the restriction made in the course of the proceedings before EUIPO, in Classes 9, 15 and 25 of the Nice Agreement concerning the International Classification of Goods and Services for the Purposes of the Registration of Marks of 15 June 1957, as revised and amended, and correspond for each of those classes to the following description:

– Class 9: 'Scientific, nautical, surveying, photographic, cinematographic, optical, weighing, measuring, signalling, checking (supervision), apparatus and instruments for conducting, switching, transforming, accumulating, regulating or controlling electricity; Apparatus for recording, transmission or reproduction of sound or images; magnetic data carriers, recording discs; automatic vending machines and mechanisms for coin-operated apparatus; cash registers, calculating machines, data processing equipment and computers; fire-extinguishing apparatus; none of the aforementioned including swimming goggles, digital music players and accessories related thereto or cameras and accessories related thereto';

– Class 15: 'Musical instruments; bass drum sticks; batons (conductors'); bellows for musical instruments; bow nuts for musical instruments; bows for musical instruments; bridges for musical instruments; cases for musical instruments; catgut for musical instruments; chin rests for violins; conductors' batons; dampers for musical instruments; drumheads; drumsticks; harp strings; horsehair for bows for musical instruments; intensity regulators for mechanical pianos; kettledrum frames; keyboards for musical instruments; keys for musical instruments; mouthpieces for musical instruments; music rolls [piano]; music stands; mutes for musical instruments; pedals for musical instruments; pegs for musical instruments; perforated music rolls; piano keyboards; piano keys; piano strings; picks for stringed instruments; plectrums; reeds; rolls (perforated music); sheet music (turning apparatus for); skins for drums; stands (music); stands for musical instruments; sticks (drum); sticks for bows for musical instruments; strings for musical instruments; tuning forks; tuning hammers; turning apparatus for sheet music; valves for musical instruments; wind pipes for organs';

– Class 25: 'Clothing, footwear, headgear; all of the aforementioned promoting or displaying musical instruments including guitars; boot uppers; cap peaks; dress shields; fittings of metal for shoes and boots; footwear uppers; hat frames [skeletons]; heelpieces for boots and shoes; heelpieces for stockings; heels; inner soles; pockets for clothing; ready-made linings [parts of clothing]; shirt fronts; shirt yokes; soles for footwear; studs for football boots [shoes]; tips for footwear; visors [hat making]; welts for boots and shoes; babies' diapers of textile; babies' napkins of textile; boots (heelpieces for); boots (iron fittings for); boots (non-slipping devices for); boots (welts for); diapers (babies') of textile; football boots (studs for); footwear (tips for); frames (hat) [skeletons]; linings (ready-made) [parts of clothing]; napkins (babies') of textile; non-slipping devices for boots and shoes; peaks (cap); shields (dress); shoes (heelpieces for); shoes (iron fittings for); shoes (non-slipping devices for); shoes (welts for); stockings (heel pieces for); uppers (footwear); yokes (shirt)'.

4   After the application for registration had been published in *Community Trade Marks Bulletin* No 132/2010 of 20 July 2010, the contested trade mark was registered on 30 November 2010 under No 9179953.

5   On 7 October 2014, the intervener, Mr Hans-Peter Wilfer filed an application under Article 52(1)(a) of Regulation No 207/2009 (now Article 59(1)(a) of Regulation 2017/1001), read in conjunction with Article 7(1)(b), (d) and (e) of Regulation No 207/2009 (now

Article 7(1)(b), (d) and (e) of Regulation 2017/1001), for a declaration of partial invalidity of the challenged mark in so far as it had been registered for 'musical instruments' in Class 15.

6    By decision of 21 December 2016, the Cancellation Division upheld the application for a declaration of partial invalidity. It held essentially that the challenged mark was devoid of inherent distinctive character for the goods at issue within the meaning of Article 7(1)(b) of Regulation No 207/2009 and that, furthermore, the applicant had failed to establish the distinctive character acquired by that mark in the European Union within the meaning of Article 52(2) of Regulation No 207/2009 (now Article 59(2) of Regulation 2017/1001).

7    On 23 February 2017, the applicant filed a notice of appeal with EUIPO, pursuant to Articles 58 to 64 of Regulation No 207/2009 (now Articles 66 to 71 of Regulation 2017/1001), against the decision of the Cancellation Division.

8    By decision of 8 March 2018 ('the contested decision'), the Second Board of Appeal of EUIPO dismissed the appeal. In particular, it held, in paragraphs 17 to 30 of the contested decision, that even if electric guitars with V-shaped bodies may have been very unusual when they were released in 1958, that shape is now perceived as one possible variant of the many shapes of electric guitars on the market and no longer departed significantly from the norms and customs of the electric guitar sector at the time the challenged mark had been filed. Furthermore, in 2010, the presence on the market of electric guitars with a V-shape made by different manufacturers than the applicant was a fact, even if those guitars could be regarded as infringing copies of the applicant's original Flying V model. Consequently, consumers could not base their decision to purchase solely on the V-shape as an indication of origin, since that shape is devoid of inherent distinctive character. As regards distinctive character acquired by use, it was held in paragraphs 36 to 53 of the contested decision that the first surveys produced by the applicant which were carried out in three Member States (Germany, Italy and Sweden), even if they were reliable, were not sufficient to extrapolate the results to the rest of the European Union. The additional surveys concerning five other Member States (Bulgaria, Spain, the Netherlands, Poland and the United Kingdom) were not carried out by independent institutes, but by the applicant's local consultants and were not sufficiently representative. In any event, the submission of surveys concerning a total of eight Member States is not sufficient for the extrapolation of their results to the rest of the European Union. Furthermore, it was not proved that the markets of the countries in which no survey had been carried out were comparable to those in which such surveys had been conducted, with regard, in particular, to the homogeneity of the markets concerned, and no evidence of use of the mark had been submitted at least in respect of Cyprus and Slovenia.

**Forms of order sought**

9    The applicant claims that the Court should:

–    annul the contested decision;

–    order EUIPO and the intervener to pay the costs.

10   EUIPO and the intervener contend that the Court should:

–    dismiss the application;

–    order the applicant to pay the costs.

**Law**

11   The applicant relies on two pleas in law in support of its action. The first plea is based on an infringement of Article 52(1)(a) of Regulation No 207/2009, read in conjunction with Article 7(1)(b) thereof, and is divided into two sub-pleas. First, the Board of Appeal failed to properly apply the standard for assessing the inherent distinctiveness of the challenged mark. Second, the contested decision lacks proper reasoning in that regard, which resulted in a wrongful discharge of the burden of proof. The second plea in law is based on an infringement of Article 52(2) of Regulation No 207/2009, read in conjunction with Article 7(3) thereof (now Article 7(3) of Regulation 2017/1001) and is divided into three sub-pleas. First, the Board of Appeal wrongly held that the challenged mark had become iconic independent of the applicant and that its reputation precluded the acquisition of distinctive character through use. Second, the proper standard for assessing the challenged mark's acquired distinctiveness was not taken into account. Third, the contested decision lacks proper reasoning as regards the examination of distinctiveness acquired through use.

12   EUIPO and the intervener contend that the two pleas relied on by the applicant should be rejected.

13   As a preliminary point, it must be emphasised that even if the Board of Appeal states in the contested decision that it applies the provisions of Regulation 2017/1001, those references should be understood, as far as concerns the substantive rules, as referring in fact to the identical provisions of Regulation No 207/2009.

*The first plea in law alleging, first, an infringement of Article 52(1)(a) of Regulation No 207/2009, read in conjunction with Article 7(1)(b) thereof and, second, a breach of the duty to state reasons*

14   In the first place, the applicant claims that the Board of Appeal committed an error, specifically in paragraph 25 of the contested decision, when it held that the registration of an EU trade mark was to be refused if the sign at issue was simply perceived as a variant of a usual shape. The approach adopted by the Board of Appeal failed to consider the fact that, in such a situation, the perception of the relevant public must be taken into account when examining the distinctive character of a three-dimensional sign because it is conceivable that the average consumer of the goods at issue distinguishes, without conducting an analytical examination and without paying particular attention, the goods concerned from those of other undertakings.

15   In the present case, the challenged mark has a shape with a specific character and a unique and striking appearance which can be easily remembered so that it will be perceived as indicating commercial origin.

16   The Board of Appeal failed to consider the meaning and scope of the requirement of a 'significant departure from the norms or customs of the sector' as it is interpreted both by the Court of Justice and, in Germany, by the Bundesgerichtshof (Federal Court of Justice). In that connection, it is only necessary, for a mark to reach the uniform level of distinctiveness, to take into consideration certain individual aspects of a three-dimensional trade mark as compared with a conventional description, but without changing the tradition criteria for assessing distinctiveness, which are uniform and as such apply equally with respect to the different types of marks.

17   The Board of Appeal has therefore committed an error of law by basing its assessment solely on whether or not the challenged mark was a variant of the usual shape of the goods at issue, whereas it should also have taken into consideration the perception of the average consumer.

18   In the second place, during the examination of the challenged mark as a three-dimensional mark, the applicant claims that the Board of Appeal carried out an incorrect assessment of the norms or customs of the sector. The Board of Appeal referred decisively to evidence, that it should have disregarded, and which related to the shape of electric guitars on the markets in the United States and Canada, whereas the norms or customs applicable should have been those of the European market. The Board of Appeal also failed to establish that relevant consumers in the European Union were aware of those factors. Furthermore, whereas it should have been bound solely by the valid evidence produced by the intervener, who was then the cancellation applicant, the Board of Appeal carried out of its own motion the examination of the criteria for invalidity, thereby acting unlawfully.

19   Moreover, the Board of Appeal unlawfully referred to well-known facts in order to establish the norms or customs of the electric guitar sector on the EU market, whereas that is an exception to the principles governing the burden of proof in *inter partes* proceedings and, as regards a specific niche market which concerns goods which are not for mass consumption or for the general public, it is unlikely that anyone is aware of its peculiarities.

20   In the third place, the Board of Appeal also committed an error by failing to duly take account of the perception of the relevant public in order to determine whether the challenged mark enabled the goods or services concerned to be distinguished as originating from a particular undertaking.

21   On that basis, the applicant states that it disagrees with the Board of Appeal's findings that the V-shape of the Flying V guitar might have been revolutionary when it was released in 1958, but that, in 2010, it was only one possible variant of the many existing shapes. On the contrary, a guitar as iconic and unique as the Flying V enjoys a continued perception as an indicator of origin by the relevant public. First of all, novelty is not a requirement for a three-dimensional trade mark's distinctiveness. On the contrary, the more long-standing the use of a trade mark is, the more recognition that mark will have among the relevant public and the more valuable it will become. Next, the perception of the challenged mark as an indicator of origin is strengthened by the fact that the applicant is the manufacturer of the original Flying V guitar, and the relevant public continues to strongly identify that shape with the applicant. Finally, it is for the intervener to demonstrate why the relevant public's perception changed over time, although it has provided no such evidence.

22   The applicant also claims that the existence, known by the relevant public, of different manufacturers of V-shaped guitars has no impact on the distinctiveness of the challenged mark. On one hand, a person's right to protect his own trade mark cannot be undermined by the unlawful use of that mark by third parties. On the other hand, the intervener has failed to show that the relevant public made an association between the goods covered by the challenged mark and any third-party goods. On the contrary, the applicant has produced evidence, including articles showing that the public differentiates the original from the counterfeit copies and imitations.

23   As regards the alleged failure to state reasons, the applicant argues that, by accepting irrelevant evidence mainly from outside the European Union, the Board of Appeal failed to provide proper reasoning in the contested decision, also incorrectly finding that the intervener had provided the evidence required. The challenged mark enjoys a presumption of validity, even if it is a three-dimensional mark. The Board of Appeal also failed to explain why, four years after its registration, the challenged mark lost its inherent distinctiveness.

24   EUIPO, supported by the intervener, disputes the applicant's arguments.

25   It should be recalled that, under Article 52(l)(a) of Regulation No 207/2009, an EU trade mark is to be declared invalid on application to EUIPO where that mark has been registered contrary to the provisions of Article 7 thereof.

26   Under Article 7(1)(b) of Regulation No 207/2009, 'trade marks which are devoid of any distinctive character' are not to be registered. Moreover, Article 7(2) of Regulation No 207/2009 (now Article 7(2) of Regulation 2017/1001) states that Article 7(1) 'shall apply notwithstanding that the grounds of non-registrability obtain in only part of the European Union'.

27   According to the case-law, an absolute ground for refusal must be interpreted in the light of the general interest underlying it. As regards Article 7(1)(b) of Regulation No 207/2009, the notion of general interest is manifestly indissociable from the essential function of a trade mark, which is to guarantee the identity of the origin of the marked product or service to the consumer or end user by enabling him, without any possibility of confusion, to distinguish the product or service from others which have another origin (see judgment of 8 May 2008, *Eurohypo* v *OHIM*, C-304/06 P, EU:C:2008:261, paragraphs 55 and 56 and the case-law cited).

28   For a trade mark to possess distinctive character, for the purposes of Article 7(1)(b) of Regulation No 207/2009, it must serve to identify the goods or services in respect of which registration is sought as originating from a particular undertaking, and thus to distinguish those goods or services from those of other undertakings (see judgment of 29 April 2004, *Henkel* v *OHIM*, C-456/01 P and C-457/01 P, EU:C:2004:258, paragraph 34 and the case-law cited).

29   The distinctive character of a mark must be assessed, first, by reference to the goods or services in respect of which registration has been applied for and, second, by reference to the relevant public's perception of the mark, the relevant public consisting of average consumers of those goods or services, who are reasonably well informed and reasonably observant and circumspect (judgments of 29 April 2004, *Henkel* v *OHIM*, C-456/01 P and C-457/01 P, EU:C:2004:258, paragraph 35, and of 22 June 2006, *Storck* v *OHIM*, C-25/05 P, EU:C:2006:422, paragraph 25) The level of attention of the average consumer, who is deemed to be reasonably well

informed and reasonably observant and circumspect, varies according to the category of the goods or services in question (judgment of 10 October 2007, *Bang & Olufsen v OHIM (Shape of a loudspeaker)*, T-460/05, EU:T:2007:304, paragraph 32).

30   According to settled case-law, the criteria for assessing the distinctive character of three-dimensional marks consisting of the appearance of the product itself are no different from those applicable to other categories of trade mark (see judgment of 22 June 2006, *Storck v OHIM*, C-25/05 P, EU:C:2006:422, paragraph 26 and the case-law cited).

31   However, when those criteria are applied, the perception of the relevant public is not necessarily the same in the case of a three-dimensional mark consisting of the appearance of the product itself as it is in the case of a word or figurative mark consisting of a sign which is independent of the appearance of the products which it designates. Average consumers are not in the habit of making assumptions about the origin of products on the basis of their shape or the shape of their packaging in the absence of any graphic or word element, and it could therefore prove more difficult to establish distinctive character in relation to such a three-dimensional mark than in relation to a word or figurative mark (see judgment of 22 June 2006, *Storck v OHIM*, C-25/05 P, EU:C:2006:422, paragraph 27 and the case-law cited).

32   Furthermore, the more closely the shape for which registration as a trade mark is sought resembles the shape most likely to be taken by the product in question, the greater the likelihood of the shape being devoid of any distinctive character for the purposes of Article 7(1)(b) of Regulation No 207/2009. In those circumstances, only a mark which departs significantly from the norm or customs of the sector and thereby fulfils its essential function of indicating origin is not devoid of any distinctive character for the purposes that provision (see judgment of 7 October 2004, *Mag Instrument v OHIM*, C-136/02 P, EU:C:2004:592, paragraph 31 and the case-law cited).

33   It is in the light of those considerations that the applicant's arguments must be examined.

34   In the present case, in so far as they appear to be well founded in the light of the evidence in the file and they are not challenged by the applicant, the findings of the Board of Appeal, as set out in paragraph 19 of the contested decision, as regards the definition of the relevant public with respect to the goods at issue must be confirmed. On that basis, it must be observed that, although those goods are 'musical instruments', the question as to the distinctive character of the challenged mark arises only with regard to 'electric guitars' in so far as it concerns the possible shape of the body of an electric guitar. Therefore, the Board of Appeal held, without committing an error, that the relevant public was composed of professional and amateur electric guitarists in the territory of the European Union. As far as concerns the level of attention of that public, it was considered to be higher than average, which must be interpreted as a fairly high degree of attentiveness in the light of the specialist nature of the goods at issue, which do not fall within the category of commonly used consumer goods.

35   In the first place, as regards the applicant's argument that the Board of Appeal held that the registration of an EU trade mark had to be refused where the sign at issue was simply perceived as a variant of a usual shape, it must be observed that the applicant has misread the contested decision. First of all, the Board of Appeal stated, in paragraph 25 of the contested decision, that in order to determine whether the shape of the contested sign departed significantly from the norms or customs of the sector, it was unnecessary to prove that an identical or almost identical shape already existed on the market, but that it was necessary to examine whether the sector concerned was characterised by a broad range of shapes in respect of which the sign at issue was simply regarded as one variant.

36   That approach must be approved, because the presence on the market of a significant number of shapes encountered by consumers makes it unlikely that they will regard a particular shape as belonging to a specific manufacturer rather than being just one of the variety of shapes characterising the market. The broad range of shapes with an original or fanciful appearance already present on the market limits the likelihood of a particular shape being considered as departing significantly from the prevailing norms on that market and, therefore, from being identified by consumers solely on the basis of its specificity or its originality.

37   In that connection, in paragraphs 26 to 27 of the contested decision, the Board of Appeal examined the evidence produced by the intervener, which led it to conclude that, when the challenged mark was applied for, 'there was a broad range of different, rather peculiar, shapes of electric guitar bodies' on the market.

38   The selection of photographs of electric guitars set out in paragraph 26 of the contested decision confirms the wide variety of shapes on the market. That selection, limited to several extracts from the large amount of evidence in the file submitted by the intervener in the cancellation proceedings, nonetheless consists of photographs of 10 electric guitars and 2 electric bass guitars. That is already an indication that there are at least a dozen shapes of guitar bodies on the market, from the traditional rounded shape to angular V or X shapes, or shapes which imitate an axe. As the Board of Appeal held, those photographs all date from before 16 June 2010, the date of the application for registration of the challenged mark, the oldest dating from 1982, and therefore they are relevant for evaluating and confirming the broad range of shapes on the market before that date.

39   Thus it appears that, contrary to the applicant's submissions, the Board of Appeal's conclusions are not based on the finding as to whether or not the contested sign is a variant of the usual shape of the goods at issue, but on the fact that it was only one possible variant of the many existing shapes, so that when the application for registration of the challenged mark was filed, the V-shape did not depart significantly from the norms and customs of the sector.

40   Furthermore, although the applicant may rightly rely on the fact that the shape of the Flying V guitar was very original when it was released on the market in 1958, it cannot however deny the evolution of the market during the following 50 years, which was henceforward characterised by a wide variety of available shapes, as is clear from the examination of the evidence in the file. The originality of a shape must be evaluated in the light of the situation on the market taking as the starting point the date of filing of a three-dimensional mark, in this case 16 June 2010. In that connection, as EUIPO observes, the presence on the market of shapes which the applicant claims are counterfeit copies is irrelevant to the assessment of the inherent distinctiveness of the challenged mark with regard to its perception by the relevant public (see, to that effect, judgment of 21 May 2014, *Bateaux mouches v OHIM (BATEAUX-MOUCHES)*, T-553/12, not published, EU:T:2014:264, paragraph 46). Therefore, the applicant's arguments do not appear to be well founded and must be rejected.

41  In the second place, as regards the applicant's arguments that the Board of Appeal incorrectly determined the norms or customs of the EU market based on the characteristics of the North American market, which are not relevant in the present case, it must be held that, contrary to the applicant's submissions, the Board of Appeal did not commit an error in determining those norms or customs.

42  In paragraph 29 of the contested decision, the Board of Appeal states that, although the majority of the evidence filed by the intervener is taken from American and Canadian publications, those publications also enable some conclusions to be drawn with regard to the EU market. That situation arose inter alia due to the fact that the publications concerned contained photographs of famous guitarists, including guitarists from the European Union, photographed with their instruments, who performed worldwide and used the same instruments in their concerts in the United States or Canada as in the European Union, with the result that the guitar shapes they used were also known there.

43  According to the Board of Appeal, apart from the fact that the instruments used by those famous guitarists, in particular professional guitarists from the European Union, were very often from North American guitar manufacturers, the evidence produced shows that the electric guitar market was an international market.

44  First, it appears that the Board of Appeal has not committed any error as far as concerns the findings it made with regard to the nature of the evidence produced by the intervener. Annex A.2 to the intervener's file during the administrative proceedings contains extracts from American and Canadian magazines specialising in the guitar world, in particular *Guitar player*, *Vintage guitar magazine*, *International musician and recording world* and *Premier guitar*. Those magazines feature many famous guitarists photographed with their instruments and, as the Board of Appeal observed, some of them are nationals of the Member States of the European Union, in particular German guitarists Rudolf and Michael Schenker, United Kingdom guitarist Kenneth 'K.K.' Downing, or Swedish guitarist Michael Amott, who play or have played guitars from North American manufacturers, some of which have a V-shaped body. Therefore, it is clear that the evidence examined by the Board of Appeal does not only concern the North American market.

45  Second, the conclusions drawn by the Board of Appeal as a result of findings on the evidence produced during the administrative phase do not appear to be incorrect. As electric guitars are aimed at a limited group of consumers consisting of professional and amateur musicians who have a higher than average degree of attentiveness given the specialised nature of the goods concerned, the relevant market appears to be itself limited and specialised. Professional guitarists, in particular, the most famous among them who perform worldwide, enjoy a high degree of recognition and are role models, so that the guitars they use may be regarded as iconic by the relevant public.

46  In those circumstances, the electric guitar market must be regarded as a specific market with an international dimension, in which the prevailing cultural references, while they originate mainly in North America, are nonetheless universal values, also recognised by EU consumers. The evidence produced which was analysed by the Board of Appeal, since it contains references to musicians from the European Union who may be role models for those consumers, enable the characteristics of the EU market to be evaluated. Furthermore, in the light of the international dimension of the market, the evidence produced, although it derives from North American publications, is very relevant in the present case.

47  In that connection, it must be observed that the applicant incorrectly relies on the case-law deriving from the judgment of 12 January 2006, *Deutsche SiSi-Werke* v *OHIM* (C-173/04 P, EU:C:2006:20, paragraphs 36 and 37), to support its claim that any evidence which does not relate exclusively to the EU market should be ignored, whereas the Court of Justice held at most in that judgment that, as regards the restriction of the market on which the comparison was made in order to evaluate the departure of a three-dimensional mark from the norms or customs prevailing in the sector concerned, it might be necessary to take into consideration a wider market than that which covers the goods designated by such a mark, since the definition of market in this case is to be considered from a sectoral, not geographical point of view (in that case the sector for the packaging of liquid foods in general and not only the sector for drinks packaging) (judgment of 12 January 2006, *Deutsche SiSi-Werke* v *OHIM*, C-173/04 P, EU:C:2006:20, paragraphs 31 and 32).

48  Furthermore, although, in paragraph 35 of the judgment of 12 January 2006, *Deutsche SiSi-Werke* v *OHIM* (C-173/04 P, EU:C:2006:20), the Court of Justice held that the restriction of the sector in which the comparison is to be made falls within the appraisal of the facts and was not therefore a question of law subject to its review in appeal proceedings, it should be observed however that, in point 35 of his Opinion in *Deutsche SiSi-Werke* v *OHIM* (C-173/04 P, EU:C:2005:474), Advocate General Ruiz-Jarabo Colomer stated essentially that, as far as concerns the spatial delimitation, although the restriction to the territory of the European Union was relevant as regards the effects of the relative ground for refusal referred to in Article 8(1)(b) of Regulation No 207/2009 (now Article 8(1)(b) of Regulation 2017/1001) in order to ascertain whether there was a likelihood of confusion between the two marks, it was not, by contrast, necessarily justified where the abstract distinguishing potential of a sign was being assessed, since that assessment may lead to a finding of the existence of an absolute ground for refusal.

49  In those circumstances, it appears that the Board of Appeal rightly held that the evidence produced by the intervener gave information enabling the characteristics specific to the market for musical instruments consisting of electric guitars in the European Union to be defined, in particular as regards the perception of the goods concerned by the relevant public, because the market considered had to be regarded as being a global market.

50  Therefore, the Board of Appeal did not commit an error by taking into consideration the evidence consisting in North American publications and by holding that those publications enabled the perception of the challenged mark by the relevant public in the European Union to be evaluated. Moreover, the Board of Appeal's approach is clearly set out and, in that regard, does not suffer from any failure to state reasons.

51  Finally, as regards the reference in paragraph 27 of the contested decision to the well-known fact regarding the existence of hundreds of different shapes of electric guitar bodies on the market, it should be observed that that evidence was mentioned by the Board of Appeal for the sake of completeness following the examination of the evidence submitted, and that that evidence is not the legal basis of the contested decision. The argument relied on by the applicant of the allegedly unlawful reference to the well-known fact is therefore ineffective. The applicant's argument based on an incorrect assessment of the norms or customs of the market in the European Union must therefore be rejected.

52    In the third place, as regards the alleged failure to take account of the perception of the relevant public, it appears that the Board of Appeal did in fact take account of the perception of that public, faced with a large number of electric guitar bodies with varied and original shapes on the market. As stated in paragraph 40 above, although the V-shape was highly original in 1958, that originality could not serve as a reference for an analysis of the perception of the relevant public in June 2010 when, at the latter date it was established that the market was characterised by a wide variety which necessarily influenced the perception of the relevant public. Therefore, the Board of Appeal concluded, in paragraph 34 of the contested decision, without committing an error, that 'at the relevant point in time, the relevant public knew that V-shaped guitars had different manufacturers and that they could not rely on the V-shape alone as an indication of origin'. Thus, the applicant's argument must be rejected and therefore also the first part in its entirety.

53    As regards the second part, relying on a failure to state reasons in the contested decision, which led the Board of Appeal, in particular, to misapply the rules governing the burden of proof and the presumption of legality of the registration of the challenged mark, it must be observed, to the contrary, that the analysis of the first part supports a finding that the contested decision contains a full statement of reasons, having regard to the approach which enabled the assessment of the norms and customs of the sector. The second part must therefore be rejected in that regard. However, although, by those arguments the applicant in fact challenges the merits of the contested decision, it must be pointed out that, according to settled case-law, the duty to state adequate reasons in decisions is an essential procedural requirement which must be distinguished from the question whether the reasoning is well founded, which is concerned with the substantive legality of the measure at issue (judgments of 2 April 1998, *Commission* v *Sytraval and Brink's France*, C-367/95 P, EU:C:1998:154, paragraph 67, and of 22 March 2001, *France* v *Commission*, C-17/99, EU:C:2001:178, paragraph 35). Thus the applicant's arguments in support of the second part of the first plea must be rejected.

54    It is therefore necessary to reject the second part and accordingly the first plea in its entirety.

*The second plea in law, infringement of Article 52(2) of Regulation No 207/2009, read in conjunction with Article 7(3) thereof*

55    As regards the first part, the applicant asserts that the influence of its own reputation was not correctly taken into consideration by the Board of Appeal in the assessment of the distinctiveness acquired by the challenged mark, and that the Board of Appeal committed an error of law in that, by referring to fame and a certain lifestyle, it had applied the criteria in Article 8(5) of Regulation No 207/2009 (now Article 8(5) of regulation 2017/1001) whereas the criteria of Article 7(1)(b) thereof were relevant.

56    First of all, the applicant observes that the 'representation of a certain lifestyle' may be a criterion for the assessment of the reputation of a mark, beyond the main function of the latter which is to indicate origin, so that the pleasing or attractive shape cannot exclude it from registration as a mark. Next, it states that the fact that the challenged mark is well known is not a factor which goes against its acquired distinctiveness; but a factor which pertains to a different legal standard, namely to that of reputation. Finally, the Board of Appeal's approach, which consists in using the reputation of the challenged mark against its distinctiveness is incorrect, since the case-law of the Court of Justice states, to the contrary, that the reputation of an EU trade mark or its proprietor does not affect the absolute ground for refusal laid down in Article 7 of Regulation No 207/2009.

57    The applicant claims, as regards the second part, that the Board of Appeal committed an error by holding that consumers do not rely solely on the shape of the goods as an indication of origin, but they will look for word elements. The case-law does not require the depiction of a word element in order to render the challenged mark distinctive.

58    As regards the third part, claiming a failure to state reasons, the applicant states that the Board of Appeal has not explained why it did not take into account the surveys provided, or why it considered them to be insufficient, in particular, without among other things indicating what sample size would have been sufficient and without taking into account the fact that the electric guitar market is a small and niche market. Likewise, in the analysis of the results of those surveys, the Board of Appeal did not explain the reasons why it disagreed with the method consisting in attributing to the applicant the answers of participants who identified the shape at issue as belonging to one manufacturer, without being able to name the latter. Similarly, the contested decision did not contain any explanations of the fact that the existence of a dealer network in Cyprus and Slovenia is not sufficient to establish use in those two Member States, whereas the Board of Appeal also insists on the importance of such a network for the purpose of extrapolation. Furthermore, it followed contradictory reasoning by holding that the electric guitar market was global, while requiring the production without exception of sales figures for each Member State, which leads to the imposition of overly burdensome evidential requirements.

59    EUIPO observes as a preliminary point, in relation to the second part, that the applicant commits an error by relying on an infringement of Article 52(2) of Regulation No 207/2009, read in conjunction with Article 7(3) thereof. Article 52(2) of Regulation No 207/2009 is sufficient in itself by providing for a *sui generis* defence claim. However, that is irrelevant in the present case, because the two provisions at issue are governed by the same logic and must be interpreted in the same manner and assessed in the light of the same relevant factors.

60    EUIPO, supported by the intervener, disputes the applicant's arguments.

61    Under Article 52(2) of Regulation No 207/2009 where an EU trade mark has been registered in breach of the provisions of Article 7(1)(b) of that regulation, and is thus devoid of distinctive character, it may nevertheless not be declared invalid if, in consequence of the use that has been made of it, it has after registration acquired a distinctive character in relation to the goods or services for which it is registered.

62    The distinctive character of an EU trade mark the validity of which is challenged having regard to an alleged lack of inherent distinctiveness must be established by its proprietor in the territory in which the absolute ground for refusal was deemed to exist (see, by analogy, judgments of 7 September 2006, *Bovemij Verzekeringen*, C-108/05, EU:C:2006:530, paragraph 28, and of 30 March 2000, *Ford Motor* v *OHIM (OPTIONS)*, T-91/99, EU:T:2000:95, paragraph 27).

63    In determining whether a mark has acquired distinctive character following the use made of it, the competent authority must make an overall assessment of the evidence that the mark has come to identify the product concerned as originating from a particular undertaking, and thus to distinguish that product from goods of other undertakings. In that regard, the market share held by the mark; how intensive, geographically widespread and long-standing use of the mark has been; the amount invested by the undertaking in promoting the mark; the proportion of the relevant class of persons who, because of the mark, identify goods as originating from a

particular undertaking; and statements from chambers of commerce and industry or other trade and professional associations, may be taken into account (see, by analogy, judgment of 4 May 1999, *Windsurfing Chiemsee*, C-108/97 and C-109/97, EU:C:1999:230, paragraphs 49 and 51).

64    In the present case, it must be held, as a preliminary point, that while the applicant relies on an infringement of Article 52(2) of Regulation No 207/2009, read in conjunction with Article 7(3) thereof, the first of its provisions, as EUIPO states, is sufficient in itself, providing for a defence consisting in establishing the distinctive character acquired by an EU trade mark. That does not affect the substance of the case, in so far as the provisions at issue are governed by the same logic and must be interpreted in the same way, in the light of the same relevant factors. However, the second plea in law must be examined only with regard to Article 52(2) of Regulation No 207/2009.

65    As regards the first part, alleging that the Board of Appeal should have held that the reputation of the challenged mark was such that it had become iconic and represented a certain lifestyle, which, in essence, made it ordinary and prevented the acquisition of a distinctive character, it must be held, as EUIPO submits, that that argument is not supported by the wording of the contested decision.

66    While it is true that, in paragraph 52 of the contested decision, the board of Appeal relied on the use of the V-shape to illustrate a certain lifestyle (the V-shape is used as an item of furniture in a music school in Sweden or as a giant emblem at the entrance of a famous theme restaurant in the United States), it did so after an in-depth examination, in paragraphs 39 to 51 of the contested decision, of the evidence which had been submitted in order to establish the acquisition of a distinctive character in the territory of the European Union.

67    However, it must be observed that the Board of Appeal concluded that no distinctive character had been acquired after, finding, in particular, that the surveys produced by the applicant, which initially concerned Germany, Italy and Sweden, and subsequently supplemented by surveys concerning Bulgaria, Spain, the Netherlands, Poland and the United Kingdom, were insufficient to prove that the relevant public attributed a unique commercial origin to a V-shaped guitar and, therefore, that the challenged mark had acquired a distinctive character throughout the European Union.

68    The Board of Appeal's approach is consistent with the requirement to establish that distinctive character has been acquired in relation to a significant part of the relevant public throughout the territory of the European Union and it must be approved (see, to that effect, judgment of 24 February 2016, *Coca-Cola v OHIM (Shape of a contour bottle without fluting)*, T-411/14, EU:T:2016:94, paragraph 80).

69    In those conditions, since the reasoning in the contested decision with regard to the reputation of the challenged mark at most reinforces the conclusion previously reached that there has been no demonstration of distinctive character acquired in the light of the evidence adduced, the plea to the effect that the reputation of the challenged mark was wrongly taken into account in order to reject the finding of acquired distinctive character is ineffective since, if it were well founded, it would not be capable of leading to the annulment of the contested decision, with the result that it must be rejected (see, to that effect, judgment of 21 September 2000, *EFMA v Council*, C-46/98 P, EU:C:2000:474, paragraph 38).

70    As regards the second part, alleging that the Board of Appeal committed an error in holding, in paragraph 51 of the contested decision that, since the challenged mark was three-dimensional, consumers would look for word elements on such a mark, it must also be held that the applicant misread the contested decision.

71    The Board of Appeal, after stating that the evidence produced by the intervener showed that several guitar manufacturers unrelated to the applicant produced guitars with an identical or similar V-shape, held that the relevant consumers, conscious of that situation, would not rely only on the shape of the goods as an indication of origin, but would also rely on other indications.

72    Contrary to the applicant's assertions, those findings of the Board of Appeal do not constitute a general statement that word elements are necessary to confer distinctive character on a sign such as the challenged sign, but that, in the light of the situation on the market, characterised by the presence of electric guitars with a V-shape originating from other manufacturers than the applicant, the V-shape was insufficient to enable consumers to take, on that sole basis, a decision to purchase, knowing the origin of the goods, in spite of the renown of the Flying V model.

73    In those circumstances, the applicant's argument is irrelevant and the second part must be rejected.

74    Finally, as regards the third part, alleging a failure to state reasons, in that the Board of Appeal did not in essence set out the reasons explaining the failure to take the surveys provided into account and their inadequacy, or why it considered that use had not been established in Cyprus and Slovenia, it must be held, as EUIPO observes, that in reality the applicant challenges the merits of the contested decision, relying on complaints relating to the analysis by the Board of Appeal of evidence submitted to it rather than challenging the reasoning of that decision.

75    In any event, it must be recalled that, for the purposes of the application of Article 7(3) of Regulation No 207/2009, that is also the case with regard to Article 52(2) thereof, in the case of a mark that does not have inherent distinctive character throughout the European Union, the distinctive character acquired through use of that mark must be shown throughout that territory, and not only in a substantial part or the majority of the territory of the European Union, and consequently, although such proof may be produced globally for all the Member States concerned or separately for different Member States or groups of Member States, it is not, however, sufficient that the party with the burden of providing such evidence merely produces evidence of such acquisition that does not cover part of the European Union, even a part consisting of only one Member State (see, to that effect, judgment of 25 July 2018, *Société des produits Nestlé SA and Others v Mondelez UK Holdings & Services*, C-84/17 P, C-85/17 P and C-95/17 P, EU:C:2018:596, paragraph 87).

76    In the present case, as regards Cyprus and Slovenia, the Board of Appeal rightly held, in paragraphs 45 and 46 of the contested decision, that an extrapolation of the global data concerning the EU market could not be made with regard to those two Member States, since the applicant had not previously demonstrated use of the challenged mark on their territory.

77    In that regard, the contested decision mentions certain evidence which was not refuted by the applicant, such as the absence of a breakdown of the sales figures and advertising by Member State and the lack of invoices addressed to consumers in Cyprus and

Slovenia. In those circumstances, the Board of Appeal could properly conclude that the mere presence of official dealers in the Member States in question did not establish use of the challenged mark.

78   Those findings by the Board of Appeal in themselves enabled it to conclude that the applicant had not established the acquisition of distinctive character in all the Member States, which was sufficient to defeat the defence claim in Article 52(2) of Regulation No 207/2009.

79   In those circumstances, the third part as well as the second plea must be rejected and, therefore, the action must be dismissed in its entirety.

**Costs**

80   Under Article 134(1) of the Rules of Procedure of the General Court, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings.

81   Since the applicant has been unsuccessful, it must be ordered to pay the costs, in accordance with the form of order sought by EUIPO and the intervener.

On those grounds,

THE GENERAL COURT (Second Chamber)

hereby:

1.   **Dismisses the action;**

2.   **Orders Gibson Brands, Inc. to pay the costs.**

Prek                                    Schalin                                    Costeira

Delivered in open court in Luxembourg on 28 June 2019.

E. Coulon                                                                          E. Buttigieg

Registrar                                                                          President

\*   Language of the case: English.