# United States District Court
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| GIBSON BRANDS, INC., | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No.  4:19-CV-358 |
| | § | Judge Mazzant |
| v. | § | |
| | § | |
| ARMADILLO DISTRIBUTION | § | |
| ENTERPRISES, INC., and CONCORDIA | § | |
| INVESTMENT PARTNERS, LLC, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |

## FINAL INSTRUCTIONS TO THE JURY

**MEMBERS OF THE JURY**:

It is my duty and responsibility to instruct you on the law you are to apply in this case.  The law contained in these instructions is the only law you may follow.  It is your duty to follow what I instruct you the law is, regardless of any opinion that you might have as to what the law ought to be.

If I have given you the impression during the trial that I favor either party, you must disregard that impression.  If I have given you the impression during the trial that I have an opinion about the facts of this case, you must disregard that impression.  You are the sole judges of the facts of this case.  Other than my instructions to you on the law, you should disregard anything I may have said or done during the trial in arriving at your verdict.

You should consider all of the instructions about the law as a whole and regard each instruction in light of the others, without isolating a particular statement or paragraph.

The testimony of the witnesses and other exhibits introduced by the parties constitute the evidence.  The statements of counsel are not evidence; they are only arguments.  It is important

for you to distinguish between the arguments of counsel and the evidence on which those arguments rest.  What the lawyers say or do is not evidence.  You may, however, consider their arguments in light of the evidence that has been admitted and determine whether the evidence admitted in this trial supports the arguments.  You must determine the facts from all the testimony that you have heard and the other evidence submitted.  You are the judges of the facts, but in finding those facts, you must apply the law as I instruct you.

You are required by law to decide the case in a fair, impartial, and unbiased manner, based entirely on the law and on the evidence presented to you in the courtroom.  You may not be influenced by passion, prejudice, or sympathy you might have for the plaintiff or the defendant in arriving at your verdict.

### BURDEN OF PROOF

There are two standards of proof that you may be asked to apply in this case.

You will be instructed to answer some questions based upon a "preponderance of the evidence."  To establish by a preponderance of the evidence means to prove something is more likely so than not so.  Let me give you the example I gave at the beginning of trial.  Take the evidence and imagine that it is equally balanced on a scale, so that both sides of the scale are even. Now take a feather and add it to one side of the scale, so that the scale tips ever so slightly in that direction.  That is a preponderance of the evidence.

If you find that a party has failed to prove any element of its claims or defenses by a preponderance of the evidence, then it may not recover on that claim or defense.

You will be instructed to answer some questions based upon "clear and convincing evidence."  Clear and convincing evidence means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

2

**EVIDENCE**

The evidence you are to consider consists of the testimony of the witnesses, the documents and other exhibits admitted into evidence, and any fair inferences and reasonable conclusions you can draw from the facts and circumstances that have been proven.

Generally speaking, there are two types of evidence. One is direct evidence, such as testimony of an eyewitness. The other is indirect or circumstantial evidence. Circumstantial evidence is evidence that proves a fact from which you can logically conclude another fact exists. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overruled the objection, the question may be answered or the exhibit received. If I sustained the objection, the question cannot be answered, and the exhibit cannot be received. Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may have ordered that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you are deciding the case, you must not consider the stricken evidence for any purpose.

### What is Not Evidence

Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

1.      Arguments and statements by lawyers are not evidence. The lawyers are not

witnesses.  What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have state them, your memory of the facts controls.

2.      Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the court's ruling on it.

3.      Testimony that is excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence only for a limited purpose, you must do so and you may not consider that evidence for any other purpose.

Anything you may see or hear or have seen or head when the Court was not in session is not evidence.  You are to decide the case solely on the evidence received at trial.

### Demonstrative Evidence

Some documents have been presented to you as illustrations.  We call these "demonstratives."  Demonstratives are a party's description, picture, PowerPoint presentation or slide, or model used to describe something involved in this trial.  If your recollection of the evidence differs from the document, rely on your recollection.

### Charts and Summaries

Certain charts and summaries have been shown to you solely to help explain or summarize the facts disclosed by the books, records, and other documents that are in evidence.  These charts and summaries are not evidence or proof of any facts.  You should determine the facts from the evidence.

4

*Interrogatories*

Evidence was presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side.  These answers were given in writing and under oath before the trial in response to questions that were submitted under established court procedures.  You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand.

*Witnesses*

An important part of your job will be making judgments about the testimony of the witnesses, including the representatives of Gibson and Armadillo and Concordia, who testified in this case.  You should decide whether you believe all or any part of what each person had to say, and how important that testimony was.

You alone are to determine the questions of credibility or truthfulness of the witnesses.  In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case, that he or she may have, and the consistency or inconsistency of his or her testimony considered in the light of the circumstances.  Has the witness been contradicted by other credible evidence? Has he or she made statements at other times and places contrary to those made here on the witness stand?  You must give the testimony of each witness the credibility that you think it deserves.

Even though a witness may be a party to the action and therefore interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence, if you believe the testimony.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides.  Witness testimony is weighed; witnesses are not counted.  The test is not the

relative number of witnesses, but the relative convincing force of the evidence.  The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all of the other evidence, you believe that witness.

## Expert Witnesses

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field—he or she is called an expert witness—is permitted to state his or her opinion on those technical matters.  However, you are not required to accept that opinion.  As with any other witness, it is up to you to decide whether to rely on it.

## Impeachment by Witness's Inconsistent Statement

In determining the weight to give to the testimony of a witness, consider whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony given at the trial.

A simple mistake by a witness does not necessarily mean that the witness did not tell the truth as he or she remembers it.  People may forget some things or remember other things inaccurately.  If a witness made a misstatement, consider whether that misstatement was an intentional falsehood or simply an innocent mistake.  The significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

## Deposition Testimony

Certain testimony has been presented to you through a deposition.  A deposition is the sworn, recorded answers to questions a witness was asked in advance of the trial.  Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness's testimony may be presented, under oath, in the form of a deposition.  Some time before this trial, attorneys representing the parties in this case questioned this witness under oath.  A court reporter

was present and recorded the testimony.  The questions and answers have been read and shown to you.  This deposition testimony is entitled to the same consideration as if the witness had been present and had testified from the witness stand in court.

***Limiting Instruction***

When testimony or an exhibit is admitted for a limited purpose, you may consider that testimony or exhibit only for the specific limited purpose for which it was admitted.

For example, the 2009 Trademark Trial and Appeal Board Decision pertaining to the accused headstock was admitted solely for the limited purpose of determining laches and not for purposes of determining likelihood of confusion.  You may not consider the 2009 Trademark Trial and Appeal Board decision for any purpose other than laches.

As another example, you are instructed that for social media posts admitted into evidence you are not to consider statements made by one other than the parties for the truth of the matter asserted.

## INSTRUCTION REGARDING USE OF NOTES

Remember at all times, you are the judges of the facts.  You have been allowed to take notes during this trial.  Any notes that you have taken during this trial are only aids to your memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes.  The notes are not evidence.  A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

## INSTRUCTION REGARDING JUROR QUESTIONS

As I told you in my preliminary instructions, I have given you the opportunity to give me

written questions anonymously after a witness testified when you had an important question of the witness that was strictly limited to the substance of the witness' testimony.  Remember that I asked you not to be offended if I did not present your question to be answered by the witness.  You should not speculate on the answer to any unasked question and you should not speculate on or consider any facts or events outside the testimony and exhibits you have heard and seen in this courtroom.

### NO INFERENCE FROM FILING SUIT

The fact that a person brought a lawsuit and is in court seeking damages creates no inference that the person is entitled to a judgment.  Anyone may make a claim and file a lawsuit. The act of making a claim in a lawsuit, by itself, does not in any way tend to establish that claim and is not evidence.

### Bias—CORPORATE PARTY INVOLVED

Do not let bias, prejudice or sympathy play any part in your deliberations.  A corporation and all other persons are equal before the law and must be treated as equals in a court of justice.

### STATEMENT OF THE CASE

In this lawsuit, Plaintiff Gibson Brands, Inc., who I may refer to as "Gibson," seeks monetary damages against Defendants Armadillo Distribution Enterprises, Inc. and Concordia Investment Partners, LLC, who I may refer to as "Armadillo" and "Concordia," respectively.

Gibson claims trademark rights in seven trademarks.  Four of the trademarks are for guitar body shapes: (1) the Flying V Body Shape Design; (2) the Explorer Body Shape Design; (3) the ES Body Shape Design; and (4) the SG Body Shape Design.  Gibson also claims rights in the Dove Wing Headstock Design Trademark.    Finally, Gibson claims rights in two word

trademarks: (1) HUMMINGBIRD; and (2) FLYING V.

I will refer to all seven trademarks collectively as the "Gibson Trademarks." At times though, I will refer to the Flying V Body Shape Design Trademark, the Explorer Body Shape Design Trademark, the ES Body Shape Design Trademark, the SG Body Shape Design Trademark, and the Dove Wing Headstock Design Trademark as the "Gibson Shapes." By contrast, I will occasionally refer to the HUMMINGBIRD and FLYING V word trademarks as the "Gibson Words."

Gibson contends Armadillo violated, and continues to violate, the Lanham Act by manufacturing, offering to sell, and selling guitars displaying identical or substantially similar marks to the Gibson Trademarks. Gibson argues Armadillo has been unjustly enriched by its alleged infringement of the Gibson Trademarks. Gibson also contends Concordia contributed to Armadillo's trademark infringement of the Gibson Trademarks.

Armadillo and Concordia deny Gibson's contentions. Armadillo and Concordia contend that their offer and sale of guitars does not violate the Lanham Act because the shapes are generic and ordinary consumers are not likely to be confused. Armadillo and Concordia also contend Gibson's trademark claims are barred by laches, an equitable defense that precludes recovery where there has been an inexcusable delay that results in prejudice to the defendant. I will explain what a laches defense entails in more detail later in my instructions.

Armadillo and Concordia have also filed counterclaims against Gibson for cancellation of the Gibson Shapes—with the exception of the Dove Wing Headstock—on the grounds that they are common, generic shapes. Finally, Armadillo has brought a counterclaim against Gibson for intentional interference with prospective business relations.

**TRADEMARK LIABILITY**

The trademark laws balance three often-conflicting goals: (1) protecting the public from being misled about the nature and source of goods, so that the ordinary consumer is not confused or misled in the market; (2) protecting the rights of a business to identify itself to the public and its reputation in offering goods to the public; and (3) protecting the public interest in fair competition in the market.

The balance of these policy objectives vary from case to case, because they may often conflict.   Accordingly, each case must be decided by examining its specific facts and circumstances, of which you are to judge.

Let me start by giving you a brief explanation of the legal terminology you will hear throughout my instructions.

*Trademark Definition*

A trademark is a word, a name, a symbol, a device, or a combination of them that indicates the source of goods.  Essentially, a trademark identifies a brand and signifies that all goods bearing the trademark derive from a single source.  The owner of a trademark has the right to exclude others from using the identical mark or a similar mark that is likely to cause confusion in the marketplace to ordinary consumers.  A person who uses the trademark of another may be liable for damages.

*Ownership of a Trademark*

Ownership of a trademark is established by use, not by registration.  The first one to use a protectable mark is generally held to be the "senior" user and may be entitled to stop others from using a mark that is likely to cause consumer confusion.  Rights in a trademark are obtained only through commercial use of the mark.

A trademark is "used," in connection with goods, for purposes of this instruction when it is transported or sold in commerce and the trademark is attached to the product, or placed on its label or container, or if that is not practical, placed on documents associated with the goods or their sale.

*Trademark Registration*

While it is not necessary to register a trademark with the United States Patent and Trademark Office for it to be protectable, there are benefits to obtaining such a registration.

To obtain a United States trademark registration, an applicant files a trademark application with the United States Patent and Trademark Office.  The application is reviewed by a trademark examiner.  An examiner's review of a trademark application includes a search of the United States Patent and Trademark Office's database for prior conflicting applications and registrations.

A registration may be challenged at the Trademark Trial and Appeal Board or in court.

Principal Register

Registration of a mark on the Principal Register of the United States Patent and Trademark Office creates a rebuttable presumption that the mark is protectable, and that the registered owner has the exclusive right to use the mark in commerce with the products or services listed on the registration.  A trademark registration on the Principal Register can be cancelled on certain grounds at any time.

The Flying V Body Shape Design Trademark, the Explorer Body Shape Design Trademark, the SG Body Shape Design Trademark, the Dove Wing Headstock, and the HUMMINGBIRD and FLYING V word trademarks as are all registered with the United States Patent and Trademark Office on the Principal Register.  I will refer to these as the "Gibson

Registered Trademarks."

<u>Supplemental Register</u>

Registration of a mark on the Supplemental Register of the United States Patent and Trademark Office does not create a rebuttable presumption that the mark is protectable.   A trademark registration on the Supplemental Register can be cancelled on certain grounds at any time.  The ES Body Shape Design is on the Supplemental Register of the United States Patent and Trademark Office.

*"Market" for a Trademark*

The "market" for a trademark is the geographic territory in which the products are sold under that trademark.  For any federally-registered trademark, the geographic territory is the United States.

I will next instruct you as to the law you are to consider in deciding if Armadillo and Concordia are liable to Gibson for violating trademark law.  These facts are relevant to whether Armadillo is liable for:

1. Infringing the Gibson Trademarks, by using a trademark in a manner likely to cause confusion among ordinary consumers;

2. Counterfeiting the Gibson Trademarks, except the ES Body Shape Design, by intentionally using a counterfeit that is identical with, or substantially indistinguishable from, Gibson's Trademarks in a manner likely to cause confusion among ordinary consumers; and

3. Unfairly competing with the Gibson Trademarks by using a trademark in a manner likely to cause confusion among ordinary consumers.

12

These instructions are also relevant to whether Concordia is liable for either:

1. Inducing or causing Armadillo to Infringe the Gibson Trademarks; or

2. Supplying products to Armadillo despite knowing or having reason to know that Armadillo was infringing the Gibson Trademarks.

Finally, these instructions are relevant to whether the Gibson Shapes should be cancelled— or in the case of the ES Body Shape Design, whether its pending application should be rejected— because they are generic.

## Trademark Infringement

On Gibson's claims for trademark infringement of the Gibson Trademarks, Gibson has the burden of proving each of the following elements by a preponderance of the evidence:

1. Gibson owns a valid, protectable trademark;

2. Armadillo used the same or a similar trademark without Gibson's consent; and

3. Armadillo's use of the Gibson Trademarks is likely to cause confusion to an ordinary consumer as to the source, affiliation, sponsorship, or approval of either party's products.

## Trademark Counterfeiting

Gibson alleges Armadillo is liable for trademark counterfeiting of the Flying V Body Shape Design Trademark, the Explorer Body Shape Design Trademark, the SG Body Shape Design Trademark, the Dove Wing Headstock, and the HUMMINGBIRD and FLYING V word trademarks.  Gibson has the burden of proving the following elements by a preponderance of the evidence:

1. Gibson owns a valid, protectable trademark;

2. Armadillo intentionally used the Gibson Trademarks in connection with the sale,

offering for sale, or distribution of Armadillo's good;

3.  Armadillo knew the mark was counterfeit; and

4.  Armadillo's use of the mark is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the good.

A mark is considered counterfeit when it is identical with, or substantially indistinguishable from, a registered mark.

Counterfeiting is limited to those marks registered on the United States Patent and Trademark Office's Principal Register.   When determining whether a mark is considered counterfeit, it should be compared with the registered mark as it appears in the actual market.

*Validity*

As you may have noticed, all of Gibson's trademark claims first require that Gibson prove by a preponderance of the evidence that the mark is "valid."   Only a valid trademark can be infringed.   Only if you determine Gibson proved by a preponderance of the evidence that the Gibson Trademarks are valid trademarks should you consider whether Armadillo's actions infringed the Gibson Trademarks.

The registration of a mark with the United States Patent and Trademark Office Principal Register creates a rebuttable presumption that the mark is valid.   The Gibson Trademarks are all on the United States Patent and Trademark Office's Principal Register except for the ES Body Shape Design, which is on the Supplemental Register.   Therefore, unless Armadillo rebuts the presumption, the Gibson Trademarks—except the ES Body Shape Design—are presumed valid.

For the ES Body Shape Design, Gibson must prove by a preponderance of the evidence that the trademark is valid, non-functional, and distinctive.

If you determine that Armadillo (including its predecessors) first used its Dean V and Dean

Z body shapes before Gibson received its federal trademark registrations in 1997 for the Flying V Body Shape Design and Explorer Body Shape Design, then you must determine whether Gibson's asserted Flying V and Explorer body shapes had acquired "Secondary Meaning" as of the date you determined that Armadillo first used its Dean V and Dean Z body shapes.  I will further instruct you regarding "Secondary Meaning" below.

### Distinctiveness

Trademark law provides great protection to distinctive or strong trademarks.  Conversely, trademarks that are not as distinctive or strong are called "weak" trademarks and receive less protection from infringing uses.  Trademarks that are not distinctive are not entitled to any trademark protection.

### Spectrum of Marks

Trademarks are grouped into five categories according to their relative strength.  These five categories are, in order of strength or distinctiveness: (1) fanciful; (2) arbitrary; (3) suggestive; (4) descriptive; or (5) generic.

**Generic** and **descriptive** terms are not inherently distinctive.

- A generic term is simply the ordinary name of a product.  For example, the word "Fish" is a generic term for bass, trout, and salmon.  A generic term is not inherently distinctive and is never protectable as a trademark for the products it names.

- A descriptive term is one that identifies a characteristic or quality of the products with which it is used, such as color, function, dimensions or ingredients.  A descriptive term is not inherently distinctive and is protectable as a trademark only if it has achieved secondary meaning as identifying the source of the products with

which it is used.

In contrast, *suggestive*, *arbitrary* and *fanciful* terms are inherently distinctive and are protectable as trademarks.

- A suggestive term is one that suggests, rather than describes, some characteristic of the products with which it is used.  If a term requires imagination to apply it to the product in question, then that tends to show that the term is suggestive.  Examples of suggestive terms include "Penguin" for refrigerators and "Coppertone" for sun tanning products.

- Arbitrary and fanciful terms have no relation to the products with which they are used.  An example of an arbitrary term is "Ivory" for soap.  An example of a fanciful term is "Kodak" for photographic supplies.

In evaluating the distinctiveness of an alleged mark, it is proper to give more weight to the distinctive portions of the mark and less weight to the unremarkable or generic portions of the mark.

If you decide that the HUMMINGBIRD and/or FLYING V trademarks are arbitrary or suggestive, they are considered to be inherently distinctive.  An inherently distinctive trademark is valid and protectable.  Product designs cannot be inherently distinctive.

If you determine that the ES Body Shape Design, Explorer Body Shape Design, Flying V Body shape Design, and SG Body Shape Design trademarks are generic, they cannot be distinctive and therefore are not valid or protectable. You must then render a verdict for Armadillo on the charge of trademark infringement and counterfeiting.

If you decide that the ES Body Shape Design—and possibly the Flying V Shape Design or Explorer Body Shape Design—are descriptive, you will not know if the trademark is valid or

invalid until you consider whether it has gained distinctiveness by the acquisition of secondary meaning, which I explain in the next instruction.

The Gibson Registered Trademarks on the Principal Register are conclusively proved distinctive through their status as "incontestable" registrations.  However, if you determine Armadillo (or its predecessors) first used its Dean V and Dean Z guitars before 1997—the date Gibson obtained its trademark registrations for the Flying V Body Shape Design and Explorer Body Shape Design—then Gibson must also offer evidence that the Flying V and Explorer Body Shape Designs have acquired secondary meaning.

While proof of secondary meaning may not be required for the ES Body Shape Design—and possibly the Flying V Shape Design or Explorer Body Shape Design—Gibson must offer evidence that the ES Body Shape Design has acquired secondary meaning, which I will explain in the next instruction.

Again, Gibson's trademarks should be considered separately, one at a time.

*Secondary Meaning*

"Secondary Meaning" refers to the recognition that the marks have among prospective consumers.

For the ES Body Shape Design, you must determine whether Gibson has shown, by a preponderance of the evidence, that the ES Body Shape Design has attained secondary meaning and is thus distinctive by the time Armadillo first used the Luna Athena 501 Guitar.

Similarly, if you determine Armadillo (or its predecessors) first used its Dean V and Dean Z guitars before 1997—the date Gibson obtained its trademark registrations for the Flying V Body Shape Design and Explorer Body Shape Design—then you must also determine whether Gibson has shown, by a preponderance of the evidence, that the Flying V and Explorer Body Shape

Designs have attained secondary meaning and is thus distinctive.

To establish secondary meaning, Gibson must show that, in the minds of the public, the primary significance of the trademark is to identify the source of the product rather than the product itself.  In other words, Gibson must show that the primary significance in the minds of the prospective consumers is not the product itself, but the identification of the product with a single source, regardless of whether ordinary consumers know who or what that source is.  Unless you find that the preponderance of the evidence shows that a significant number of the consuming public associates the Gibson trademark with a single source, then you cannot find that it has acquired secondary meaning.

When you are determining secondary meaning, consider the following factors:

1.  Length, manner, and geographic use of the mark;

2.  Volume of sales;

3.  Amount and manner of advertising;

4.  Nature of use of the mark in newspapers and magazines;

5.  Consumer survey evidence;

6.  Direct consumer testimony;

7.  Armadillo's intent in allegedly copying the mark.

The presence or absence of any particular factor should not necessarily resolve whether a trademark has acquired secondary meaning.

As for promotion and advertising, spending substantial amounts of money does not of itself cause a mark to acquire secondary meaning.  The relevant question is not the *extent* of the promotional efforts, but their *effectiveness* in alerting the meaning of the mark to the consuming public.

Descriptive marks are protectable only to the extent you find they acquired distinctiveness through secondary meaning by the public coming to associate the mark with the owner of the mark. Descriptive marks are entitled to protection only as broad as the secondary meaning they have acquired, if any.  If they have acquired no secondary meaning, they are entitled to no protection and cannot be considered a valid mark.

The mere fact that Gibson is using a Gibson trademark, or that Gibson began using the trademark before Armadillo, does not mean that the trademark has acquired secondary meaning. There is no particular length of time that a trademark must be used before it acquires a secondary meaning.

Gibson has the burden of proving whether the ES Body Shape Design—and possibly the Flying V Shape Design or Explorer Body Shape Design—has acquired a secondary meaning.

### *Likelihood of Confusion*

As to any of the marks that you have found valid, you must consider whether Gibson has proven that Armadillo's use of that mark, or a similar mark, creates, when viewed in its entirety as actually used in the market, a likelihood of confusion among ordinary purchasers as to the source, origin, or sponsorship of Armadillo's goods.

Gibson must prove by a preponderance of the evidence that confusion is probable, not a mere possibility, in order to establish trademark infringement.  When determining whether Armadillo's use creates a likelihood of confusion, you may consider all the evidence presented, particularly evidence relevant to the non-exhaustive list, which follows below.  No single factor or consideration is determinative, and Gibson need not prove that all, or even most, of the factors listed below are present in any particular case to be successful.  Nor are you limited to consideration of only these factors.  The presence or absence of any particular factor should not

necessarily resolve whether there was a likelihood of confusion.

The factors you should consider include, but are not limited to the following:

1.   Type of mark allegedly infringed;

2.   Similarity between the two marks;

3.   Similarity of the products;

4.   Identity of retail outlets and purchasers;

5.   Identity of advertising media used;

6.   Armadillo's intent;

7.   Evidence of actual confusion; and

8.   Care exercised by potential customers.

I will now give you additional information about these factors.

1.   **Type of Mark Infringed**.  The type of mark refers to the strength of each alleged mark. If the mark is suggestive then it is entitled to more protection.  You should analyze two factors when determining the type of mark: (1) the mark's position along the spectrum of distinctiveness (conceptual strength), and (2) the standing of the mark in the marketplace (commercial strength).  The first factor refers to the five categories of distinctiveness I described earlier.   In evaluating the strength of a mark, you should consider where the mark falls on the spectrum of distinctiveness (i.e., whether the mark is generic, descriptive, suggestive, arbitrary, or fanciful) with the strength increasing as one moves from the generic end to the fanciful end of the spectrum.   Conversely, if the mark is descriptive then it is entitled to less protection under the law.   The second factor refers to the mark's standing in the marketplace.  Among the things you may consider are the length and manner of use; the volume of sales associated with the mark; the amount and manner of advertising

of the mark; consumer-survey evidence regarding market recognition; and third-party use of similar marks.  The greater number of more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion.

2. **Similarity of Marks**.  Mark similarity is determined by comparing the appearance, sound, and meaning of the two marks.  The marks should be considered in the context of how the consuming public would find them in the marketplace.  The greater the similarity between the marks, the greater the likelihood of confusion.  Conversely, the greater the dissimilarity between the marks, the less likely there is a likelihood of confusion.

3. **Similarity of Goods**.  The greater the similarity between the products sold by Gibson and by Armadillo, the greater the likelihood of confusion.  Conversely, where the products sold by Gibson and Armadillo are not similar, a likelihood of confusion is less likely.

4. **Identity of Retail Outlets and Purchasers**.  The greater the overlap that exists between the retail outlets and purchasers of Gibson's and Armadillo's products, the greater the likelihood of confusion.  Conversely, where there is little overlap between the retail outlets and purchasers of Gibson and Armadillo's products, a likelihood of confusion is less likely.

5. **Identity of Advertising Media Used**. The greater the overlap that exists between the advertising media used by Gibson and Armadillo, the greater the likelihood of confusion.  Conversely, where there is little overlap between the advertising media used by Gibson and Armadillo for their products, a likelihood of confusion is less likely.

6. **Armadillo's Intent**.  Evidence that a defendant adopted its accused trademarks/trade dress with the intent to cause actual confusion between its products and the plaintiff's products weighs in favor of a likelihood of confusion.  Mere knowledge of the plaintiff's trademarks/trade dress does not amount to an intent to deceive.

21

7. **Actual Confusion**.  Evidence of actual confusion is not necessary to a finding of likelihood of confusion, but if there is actual evidence that consumers have confused Armadillo's mark for one or more of Gibson's alleged marks this is the best evidence of a likelihood of confusion.  Evidence of actual confusion must show more than a fleeting mix-up of names; rather it must show that the confusion was caused by the trademarks employed and it swayed consumer purchases.  Consumer confusion can occur pre-purchase, at the moment of purchase, and post-purchase.

8. **Degree of Care Exercised by Potential Consumers**.  More sophisticated buyers, or purchasers of more sophisticated products, are likely to be more careful and discriminating when purchasing those products.  Consequently, such purchasers may be less likely to be confused by similarities between two trademarks.  On the other hand, confusion is more likely if the potential buyers of the products in question are less sophisticated, or if the products in question are impulse items or are inexpensive.

The factors are not to be considered in isolation or in the abstract.  Rather, you must consider them in the circumstances and context peculiar to this case.  First, you must consider the application of each factor in light of the specific circumstances of the case, for example, who is advertising the marked products, in connection with what merchandise, and other facts particular to this case.  Second, you must consider the marks in the context that a customer perceives them in the market, which includes their presentation in advertisements, if any, packaging, stores, and so on.  In addition to these eight factors, the particular context in which the mark appears must receive special emphasis.

*Willful Infringement*

If you find that Armadillo infringed any valid trademark owned by Gibson, you must also

determine whether Gibson has proven that, at the time Armadillo used the trademark, Armadillo acted willfully.  Armadillo acted willfully if it knew that it was infringing Gibson's trademark or if it acted with deliberate indifference to Gibson's trademark rights.  Gibson bears the burden of proving willfulness by a preponderance of the evidence.

**Unfair Competition; False Designation of Origin**

Gibson also claims that Armadillo has engaged in unfair competition under federal and state law by using the Gibson Trademarks in connection with Armadillo's products.   The basis of the law of unfair competition is that no one shall sell his goods in such a way as to make it appear that they come from some other source.

Any person who makes commercial use of any word, term, name, or symbol, or combination thereof or false or misleading designation of origin that is likely to cause confusion as to the origin of that person's goods or services or as to that person's affiliation, connection or association with another person is liable to any person who is or is likely to be damaged by the false designation of origin.

On Gibson's claims for unfair competition, Gibson has the burden of proving each of the following by a preponderance of the evidence:

1. Armadillo used Gibson's marks in commerce, in connection with any goods, or any container for goods, any word, term, name, symbol, or device, or any combination thereof;

2. In a fashion likely to cause confusion or mistake, or to deceive;

3. As to the affiliation, connection, or association of Gibson with Armadillo, or as to the origin, sponsorship, or approval of Armadillo's goods by Gibson; and

4. Gibson has been or is likely to be damaged by these acts.

**Contributory Infringement**

If you find that Armadillo infringed any valid trademark owned by Gibson, you must determine whether Concordia contributorily infringed the Gibson Trademarks.  For Concordia to be liable to Gibson for contributory infringement, Gibson must prove by a preponderance of the evidence that:

1. Concordia intentionally induced or caused Armadillo to infringe Gibson's asserted trademarks or trade dress; or

2. Concordia knew or had reason to know Armadillo was infringing the Gibson Trademarks but continued to supply its products to Armadillo.

DEFENSE TO TRADEMARK LIABILITY

**Laches**

If you find that Armadillo infringed any valid trademark owned by Gibson, you must also determine whether Defendants have proven by a preponderance of the evidence that:

1. Gibson delayed in asserting its trademark right;

2. Gibson lacks an excuse for the delay; and

3. The delay caused undue prejudice to Armadillo and/or Concordia.

*Delay*

The length of delay, for purposes of laches, depends on the circumstances.  The period of delay begins when the trademark holder knew or should have known of the infringement and generally ends when the trademark owner files suit.  For purposes of delay, you may consider whether the trademark owner has made an objection to the infringement, for example, in the form of a cease-and-desist letter.  However, the period of delay continues to run if an on owner objects

but does not sue within a reasonable time after making the objection.

*Lack of Excuse*

A delay in asserting trademark rights may be excused where the unlicensed user begins to use the trademark in the market, and later modifies or intensifies its use of the trademark to the effect that the unlicensed user significantly impacts the trademark owner's good will and business reputation, so that the unlicensed user is placed more squarely in competition with the trademark owner.  The mark owner need not sue until the harm from the unlicensed user's use of the mark looms large.  Thus, the significant increase in the scope of the unlicensed user's business, rather than reliance on the same general business model, a trademark owner's possible excuse.

*Undue Prejudice*

An unlicensed user is unduly prejudiced when, in reliance on the trademark owner's unexcused delay in filing suit, the user makes major business investments or expansions that depends on the use of the marks; these investments and expansions would suffer appreciable loss if the marks were enforced; and this loss would not have been incurred had the trademark owner enforced its rights earlier.  Prejudice also occurs where the trademark owner's unexcused delay has resulted in the loss of relevant evidence, including the death of witnesses, the loss of documents, or faded witness memories because of the passage of time.  The amount of prejudice suffered may vary with the length of the delay.

**Unclean Hands**

Defendants may not assert their laches defense if Defendants have "unclean hands." Gibson must prove, by a preponderance of the evidence, that Armadillo and/or Concordia knowingly intended to use the Gibson Trademarks for the purpose of deriving benefit from Gibson's goodwill.

Unclean hands may be found only where the unlicensed user "subjectively and knowingly" intended to cause mistake or to confuse or deceive buyers.  Mere awareness of a trademark owner's claim to the same mark does not amount to having unclean hands nor establishes bad intent necessary to preclude a laches defenses.  The owner of the trademark must demonstrate that at the time the unlicensed user began using the marks or sometime thereafter, said unlicensed user knowingly and intentionally did so with the bad faith intent to benefit from or capitalize on the mark owner's goodwill.

### DAMAGES FOR TRADEMARK LIABILITY

Even though I am instructing you on monetary damages, this should not be taken to mean that I believe Armadillo is liable for the claims brought or that such damages are appropriate. These are issues for you to resolve under the instructions I have given you should you decide that Gibson is entitled to recover.

Damages for a claim means the amount of money which will reasonably and fairly compensate Gibson for any injury you find was caused by Armadillo's infringement as to that claim. Gibson has the burden of proving its actual damages for each claim by a preponderance of the evidence.

It is for you to determine what damages, if any, have been proved.

Your award must be based upon evidence and not upon speculation, guesswork or conjecture.  It is your task first to decide whether each party is liable.

In answering questions about damages, answer each question separately.  Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

**Actual Damages**

If you find that Gibson has proven infringement of any of the Gibson Trademarks and that the infringement caused Gibson injury, you must determine the amount of Gibson's actual damages, if any.  Gibson must prove the amount of its damages by a preponderance of the evidence.  Damages means the amount of money that will reasonably and fairly compensate Gibson for any injury you find was caused by Armadillo's infringement.

In determining the amount of Gibson's actual damages, you should consider:

1. The lost profits that Gibson would have earned but for Armadillo's infringement;

2. The injury to Gibson's goodwill, including injury to Gibson's reputation;

3. Whether the evidence supports a reasonable royalty for Armadillo's infringement;

4. The cost of any pre-trial corrective advertisements to counteract any public confusion caused by the infringement;

5. The cost of any prospective costs to counteract public confusion caused by the infringement.

When considering prospective costs (e.g., cost of future advertising, expense of preventing customers from being deceived), you must not overcompensate.  Accordingly, your award of such future costs should not exceed the actual damage to the value of Gibson's trademark(s) at the time of the infringement by Armadillo.

**Armadillo's Profits**

In addition to actual damages, Gibson may be entitled to profits earned by Armadillo that are attributable to Armadillo's infringement, which Gibson must prove by a preponderance of the evidence.  You may not, however, include in any award of profits any amount that you took into account in determining actual damages.

In assessing Armadillo's profits that are attributable to the infringement, Gibson is only required to prove the amount of Armadillo's total gross sales.  Gross sales is all of Armadillo's receipts from using the trademark(s) in question in the sale of a product.  Gibson has the burden of proving Armadillo's gross sales attributable to the infringement by a preponderance of the evidence.

Profit is determined by deducting all expenses from gross revenue.

Gross revenue is all of Armadillo's receipts from using the trademark(s) in the sale of a product. Gibson has the burden of proving Armadillo's gross revenue by a preponderance of the evidence.

Armadillo has the burden of proving, by a preponderance of the evidence, all operating costs, overhead, production, and other deductible costs incurred that are actually related to producing the gross revenue.

Unless you find that a portion of the profit from the sale of Armadillo's goods using the trademark is attributable to factors other than use of the trademark(s), you should find that the total profit is attributable to the infringement.

**<u>Statutory Damages</u>**

If you find for Gibson on its counterfeiting claim, Gibson may recover statutory damages, if any, instead of any actual damages or alleged infringer's profits.

Statutory damages are damages established by Congress in the Lanham Act. You may award statutory damages between $1,000 and $200,000 for each trademark that Gibson proves Armadillo used, for each type of goods sold, offered for sale, or distributed.

If you find Gibson has proved Armadillo knew the trademark it used was a counterfeit mark, you may award additional statutory damages. It is not necessary that Armadillo knew that

the mark was registered by Gibson, only that Armadillo knew that the trademark was the same or substantially indistinguishable from any of the Gibson Trademarks.

If Gibson proves Armadillo's use of the counterfeit trademark was willful, then you may, but are not required to, increase the statutory damage award to a maximum of $2,000,000 per type of good sold, offered for sale, or distributed.  Armadillo acted willfully if it knew that it was infringing the Gibson Trademarks, or if it acted with deliberate indifference to Gibson's trademark rights.

## Exemplary Damages

If you find for Gibson on its trademark infringement and unfair competition claims, you may also consider whether to award exemplary damages. Exemplary damages are damages designed to punish a defendant and to deter similar conduct in the future.

You may award exemplary damages if Gibson proves by clear and convincing evidence that the harm to Gibson resulted from malice.  "Malice" means:

(a)  a specific intent by Armadillo to cause substantial injury or harm to Gibson; or

(b)  an act or omission by Armadillo,

    i.    which, when viewed objectively from the standpoint of Armadillo at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

    ii.    of which Armadillo had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

If you decide to award exemplary damages, you should consider the following factors in deciding the amount:

1.      The nature of the wrong.

2.      The character of the conduct involved.

3.      The degree of culpability of Armadillo.

4.      The situation and sensibilities of the parties concerned.

5.      The extent to which such conduct offends a public sense of justice and propriety.

6.      The net worth of Armadillo.

The amount of any exemplary damages award should bear a reasonable relationship to the harm caused to Gibson.

You may assess exemplary damages against Defendants, or you may refuse to impose exemplary damages.

### REMAINING CLAIM: UNJUST ENRICHMENT

Gibson claims that Armadillo has been unjustly enriched through the use of Gibson's trademarks.  To prevail on its claim, Gibson must prove by a preponderance of the evidence that:

1.  Armadillo obtained a benefit from Gibson;

2.  By fraud, duress, or undue advantage.

If you find for Gibson on its unjust enrichment claim, the damages, if any, are limited to the amount for which Armadillo was not unjustly enriched or, alternatively, the amount of Gibson's diverted sales and lost profits as a result of Armadillo's actions.

### COUNTERCLAIMS: LIABILITY

**Cancellation**

Defendants have alleged the ES Body Shape Design, Explorer Body Shape Design, Flying V Body shape Design, and SG Body Shape Design trademarks should be cancelled on the ground that they are generic.  Defendants must prove by a preponderance of the evidence that these body

shape designs are generic.

A claimed trademark is generic if it is the word, name, symbol, device, or any combination thereof, by which the good is commonly known. An example of a generic trademark is "escalator" for moving stairs, or the shape of a fish for gummy candies.

Registration of a mark on the Principal Register of the United States Patent and Trademark Office creates a rebuttable presumption that the mark is protectable, and that the registered owner has the exclusive right to use the mark in commerce with the products or services listed on the registration.  Regardless of whether a trademark is incontestable, a trademark may become generic over time due to widespread third-party use and loss of its source-identifying ability over time. Whether a claimed trademark is generic is viewed from the perspective of a member of the relevant public.

**Tortious Interference with a Prospective Business Relation**

To succeed on its claim that Gibson tortiously interfered with Armadillo's prospective business relationships, Armadillo must prove by a preponderance of the evidence that there was:

1. A reasonable probability existed that Armadillo would have entered into a contractual or business relationship with a third party;

2. A willful and intentional act of interference with the formation of the contractual or business relationship by Gibson;

3. Gibson's conduct was independently tortious or unlawful;

4. Gibson's proximately caused Armadillo injury; and

5. Gibson's conduct caused actual damages or loss to Armadillo.

**DEFENSE TO TORTIOUS INTERFERENCE WITH A PROSPECTIVE BUSINESS RELATION**

<u>**Justification**</u>

If you find Gibson tortiously interfered with Armadillo's prospective business relations, you must determine if Gibson was justified in doing so.  Justification is an affirmative defense to tortious interference with prospective business relations.  Gibson must prove, by a preponderance of the evidence, that it was justified in interfering by the exercise of either:

1.  its own legal rights; or

2.  a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken.

**COUNTERCLAIMS: DAMAGES**

Even though I am instructing you on monetary damages, this should not be taken to mean that I believe Gibson is liable for the claims brought or that such damages are appropriate.  These are issues for you to resolve under the instructions I have given you should you decide that Armadillo is entitled to recover.

Damages for a claim means the amount of money which will reasonably and fairly compensate Armadillo for any injury you find was caused by Gibson's tortious interference. Armadillo has the burden of proving its actual damages for each claim by a preponderance of the evidence.

It is for you to determine what damages, if any, have been proved.

Your award must be based upon evidence and not upon speculation, guesswork or conjecture.  It is your task first to decide whether each party is liable.

In answering questions about damages, answer each question separately.  Do not increase or reduce the amount in one answer because of your answer to any other question about damages.

Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

If you find for Armadillo on Armadillo's tortious interference with prospective business relations claim, you must determine what, if any, damages Armadillo is entitled to as a result of Gibson's interference.  Damages for interference with prospective business relations include the prospective contract's or business relationship's benefit and consequential losses.

**Exemplary Damages**

If you find for Armadillo on its tortious interference with prospective business relations claim, you may also consider whether to award exemplary damages. Exemplary damages are damages designed to punish a defendant and to deter similar conduct in the future.

You may award exemplary damages if Armadillo proves by clear and convincing evidence that the harm to Armadillo resulted from malice.  "Malice" means:

(c)  a specific intent by Gibson to cause substantial injury or harm to Armadillo; or

(d)  an act or omission by Gibson,

   iii.  which, when viewed objectively from the standpoint of Gibson at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

   iv.  of which Gibson had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

If you decide to award exemplary damages, you should consider the following factors in deciding the amount:

1.  The nature of the wrong.

2.      The character of the conduct involved.

3.      The degree of culpability of Gibson.

4.      The situation and sensibilities of the parties concerned.

5.      The extent to which such conduct offends a public sense of justice and propriety.

6.      The net worth of Gibson.

The amount of any exemplary damages award should bear a reasonable relationship to the harm caused to Armadillo.

You may assess exemplary damages against Gibson, or you may refuse to impose exemplary damages.

### DUTY TO DELIBERATE

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so.  Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury.  While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong.  However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges—judges of the facts.  Your only interest is to seek the truth from the evidence in the case.  Do not let bias, prejudice, or sympathy play any part in your deliberations.  This case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.  A corporation is entitled to the same fair trial at your hands as a private individual and should be treated as such.  The law is no respecter of persons; all persons, including corporations and other organizations, stand equal before the law, and are to be dealt with as equals

in a court of justice.

When you retire to the jury room to deliberate on your verdict, you will take this charge with you, as well as exhibits that the court has admitted into evidence.  When you go to the jury room, the first thing that you should do is select one of you as your Foreperson, who will help to guide your deliberations and will speak for you here in the courtroom.  The Foreperson should read, or have another juror read, these instructions to the jury.  You should then begin your deliberations.

If you recess during your deliberations, follow all of the instructions that the Court has given you on your conduct during the trial.  Do not discuss the case unless all jurors are present in the jury room.

After you have reached your unanimous verdict, your Foreperson must fill in your answers to the written questions and sign and date the verdict form.  Do not reveal your answers until such time as you are discharged, unless otherwise directed by me.  You must never disclose to anyone, not even to me, your numerical division on any question.

If you want to communicate with me at any time, please give a written message or question to the court security officer, who will bring it to me.  I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally.

The presiding juror or any other juror who observes a violation of the Court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

After you have reached a verdict, you are not required to talk with anyone about the case unless the court orders otherwise. You may now retire to the jury room to conduct your deliberations.

**SIGNED this 26th day of May, 2022.**

35

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE