```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF TEXAS
 2                   SHERMAN DIVISION

 3   GIBSON BRANDS, INC.          | DOCKET 4:19-CV-358
                                  |
 4   VS.                          |
                                  | MAY 13, 2022
 5   ARMADILLO DISTRIBUTION       | 9:34 A.M.
     ENTERPRISES, INC.; CONCORDIA |
 6   INVESTMENT PARTNERS, LLC; AND|
     DOES 1 THROUGH 10            | SHERMAN, TEXAS
 7   -----------------------------------------------------

 8            VOLUME 1 OF 1, PAGES 1 THROUGH 73

 9        REPORTER'S TRANSCRIPT OF PRETRIAL CONFERENCE

10         BEFORE THE HONORABLE AMOS L. MAZZANT, III
11          UNITED STATES DISTRICT JUDGE, AND A JURY

12   -----------------------------------------------------

13   APPEARANCES:

14   FOR THE PLAINTIFF:    ANDREA E. BATES
                           KURT W. SCHUETTINGER
15                         JOHNATHAN M. BATES
                           JASON COX
16                         BATES & BATES, LLC
                           1890 MARIETTA BOULEVARD NW
17                         ATLANTA, GEORGIA 30318

18                         STEPHEN D. HOWEN
                           LAW OFFICE OF STEVE HOWEN
19                         7111 BOSQUE BLVD., SUITE 305
                           WACO, TEXAS 76710
20

21
     COURT REPORTER:       CHRISTINA L. BICKHAM, CRR, RDR
22                         FEDERAL OFFICIAL REPORTER
                           101 EAST PECAN
23                         SHERMAN, TEXAS 75090

24

25      PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
       TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

1

FOR THE DEFENDANTS ARMADILLO DISTRIBUTION ENTERPRISES, INC.
2     AND CONCORDIA INVESTMENT PARTNERS, LLC:

3                          DOUGLAS A. RETTEW
                          ANNA NAYDONOV
4                          PATRICK J. RODGERS
                          ELYSE E. MCNAMARA
5                          FINNEGAN, HENDERSON, FARABOW,
                          GARRETT & DUNNER, LLP
6                          901 NEW YORK AVENUE NW
                          WASHINGTON, DC 20001
7
                          VIC HOUSTON HENRY
8                          EMILEIGH STEWART HUBBARD
                          HENRY, ODDO, AUSTIN & FLETCHER
9                          1700 PACIFIC, SUITE 2700
                          DALLAS, TEXAS 75201
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5/13/2022 Pretrial Conference

```
 1              (Open court, all parties present by telephone.)

 2              THE COURT:  Okay.  Good morning.  This is Judge

 3   Mazzant.  Again we're here in 4:19-cv-358.  You've already

 4   made your appearances.  Just make sure you identify

 5   yourself every time you speak.  I know you know the drill.

 6              And I will tell you I only -- I have another call

 7   at 10:00, so I only have about 30 minutes.  That may or may

 8   not be enough time to resolve this issue; and if you want

 9   to, we can meet up again this afternoon.

10              But let me just first say I know there's been a

11   flurry of paperwork and emails regarding MILs 6 and 7, and

12   I first just wanted to say that I know that defense took

13   issue that the Court granted MILs 6 and 7 without -- I'm

14   reading from the letter of May 12 -- without the

15   opportunity for defendants to respond to Gibson's

16   inaccurate, misleading, and factually incorrect claims in

17   the letter it submitted.

18              Well, first, let me say I didn't even look at

19   their letter in that regard.  I didn't ask for additional

20   briefing on 6 and 7, so I actually skipped over that.  I

21   couldn't tell you what it said because I didn't read it.  I

22   went to the other issues that the Court allowed submissions

23   on and will consider those other issues in due course.

24              But just so defense realizes, I mean, we -- there

25   was considerable briefing on MILs 6 and 7 which the Court
```

1   had reviewed as well as argument at the pretrial

2   conference, and I took the matter under advisement.  So

3   there is no issue here in terms of I'm considering

4   something that Gibson filed because, again, I didn't look

5   at it.  I just skipped past that issue because I didn't ask

6   for anything on that issue.

7           So I understand that the defense is not happy with

8   the Court's ruling.  Of course, the Court's ruling is one

9   that just requires you to approach the bench before you can

10  get into any of those matters.

11          So I just wanted to set the record straight that,

12  you know, there was no response necessary because I didn't

13  consider what they filed.  We already had plenty of

14  argument and briefing on the issue, and I made a decision.

15  You know, I understand that defense doesn't like it but --

16  so -- but I wanted to at least set the record straight that

17  there wasn't anything done improperly because the Court did

18  not look at that and -- because, again, the Court did not

19  ask for any comment on that so I did ignore it.  But there

20  had been plenty of briefing on the issue and argument on

21  the issue the day before, and I just took the matter under

22  advisement and made a decision.

23          Now, I will give the opportunity -- I know that

24  defense doesn't like what I did but -- if you want to say

25  something on the matter, go ahead, but --

1          MS. NAYDONOV:  Good morning, your Honor.  This is

2    Anna Naydonov for defendants.

3          And thank you so much for clarifying this for us.

4    We, by no means, wanted to imply that the Court did

5    anything improper or anything like that.

6          There appears to be a misunderstanding perhaps

7    because of the many motions *in limine* involved that, you

8    know, led to some of the findings that we saw yesterday

9    about their Motions *in Limine* 6 and 7.

10         Specifically, Court held that defendants did not

11   contest that Dean Guitars lost prominence and the name went

12   dormant after it was purchased by Tropical Music and until

13   Armadillo took over in 1997.  We absolutely contest that.

14   This is actually a hotly contested factual issue, in our

15   opinion, for the jury to decide.  Your Honor, we actually

16   prepared demonstratives for use in this hearing.  Because

17   it's telephonic, we had them delivered to your chambers in

18   hard copy and emailed them today.

19         But this is a compilation of extensive and

20   powerful evidence that completely refutes the argument that

21   the brand got abandoned and went dormant.  The brand never

22   got abandoned.  There was never any loss of chain of title

23   for the brand.

24         And, your Honor, if I may turn the

25   Court's attention to some of the examples of this extensive

1    evidence.  If you look at Slide 2 in the demonstratives, we

2    have a stipulated sworn declaration from Tropical Music's

3    president, who owned -- they owned the Dean brand from '91

4    to '95, saying that he purchased and is knowledgeable about

5    ownership and sale of Dean Guitars, Inc., the company.  He

6    also attaches examples of actual guitars sold between '91

7    and '95 in the United States with the Dean brand.

8            He also says that the Dean guitars were

9    manufactured in Florida, some were made from scratch in

10   Florida during the time that Tropical owned the brand, some

11   of the guitars were sold and distributed in the United

12   States.

13           Also, he -- if you look at Slide 4, which are

14   examples of those guitars that were offered and sold in the

15   United States under the Dean brand, examples of

16   advertising, that completely refutes the notion that the

17   mark was abandoned or that the brand went dormant.

18           And Gibson knows that.  How do they know that?

19   Because they questioned, in deposition, Dean's founder,

20   Dean Zelinsky, and used what is marked as DTX-308 and 307,

21   which are third-party publications, price guides and media

22   publications, corroborating the evidence that we would like

23   the jury to hear.

24           And I quote (as read):  "Zelinsky sold Dean

25   Guitars in 1990 to Oscar Mederos, the owner of Tropical

 1   Music.  The Dean Guitars facility in Plant City, Florida,

 2   was run by Tracy Jon Hill.  The new guitars were

 3   distributed to markets in the U.S.  In '95 Armadillo of

 4   Clearwater, Florida, bought Dean from Tropical Music."

 5            Now I'm reading from another exhibit that Gibson

 6   knew about, presented, and questioned the founder on in his

 7   deposition.  (As read):  "In '91 Zelinsky sold the company

 8   to Tropical Music in Miami.  From '93 to '94 there was

 9   again limited U.S. California production of the Elite,

10   Cadillac, and ML models under the supervision of Zelinsky

11   and Cory Wadley.  Korean versions were also produced."

12            So the mark continued to be very much in use.

13            Now turning your attention to Slide 7 in our

14   demonstratives, DTX-1699, 1993 ads from Tropical times with

15   Tropical address at the bottom showing Dean-branded guitars

16   advertised and sold in the United States.

17            Slide 8, 1993 catalog in the U.S. with the Dean

18   brands under Tropical ownership, advertising and selling

19   the guitars in the United States.

20            Slide 9, 1994 catalog when Tropical owned the

21   brand, showing the Dean brand of guitar advertised and sold

22   in the United States, saying on the back of the catalog the

23   company has been around since 1977.

24            Then Oscar Mederos of Tropical in his stipulated

25   trial declaration also said that in the '90s, in the brief

1    time that he owned the brand, he licensed the Dean mark to

2    Washburn, a major guitar company, for use in products for

3    guitars for Darrell Abbott, one of the most prominent

4    guitar players in the world.

5           Slide 10 in the demonstratives, your Honor, 1992

6    *Guitar World* publication showing Darrell Abbott with his

7    Dean guitars.

8           Slide 11, '93 *Guitar for the Practicing Musician*

9    magazine cover showing Dean guitars with Darrell Abbott.

10          Slide 12, 1994 *Guitar* magazine cover.  Again on

11   the cover of the magazine, Darrell Abbott prominently

12   showcasing Dean guitars.

13          Slide 13, DTX-1702, another piece of evidence we

14   would like the jury to see, 1996 retail price list with the

15   Dean brand.

16          Slide 14, 1996 Dean Guitars catalog.  At that time

17   actually, in 1996, Armadillo already purchased the business

18   from Tropical; and it's a catalog distributed in the U.S.

19   offering Dean V and Dean Z guitars for sale.

20          Slide 16, 1997 Dean Guitars catalog.  On the cover

21   it says "1977-1997," showing that there has always been

22   continuity, no break in title, no brand going dormant or

23   going out of business, and again offering for sale in the

24   U.S. the Dean V and Z guitars, among other models.

25          So, your Honor, we just wanted to clarify that far

1  from defendants not contesting, we marshaled extensive

2  evidence that the brand never went dormant, continued to be

3  in use throughout all these years.

4         And we have sworn testimony from Tropical.  Dean

5  Zelinsky's own founder testified in deposition that he sold

6  the business to Tropical and Tropical then sold the

7  business to the current owners, Armadillo.

8         We also will have our music history expert, George

9  Gruhn, testify that the Dean brands never lost prominence,

10 never went dormant.

11        There were multiple guitars on the secondary

12 market, and Gibson's own witnesses admit that secondary

13 market is one of their biggest competitors and those

14 guitars were in prominent use.

15        So there was never, never any abandonment; and

16 Gibson has made this very strange and legally incorrect

17 argument that -- they are saying that because -- they are

18 contending that the business was not sold but just the

19 brand.

20        First of all, the business was sold.  Oscar

21 Mederos testified the business was sold.  Dean Zelinsky

22 testified the business was sold and current owners then

23 purchased the business.

24        But even if the trademark alone was sold, that is

25 still sufficient.  You don't need to always sell the whole

1    company to transfer rights in the mark.

2          For example, Crunch candy used to be owned by

3    Nestle.  They sold that trademark to Ferrero.  Crunch mark,

4    still well and alive, not abandoned.

5          So even if taken for granted and for truth --

6    which it's not the truth; they twisted excerpts from

7    deposition saying they only sold the Dean mark -- that is

8    still sufficient because a trademark can only be

9    transferred with the underlying goodwill.  And what is the

10   goodwill here?  It's the goodwill in the guitars.

11         So the fact -- even taking for grant -- as true

12   their representations that only the brand was sold and not

13   the whole company, that is still sufficient because the

14   goodwill transferred with the brand.

15         Moreover, your Honor, even if there was no

16   production of guitars from '91 to '95, which there

17   absolutely was, we are asking to present the jury with this

18   evidence of all of these multiple exhibits, catalogs,

19   *Guitar* magazine covers, price lists.

20         But even if all of that was disregarded, there is

21   well-established concepts in trademark law called residual

22   goodwill.  In the words of the leading trademark treatise,

23   even after the sale of product has ended, many consumers

24   will continue to recognize the mark as a source indicator.

25   The doctrine recognizes that even after a mark maybe

1    stopped being in use, there is still residual goodwill

2    among consumers.

3            In fact, the main case on the issue involved

4    Ferrari Daytona Spyder trade dress.  The car was out of

5    production for 13 years with no plans to resume use; but

6    the Court, nevertheless, held that there was no abandonment

7    because of the residual goodwill that persisted in the

8    marketplace.

9            And here everyone admits there were secondary

10   markets flooded with guitars from the '70s and the '80s

11   when -- even Gibson doesn't dispute -- in the '70s and '80s

12   up until the very brief period with Tropical Music, Dean

13   brand was well-known, famous, played by ZZ Top, Cars,

14   Doobie Brothers, on the covers of the most famous

15   magazines, one of the most well-known brands in rock and

16   roll and guitar history.

17           So even if there was abandonment, which there was

18   absolutely not and we're ready to present evidence,

19   residual goodwill persisted.

20           And regarding -- so that's on the Motion *in Limine*

21   Number 6, your Honor.  We have multiple evidence, multiple

22   witnesses who completely will refute and contest that there

23   was any abandonment.  They will show continuity.

24           And, your Honor, I just wanted to point out to the

25   last slide in our presentation, 16, which is modern

1   advertising from the modern day, the current owners of Dean

2   Guitars actually touting the history from 1977, saying

3   "since 1977" or "I created this guitar in 1976" or saying

4   that the brand has been around and in continuous use.

5           So the jury will be so confused if we are

6   prevented from telling them what happened and we all have

7   to pretend that this company didn't exist until '97 when it

8   totally did.  When our CEO is questioned, "How did you come

9   up with this shape in '97," he will be prevented from

10  telling the truth to the jury that the brand has been

11  around since '77 and has existed uninterrupted.  So it will

12  be completely confusing to the jury, and our witnesses will

13  not be able to tell the truth.

14          On the Motion *in Limine* 7, which is third-party

15  usage, the Court's ruling again appears to be grounded in

16  this misunderstanding that we don't contest that there was

17  some sort of discontinuation.  We do contest that.

18          But also the five-year look-back rule does not

19  apply in genericness cases, so it would be improper to cut

20  off the third-party uses at 1992 for two reasons.

21          First of all, as I just described and presented

22  evidence, there was no abandonment so we can tag back to

23  1977 so the five-year look-back rule would not go back to

24  '92 anyway.  But, regardless, genericness cases do not

25  apply this five-year cutoff look-back rule.

1          Gibson relies on this decision in *Converse*, which

2     your Honor cited yesterday as well.  That decision involved

3     secondary meaning, not genericness.  Secondary meaning is

4     very different.  For secondary meaning, when we have a

5     descriptive trademark or a descriptive trade dress, the

6     Lanham Act says you can apply to register; but you have to

7     show that it's been in substantially exclusive use for the

8     past five years.

9          So in *Converse* the issue was can they seek

10    protection and establish secondary meaning, have they

11    substantially exclusively used it for the past five years.

12    That is why, in secondary meaning, five years has any

13    relevance.

14         And even then, the Court in *Converse* said -- they

15    remanded the case and said let's look at the evidence from

16    before the five years and see if it's relevant.  It never

17    applied the rigid cutoff five-year rule.

18         But what's most important, Gibson here has not

19    cited a single case, not from this circuit, not from

20    anywhere else in the country, saying that anyone has ever

21    applied this five-year rule in genericness cases.

22         For genericness, the determination is you look at

23    the whole history of the use of this mark or shape and you

24    have to decide do consumers -- has it lost significance,

25    has there been so many third-party uses that over time have

1   eroded any trademark significance and destroyed the

2   trademark significance so much so that the mark or the

3   shape has become generic.

4         So if we look at the genericness cases, they

5   look -- all look beyond five years and look at the whole

6   history.  Probably the most relevant case is Stuart Spector

7   Designs against Fender, 94 USPQ2d 1549, where the Trademark

8   Trial and Appeal Board invalidated Fender's Stratocaster

9   guitar shape in 2009 but looked at the evidence of

10  third-party use since the 1970s and said that the record

11  shows that at least from the mid 1970s, consumers in the

12  United States have been exposed to guitars in these shapes

13  emanating from third parties.  Based on all of that

14  collective evidence, in 2009, invalidated Fender's mark,

15  which should be the result here with the generic shape

16  here.

17        Another example, Malaco Leaf against Promotion in

18  Motion, 287 F.Supp. 2d 355, Southern District of New York,

19  2003, finding that -- the Swedish Fish, fish-shaped gummy

20  candy, generic based on decades of competitive third-party

21  gummy fish-shaped candy.

22        And, once again, even the *Converse* case which

23  secondary meaning, different concepts, inapplicable,

24  completely inapplicable here, even they said -- I quote --

25  evidence older than this five-year period should be

 1   reevaluated on remand to determine whether it is relevant.

 2   Even there.

 3           Here, our music history George Gruhn will testify

 4   that for years, since the '60s, scores and scores of third

 5   parties have used this guitar shape.  So we have consumers

 6   in the U.S. who are very relevant.  They're in their 60s or

 7   70s.  Their whole life has been exposed to this generic

 8   shape, and the jury is once again entitled to hear this

 9   evidence.

10           And, your Honor, as the Fifth Circuit held in

11   Xtreme Lashes against Xtended Beauty case, 576 F.3d 221,

12   the determination of whether a mark is weak or whether a

13   mark is strong should be for the jury.  That's what the

14   Fifth Circuit held.

15           So we respectfully are requesting that you please

16   reconsider that ruling and -- for two main reasons.  First,

17   it's a hotly contested factual issue, at the very least,

18   with marshaled evidence there was never any abandonment.

19   We should be able to tell our story with consistency, with

20   no interruption in abandonment, used the Dean Guitars mark

21   from 1977 to the present.  And, second, in genericness

22   cases it's highly relevant, highly relevant to show that

23   the mark has been generic for decades; so the arbitrary

24   five-year look-back rule doesn't apply.

25           Thank you so much for your consideration.  And we

1    apologize for the flurry of last-minute emails, but this

2    was -- this ruling would be devastating and tantamount to a

3    summary judgment ruling that would prevent us from telling

4    our story to the jury.  So thank you so much for getting on

5    the phone with us today.

6            THE COURT:  And let me ask, of course, just one

7    question.  So is it your position the name -- Dean name

8    never went dormant, ever?

9            MS. NAYDONOV:  Correct, your Honor, and we have

10   evidence to present to that effect.

11           THE COURT:  Okay.  So I will tell you this, is

12   that as I indicated at the beginning, I only have until

13   10:00; and so I only have a couple minutes to give the

14   other side a response since I probably have people probably

15   calling in now for the 10:00 call.

16           But what I -- I can give you a couple minutes if

17   you want to respond, but it may be more appropriate if --

18   that -- if y'all want to just come this afternoon and we'll

19   have more discussion on this issue.

20           I ask the parties any thoughts.  Let me hear from

21   Gibson real quick.  I don't have --

22           MR. HOWEN:  Your Honor --

23           THE COURT:  -- because I don't really have much

24   time for you right now so --

25           MR. HOWEN:  Your Honor, you're getting beeps from

 1  the other calls.  Your instinct is what we would say.  I

 2  think maybe we just need to talk this afternoon.

 3          THE COURT:  Okay.  Why don't we do that.  Do y'all

 4  want to just come here?  I have a 2:00 hearing that

 5  hopefully won't take long, so if you want to come -- why

 6  don't we just -- it might be easier to have y'all come back

 7  to the courthouse at 2:30.

 8          MS. NAYDONOV:  Of course, your Honor.

 9          THE COURT:  You don't have to necessarily be that

10  early because I do have a 2:00 call.  I don't think it will

11  take real long but -- so let's just plan on trying to start

12  around 2:30 and --

13          MR. HOWEN:  We'll be there, your Honor.  Thank

14  you.

15          THE COURT:  And I'll try to resolve some of these

16  other issues, too, that are still pending hopefully before

17  that; but, again, I have a number of these calls.

18          So, okay, very good.  Well, I'll see y'all at

19  2:30.

20          MS. NAYDONOV:  Thank you, your Honor.

21          MR. HOWEN:  Thank you.

22          (Recess, 9:55 a.m. to 2:26 p.m.)

23          (Open court, all parties present.)

24          THE COURT:  Please be seated.

25          We're back here in 4:19-cv-358, a continuation of

 1  our discussion today by telephone.

 2          Let me ask just a couple questions and make sure.

 3  We've had a lot of discussion on MILs 6 and 7.  What

 4  specifically -- make sure I understand what the defense is

 5  seeking this third-party evidence is for.  What is the

 6  specific purpose?  Make sure I'm on the right page for what

 7  the purpose is.

 8          MS. NAYDONOV:  Thank you, your Honor.

 9          THE COURT:  And I have to say you used a lot of

10  time this -- and I'm not complaining, but I was wondering.

11  You talked continuously without a breath today, so that was

12  impressive.  I don't --

13          MS. NAYDONOV:  I will try to be a lot more

14  concise, your Honor.

15          THE COURT:  No, no, no.  It wasn't that.  It was

16  just that I made a comment to my law clerk, did she take a

17  breath, you know, so -- it's impressive you could do that

18  but --

19          MS. NAYDONOV:  I do breathe.  I can represent

20  that.

21          THE COURT:  No, I know.  I'm not -- I'm not giving

22  you grief.  It was a compliment so --

23          MS. NAYDONOV:  So, your Honor, in terms of the

24  third-party evidence, your Honor has already acknowledged

25  in prior rulings on multiple occasions that this evidence

1    is critical and core for defendants' case in terms of

2    proving whether Gibson's alleged trademarks are generic.

3            Third-party evidence is what the courts and the

4    Trademark Trial and Appeal Board routinely rely on to

5    ascertain whether people perceive a shape or a mark as a

6    brand name, a source identifier, or whether it's generic.

7    So --

8            THE COURT:  So are you seeking to offer this on

9    genericness for purposes of disproving infringement or for

10   your cancelation claim?

11           MS. NAYDONOV:  Both, your Honor.

12           Under Fifth Circuit law, one of the factors in the

13   likelihood of confusion standard is the strength of the

14   asserted mark.  Here we're contending because there have

15   been, by the admission of their own music history expert,

16   over 50 third-party uses of each of the shapes over many

17   years, the alleged shapes are, if not unprotectible, very

18   weak.  So there is no likelihood of confusion because

19   people do not associate them with one source or they will

20   look at the brand name on the headstock and distinguish

21   them.

22           But that evidence is also critical for our

23   cancelation counterclaims to cancel their trademark

24   registrations as generic.

25           And if I may approach, your Honor, here is a

1    representative example of what defendants would like to

2    offer during their opening statement and later on at trial,

3    which is just a sampling -- not everything but just for the

4    two shapes at issue, the V shape and the ES-335 shape --

5    just a sampling of all the third parties that have been out

6    there making the exact same or very similar shapes over

7    many years.  This is exactly what the Court in the Fifth

8    Circuit and other jurisdictions have used to decide whether

9    the shape is generic.

10           Now, if the requested ruling is maintained that

11   only third-party evidence after '92 can come in, the jury

12   essentially will be deprived of this critical, core

13   evidence of what was going on in the '70s, '80s, and early

14   '90s of all these scores of third parties being out there

15   and weakening and basically showing that the mark -- the

16   alleged marks are generic.

17           And also plaintiffs admittedly want to rely on

18   1958 as the first use date of the Flying V shape and the

19   Explorer shape.  So if the jury doesn't see all the third

20   parties that were there in the '70s, '80s, '90s, they will

21   be deceived into believing that in '58 Gibson comes out

22   with the Flying V shape and they would think there are no

23   third parties and then third parties start to come along in

24   the '90s and, you know -- but they will be deceived and

25   they will not see that actually since the '60s, right after

 1  Gibson introduced this shape, there were scores of third

 2  parties who have used the same shapes.

 3         So they have been weak and generic for decades,

 4  which is why we request that your Honor allow us to

 5  introduce third-party evidence dating all the way back to

 6  when they asserted they started using these shapes, so the

 7  jury has an accurate and not a twisted picture of the

 8  United States' marketplace.  So this is our position on the

 9  third-party evidence.

10         And for reasons that we mentioned this morning,

11  your Honor, we believe that the five-year look-back rule

12  does not apply, first of all, because --

13         THE COURT:  And I will tell you.  It wasn't -- I

14  wasn't really adopting -- the plaintiff suggested the

15  five-year.  I don't necessarily -- I don't necessarily

16  agree that when I issue my decision that it's necessarily a

17  five-year rule.  I wasn't creating a rule.  It's more of I

18  have to draw the line somewhere, and where is the point

19  where it becomes too confusing to the jury and highly

20  prejudicial.

21         So I wasn't trying to adopt the five-year rule, to

22  make that clear; but I felt like a line had to be drawn

23  somewhere.  So just -- I wanted you to understand that I

24  wasn't trying to adopt any kind of bright-line rule on that

25  but --

 1          MS. NAYDONOV:  Thank you, your Honor.

 2          So we believe that a line should be drawn from

 3   basically when plaintiffs started using their shapes and

 4   assert that they can assert protectable marks.  For

 5   example, in the case of Flying V in 1958, the jury -- they

 6   are going to stand up and tell the jury, "We've used this

 7   trademark since 1958 and it's famous and it has marketplace

 8   impact."

 9          We should be allowed to simply respond that, no,

10   there have been third parties starting in the '60s and '70s

11   who have used the same shape and, therefore, it's weak and

12   it's generic or at least if it's not generic, it's

13   commercially weak and the scope of the rights in their mark

14   is very narrow.

15          So we plan to be very efficient in how we

16   introduce this evidence, as you can see with the summary

17   representation here.  We're not planning to inundate the

18   jury.  We'll stick to our trial time.  But we believe the

19   jury deserves to see all the third parties that have used

20   the same shapes for all these decades.

21          And that's, as I mentioned, what the courts have

22   done, the TTAB has done.  For example, when the Fender

23   Stratocaster shape was invalidated on genericness grounds

24   in 2009, they looked back at the decades of third-party

25   usage to find that the shape is not protectable.

 1            THE COURT:  Okay.  Thank you.

 2            Okay, response.  And I'll say that -- I know you

 3    haven't had a chance to respond to what happened this

 4    afternoon *(sic)* and then -- again, I started with her

 5    because I had a couple more questions.  But, you know, the

 6    goal of the Court is to try to get this right, and the

 7    question is did the Court not get it right when I issued my

 8    order on MILs 6 and 7 and -- you know, so I know we

 9    spent -- there's been a lot of paper on this issue and a

10    lot of argument and, again, my goal is to get it right

11    so -- I know you probably think I got it right but -- but

12    I'm not so sure, so I leave that with you that --

13            And, you know, I know that -- let me go back to my

14    order on this issue about whether or not the mark was --

15    or -- was dormant.  And clearly that is a hotly contested

16    issue, and I know we didn't spend a lot of time talking

17    about that and maybe the terminology but -- but, okay, I'll

18    leave it to you to go ahead and tell me what you want to

19    tell me.

20            MR. HOWEN:  You got it right.

21            THE COURT:  I know you're going to say that but --

22    but you're going to always say that because I ruled in what

23    the plaintiff asked me to do so -- but that doesn't mean I

24    got it right.  It means I agreed with you initially.

25    So the question is should I stay there.

1            MR. HOWEN:  So I'm going to attempt to tell you

2    why you got it right.

3            The way we read the order, first of all, is that

4    it's a motion *in limine*.  It is not evidentiary at that

5    point.  I understand, sympathize and, from prior personal

6    experience, empathize with counsel.  I think their problem

7    here is that they obviously do not -- they want to use this

8    stuff in opening statement and don't want to run afoul of

9    the Court by putting up something that might or likely

10   would not come in.  And that's the -- that's why they

11   responded saying, wait a minute, we need this before the

12   trial starts.

13           And in our response letter, we indicated that

14   that, to me, turns this into a Rule 104 hearing.  And what

15   they're trying to say is we need a determination on the

16   admissibility of evidence, this third-party use stuff,

17   before the trial starts.  And that's how we view this

18   hearing is a Rule 104 hearing.

19           And I think the rules almost perfectly fit for

20   this sort of situation because as we read the opinion -- or

21   the order, excuse me, it -- what it seemed to say, to us at

22   least, was that that dormancy period was crucial to making

23   a distinction between the Fifth Circuit case that you

24   analyzed at the start and said, well, we're not really in

25   that situation because we had this period of dormancy.

1           And defendants have objected, saying, no, there

2   was no period of dormancy.

3           And so it seemed to us the crucial question here

4   is was it dormant for some period of time, and the real

5   issue here -- or they've tried to attack that factual

6   premise in two ways.  They have suggested that they bought

7   a company that would have owned the rights, the actual

8   trademark rights going forward, and that that would

9   actually apply not only to the genericness argument but

10  also to the laches argument, which are the two key defenses

11  in the case.

12          And then they say, "Well, if we didn't buy the

13  company, then the use of the brand name by other people was

14  continuous until we picked up the sword; and, therefore,

15  based on that continuous use from 1977 to 1997, we can tack

16  back all the way back to when Dean Zelinsky started making

17  guitars."

18          And so we're going to try and address those two

19  key issues here.

20          But we would also point out that our understanding

21  of this is that you did exactly what you -- or you would

22  intend exactly what you said in your order, which is the

23  ruling is limited to advertising and sales.  That was the

24  basis of the motion *in limine*.

25          We did not move, and we do not understand the

1    Court's order, to prevent either party from explaining the

2    history of their companies and their brands.  And so the

3    idea -- at the end of counsel's argument this morning, she

4    indicated, "Well, we couldn't even say that Dean Zelinsky,

5    you know, first came up with these models and tell that

6    story."  And we don't see that in the Court's order.  I

7    don't know if -- if that helps them at all, but we

8    certainly didn't intend that.

9         I think the Court was pretty specific that what

10   you would be barring would be third-party advertising and

11   sales from 1992 forward and the same thing for Dean itself

12   from 1997 backwards.

13        And, frankly, as far as I can tell, there is not

14   hardly any, if any, evidence on sales during that time

15   period.  What we're talking about are hundreds of these

16   catalogs and advertisements.  That's the exhibits that the

17   Court's order would touch.

18        So starting there, the question is did it become

19   dormant; and the first thing I'm going to address is this

20   idea that they potentially could have purchased a company.

21   And to do that, we're going to look at the history of the

22   Dean brand, which is the guitars Armadillo sells.  And all

23   of this comes -- all the evidence that supports this is in

24   the binder that the Court has and counsel has here, and we

25   think -- while there's always some discovery-type issues in

1    depositions, we think this is fairly clear.

2          1976-1977 near Chicago, Illinois, a teenager at

3    the time by the name of Dean Zelinsky began the boutique

4    manufacture of American guitars.  They're made in the USA.

5    He was not a large company, as one might expect for

6    somebody who is 18 or 19 years old starting a company.  It

7    is actually very impressive that he was able to pull this

8    off.  And he used the Flying V and Explorer body shapes.

9    We would contend and do contend that he used two of the

10   four body shapes that are at issue in this case.  That

11   company that he started was incorporated as Dean Guitars,

12   Inc.; and in Tab A is all the testimony that would support

13   that.

14         In 1985 he either by choice or had to change his

15   focus.  And what happened there is instead of manufacturing

16   the guitars in the United States, he went to an import

17   model.  And as the result of that, he said he had to get a

18   new financing structure.  And in part of his refinancing,

19   that required a change of corporate entities and he left

20   Dean Guitars, Inc., and he started Guitars, Inc., although

21   the guitars were still sold as Dean guitars.  So that's

22   what happened in 1985.

23         Whether business losses, desire to do something

24   else -- I'm not going to impute motives -- in 1991 Dean

25   Zelinsky clearly ceased operations in terms of building or

1   selling guitars.  When he did this changeover, he had

2   previously assigned some of the assets of Dean Guitars,

3   Inc., the original company, to creditors; and he was

4   shutting down.  And what he was left with was this name,

5   and people -- there are some people that liked Dean

6   guitars, had an affinity for them; and so he sold that

7   name, the brand name, along with logo rights, to a man

8   named Oscar Mederos.

9          Now, Oscar Mederos, we have -- in Tab B we have

10  his whole declaration.  Oscar Mederos was and, importantly

11  later in the argument, still is the president of a company

12  called -- that goes by Tropical Music, Inc.

13         In paragraph 11, which is the second paragraph,

14  Mr. Mederos describes his business model; and that said

15  (as read):  "Tropical Music conducts 95 percent of its

16  sales outside of the United States and has done so from

17  approximately 1985 to the present.  This declaration was

18  given in the course of discovery in the lawsuit."  So I

19  would say the "present" there is still the present.

20         What that says is that all of its business -- he

21  sells many instruments, basically to the Caribbean market.

22  That's where Tropical Music does business.

23         And he tells the Court -- now, he is the person

24  and that is the company that had the Dean brand name from

25  1991 to 1997.  And he tells the Court (as read):  "Other

1   than the documents labeled Tropical 1 through 7, I do not

2   recall which Dean model guitars Tropical Music sold,

3   offered, advertised, marketed, distributed, or promoted

4   while owning Dean Guitars."

5          And so he would have the most knowledge of what

6   was going on with Dean Guitars between 1991 to 1997, and he

7   has given us seven pieces of paper and says that's what I

8   remember about that.

9          Moving forward, in 1997 Armadillo -- excuse me --

10  Concordia -- so there's two defendants here, Armadillo and

11  Concordia.  Concordia is the holding company for the

12  intellectual property rights.  That's who owns whatever

13  trademarks or names they are using.  And then it licensed

14  them to Armadillo, who actually manufactures and sells the

15  guitars; and the license agreement allows, for instance,

16  the Dean name or logo to be put on an Armadillo Dean

17  guitar.  And so Concordia acquired Dean in 19- -- the Dean

18  name in 1997.

19         Now, currently Evan Rubinson is the CEO and

20  president of both Armadillo and Concordia.  He is the son

21  of Elliott Rubinson, who until recently was the president

22  and CEO of both of those companies.  Unfortunately,

23  Mr. Elliott Rubinson passed away from cancer not too long

24  ago.

25         But the question is when these companies acquired

 1  the rights from Dean, what was the status of that Dean

 2  brand or mark?  And Mr. Elliott Rubinson repeatedly -- we

 3  have four examples, and those are just the ones we

 4  selected -- repeatedly, at trade shows and in promotion of

 5  this new venture of his, spoke about the history, the exact

 6  thing that we're talking about in court today.

 7          And this is a clip from -- in which Mr. Rubinson

 8  explains that history.

 9          (Audiovisual presentation to the Court.)

10          MR. HOWEN:  So that was a little loud; and the

11  actual transcript of that is in Tab C of your folder, as is

12  the transcript of the other three times he makes almost

13  exactly the similar statement.

14          So, to be honest, your Honor, I'm a little taken

15  aback when we get accused of twisting and misrepresenting

16  the facts by saying that we're contending that this thing

17  was dormant when they got it when their own founder, the

18  person who completed the purchase, said it was dormant, it

19  was dead, it was 10 feet underground.  That is his

20  description of the status of the Dean mark and business

21  when these defendants acquired it.  So that seems to --

22  that carries weight with us.

23          There was some -- in the recent briefing there was

24  some indication that, well, gee, Mr. Rubinson didn't say

25  that under oath.  And if you turn to Tab D -- this isn't

1    exactly on point.  But when he's getting this company up

2    and going, this Armadillo and Concordia, when he's getting

3    it up and going --

4           And a little backtracking.  Elliott Rubinson had

5    been, until right before this, one of the largest

6    distributors of Gibson guitars in the southeast.  And so

7    he's going from selling -- and he sold other guitars.  He

8    sold Dean guitars.  He sold a lot of guitars and other

9    musical instruments; but, as I said, he sold a lot of

10   Gibson guitars.  And so he's going from a retail or

11   wholesale sort of operation to an actual manufacturer,

12   getting on the other side of the business.

13          And, of course, getting all of that stuff up and

14   running and he's going to do it with the Dean guitars, he's

15   trying to bring in all of the Dean marks that he can.  And

16   one of those was a headstock registration that they had a

17   mark on a headstock.  And Tab D demonstrates that in 1998,

18   that's when that asset came into the company.

19          The next exhibit, Exhibit E -- and I'm not sure we

20   got the right one in the book.  I'm sorry.  We will get

21   that to -- oh, I'm sorry.  It's just the first page is

22   redundant.  You have to start on the second page of

23   Exhibit E.  That's the trademark license agreement.  That

24   is the agreement through which Armadillo can sell guitars

25   with the Dean marks on them.  And the important thing for

 1   today's purposes is that license agreement came into being

 2   on July 1st, 1997.

 3           In summary judgment declarations in this case, the

 4   current CEO, Mr. Evan Rubinson, dated -- and if we go to

 5   Tab F, paragraph 17, he says (as read):  "From at least

 6   1997 to the present Armadillo has displayed and promoted

 7   the Dean V and Z guitars at the annual NAMM show and

 8   numerous other events and in connection with many different

 9   artists."

10           He told the Court through that that that's when

11   they started promoting these guitars, in 1997.

12           And, finally, in the contention interrogatories we

13   sent them, their answer was that Armadillo started selling

14   these guitars -- first use by -- I shouldn't say sale --

15   1995, 1995, there's four shapes that are at issue on

16   genericness and cancelation, 2012, and 2010.

17           So it's clear that Armadillo, the defendant in

18   this case, the corporate entity that's in this case, only

19   began using this mark in the late 1990s.  I don't see how

20   anybody could look at that any other way.

21           The suggestion that, hey, we're actually -- that's

22   when we started using it as a company but we did it by

23   buying another company, which is the insinuation that has

24   been made, can be easily answered by asking this question:

25   What company did they buy?

1          They never had any direct dealings in purchasing

2  anything from Dean Zelinsky.  It turns out in 2000 he came

3  and worked for them as a consultant for a while, but they

4  never bought anything directly from Dean Zelinsky.

5          The only company that they dealt with was this --

6  Oscar Mederos' company, Tropical Music; and as Tab H

7  demonstrates, Tropical Music is still its own company run

8  by Oscar Mederos.  That's the Florida Secretary of State

9  yesterday's informational listing on it.

10          So this discussion and, actually, accusation

11  against us that we are somehow twisting facts by saying

12  that they didn't buy a company -- they clearly did not buy

13  a company.  They bought the name, the mark.  They didn't

14  buy any of the shapes because we own the shapes.  They just

15  bought the name and mark.

16          And so I don't think, from a corporate entity "we

17  own it" standpoint, they can claim anything other than

18  exactly what Elliott Rubinson said four times at least

19  over, is he revived a dead brand starting in 1997.  That's

20  his testimony.

21          Their alternative argument is, well, actually, we

22  can because the Dean brand itself, whether it was owned by

23  us or Oscar Mederos or Dean Zelinsky's companies, stayed in

24  continuous use going forward.

25          And we've provided one case that's attached there.

 1    It's an *Exxon* case from the Fifth Circuit in 1983.  And
 2    what we provide it for is to give some context to exactly
 3    what "dormant" might mean.  And what the case stands for is
 4    the idea -- that was a -- there was -- as the Court
 5    probably is aware, Exxon used to be Humble; and later in
 6    their conglomeration they adopted the Exxon brand name.
 7    But they wanted to keep Humble as something they could
 8    potentially use, and so they -- what they did was they
 9    tried to do limited sales of Humble-branded products over
10    time.
11         And the Fifth Circuit said, one, and to be candid
12    with the Court, when you're doing it for that purpose, that
13    sort of defeats the idea of actually putting it in commerce
14    but, two, you're hardly doing anything and just having
15    these small random events isn't enough to not abandon the
16    mark.
17         And so in terms of the Court's analysis, I think
18    the question here was, well, was there an abandonment, not
19    an intentional abandonment but an effective abandonment,
20    between 1991 and 1997.  And in response to that, that was
21    the evidence that was part of their PowerPoint this
22    morning; and that was the purpose of here's these catalogs
23    from this time period.
24         And so what we did was try to look at those --
25    that evidence and put it in context of this case to see is

1   this really the brand had been kept going in the United

2   States from 1991 to 1997, or what is the strength of that

3   evidence to show -- we know it wasn't a company, but what

4   is the strength of the evidence to show what sort of brand

5   presence they had in 1997, given what they showed you on

6   the PowerPoint.

7           Mr. Schuettinger is the one that took the laboring

8   oar in that because we only had a couple hours after

9   looking at their PowerPoint; so if you don't mind, I'd like

10  to turn it over to him to explain that.

11          THE COURT:  Go ahead.

12          MR. SCHUETTINGER:  Good afternoon, your Honor.

13          THE COURT:  Good afternoon.

14          MR. SCHUETTINGER:  We haven't met before.  I've

15  talked to you on the phone in teleconferences, but I'm

16  Mr. Schuettinger.

17          THE COURT:  Welcome.

18          MR. SCHUETTINGER:  So you had asked opposing

19  counsel today was there any time frame that the mark went

20  dormant, and my colleague was saying about the history of

21  the entities.

22          And so we know from the deps around 1988, Dean

23  Zelinsky's U.S.-based company -- he had stopped the

24  factory, closed it down.  He assigned all his U.S. assets

25  to his creditors, and he starts a new entity.  That entity

1   has no corporate office in the U.S.  He was only importing

2   guitars made overseas and selling them.

3          And so the question becomes from 1988 when this

4   factory closes and to when he eventually just assigns the

5   trademark to Tropical, who was primarily an exporter,

6   what's going on in the U.S.?  What do consumers see?

7          And so we looked at their evidence in this case

8   because their argument this morning was this is a highly

9   contested issue, let's give it to the jury.  And we looked

10  at their exhibit list; and they have on the exhibit list

11  almost 4,000 documents.  It's 3,958 exhibits.

12         And so I went and I typed "Dean" to figure out how

13  many exhibits say "Dean" on them.  And of the approximately

14  4,000, 967 mention Dean.  So I looked through all of them.

15         And when we look at advertising, page 180 of their

16  exhibit list shows that they can present to a jury a Dean

17  price list from 1988.  So this is the time when Dean

18  Zelinsky is closing his factory, but he's made a price list

19  for that year.

20         And then the next ad they can show, or purport to

21  show to the jury, is a 1993 Dean ad.  So we have a

22  five-year gap in activity.

23         Then the next advertising -- or evidence I could

24  find is 100 pages later, on page 288; and there they have

25  what purport to be Budweiser guitars.  And I deposed

1  Mr. Zelinsky about these, and he said he made some

2  promotional guitars for Budweiser the company and this was

3  around the time his factory is closed and this was kind of

4  his last big sale.

5         And so we have 1988 we have one price guide that

6  they can show the jury.  In '89 they have a promotional

7  guitar that they can show the jury, to Budweiser.

8         Then we go to Tropical.  Here, Tropical has now

9  bought the company; and he says, in paragraph 7 (as read):

10 "Tropical Exhibit 1 is a true and correct copy of an

11 advertisement from 1992."  So we've gone now from 1989 to

12 '92, three years.  And he says (as read):  "The ad was

13 created by Heartland Group, which distributed the Dean

14 model depicted in the United States after purchasing from

15 Tropical Music during the time Tropical Music owned Dean."

16        Next he says (as read):  "Tropical 2 is an

17 advertisement created by Barnes & Mullins who distributed

18 the Dean model depicted in the U.K. after purchasing from

19 Tropical Music."

20        So he's pointed to two pieces of evidence.  One he

21 says was a U.S. entity; the other he says was a U.K.

22 distribution.

23        And this is what they showed the Court today

24 during the hearing as their evidence of never being

25 dormant, and this is Tropical 1.  And if you look, it's

1   clearly an advertising mockup.  It's not an ad that anyone

2   here or any witness could tell you what magazine this

3   appeared in in the United States, where it was distributed

4   in the United States.  It still has, on the bottom left,

5   the Dean ad along with the color and margins; and at the

6   bottom right, it just says it was printed in 1992.

7          And so what we see here is from 1989 to 1992, they

8   are going to be able to present to the jury this mockup.

9   And if the shoe was on the other foot and we were here on

10  an infringement case in 1993 and I had 4,000 exhibits and

11  your Honor said, "Well, what's your evidence in 1990 that

12  they sold a Dean product, what's your evidence in 1991 they

13  sold a Dean product, what's your evidence in 1992 they sold

14  a Dean product" and I said, "Your Honor, look at this

15  printout.  This is what I'm going to present to the jury,"

16  I don't have any evidence of use in commerce in the United

17  States, right?

18         And so this is the second piece of evidence that

19  Tropical pointed to in their deck, and here you can clearly

20  see that this ad says it's (as read):  "East of Eden and

21  All Over Great Britain."  And if you look at the bottom, it

22  says (as read):  "Dean Guitars exclusive U.K. distribution

23  via Barnes."  So this is clearly an ad that was provided

24  overseas, not to U.S. consumers.

25         And this is what you would think.  When you look

5/13/2022 Pretrial Conference                    39

1    at their exhibit list, 1990-'91, zero exhibits out of

2    nearly 4,000 that they are going to present to the jury.

3          From 1992 they have one mockup ad that they are

4    going to present to the jury, with no witness who can

5    testify that that ad the jury is going to see consumers

6    ever saw in the U.S.

7          And then they showed the Court in the hearing this

8    morning three undated catalogs -- but when you look at the

9    catalog itself, there is no way of knowing the date that

10   that was made and they don't have a witness to testify was

11   that catalog distributed -- and a 1996 price list.

12         And so when you look at this activity, what does

13   it show?  Well, it shows their owner, Elliott Rubinson, was

14   being honest.  He bought a dormant company.  This is all

15   activity you would think a dormant company would do.

16         And if you look at their exhibit list, they were

17   able to pull most of their exhibits, or very old catalogs,

18   from third parties that they were able to find.  They hired

19   an expert to use things like Wayback and Ventex (phonetic

20   spelling) to find all sorts of ads from the '70s and '80s

21   related to third-party distributors --

22         THE COURT:  Would you mind putting it on your --

23         MR. SCHUETTINGER:  Put it up here?

24         THE COURT:  Just put it on your lapel so it will

25   be easier because you're like me.  You talk with your hands

 1  so --

 2              MR. SCHUETTINGER:  Is this better?

 3              THE COURT:  That will be good.  Thank you.

 4              MR. SCHUETTINGER:  Okay.  So they were able to

 5  find all these ads for third parties to show their use, but

 6  they can't provide any evidence for two years.  They can

 7  provide one mockup for another year, and they can provide

 8  other catalogs for 1993 and '94 that they say are from

 9  those years but no witness to say whether they were

10  distributed in the United States.

11              And so this is evidence of dormant.  And if you

12  want to draw a line, I think our brief and your ruling show

13  this is a proper line.  They were not around.  We couldn't

14  have sued anyone in 1990.  We couldn't have sued anyone in

15  1991.  1992, if anyone wanted to sue them for using the

16  Dean mark, they don't have any use in commerce; they have a

17  mockup ad.

18              And so I think that addresses your point.

19              And this is what I'm mentioning here.  This is

20  what they showed the Court.  They say this ad is from 1993.

21  There is no way of knowing when this ad is from.  They

22  don't have a witness that can say when this ad is from; and

23  this ad isn't a self-authenticating publication where I can

24  see the cover of the magazine to prove when it was

25  published, where it was distributed.

1         Here is the ad from 2003.  This is a catalog -- or

2    1993.  If you look at the bottom, underneath the image, you

3    can barely see it but it says "1993 catalog."  Here again

4    this isn't a publication in distribution, i.e., a

5    guitar.com magazine where I can tell your Honor, "Well,

6    this is distributed throughout the United States."  So

7    there is no way of knowing where this ad was distributed,

8    if it was.

9         And so the next thing that we see that on its face

10   you know what it is is a 1996 retail price list where at

11   the bottom left it says, "Effective Date January 1st,

12   1996," which is in line with Elliott Rubinson's testimony

13   and what we think the evidence will show, that around

14   1996-'97 he's trying to revive the brand and here is a

15   price list.  It's the first price list we see in this case

16   on their evidence list since 1988.

17        Here again is another thing they presented this

18   morning to show continued use.  There is no evidence on

19   here of knowing when this was made, produced, or if it was

20   distributed in the United States.

21        And so based upon that, we think we've shown that

22   it clearly was dormant, at least for a period of three to

23   four years.

24        MR. HOWEN:  And, your Honor, just to wrap up the

25   presentation, I think that the Court, both in the ruling

 1   and in the questioning of counsel earlier, got it right,

 2   which is that what you're trying to do and what you should

 3   do is to gauge what the marketplace looked like when the

 4   defendants entered the marketplace.  That's the *Boston Duck*

 5   case that we cited to you.

 6        Add to that, just for clarity's sake, the

 7   trademarks at issue in this case were not issued until

 8   1996, the first one, two in '97 and one in 1999.

 9        So we've got -- they want to talk about a Fender

10   guitar back in 1968 -- and I'll segue to *Fender* for a

11   moment.  They keep saying that it was invalidated.  That's

12   incorrect.  In the *Fender* case it was never issued, the

13   registration for the Stratocaster.

14        But the point being they want the jury to see

15   these ads from 1968, ads or catalogs from third-party uses,

16   which was 30 years in that instance, or 29 years, before

17   they entered the market and 29 years before the trademark

18   was issued on it.

19        And so I do think, when the Judge says I need to

20   draw a relevance line somewhere to get control of these

21   4,000 exhibits and figure out what really matters to the

22   jury, that a timeline is appropriate.  And given that, hey,

23   they entered the market in 1997, I think that's more than

24   appropriate.

25        And I would point out what that demonstrates is

1   we're 25 years from then, right?  And really what the jury

2   would probably be deciding is are they generic today, are

3   our shapes generic today.

4        We're asking for damages back to 2011 because

5   that's the first date that anybody can provide sales

6   information, either them or us; and we're asking for an

7   injunction going forward.  And so I know the trademark

8   lawyers are scribbling all about what I just said.  But the

9   jury, in a commonsense approach, that's what they're being

10  asked is, hey, are they generic today; and, frankly, your

11  Honor, they would have 25 years of evidence to show that

12  they are or are not generic today.

13       And in our briefing on the letter in response to

14  what they sent, we took their opening statement exhibit

15  list and said out of the 367 exhibits, what would the

16  Court's motion *in limine* exclude from that and highlighted

17  them in orange and then what would it allow, as long as

18  they were independently admissible of the Court's ruling,

19  and highlighted them in green; and then we said what falls

20  into the middle, in the period that you're talking about,

21  and highlighted those in yellow.  There were a couple in

22  pink where we couldn't figure out a date.

23       The result of that was it was the majority green.

24  This ruling wasn't keeping those things out.  We might have

25  other evidence objections to them, but it wasn't -- the

1   motion *in limine* ruling was not saying those things would

2   be precluded.

3          And the pattern, I think, is startling because it

4   tracks exactly what the Court's perception was, which was,

5   yes, there was a lot of activity in the -- leading up to

6   this.  But as we see it, Gibson took control of the market;

7   and they don't have much evidence in the '90s that there

8   was a lot of competition.  Those are the few yellow

9   entries.

10         And then you've got all of these Dean stuff from

11  1997 forward, and that would be admissible under the

12  Court's ruling.  That's stuff that is not being kept out.

13         And so in terms of management of this trial, I

14  think that's important; but most importantly, the jury

15  should not be confused that we can't have a valid mark

16  because somebody 30 or 40 years ago used a guitar that

17  looks somewhat like ours.

18         And, of course, all of this is conditioned on we

19  don't think the guitars they are showing in the third-party

20  use are actually infringing on our guitars and, therefore,

21  they're wrong to say that even if it did come in.

22         But the amount of time and effort it takes to say,

23  wait a minute, this guitar from 1972 made by manufacturer X

24  that they contend looks like an SG model guitar, now we're

25  going to have to demonstrate to the jury where the

 1  difference in the shape in that guitar is; and then we're

 2  going to have to demonstrate the next of their 4,000

 3  exhibits and then the next of their 4,000 exhibits and then

 4  the next of their 4,000 exhibits.  And we don't want to

 5  just be swamped by volume when we've got an answer to all

 6  of those things but we only have 25 hours now to present

 7  it.

 8         And so for all of those reasons, we think

 9  practically and legally the order should stand on that

10  motion *in limine*.  I know you indicated you might talk

11  about the others, but that's sort of our point there.

12         MS. NAYDONOV:  May I respond?

13         THE COURT:  Yes, go ahead and respond.

14         MS. NAYDONOV:  Thank you, your Honor.

15         May I approach to provide a copy?

16         THE COURT:  Yes.

17         MS. NAYDONOV:  That's from this morning.

18         Your Honor, this is not a summary judgment ruling

19  and this is not a bench trial.  Gibson requested a jury

20  trial.  They got it.  And our clients deserve a day in

21  court to argue their side of the story.

22         They just spent about an hour basically doing an

23  opening statement that they should be doing to the jury on

24  Monday.  They asked you to weigh the evidence.  "This

25  evidence we interpreted that way, this evidence should be

 1  accorded this weight, this evidence is not persuasive,"

 2  according to them.

 3          But this is what the jury has to decide in this

 4  case.  Actually, the question -- one of the questions aside

 5  from the infringement is is the action barred by laches

 6  because they waited too long to sue.  That is the question

 7  for the jury.  We contend they waited too long because we

 8  came to the market in 1977, and we have all this evidence

 9  demonstrating continuity.

10          We moved for summary judgment on laches, your

11  Honor, and they argued that there are fact issues

12  precluding summary judgment and your Honor agreed and

13  denied summary judgment and said there are factual issues

14  precisely over all these things.  They spent, like, over an

15  hour describing and attaching hundreds of pages of evidence

16  and trying to weigh it before your Honor.  The jury should

17  be weighing it.

18          So it's a hotly contested factual issue as to

19  whether the company was dormant.  They clearly believe it

20  is; we clearly believe it does not.

21          And summary judgment was already denied because

22  your Honor very correctly found that there are factual

23  issues that need to go to the jury.  Under the Lanham Act

24  abandonment takes place if there is no use for three years

25  with no intent to resume use.  They cannot show that,

1    especially the no intent to resume use.

2          But also the key question is there is this whole

3    sideshow about the continuity of the Dean mark.  They are

4    not suing us -- or we're not suing them over the Dean word

5    mark or logo.  The question is can we tag back to 1977 for

6    use of the guitar shapes that are not marks at all?  We

7    contend that they are generic.

8          And a lot of statements were made that I would

9    like to just briefly address about the history of the

10   company.  Dean came to the market in 1977 by a 19-year-old

11   gentleman, Dean Zelinsky, who quickly became very famous,

12   one of the most prominent guitar brands in the United

13   States.  As I mentioned this morning, Cars, Doobie

14   Brothers, ZZ Top playing their guitars.  Gibson, no

15   question, knew about us.

16         We completely disagree that, you know, he went out

17   of business and didn't do anything starting in 1986.  He

18   testified that he continued to sell guitars up until 1991.

19   Then he sold the brand to Tropical Music, and that's where

20   the declaration comes in from Tropical Music.  They only

21   showed your Honor parts of that declaration, but the

22   declaration makes very clear -- and by the way, they

23   stipulated that this declaration is admissible at trial,

24   admissible at trial instead of testimony from Oscar

25   Mederos.

1          But it clearly says that Tropical Music had

2   manufactured and then distributed during the time Tropical

3   Music owned Dean Guitars.  Some of the guitars bearing the

4   Dean mark were assembled in Florida.  Some were made from

5   scratch in Florida during this time.  Some of those guitars

6   were sold and distributed in the United States.

7          It also says that Tropical Music -- at

8   paragraph 12 -- entered into -- with Washburn -- into a

9   license that permitted Washburn to use the Dean word mark

10  and Dean logo in the U.S. in connection with Dimebag

11  Darrell products.

12         Use by a licensee inures to the benefit of the

13  licensor.

14         Paragraph 7, attaching a copy of the 1992 ad.

15         Attaching also, as you can see, your Honor,

16  pictures at page 6, 7, 8, 9, 10 of actual guitars bearing

17  the Dean brand that are being sold in the United States.

18  They simply cannot show abandonment because Dean brand

19  continued to exist and was being sold.

20         And they spent, you know, half an hour nitpicking

21  at various catalogs and, you know, copies of that saying

22  "We think it's not persuasive" or "You cannot show exactly

23  where they were distributed."  We have witnesses who will

24  testify about those ads being used in the U.S., products

25  being sold in the U.S.; and this is exactly the question

1    for the jury to decide.

2          And I find it ironic that the first slide of their

3    presentation is "Dormant?"  It's a big question indeed.

4    It's a big factual question that the jury deserves to

5    decide, and we deserve our day in court.

6          So that's on the first issue of whether there was

7    dormancy or continuity, factual issue.  Completely

8    different, in our opinion, your Honor, from the third-party

9    uses.

10          The third-party uses -- they want to tell the

11    jury, "We started using these shapes in the '50s and we own

12    exclusive trademark rights, common-law rights, since then

13    all up until now."

14          The jury, for genericness purposes, deserves to

15    see what the marketplace looked like in the '70s, '80s,

16    '90s.  So irrespective of whether we came along in '77 --

17    we did -- or in the '90s, the jury deserves to see the full

18    picture.  They are trying to blind the jury, shut their

19    ears, and have this distorted picture of the marketplace as

20    if there was nobody in the '60s, '70s, and '80s, it was

21    just them.  No, not true.  There were --

22          And counsel is correct, yeah, there are thousands

23    and thousands of pages of third-party evidence just because

24    they didn't police those shapes.  That is the definition of

25    when something is generic.  They are overwhelmed by this

1    evidence because there is just so many third-party uses out

2    there, but that is sort of the problem of their own doing

3    for not policing their brands for all these decades.

4            And as I mentioned, we will present the evidence

5    very concisely to the jury in the form of summary charts,

6    concise testimony; and we will stick to the 25 hours to

7    present our case as your Honor has allowed us to.  And they

8    cannot cite a single case where the Court held that you

9    have to cut off, for evaluating genericness purposes, what

10   was going on in the marketplace, especially during the time

11   that they contend they were using their marks.

12           They are essentially saying, "We started using the

13   marks in the '50s, but you are not allowed to know what

14   everybody else was doing for the next 30 years."  There

15   were a bunch of other companies using the same shapes for

16   the next 30, 40 years.  It's just -- it will deceive the

17   jury.

18           So we view the third-party completely different

19   from the dormancy and ultimately the jury just deserves to

20   see all this evidence and make the ultimate conclusion as

21   to laches, as to infringement, and as to genericness and

22   it's improper to preclude the jury from viewing this

23   evidence.

24           Thank you, your Honor.

25           MR. HOWEN:  I'll try to be concise, your Honor.  I

1  guess I went too long earlier.

2           The first point she made, as I recall it, related

3  to laches, after we talked about generic for a long time.

4  And I didn't address laches because -- but I'll connect it

5  to the point where we didn't hear anything on response --

6  or reply or rebuttal or whatever we're going to call it --

7  about did they purchase a company.  And that's I think

8  because it's clear, I hope now, that they did not purchase

9  a company.  And why that is important to laches is they

10  said, "Hey, you didn't sue back in 1977."  That's not the

11  laches question.  It's "You didn't sue us back in 1977,"

12  because the whole concept of laches is that it's unfair to

13  the defendant to bring the case now.

14           Well, because they didn't purchase a company,

15  there is no way possible that Gibson Guitar Corp. could

16  have sued Armadillo in 1977, one, because the evidence

17  would show Armadillo didn't even exist in 1977; and, two,

18  Armadillo was not selling any guitars and they certainly

19  were not selling any guitars that infringed on Gibson's

20  trademarks in 1977.  So this whole "it would hurt us on the

21  laches" argument, I fail to comprehend.

22           Second, we get the assertion that the jury has to

23  understand what the marketplace was in the '60s and '70s as

24  they sit in that jury box in 2022, again 30 years before

25  the trademarks were issued, 30 years before they entered

 1   the market.  I fail to see what the relevance of that is.

 2   And even if it is relevant, slightly relevant, that's a

 3   straight 403 finding because, as we pointed out, it's easy

 4   to put up a thumbnail image and say, "Our expert says that

 5   guitar looked like your guitar and there's a hundred of

 6   them."

 7           Well, as I pointed out, we're going to have to

 8   rebut each of those hundred guitars to say, "Let's blow

 9   that up.  Let's pick this guitar up and you'll see that

10   this part of the design is completely different, that yes

11   they both are -- they are both double cutaways" -- which is

12   a term you will be hearing -- "but the depth, the shapes

13   are not the same even though they are both double

14   cutaways."

15           And we have to do that hundreds of times for

16   guitars that are no longer sold, might have been licensed

17   by us to allow somebody to do that, all because the jury

18   deserves to understand what the marketplace looked like in

19   1972, 50 years ago.  And I just fail to see how that is

20   relevant.  But, again, if it is relevant, it creates a

21   tremendous burden on us in a two-week trial; and it would

22   create a burden in a month trial or a two-month trial.  And

23   just the bald assertion that it's relevant, I don't get.

24           And so, again, for all of those reasons, we think

25   the Judge appropriately -- the Court appropriately drew a

1    timeline that gives -- again, there's plenty of evidence

2    that's coming in under that ruling.  Just look at our

3    chart.  That's just their -- what they wanted to show in

4    opening.  They've got much more beyond that.  And so

5    there's hundreds of exhibits that we're going to have to do

6    what I just explained to do, but those are exhibits that

7    are closer in time to when they were in the market and we

8    had a trademark registration issued for us.  So that makes

9    more sense, I think, to do that.

10           And, finally, this idea that we're trying to get a

11   summary judgment or conduct a bench trial.  That's why I

12   started with the Rule 104 analysis.  Under Rule 104 when

13   you have questions like this, when the Court has questions

14   like this, how do I determine what is relevant?  And the

15   Court identified the appropriate condition that it had to

16   determine, what was the activity in the marketplace that

17   relates to these parties.

18           And what Rule 104 says is you should -- actually,

19   the rule says you must consider -- it's not just evidence.

20   You can also consider inadmissible information to determine

21   whether a reasonable juror could determine that there was a

22   material fact that relates to, in this case, the

23   genericness of the guitars from way back when.

24           And all I've heard is we want to show it, not why

25   50, 60, 70 years ago is important to a case that's being

1    decided in 2022.

2            Thank you, your Honor.

3            MS. NAYDONOV:  Your Honor?

4            THE COURT:  Go ahead.

5            MS. NAYDONOV:  Very briefly.

6            On the last question, as to why, to make clear,

7    Gibson is asserting they entered the marketplace, for

8    example, with the Flying V and Explorer shapes in 1958.

9    They are asserting trademark rights dating back to that

10   date.  They want to tell the jury, "We've used the mark for

11   so long, supposedly exclusively.  We rely on all these

12   years of supposed trademark rights."

13           We want to tell a very different story.  "You

14   never had trademark rights, including dating this far back,

15   because in the '50s, '60s, '70s there were scores of third

16   parties."

17           And I'm sorry that it's burdensome for Gibson now,

18   after 40 years of delay and lack of policing of their

19   rights, to deal with all of this.  I'm sorry, but that's

20   the reality of the situation when marks become generic.

21   That is why.

22           And that's what Courts consider in the genericness

23   analysis.  Like when the Fender Stratocaster shape was

24   found generic, the Courts in -- the TTAB in 2009 looked at

25   evidence dating back to the '70s; Swedish Fish gummy candy,

1    looked at decades of evidence and concluded because of this

2    decades of evidence, there is no trademark significance

3    left.  So that is why and, as I said, we would present the

4    evidence in a very efficient manner.

5           Now, with regard to dormancy, which is completely

6    different and --

7           THE COURT:  Let me just ask you.  The issue of the

8    fish-shaped gummy candy, that was in a completely different

9    context than we have here because wasn't that whole issue

10   on product configuration and trade dress infringement and

11   not what we have here?

12          MS. NAYDONOV:  Well, your Honor, this case -- we

13   think it's actually very similar because it also involves

14   the trade dress.  It involves the configuration of the

15   guitars.

16          So in the -- in the Swedish Fish case, it was the

17   configuration of the actual candy.  In this case they are

18   claiming they own an outline of the guitar, Flying V.  They

19   own an outline of the guitar.  So it was the exact same

20   thing.  It was the trade dress and the genericness of the

21   trade dress.

22          As well as in the Fender, Fender Stratocaster,

23   very commercially successful guitar; and they tried to

24   obtain trademark rights in the outline of the shape of the

25   guitar -- very much like Gibson is trying to say "We own

 1    the outline of the V, of the Explorer guitar" -- and they

 2    couldn't get it.  It was found to be generic because of the

 3    decades of widespread third-party use, just like here,

 4    other guitar companies using the same or similar guitar

 5    shape.

 6            The TTAB looked at it.  The Court in the Swedish

 7    Fish case -- there are other examples -- looked at it and

 8    said, no, we're going to look at the whole history for

 9    decades or years or whatever it is.  There are other

10    companies who used this same or similar shape, so there is

11    no significance -- trademark significance of this shape.

12            And if somehow we're only allowed to present what

13    third parties have done in '92 going forward, the jury will

14    think there were no third parties from '58 when they

15    started asserting their trademarks to '92.  They'll think

16    that it was just them; but that is not true, your Honor.

17    We've provided samples.

18            And to the extent counsel is suggesting that it's

19    just a preliminary ruling and we should approach the bench,

20    your Honor, we're approaching the bench now for opening

21    statements and cross-examination at trial starting on

22    Monday.

23            So that's on the issue of genericness as to why.

24            On the issue of supposed dormancy, which we

25    disagree.  We've been around since '77, no abandonment.  We

5/13/2022 Pretrial Conference                              57

1    bought the -- the current owners, Armadillo, bought the

2    company.  Dean Zelinsky -- and it's in the Oscar Mederos

3    declaration in front of you which, again, Gibson stipulated

4    is admissible at trial.  He says (as read):  "I am familiar

5    with the Tropical Music purchase, ownership, and sale of

6    Dean Guitars, Inc.," company.  He purchased the company.

7           Dean Zelinsky also, in his deposition testimony

8    which we will present at trial, said he sold the company

9    and the company was later sold to Armadillo.

10          But to once again reiterate, you don't need to

11   sell the entire business to validly transfer the mark.  As

12   I was mentioning this morning, the Crunch candy Nestle sold

13   to Ferrero.  Nestle didn't have to sell its entire

14   conglomerate to transfer the rights of the brand.  And

15   there is good reason under trademark law.  You can sell a

16   brand because -- a trademark, all it is is it represents

17   the goodwill.  So when you sell the trademark, you sell the

18   underlying goodwill.

19          So when they sold -- when Elliott Rubinson and

20   other witnesses have said we sold the brand, that entails

21   with it the name, logo, and the underlying goodwill, which

22   is the guitars.  So we absolutely sold the company, and

23   also the sale of the trademark is alone sufficient as well.

24          And we just believe, your Honor, that we're

25   entitled to tell our story to the jury and have them weigh

 1   all this evidence on the question of laches as well as on

 2   the question of genericness.

 3               MR. HOWEN:  Your Honor, could I address --

 4               THE COURT:  Wait one second.

 5               MR. HOWEN:  Of course.

 6               MS. NAYDONOV:  I'm so sorry.  One more point, your

 7   Honor.  I'm sorry.

 8               On the third-party evidence, your Honor has

 9   already determined in prior rulings -- Docket 170,

10   Docket 183, Docket 267 -- how important this evidence is.

11               170.  "The third-party sales data are at the core

12   of Armadillo's argument that Gibson's marks are generic.

13   It is therefore necessary to Armadillo's defense."

14               Docket 267 denying a *Daubert* motion to exclude

15   testimony of George Gruhn, who is going to be our music

16   history expert.  "Gruhn's opinion aids the jury by

17   providing insight into Gibson's trademarks and relevant

18   third-party usages of similar guitar shapes."

19               So your Honor already recognized how critical it

20   is, and we would be basically cut off at our knees if we

21   cannot present the full scope of these third-party uses.

22               And last point for -- a separate issue for the

23   laches.  It's absolutely -- we have a valid chain that we

24   can tag back to 1977.  We have evidence that we have shown

25   to your Honor this morning, and that we will present to the

 1  jury, that the business and underlying goodwill passed from

 2  Dean Zelinsky to Tropical, from Tropical to Armadillo and

 3  Concordia.

 4          To the extent they disagree, they can

 5  cross-examine the witnesses.  They can tell the jury what

 6  they've been telling you today, but it's ultimately for

 7  them to decide.

 8          Thank you.

 9          THE COURT:  Thank you.

10          MR. HOWEN:  Your Honor asked about the Swedish

11  Fish case.  That case was a product configuration claim on

12  a trademark dilution issue.  We're not seeking recompense

13  for trademark dilution in this case, and so I think the

14  Court's instinct was correct.  It's inapplicable here.

15          The Stratocaster case, that was an application

16  proceeding.  It was not anything like what's going on in

17  this Court.

18          They complained that if you stick by this ruling

19  there will be -- well, they point out that in other cases

20  there are decades of third-party uses allowed for the jury

21  or the TTAB to hear.  There will be decades in this case

22  for them to hear.

23          And, again, I -- I've beat a dead horse.  Thank

24  you.

25          THE COURT:  Okay.  So, of course, the Court has

5/13/2022 Pretrial Conference                                    60

 1  already entered a decision and, of course, I will revisit

 2  my ruling and, of course -- I wish I could say I've devoted

 3  the whole day to your case.  I haven't.  I've had so many

 4  other matters going on.  So I will try to revisit it, look

 5  at it.  Again, the goal of the Court is trying to get it

 6  right and -- I wasn't certainly trying to cut the defense

 7  off at their knees.  Both sides get to tell their stories.

 8  So -- but unless I change something between now and Monday

 9  morning, you know -- well, hopefully by Monday morning I'll

10  have it completely resolved because we'll have *voir dire*

11  first, before we ever get to opening statements.

12          Okay.  This is -- this is a good problem for the

13  Court to have, when you have such good lawyers.

14          They are reminding me that CM/ECF is going to be

15  down this weekend.  We are switching to Next Generation.

16  So if I do something over the weekend, it won't be a docket

17  order.  If I get something done this weekend, it will be

18  a -- we'll send an email.  It won't get docketed until

19  Monday, until ECM is back up.  I'm glad they reminded me

20  because I keep forgetting.  They have reminded me three

21  times now, and they had to pass me another note to remind

22  me.

23          No.  This is good problem for the Court to have,

24  when you have such good lawyers for both sides.  I was just

25  interviewing law clerks this week and I said to the law

 1  clerk -- I always ask the prospective law clerks, "What do

 2  you do when you have really good lawyers on both sides,

 3  really good briefing on both sides, and you have to make a

 4  decision -- at least you have to make a recommendation to

 5  me on how to resolve a motion?"  And so I find myself

 6  perplexed in the same situation.  I've made a decision.

 7  But I also want to make sure I got it right, so I will

 8  ponder that.

 9          Let me ask.  I entered another order that, I

10  think, resolves some of the other bigger issues that we had

11  left over.  Hopefully you saw that, regarding -- now, I

12  will say, because something came up today regarding the one

13  declaration, I think I made it -- there was one of the

14  issues, I think, that Gibson raised regarding the

15  declarations for business records that went on and had

16  other things in them, that went into much more detail than

17  a normal business record affidavit.  And that's what I

18  certainly was discussing regarding saying that those -- the

19  exhibits would come in but not the declarations in that

20  situation.

21          That in no way was saying that if the parties have

22  agreed to certain declarations coming in, those couldn't be

23  entered into evidence.  I wasn't interfering with the

24  parties' agreements that certain declarations might come

25  in.  That issue, which I think I just dealt with in a

5/13/2022 Pretrial Conference                    62

 1  sentence or two, just indicated that it was dealing with

 2  the issue of the declarations that -- for business records

 3  that wasn't your typical two-page declaration.  But I think

 4  I -- I think I resolved some other issues there.

 5         So I guess the question is what other loose ends

 6  do you need from me at this point as we begin to start jury

 7  selection on Monday?

 8         MR. HOWEN:  Your Honor, I actually had not seen

 9  the order.  Can I look at it real quick?

10         THE COURT:  Yeah, go right ahead.

11         Has defense seen the order that I'm referring to?

12         MR. RODGERS:  Yes, your Honor.

13         THE COURT:  It was docketed before we got here

14  but --

15         MR. HENRY:  May I inquire just sort of --

16         THE COURT:  Make sure you have a mic on, just --

17  and that is for the purpose of the court reporter.  I can

18  hear you, but everything needs to go through the sound

19  system so the jury all hears.

20         And that is something I will remind everyone.  I

21  don't know who is going to be doing the *voir dire*.  Just

22  make sure you speak up because it's something we keep

23  addressing and we get complaints from the jury that --

24  during *voir dire*, just the way the speaker system is.  It

25  is not as big an issue in the jury box but since they will

 1    all be back in the gallery.

 2            MR. HENRY:  With respect to the order that you

 3    just referenced --

 4            THE COURT:  If you have a question about that,

 5    wait.  Mr. Howen hasn't read it yet.

 6            MR. HENRY:  I apologize.

 7            THE COURT:  No, no.  No offense about that.

 8            MR. HOWEN:  I have read it, your Honor; and I

 9    believe that we don't have anything to bring up after that

10    so --

11            THE COURT:  Okay.  Go ahead.

12            MR. HENRY:  Just kind of logistics.  So you had

13    told us Wednesday that for an exhibit, if it's referenced

14    by a witness, then that means it's coming in.  Basically

15    for preadmitted exhibits, I guess, is what I'm --

16            THE COURT:  Well, we're talking about just my

17    policy on exhibits.  If exhibits are -- I will preadmit all

18    of the exhibits, conditionally admit the exhibits, at the

19    beginning of evidence if it is not objected to or I've

20    overruled the objection.  My rule is you just have to use

21    it with a witness for it to be fully admitted.

22            Is that what you are referring to or something

23    else?

24            MR. HENRY:  Well, I apologize if I'm not

25    articulating it well.

1           If -- for instance, the documents that are

2    attached to these declarations, if a -- we still have to

3    use that with a witness and then offer it at that time?

4           THE COURT:  Well -- so in those situations where

5    there is really no objection to those, you would just use

6    the actual attached records with the witness --

7           MR. HENRY:  Okay.

8           THE COURT:  -- those exhibits, and they would be

9    fully admitted once you use them because there is not an

10   objection anymore.

11          MR. HENRY:  Got it.

12          THE COURT:  And there was really never an

13   objection -- the objection was whether the declaration

14   would come in, and I'm not so worried about that.  It's

15   just we'll have to make sure we remove the declarations

16   before it goes back to the jury.

17          MR. HENRY:  Got it.  Thank you, your Honor.

18          THE COURT:  Okay.

19          MR. HOWEN:  Your Honor, I think -- I don't want to

20   put words in his mouth, but I think what he was saying is

21   that those are business records of third parties that are

22   never going to show up here.  They will likely want to

23   argue them, but there is no witness to ever give them to to

24   comment on them because those -- because they're attached

25   to a declaration.

 1          And so I think what they're saying is can we just

 2   argue them without having shown them to any witness, and we

 3   would -- we would say yes.  I mean, we wouldn't have any

 4   objection to that aspect of it.

 5          THE COURT:  Well, that's fine.  I understand that.

 6   I assume that some witness or an expert or someone is going

 7   to be using those exhibits.

 8          MR. HOWEN:  I don't think so.

 9          THE COURT:  Maybe not.  Okay.  That's fine.  Just

10   make sure -- so in that situation where -- you just need to

11   show it to the jury.  So you would identify, you know,

12   these are business records, the exhibits.  You can put them

13   on the ELMO or electronic or whatever.  Just utilize it in

14   front of the jury in some fashion.

15          And you don't have to go through every page.

16   That's not required.

17          MR. HENRY:  Could we just say, Judge, we're

18   offering exhibit such-and-such?

19          THE COURT:  I'm okay with that generally, but the

20   issue I have is if that's going to be done a lot so -- in

21   terms of flooding the record with exhibits the jury never

22   sees.

23          So I'm not saying I won't grant an exception to

24   that, but it has to be shown to the jury in some fashion.

25   And I understand you may not have a witness to talk about

1  it.  That's fine.  But you need to at least show the jury,

2  here are these records, you know, and they are preadmitted

3  and we're offer -- it's not that you're offering them.

4  It's just that you have to do -- you can do that -- you

5  don't have to go through every page.

6          MR. HENRY:  With the protocol being, "Your Honor,

7  may I address the jury about exhibit such-and-such" and

8  then --

9          THE COURT:  Yeah.  We can see how it goes but, I

10 mean, it sounds like both sides may have some of these

11 so -- right?

12         MR. HOWEN:  We don't.

13         THE COURT:  Oh, okay.

14         MR. HOWEN:  Our witnesses will talk about all our

15 exhibits.

16         THE COURT:  That's fine.

17         MR. HENRY:  Thank you, your Honor.

18         MR. HOWEN:  Actually, two things, your Honor.  I

19 was reminded that the Court had granted our -- sustained

20 our objections on the cut-and-splice, what I called; and we

21 haven't -- we need to work out a procedure for the exchange

22 of the modified depositions, the video depositions.

23         The second thing was -- and when I looked at the

24 order I realized -- a second time -- I did realize it

25 doesn't speak to the company representative objection that

 1  we raised, that we're having people speak without personal

 2  knowledge and, on top of that, representing themselves as

 3  to be the company represent -- speaking on behalf of the

 4  company when that company is not in the courtroom, not a

 5  party.  That was all in the briefing.  I don't want to

 6  reargue it, but the ruling does not address that.

 7          THE COURT:  Yeah.  I don't think I addressed that,

 8  so that's a loose end I'll have to tie up.

 9          MR. HOWEN:  And again, your Honor, those are for

10  videos that would be played after our case, so I don't see

11  that being a huge time crunch sort of thing.

12          THE COURT:  No, I understand.  I understand.

13          MR. HOWEN:  And then we do have a question on

14  logistics.  We would like the guitars --

15          MR. RODGERS:  If I may on the last point, before

16  we go to logistics?

17          THE COURT:  That's fine.

18          MR. RODGERS:  First, on the cut-and-splice, we are

19  working on that with the opposing side for -- to resolve

20  those.

21          And then on the personal knowledge issue, just to

22  reiterate, it was our position that all of these witnesses

23  had the personal knowledge necessary.

24          THE COURT:  I understand.

25          Okay.  Logistics?

 1          MR. HOWEN:  So we'd like the guitars to be in the

 2     courtroom, and it is actually -- it is a logistical issue

 3     to get things moved up and moved down.  Can they be up

 4     during *voir dire*?  We'd be happy to meet them or stay

 5     around a little bit to try and figure out how we can do it

 6     fairly and make sure, you know, that's all arranged.  But

 7     if we tried to do it on Monday morning, I think Ms. Conrad

 8     and the CSOs would be running into them and --

 9          THE COURT:  Have you discussed this with the

10     defense?

11          MR. HOWEN:  Actually, my discussions have been

12     with Emileigh mostly; but we have discussed briefly how we

13     might handle it.  She was the one that brought up that

14     given all of our guitars combined, that this might be an

15     issue so --

16          THE COURT:  Well, I assume both sides have

17     guitars, right, that they want to bring?

18          MR. HENRY:  Yes, your Honor.

19          THE COURT:  How many are there for each side that

20     you want to display?

21          MS. NAYDONOV:  Your Honor, there are a lot of

22     guitars on both sides, a lot of them that we would like to

23     display.  But I think we can work together to rotate them

24     in and out so they are not flooding the courtroom at all

25     times.  So I don't know if we need to bother the Court at

 1    this time.

 2              THE COURT:  Oh, your mic is not on.

 3              MS. NAYDONOV:  Oh.

 4              THE COURT:  I just turned mine off, too, but --

 5              MS. NAYDONOV:  I think the battery is out.

 6              So I was saying that at all times I think there

 7    will be guitars in the courtroom for both sides.  Both

 8    sides have a lot of physical guitars on their exhibit

 9    lists, but I propose that we coordinate on --

10              MR. HOWEN:  I guess we'd like to do that now.  I

11    mean, we would need the Court to do it, obviously.

12              THE COURT:  Okay.  Well, let me -- I have to get

13    off the bench and kind of look at space here and see but --

14    we'll talk about that here in a second.

15              But any other issues?

16              MR. HENRY:  Can I address that real quick?  I

17    think there might be an easy solution.

18              If we could agree on what we're going to do Monday

19    with *voir dire*, then for the rest of the trial, we can use

20    the benches because people won't be back there and we could

21    work out some kind of --

22              THE COURT:  I understand that, yeah.  I just want

23    to -- I need to get off the bench and look and see where we

24    have space to put those.

25              Any other issues, then, just before --

```
 1          MR. HOWEN:  I don't believe so.

 2          THE COURT:  -- before we stop for the day and

 3     then --

 4          MR. RETTEW:  Sorry to add on, your Honor, but

 5     there is one issue.

 6          On the -- on the demonstrative that we showed that

 7     we would like to use in opening, beyond the issue of the

 8     time period that your Honor is considering, we've been

 9     working with Mr. Howen on trying to get agreement on what

10     we can show in our opening; and one issue that's come up is

11     documents that show the guitars that were obtained through

12     the Wayback Machine, the Internet Wayback Machine.

13          And so the parties have a dispute over whether we

14     can show those guitars, and so that's one issue.  I just

15     wanted to make sure before we open.  I don't want to use

16     anything in my opening that is going to draw an objection

17     or that the Court would not want us to use.

18          MR. HOWEN:  He's correct.  We had that discussion,

19     and I will confess that I had somebody doing the research

20     for me, actually, not with me.  The case that we saw seemed

21     to pretty clearly indicate you can't -- a Fifth Circuit

22     case -- seemed to pretty clearly indicate that just a

23     Wayback Machine, you know, front page to it saying "I got

24     this from the Wayback Machine" is not a proper

25     authentication.
```

 1          MR. RETTEW:  And, your Honor, I'll let Mr. Rodgers

 2    address that because he knows a lot more about this than I;

 3    but I do know that that case just dealt with an issue of

 4    judicial notice and didn't have a sponsoring witness like

 5    we are eventually going to have through our expert.  But

 6    I'll defer to somebody who knows a lot more on this than I

 7    do, if I may.

 8          MR. HOWEN:  Well, your Honor, I can probably

 9    short-circuit that.  On authenticity, if they have a

10    good-faith belief that they can prove it up authentic

11    without the Wayback Machine, that's up to them, but --

12          MR. RODGERS:  I'm not entirely sure on counsel's

13    argument there.  We have not requested judicial notice at

14    this point.

15          And the Fifth Circuit case that I believe opposing

16    counsel is referring to is the *Weinhoffer* case, which was

17    out of the Fifth Circuit earlier this year where the Court

18    did indeed hold that judicial notice of a Wayback Machine

19    document was inappropriate.  But it also explicitly says

20    that these types of documents are appropriate where someone

21    with personal knowledge of the reliability of the archive

22    service has been authenticated pursuant to Rule 901.

23          And we are going to be offering a sponsoring

24    witness, George Gruhn, who will testify that he, through

25    his research assistant, which your Honor has already deemed

1   was appropriate for him to use in the preparation of his

2   report, used the Wayback Machine.  And the Wayback Machine

3   is used in the ordinary course of people like Mr. Gruhn who

4   are music historians in developing opinions like the ones

5   that he issued in this case.  So we will have a sponsoring

6   witness testifying as to the reliability of the Wayback

7   Machine.

8           And in addition to that, your Honor, there are

9   numerous other indicia of reliability on these Wayback

10  Machine documents that we believe under Rule 901(b)(4)

11  would be sufficient for these documents to come in.  These

12  documents show the websites of various third parties

13  captured through the archive -- Internet archives Wayback

14  Machine where the company's trademark is on the website,

15  the guitars are shown, and the URLs of the companies

16  themselves along with the capture data.

17          THE COURT:  And you're just talking about

18  demonstratives you're going to be using during opening?

19          MR. RODGERS:  That's correct.

20          THE COURT:  So in my view, I'm not worried about a

21  demonstrative that you're going to use in opening

22  statement.  And whether the evidence comes in or not,

23  that's an issue for later.

24          Okay.  Anything else?

25          Okay.  We will be in recess, and let me just --

1            Keary, if you want to come down with me and we can

2    look at space here.

3            (Proceedings concluded, 3:50 p.m.)

4    COURT REPORTER'S CERTIFICATION

5            I HEREBY CERTIFY THAT ON THIS DATE, SEPTEMBER 19,

6    2022, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

7    OF PROCEEDINGS.

8

9            ____/s/_____
             CHRISTINA L. BICKHAM, CRR, RDR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25