# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| GIBSON BRANDS, INC., | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 4:19-cv-00358 |
| v. | § | Judge Mazzant |
| | § | |
| ARMADILLO DISTRIBUTION | § | |
| ENTERPRISES, INC. and CONCORDIA | § | |
| INVESTMENT PARTNERS, LLC, | § | |
| | § | |
| *Defendants.* | | |

## MEMORANDUM OPINION & ORDER

Pending before the Court is Defendants' Omnibus Posttrial Motion for Relief (Dkt. #561). Having considered the motion and relevant pleadings, the Court finds that Defendants' Omnibus Posttrial Motion for Relief (Dkt. #561) should be **DENIED**.

## BACKGROUND

Plaintiff Gibson Brands, Inc. ("Gibson") sued Defendants Armadillo Distribution Enterprises, Inc. ("Armadillo") and Concordia Investment Partners, LLC ("Concordia") for trademark infringement. Gibson requested monetary damages and a permanent injunction that Armadillo and Concordia be barred from offering their DEAN V guitar, DEAN Z guitar, DEAN Gran Sport guitar, LUNA Athena 501 guitar, DEAN Evo Headstock, and LUNA Fauna Hummingbird products.

The case proceeded to trial on May 16, 2022. Gibson alleged that Armadillo infringed the following Gibson trademarks: the Flying V Body Shape (U.S. Reg. No. 2051790), the Explorer Body Shape (U.S. Reg. No. 2053805), the SG Body Shape (U.S. Reg. No. 2215791), the ES Body Shape (Supp. U.S. Reg. No. 2007277), the Dove Wing Headstock Shape (U.S. Reg. No. 1020485), the HUMMINGBIRD word mark (U.S. Reg. No. 1931670), and the FLYING V word mark (U.S.

Reg. No. 1216644) (collectively, the "Gibson Trademarks"). Gibson asserted claims for trademark infringement and counterfeiting under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), along with infringement under Texas common law. Gibson also asserted a claim for contributory trademark infringement under the Lanham Act against Concordia.

Armadillo and Concordia denied all of Gibson's claims. Armadillo and Concordia also raised the affirmative defense of laches, asserting that all of Gibson's claims and requested relief were barred in their entirety based on Gibson's excessive and inexcusable delay, which caused Armadillo and Concordia substantial economic and evidentiary prejudice. Additionally, Armadillo and Concordia asserted counterclaims that the ES Body Shape Design, Explorer Body Shape Design, Flying V Body Shape Design, and SG Body Shape Design should be cancelled on the grounds that they are generic.[1] Before the case was submitted to the jury, Defendants moved for judgment as a matter of law on several grounds, including that (1) Gibson's claims were barred by laches; (2) Gibson's guitar shapes were unprotectable trademarks because they were generic designs; (3) Gibson's infringement and unfair competition claims were unsupported by adequate evidence because the products differed and there was no likelihood of confusion; (4) Concordia could not be held contributorily liable; and (5) Gibson could not sustain a counterfeiting claim when Armadillo did not use an identical trademark (Dkt. #524 at pp. 2129–32). The Court denied the motion and submitted Gibson's claims to the jury (Dkt. #524 at p. 2132).

The jury returned its verdict on May 27, 2022. The jury found that Armadillo infringed all of the Gibson Trademarks with the exception of the FLYING V word mark, and it found for Gibson on the cancellation counterclaims raised by Defendants. In addition to trademark infringement, the jury found that Armadillo sold or marketed a counterfeit of the following Gibson Trademarks: the

---

[1] Defendants also brought a counterclaim for tortious interference with Defendants' prospective business relations. However, the jury did not find for Defendants (Dkt. #498 at pp. 10–11).

Flying V Body Shape, the Explorer Body Shape, the SG Body Shape, and the HUMMINGBIRD word mark. The jury found that Concordia contributed to Armadillo's infringement of the Gibson Trademarks—except for the Flying V Body Shape. However, for the Flying V Body Shape, the Explorer Body Shape, and the Dove Wing Headstock shape, the jury found Gibson inexcusably delayed in asserting its trademark rights, thereby causing undue prejudice to both Armadillo and Concordia. In addition to finding for Defendants on their laches defense for these three shapes, the jury also found that neither Armadillo nor Concordia ever had unclean hands. The jury awarded Gibson $4,000 in statutory damages for its affirmative finding on the counterfeit claim but did not find that Gibson suffered actual damages due to Armadillo's infringement.

On July 28, 2022, the Court entered its Final Judgment, which contained a permanent injunction against both Defendants (Dkt. #547).[2] In relevant part, the injunction states:

> It is further **ORDERED** that Armadillo is permanently enjoined from the manufacture, advertisement, and/or sale of its: (1) LUNA Athena 501 guitar; (2) DEAN Gran Sport guitar; (3) guitars bearing, using, or advertising with the word "Hummingbird;" (4) DEAN V guitar; and (5) DEAN Z guitar.

> It is further **ORDERED** that Concordia is permanently enjoined from contributing, either through the use of intellectual property owned by Concordia or in any other way, to the manufacture, advertisement, and/or sale of the: (1) LUNA Athena 501 guitar; (2) DEAN Gran Sport guitar; (3) guitars bearing, using, or advertising with the word "Hummingbird;" (4) DEAN V guitar; and (5) DEAN Z guitar.

(Dkt. #547).

On August 25, 2022, Defendants filed the pending motion, asking for relief on various grounds (Dkt. #561). Defendants request that (1) judgment be entered as a matter of law on Gibson's claims; (2) a new trial be granted in this case; and (3) that the Court alter or amend the Final Judgment. Gibson responded on September 15, 2022 (Dkt. #582). On September 29, 2022,

---

[2] The Court issued a Memorandum Opinion and Order that explained the basis for the issuance of the permanent injunction (Dkt. #546).

Defendants filed their reply (Dkt. #595), and Gibson provided a sur-reply on October 6, 2022 (Dkt. #599).

## LEGAL STANDARD

### I.   Motion for Judgment as a Matter of Law

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court should properly ask whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004); FED. R. CIV. P. 50(a). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court should be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless substantial evidence does not support the findings. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). Further, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

## II.    Motion for New Trial

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). However, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party— is grounds for granting a new trial . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61.

To be entitled to a new trial, the movant must show that the verdict was against the great weight of the evidence, not merely against the preponderance of the evidence. *Taylor v. Seton Healthcare*, No. A-10-CV-650, WL 2396880, at *2 (W.D. Tex. June 22, 2012) (citing *Dresser-Rand Co.*, 361 F.3d at 838–39); *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982)). A jury verdict is entitled to great deference. *Dresser-Rand Co.*, 361 F.3d at 838. "Weighing

the conflicting evidence and the inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury, and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict." *Gibraltar Savings v. LDBrinkman Corp.*, 860 F.2d 1275, 1297 (5th Cir. 1988). Ultimately, the propriety of granting a motion for new trial is a matter left to the sound discretion of the trial court.

### III.   Motion to Alter or Amend the Judgment

The Fifth Circuit has observed that "[a]ny motion that draws into question the correctness of a judgment is functionally a motion under Civil Rule 59(e), whatever its label." *Harcon Barge Co. v. D&G Boat Rentals, Inc.*, 784 F.2d 665, 669–70 (5th Cir. 1986) (en banc) (citing 9 MOORE'S FEDERAL PRACTICE ¶ 204.12[1] at 4-67 (1985)). "Rule 59(e) serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence. . . . Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (internal citations and quotations omitted).

The Fifth Circuit recognizes that Rule 59(e) "favor[s] the denial of motions to alter or amend a judgment." *S. Constructors Grp., Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993). The rule does not exist to be a vehicle for re-litigating old issues, presenting the case under new theories, obtaining a rehearing on the merits, or taking a "second bite at the apple." *Cabalcante v. United* States, No. 4:16-cv-964, 2021 WL 2894086, at *1 (E.D. Tex. July 9, 2021) (citing *Sequa Corp v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)). However, it allows a party to "question the correctness of a judgment." *Templet*, 367 F.3d at 478. The rule for reconsideration of a final judgment allows a court to alter or amend a judgment because of (1) an intervening change in controlling law, (2) the availability of new evidence not available previously, (3) the need to

correct a clear error of law or fact, or (4) to prevent a manifest injustice. *Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 567 (5th Cir. 2003).

## ANALYSIS

Dissatisfied with the jury's verdict, and the Final Judgment that was issued, Defendants attack the results of this case on several grounds. First, Defendants renew their motion for judgment as a matter of law from trial, arguing that Gibson's trademark infringement and counterfeiting claims are infirm based on the evidence presented to the jury. Even if they are not entitled to judgment as a matter of law, however, Defendants urge that a new trial should be held on the same grounds. Alternatively, they argue that a new trial is warranted because of certain evidentiary issues that arose during trial. Lastly, Defendants request an alteration to the Final Judgment on the same grounds they present in their renewed motion for judgment as a matter of law and for their motion for new trial. But if the Court is unwilling to accept any of those bases for an amendment to the Final Judgment, Defendants ask the Court to limit the geographic scope of the permanent injunction to the United States. Complicating matters somewhat, Defendants have moved under several different Federal Rules of Civil Procedure.

In sum, the arguments presented in Defendants' motion can be grouped into three broad categories: (1) insufficient evidence exists to support the jury's findings on the trademark infringement and counterfeiting claims; (2) certain evidentiary rulings at trial prejudiced Defendants; and (3) the Court erred in its issuance of the permanent injunction. Keeping in mind that Defendants have moved under multiple Federal Rules of Civil Procedure with regards to the same arguments, the Court will address each of these categories in turn.

### I.    Insufficient Evidence for the Trademark Infringement and Counterfeiting Claims

According to Defendants, the Court should discard the jury's verdict on Gibson's trademark and counterfeiting claims because (1) the jury could not possibly find that Gibson has legally protectable trademarks in the design of its guitar body shapes and headstocks; (2) the evidence did not support the jury's finding that consumers were confused as to the origin, source, or sponsorship of Armadillo's goods for purposes of Gibson's trademark infringement claims; and (3) there was insufficient evidence for Gibson to sustain a counterfeiting claim. Defendants incorporate several different legal standards in their pending omnibus motion, including a motion for new trial, motion to alter or amend the judgment, and a renewed motion for judgment as a matter of law.

The Court disagrees with the points raised in Defendants' motion, and it finds that a rational jury could find for Gibson on its claims here. Accordingly, the jury's verdict is sustained.

### A.  Validity of Trademarks

For purposes of evaluating the current post-trial motion, the most natural starting point is Defendants' claim that Gibson failed to produce evidence that it owns protectable trademarks in the Flying V Body Shape, the Explorer Body Shape, the SG Body Shape, the ES Body Shape, and the Dove Wing Headstock (Dkt. #561 at pp. 28–40). Gibson was required to show that "it possesses valid trademarks" in these designs to prevail on its trademark claims. *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015); *see also Hot-Hed, Inc. v. Safehouse Habitats (Scot.), Ltd.*, 333 S.W.3d 719, 730 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citations omitted) (same under Texas law for trademark infringement claim); *Philip Morris USA Inc. v. Lee*, 547 F. Supp. 2d 667, 674 (W.D. Tex. 2008) (same for counterfeiting claim). Thus, assuming Defendants are correct, Gibson's case would unravel—as only the jury's finding on the HUMMINGBIRD word mark could stand.

Defendants utilize a two-step approach to support their claim that Gibson lacks valid trademarks in its designs. First, they assert that the record at trial demonstrated that the Flying V Body Shape, the Explorer Body Shape, the SG Body Shape, the ES Body Shape, and the Dove Wing Headstock are generic designs. Then, building off that premise, Defendants insist that the same designs lack secondary meaning as a matter of law. As a result, Defendants argue that Gibson does not own protected trademarks in the Flying V Body Shape, the Explorer Body Shape, the SG Body Shape, the ES Body Shape, or the Dove Wing Headstock.

Before handling the arguments before it, the Court must first disentangle some confusing points presented in Defendants' briefing. It also must remind Defendants of the exact claims and counterclaims submitted to the jury in this case.

First, Defendants' arguments regarding validity are incoherent in the context of trademark law. Defendants posit that the relevant marks are unprotectable because they are both generic and lack secondary meaning. But that is not how trademark law operates, and it is not how the jury was instructed in this case.

In order to have a valid trademark—i.e., a mark that is legally protectable—the mark must be "distinctive." *Nola Spice Designs*, 783 F.3d at 537 (citing *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008)); *see also* 1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 4.13 (5th ed.) (citation omitted) ("If a designation is not 'distinctive,' it is not a legally protectable 'mark.' . . . No distinctiveness—no validity—no mark.").[3] Distinctiveness comes in two forms:

---

[3] Gibson did bring claims for infringement under both the Lanham Act and Texas law, but the relevant analysis remains the same with respect to Gibson's claims. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235 n.7 (5th Cir. 2010); *see also Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Imp. Corp.*, 53 S.W.3d 799, 806 n.3 (Tex. App.—Austin 2001, pet. denied) (quoting *Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 47 (Tex. App.—Houston [14th Dist.] 1992, no writ)) ("A trademark infringement and unfair competition action under Texas common law presents essentially 'no difference in issues than those under federal trademark infringement actions.'").

> First, a mark is inherently distinctive if its intrinsic nature serves to identify a particular source. . . . Second, a mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.

*Nola Spice Designs*, 783 F.3d at 537 (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000)). Upon a showing of either inherent distinctiveness *or* secondary meaning, a trademark receives legal protection. *Id.* To determine distinctiveness, courts developed multiple tests. But the most notable test—and the one used consistently in trademark law today—is the *Abercrombie* test.

The *Abercrombie* test, which was laid out in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, seeks to answer the question of whether a mark is distinctive and, by proxy, deserving of legal protection. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (citing *Abercrombie*, 537 F.2d 4, 9 (2d Cir. 1976)). To do so, the *Abercrombie* test classifies marks "in categories of generally increasing distinctiveness . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful." *Id.* (citing *Abercrombie*, 537 F.2d at 9). Provided a mark falls in the last three categories, it is inherently distinctive, and therefore, valid. *Id.* (citations omitted). Descriptive marks, meanwhile, only earn legal protection upon acquiring secondary meaning. *Id.* at 769 (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 196 (1985)). Lastly, a finding of genericness means a term or design has no legal protection whatsoever—it is invalid and cannot acquire secondary meaning. *Id.* at 768 (citations omitted); *see also Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009) (citing *Two Pesos, Inc.*, 505 U.S. at 769) ("Generic terms receive no trademark protection, while descriptive terms merit protection only if they have secondary meaning."). The Lanham Act enshrines this principle on genericness, providing that a registered mark can be cancelled at any time if it becomes generic.

15 U.S.C. § 1064(3) (providing for cancellation of a registered trademark "[a]t any time if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered").

Against this backdrop, it becomes clear that Defendants confuse the applicable law here. For one, assuming the relevant designs are generic, as Defendants propose, the Court would never reach a secondary-meaning analysis—the shapes would be unprotectable as a matter of law. *See Xtreme Lashes*, 576 F.3d at 227; McCarthy, *supra*, § 12.1 ("Once a designation has been judicially analyzed and held to be a 'generic name,' the invalidity of that word or designation as a trademark is determined: over and done with."). Therefore, to the extent Defendants seek to invalidate the relevant marks on the basis they are both generic and lack secondary meaning, this assertion is a misunderstanding of relevant law.

Second, and more importantly, Defendants conveniently forget the facts of this case. All but one of the marks Defendants challenge in their post-trial motion have incontestable registrations with the United States Patent and Trademark Office ("USPTO"), and the lone remaining mark, the ES Body Shape, was registered on the USPTO's Supplemental Register. Therefore, Defendants submitted counterclaims to cancel the marks on the grounds that they were generic—an issue that both parties agreed Defendants carried the burden of establishing.[4] *See Camowraps, LLC v. Quantum Digit. Ventures LLC*, 74 F. Supp. 3d 730, 735 (E.D. La. 2015) (citation omitted) (stating that party opposing an incontestable mark has the burden of establishing cancellation); *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 965 (Fed. Cir. 2015) (dealing with mark on Supplemental Register and stating that in a "cancellation proceeding, the opposer or petitioner bears the burden of proving genericness by a preponderance of the

---

[4] In their motion, Defendants never allege that the jury was improperly instructed in this case. *See* (Dkt. #561).

evidence"); *see also* (Dkt. #492 at pp. 30–31) (asking the jury if trademarks should be cancelled because of genericness based on preponderance of the evidence). Nevertheless, Defendants make no mention of these facts in their post-trial motion.

In light of these oversights, the Court construes Defendants' motion as arguing that (1) the evidence definitively showed they proved their cancellation counterclaims and (2) Defendants' trademarks are unprotectable because they lack secondary meaning. Neither argument wins the day.

### i.    Genericness of Relevant Trademarks

The Court will first handle the parties' arguments regarding the genericness of the relevant marks. As the Court alluded to previously, Gibson established that it had incontestable registrations with the USPTO for the Dove Wing Headstock, and the designs for the Flying V, Explorer, and SG Body Shapes. However, Defendants sought to cancel the marks because they were generic, and they submitted counterclaims on each mark. *See* 15 U.S.C. §§ 1064(3), 1092 (providing for cancellation of marks on USTPO's Principal and Supplemental Registers). At the end of trial, the jury concluded that Defendants did not sustain their counterclaims and found the relevant shapes should not be cancelled for genericness (Dkt. #498 at pp. 10–11).

Still, Defendants aver that the jury incorrectly found for Gibson on their counterclaims, asserting that the evidence undermines the jury's verdict. On this point, Defendants contend that the evidence clearly showed consumers no longer associate the relevant guitar designs with Gibson because similar guitar designs were introduced into the marketplace. In response, Gibson first notes that Defendants never contested the validity of the Dove Wing Headstock's trademark at trial, so they cannot now claim invalidity as it pertains to that mark. Additionally, they claim that the Dove Wing Headstock trademark is incontestable, so any arguments regarding validity are not well-taken. Even putting the Dove Wing Headstock aside, Gibson posits that the trial record clearly

12

supported a jury finding that it has protectable trademarks because its designs are original, and Defendants did not establish genericness.

The Court delves into the respective trademarks below. Ultimately though, it agrees with Gibson that Defendants cannot now challenge the Dove Wing Headstock's validity because they waived this issue. Further, as it pertains to the other trademarks, the jury's verdict must only be overturned if there was legally insufficient evidence to support the jury's verdict of noncancellation. The record reveals that the jury could rationally find the marks are not generic, and therefore, Defendants are not entitled to relief here.

### a.   Genericness and the Dove Wing Headstock

The Court agrees with Gibson that Defendants cannot challenge the validity of the Dove Wing Headstock for genericness because Defendants never raised the defense as to this mark. As such, genericness is waived as to the Dove Wing Headstock.

Again, a party suing on a trademark claim must provide it has a valid mark. *E.g.*, *Nola Spice Designs*, 783 F.3d at 537. Pursuant to the Lanham Act, however, the registration of a trademark with the USPTO is prima facie evidence of validity. *Id.* (citations omitted); *see also* 15 U.S.C. §§ 1057(b), 1115(a). Moreover, a trademark may attain stronger protections from challenges of validity if it achieves incontestable status, which occurs if, *inter alia*, the mark has been registered with the USPTO's Principal Register and used in commerce for over five years. 15 U.S.C. § 1065; *Perry v. H. J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 471 (5th Cir. 2021) (citing the same). This is important because, "[o]nce a mark becomes incontestable, its federal registration constitutes *conclusive* evidence of its validity," subject only to the defenses listed under 15 U.S.C. § 1115(b). *Perry*, 994 F.3d at 471 (emphasis in original) (citations omitted). Further still, incontestable marks are immune from challenges that they lack secondary meaning. *Park 'N Fly, Inc.*, 469 U.S. at 201–05.

Separate and apart from this discussion, though, the Lanham Act also provides that "no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered." 15 U.S.C. § 1065(b)(4). The provision is sensical because it reflects the common principle that a generic term can never receive trademark protection. *Amazing Spaces*, 608 F.3d at 241; *Xtreme Lashes*, 576 F.3d at 227 (citing *Two Pesos*, 505 U.S. at 769) ("Generic terms receive no trademark protection, while descriptive terms merit protection only if they have secondary meaning."). As a result, the Lanham Act allows for cancellation of an incontestable registration "if the trademark becomes a common descriptive term or a generic name for an item." *Brittingham v. Jenkins*, 914 F.2d 447, 453 (4th Cir. 1990) (citing 15 U.S.C. §§ 1064(3), 1065(4)). So, while the Lanham Act does not include genericness as a defense to incontestability under 15 U.S.C. § 1115(b),[5] a party can still seek to cancel an

---

[5] Section 1115(b) enumerates the following defenses relating to incontestability:

(1) That the registration or the incontestable right to use the mark was obtained fraudulently; or

(2) That the mark has been abandoned by the registrant; or

(3) That the registered mark is being used by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the source of the goods or services on or in connection with which the mark is used; or

(4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin; or

(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to (A) the date of constructive use of the mark established pursuant to section 1057(c) of this title, (B) the registration of the mark under this chapter if the application for registration is filed before the effective date of the Trademark Law Revision Act of 1988, or (C) publication of the registered mark under subsection (c) of section 1062 of this title: *Provided, however,* That this defense or defect shall apply only for the area in which such continuous prior use is proved; or

(6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: *Provided, however,* That this defense or defect

incontestable trademark on the grounds of genericness. *See Bulbs 4 E. Side, Inc. v. Ricks*, 199 F. Supp. 3d 1151, 1158 (S.D. Tex. 2016) (citation omitted); *see also* 15 U.S.C. § 1064(3) (providing for cancellation of a registered trademark if "[a]t any . . . if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered").[6]

However, Defendants never pleaded any such defense in the pretrial order or alleged a cancellation counterclaim relating to the Dove Wing Headstock. *See* (Dkt. #472) (pretrial order with no reference by Defendants as to the validity of the Dove Wing Headstock). Nor did Defendants seek an instruction, let alone a jury question, as to the invalidity or cancellation of the Dove Wing Headstock. As a result, Defendants cannot assail the validity of the mark through their post-trial motion here. *See Stephens v. C.I.T. Grp./Equip. Fin., Inc.*, 955 F.2d 1023, 1026 (5th Cir. 1992) (holding defendant waived statute-of-limitations defense when party failed to assert it in trial court proceedings). Because Defendants *did* contest the genericness of the other guitar designs at issue during trial, the Court will consider whether sufficient evidence exists to support the jury's verdict.

---

shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or

(7) That the mark has been or is being used to violate the antitrust laws of the United States; or

(8) That the mark is functional; or

(9) That equitable principles, including laches, estoppel, and acquiescence, are applicable.

15 U.S.C. § 1115(b).

[6] The Court acknowledges that the Lanham Act specifically refers to terms when dealing with genericness. While this may raise the question of whether trademarks featuring product design may be cancelled on grounds of genericness, the Federal Circuit has held that marks with product designs can be cancelled for this reason. *Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322, 1326–27 (Fed. Cir. 1999). The parties agreed that this was a valid ground for cancellation at trial.

### b.   Genericness and Gibson's Other Guitar Shapes

Again, Defendants argue that, as a matter of law, insufficient evidence exists to support the jury's finding that Gibson's Flying V, Explorer, SG, and ES Body Shapes are not generic. But, in advancing their argument, Defendants raise a glaring question: What is the proper test to determine the genericness of the relevant marks?

Defendants advocate the use of the *Seabrook Foods* test to determine genericness, which specifically applies to marks that consist of symbols or designs and was adopted by the U.S. Court of Customs and Patent Appeals in *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977). Two issues arise with this tactic.

First, Defendants never advocated the use of the *Seabrook Foods* test at trial, and its relevant factors were never submitted to the jury. Defendants asked for, and the Court agreed to, the use of the *Abercrombie* test for purposes of the validity instruction to the jury. *See* (Dkt. #433) (Defendants' proposed jury instructions); (Dkt. #492 at pp. 14–19) (instructing jury regarding validity of the relevant marks). More significantly, Defendants never advocated for the *Seabrook Foods* test with regards to their cancellation counterclaims. *See* (Dkt. #492 at pp. 30–31). This distinction is important.

While the *Abercrombie* test classifies marks as (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful to determine if a mark is distinctive, *Abercrombie*, 537 F.2d at 9, the *Seabrook Foods* test differs. Indeed, the *Seabrook Foods* test does not align marks on the same spectrum as *Abercrombie*. Rather, the *Seabrook Foods* test proceeds with a consideration of four factors to determine if a design is arbitrary or distinctive:

> [1] whether it was a "common" basic shape or design, [2] whether it was unique or unusual in a particular field, [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or [4] whether it

was capable of creating a commercial impression distinct from the accompanying words.

*Amazing Spaces*, 608 F.3d at 232 (quoting *Seabrook Foods*, 568 F.2d at 1344).

Juxtaposing the *Seabrook Foods* and *Abercrombie* tests quickly reveals their differences. Yet, inexplicably, Defendants seek to overturn the jury's findings of genericness using a completely different test than the one used in the jury instructions. Even stranger, Defendants never argue that the Court erred in its instructions at trial; they simply want a different test utilized for the purposes of their post-trial motion.

The second problem for Defendants—and the one more damning for them—is the fact that the *Seabrook Foods* test does not equate to a finding of genericness. The *Seabrook Foods* factors answer a different question than the one posed by Defendants. The *Seabrook Foods* test addresses "the question [of] whether a mark's 'intrinsic nature serves to identify a particular source,'" not the question of whether an asserted mark is generic. *Amazing Spaces*, 608 F.3d at 244 (cleaned up) (quoting *Wal-Mart Stores*, 529 U.S. at 210); *see also Seabrook Foods*, 568 F.2d at 1344 (stating that court looks to four different factors in "determining *whether a design is arbitrary or distinctive*") (emphasis added). In other words, it resolves a broader inquiry than Defendants believe; more specifically, whether a party must show secondary meaning due to a lack of inherent distinctiveness. *See Amazing Spaces*, 608 F.3d at 244. Defendants, however, contort the test and somehow believe the inquiry goes as follows: if a mark does not meet the four-factor test, then it is generic. But, as explained, the *Seabrook Foods* test does not look towards genericness, and it does not spit out a finding of genericness upon its failure. *See id.*

The Fifth Circuit's decision in *Amazing Spaces* is instructive here. *Id.* at 243–50. In *Amazing Spaces*, the court grappled with whether to apply the *Abercrombie* or *Seabrook Foods* test in relation to a certain asserted mark—opting for the latter. *Id.* at 243–47. After finding that

the asserted mark was not inherently distinctive under *Seabrook Foods*'s factors, the court then proceeded to analyze whether the mark had acquired distinctiveness through secondary meaning. *Id.* at 247–50. Thus, the Fifth Circuit implicitly recognized that the *Seabrook Foods* test does not equate to a finding of genericness. *See id.* If Defendants' view were correct, the Fifth Circuit would have no reason to analyze secondary meaning because the asserted mark would be unprotectable as a matter of law. *See id.* at 241–42 (citation omitted) ("[D]escriptive marks may be protected upon a showing of acquired or secondary meaning, while generic marks may never acquire secondary meaning and are categorically excluded from protection."). But the Fifth Circuit did not do so.

The Court goes to great lengths to explain the flaws in Defendants' argument because they have important ramifications on the appropriate analysis here. For example, it appears that Defendants conflate the doctrines of genericness and inherent distinctiveness, but the two are not interchangeable. Genericness involves a more discrete inquiry. And this is important because three of the relevant marks (the Flying V, Explorer, and SG Body Shapes) have incontestable registrations, which impacts the secondary-meaning analysis. *See Park 'N Fly*, 469 U.S. 189, 201–05 (holding incontestable registrations cannot be challenged for lacking secondary meaning). Lastly, the Court has serious reservations about applying the *Seabrook Foods* test because the jury was not instructed on the test, nor did Defendants advocate for its use at trial.[7] Facing these issues, the Court is unpersuaded that the *Seabrook Foods* test should apply to the genericness inquiry here.

---

[7] Typically, a party waives the argument that a different legal standard should have applied if the party did not urge the standard's application before the case was sent to the jury. *Coll. Network, Inc. v. Moore Educ. Publishers, Inc.*, 378 F. App'x 403, 414 (5th Cir. 2010) (citing *Hobbs v. Alcoa, Inc.*, 501 F.3d 395, 397 (5th Cir. 2007)) ("Because TCN did not urge the Ninth Circuit test before the case was sent to the jury, it has waived any argument that the test should be applied.").

Ordinarily, the "test for genericness is whether the public perceives the term primarily as the designation of the article." *Nola Spice Designs*, 783 F.3d at 538 (internal quotation marks omitted) (quoting *Soc'y of Fin. Exam'rs v. Nat'l Ass'n of Certified Fraud Exam'rs Inc.*, 41 F.3d 223, 227 (5th Cir. 1995)). The Fifth Circuit has further explained, "A generic term connotes the basic nature of articles or services rather than the more individualized characteristics of a particular product. Such terms as aspirin and cellophane have been held generic and therefore unprotectable as trademarks." *Amazing Spaces*, 608 F.3d at 241 (cleaned up) (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004)).

One quickly discerns that trademarks featuring product designs or shapes fail to fall neatly into the genericness test since it primarily deals with word marks. *Berg v. Symons*, 393 F. Supp. 2d 525, 555 (S.D. Tex. 2005) (recognizing that genericness "usually describes a bar to trademark status of a word"). As a result, courts have often applied a modified version of the genericness test to evaluate product designs. *See id.*; *see also Big Island Candies, Inc. v. Cookie Corner*, 269 F. Supp. 2d 1236, 1239–40 (D. Haw. 2003) (discussing applicability of genericness test to product design and shapes). Courts consider whether the design "is so common in the industry that it is incapable of serving to identify any one particular source." *Berg*, 393 F. Supp. 2d at 555; *see also Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 364 (S.D.N.Y. 2003) (holding product design was generic and citing evidence that "animal-shaped gummy candy is common in the candy industry"); *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 687 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012) (rejecting claim of genericness with regards to plaintiff's trademark on red-wax seal because there was insufficient evidence showing that "red dripping wax was an ordinary or even widespread indicator for distilled spirits").

19

Commonality helps decide the touchstone inquiry to genericness, that is, whether the trademark "fails to serve as an indicator of source . . . ." *Sunrise Jewelry Mfg. Corp.*, 175 F.3d at 1326–27; *accord Berg*, 393 F. Supp. 2d at 555; *Malaco Leaf*, 287 F. Supp. 2d at 364.

In line with these principles, the Court submitted Defendants' cancellation counterclaims and instructed the jury that "a trademark may become generic over time due to widespread third-party use and loss of its source-identifying ability over time" (Dkt. #492 at p. 31). Upon reviewing this instruction, it is seemingly in line with how courts treat genericness in the context of product design. Accordingly, the Court sees no reason to stray from this standard in evaluating Defendants' evidentiary arguments here.

Genericness is a question of fact. *Soc'y of Fin. Exam'rs*, 41 F.3d at 225 (citing A*m. Auto. Ass'n (Inc.) v. AAA Legal Clinic of Jefferson Crooke, P.C.*, 930 F.2d 1117, 1121 (5th Cir. 1991)). Defendants maintain that the Court should disregard the jury's verdict on noncancellation because the evidence clearly supports a finding of genericness. Specifically, they argue that a plethora of evidence was introduced showing other companies produced guitars similar to the relevant trademarked designs, such that consumers no longer associate Gibson's guitar shapes with Gibson.

First, commonality alone does not *ipso facto* prove genericness. *See Malaco Leaf*, 287 F. Supp. 2d at 364 (finding widespread third-party use *supported* finding of genericness) (emphasis added). Instead, commonality can help support a genericness finding when it shows that consumers no longer associate a certain design with a particular source. *See id.*; *see also Sunrise Jewelry Mfg. Corp.*, 175 F.3d at 1326–27. True, Defendants offered evidence that other companies sell guitars that look like the relevant shapes. But the introduction of similar guitars into the marketplace does not mean Defendants should have prevailed on their cancellation counterclaims—the critical question is whether there was evidence of so many similar guitars in the marketplace that

20

consumers no longer identify Gibson as the source of its products. *See Sunrise Jewelry Mfg. Corp.*, 175 F.3d at 1326–27.

To clear that hurdle, Defendants cite the testimony of two witnesses, Gibson's expert Jason Davidson ("Davidson") and Defendants' expert Dr. Hal Poret ("Poret"), for the proposition that the evidence undermines the jury's finding that the guitar shapes are not generic. On cross-examination, Defendants showed multiple pictures of non-Gibson guitars to Davidson and asked him to confirm they were not produced by Gibson (Dkt. #507 at p. 713). Davidson answered that he "[could not] say for certain on all of them, but for the most part that [is] true," further elaborating that he would need to see the headstocks and other identifying features to verify that they were produced by non-Gibson companies (Dkt. #507 at p. 713). For Poret, Defendants emphasize testimony where Poret summarized the findings of a confusion survey he undertook. *See* (Dkt. #524 at pp. 2274–82). Poret presented pictures of several DEAN/LUNA guitars to survey participants and asked several questions including, (1) what company made a specific guitar, (2) whether the guitar was associated with another company, and (3) whether the guitar was affiliated with another company (Dkt. #524 at pp. 2281–84). Based on his survey, Poret opined that significant confusion did not exist between the relevant designs, and customers did not associate the DEAN/LUNA guitars with Gibson (Dkt. #524 at pp. 2284–85). Defendants argue that the jury could not have possibly sided with Gibson in light of this evidence, particularly when Gibson's own expert stated he would need to see other identifying features to verify if a guitar was produced by Gibson.

If this were the only evidence on the genericness issue, and it went uncontradicted, the Court might be inclined to find in Defendants' favor. But that was not the case. Gibson vigorously challenged the reliability of Poret's study, and the jury could have discarded it altogether. Other

witnesses also testified that consumers associate Gibson's guitar shapes with its brand because they are famous designs. *See generally* (Dkt. #511 at pp. 935–954). Most importantly, at least one witness in this case specifically testified that Gibson's trademarks are not generic. Dr. Eugene Ericksen ("Ericksen") conducted a genericness survey on Gibson's behalf, and his deposition testimony was played for the jury (Dkt. #507 at pp. 781, 816). After conducting his study, Ericksen concluded that the SG, ES, Explorer, and Flying V Body Shapes were not generic because consumers associated the designs with one company (Dkt. #507 at pp. 782–783, 815–817). From this testimony, the jury could have found that designs were not generic or even disregarded Defendants' evidence altogether. At the very least, the Court does not believe this to be a situation where it must overturn the jury's verdict based on insufficient evidence.[8]

Given the evidentiary arguments made by Defendants, it is critical to note that the Court must only overturn the jury's verdict if there is legally insufficient evidence to support the jury's findings. In light of the contradictory evidence, Defendants essentially ask the Court to assign much greater value to their evidence instead of Gibson's; it declines to do so, such determinations are for the jury and not the Court. *See Olibas v. Barclay*, 838 F.3d 442, 450 (5th Cir. 2016) (quoting *Dalton v. Toyota Motor Sales, Inc.*, 703 F.2d 137, 140 (5th Cir. 1983)) ("The jury's function 'as

---

[8] Defendants cite another district court case involving Gibson for the proposition that guitar body shapes and headstocks cannot serve as source identifiers. *Gibson Brands, Inc. v. John Hornby Skewes & Co. Ltd.*, No. CV-14-00609-DDP-SSX, 2016 WL 7479317, at *7 (C.D. Cal. Dec. 29, 2016). However, the district court in *Gibson Brands* did not hold that. *Id.* Rather, it held, "To the extent that Gibson allegedly relies on its body shape and headstock shape as a source identifier, no rational jury could find that a particular body shape or headstock stamped with a different guitar brand is a *counterfeit of a Gibson trademark*." *Id.* (emphasis added). Significantly, the court reasoned that the defendant's brand name on its relevant guitars belied any claim by Gibson that defendant's guitar shapes were "identical" to, or "substantially indistinguishable from," Gibson's shapes/headstocks for the purposes of a *counterfeiting claim* under the Lanham Act. *Id.* In particular, the *Gibson Brands* court worried that allowing a counterfeiting claim under those facts "would risk rendering 'all trademark infringement claims . . . counterfeiting claims.'" *Id.* (quoting *Adams v. Grand Slam Club/Ovis*, No. 12-CV-2938-WJM-BNB, 2013 WL 1444335, at *7 (D. Colo. Apr. 9, 2013)). Therefore, *Gibson Brands* does not support Defendants' assertion and has little probative value as to the genericness issue here. *See id.*

the traditional finder of facts' is to 'weigh conflicting evidence and inferences and determine the credibility of witnesses.'"). As such, the Court will not overturn the jury's verdict.

Having found sufficient evidence to support the jury's findings on genericness, Defendants' only remaining arguments regarding the validity of the relevant marks are that they lack inherent distinctiveness and have not acquired secondary meaning. The Court will proceed to analyze these arguments as to each mark.

### ii.    Validity of Gibson's Marks

Even if a mark survives a genericness challenge, it still may have no legal protection. *See Amazing Spaces*, 608 F.3d at 240–50 (noting design was not generic but still lacked legal protection due to lack of secondary meaning). Thus, a plaintiff suing for trademark infringement still must show it has a valid trademark by showing the relevant design (or word or symbol) is "distinctive," which can be done by showing the relevant design is inherently distinctive or has acquired secondary meaning. *See id.* at 236–37. Defendants take the position that Gibson failed to prove its guitar shapes were inherently distinctive or that they had acquired secondary meaning. And, accordingly, they are entitled to judgment as a matter of law or a new trial.

To the extent Defendants argue they are entitled to judgment as a matter of law, it is questionable if Defendants can bring this argument because they never moved for judgment as a matter of law on this point. *See* (Dkt. #524 at pp. 2129–32). In fact, Defendants only moved for judgment as a matter of law on their cancellation counterclaims—not the validity of the marks in question (Dkt. #524 at p. 2130) ("[T]he evidence shows that the asserted guitar shapes are generic and should be unprotect[able] and the registrations . . . should be canceled on the ground that they are . . . generic . . . . They are classically generic and should be entitled to no trademark protection.").

Motions under Rule 50(b) are "only a renewal" of a party's original motion for judgment as a matter of law at trial. *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 290 (5th Cir. 2019) (internal quotation marks omitted) (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 172 (5th Cir. 1985)). Accordingly, parties may not use "a Rule 50(b) motion to 'assert a ground that was not included in the original motion.'" *Id.* (internal brackets omitted) (quoting *Mozingo*, 752 F.2d at 172). Because Defendants did not raise arguments on the lack of secondary meaning for the relevant guitar designs, they normally would not be entitled to judgment as a matter of law to that effect. *See id.* However, the Court will entertain Defendants' arguments here because they have moved for a new trial as well. Nonetheless, the record supports the jury's verdict that Gibson has valid marks.

### a.   The Dove Wing Headstock

As stated above, Defendants did not challenge the Dove Wing Headstock's lack of validity at trial. However, Gibson still generally had the burden to prove the headstock is a valid mark. *Perry*, 994 F.3d at 471. Because the Dove Wing Headstock had an incontestable registration, the jury was instructed that Gibson conclusively proved the headstock's validity—a point the parties agreed upon. *See Perry*, 994 F.3d at 471 (holding that because plaintiff demonstrated incontestable registration, "plaintiff has conclusive evidence that he owns a valid trademark"). Therefore, the Dove Wing Headstock is a valid mark.[9]

### b.   The SG Body Shape

Gibson also established that the SG Body Shape is distinctive. The mark obtained an incontestable registration, so it is conclusively valid and has secondary meaning. *See id.*

---

[9] Defendants never contested the validity of the Headstock on the basis that laches affects the conclusive presumption afforded to an incontestable mark.

Defendants argue that the SG design must be analyzed for secondary meaning because "the record is devoid of any evidence that Plaintiff has done anything to support, bolster, or provide any substantiation for that mark . . ." (Dkt. #561 at p. 35). Even assuming that Defendants accurately summarized the record on this point, Defendants cite no legal authority to support their argument that Gibson must still prove secondary meaning. Moreover, this argument cuts against the bright-line rule adopted in *Park 'N Fly* where the Supreme Court specifically held that marks with incontestable registrations cannot be challenged for lack of secondary meaning. *See Park 'N Fly*, 469 U.S. at 205; McCarthy, *supra*, § 32.148 ("There is no doubt that the status of an incontestable registration prevents a challenge to the validity of the mark based on an argument that the mark is not inherently distinctive and lacks secondary meaning. This is the rule of the *Park 'N Fly* case."). Thus, Defendants' argument is without merit.

### c.  The Flying V and Explorer Shapes

The analysis for the Flying V and Explorer designs proves more difficult. While both guitar shapes have incontestable registrations, the jury was not instructed that Gibson conclusively proved the trademarks' validity based on the evidence in this case.[10] *Cf. Perry*, 994 F.3d at 471 (citations omitted) ("Once a mark becomes incontestable, its federal registration constitutes *conclusive* evidence of its validity . . . ."). Although the Court noted the conclusive effect normally afforded to incontestable registrations, it instructed the jury that it might have to find secondary meaning under certain circumstances (Dkt. #492 at pp. 14–15). Namely, the jury would need to find secondary meaning if "Armadillo (including its predecessors) first used its Dean V and Dean Z body shapes before Gibson received its federal trademark registrations in 1997 for the Flying V Body Shape Design and Explorer Body Shape Design . . ." (Dkt. #492 at pp. 14–15). If the jury

---

[10] Once more, Defendants did not argue their laches defense affected the validity of the marks at trial, nor do they do so in their current motion.

found that Armadillo *did* use its shapes prior to Gibson's registrations, the jury would need to find the Flying V and Explorer designs attained secondary meaning "as of the date [the jury] determined that Armadillo first used its Dean V and Dean Z body shapes" in order to find that Gibson had valid trademarks (Dkt. #492 at p. 15).

This instruction was submitted based on the evidence presented in the case and the Federal Circuit's decision in *Converse, Inc. v. International Trade Commission Skechers U.S.A., Inc.*, 909 F.3d 1110, 1115–19 (Fed. Cir. 2018). In *Converse*, the Federal Circuit held that a federal registration and its accompanying presumption of validity "operate only prospectively from the date of registration" with the USPTO. *Id.* at 1117. Therefore, a party with a federal registration cannot rely on the statutory presumption of validity if a defendant's infringement began *before* registration. *Id.* Instead, the party suing for infringement must establish that its product had secondary meaning prior to the alleged infringement.[11] *Id.* The *Converse* decision reflects the traditional rule in trade dress law that a plaintiff must show the relevant product design attained secondary meaning before a defendant's alleged infringement began. *Id.*; *see also Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 826 (Fed. Cir. 1992); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980). Since Defendants presented some evidence that Armadillo (or its predecessors) produced similarly shaped guitars before the Flying V and Explorer's registrations, the Court submitted the previous instruction.

Because the jury found that Armadillo infringed on the Flying V and Explorer Body Shapes, it implicitly found the designs are valid trademarks. But the verdict does not reveal the jury's reasoning. Thus, it is unclear whether the jury decided Gibson has valid marks because

---

[11] Defendants miss this aspect of the *Converse* holding and believe Gibson had to establish secondary meaning "after [the marks' registration dates] for those marks to be protectible" (Dkt. #595 at p. 5 n.3). That is not the rule from *Converse* nor what the jury was instructed at trial.

(1) the Flying V and Explorer acquired secondary meaning before Armadillo's infringement or (2) Armadillo's (or its predecessors') infringement did not occur until *after* the marks became incontestable.[12] Assuming the jury found the latter, Defendants would have no recourse because the marks could not be challenged for lack of secondary meaning given their incontestable status. *See Park 'N Fly*, 469 U.S. at 201–05. However, provided the jury found the former, Defendants could challenge the sufficiency of the evidence regarding secondary meaning.

Of course, the "jury is 'free to choose between reasonable constructions of the evidence.'" *Boh Bros. Const. Co.*, 731 F.3d at 452 (quoting *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008)). And here, the jury could reasonably find that Armadillo's infringement did not begin until after Gibson registered the Flying V and Explorer marks in 1997. Accordingly, Gibson did not need to prove secondary meaning in the Flying V and Explorer designs prior to this date.

Throughout their briefing, Defendants argue that the jury had to find secondary meaning because Armadillo actively sold its Dean V and Dean Z guitars in 1996. *See* (Dkt. #561 at p. 35 n.14) ("Dean Guitars (now as part of Armadillo) has continuously offered and sold DEAN branded Dean V and Dean Z guitars with body shapes identical to those released in 1977 from at least 1996 to the present."). But Armadillo CEO Evan Rubinson testified that his company started "manufacturing" its Dean V and Dean Z guitars "in late [1995], early 1996" (Dkt. #512 at p. 1279). He did not mention when Armadillo actually started selling its guitars in the marketplace. This distinction is important here because the mere reproduction of a mark, alone, is often insufficient to find infringement. *See Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 532 (5th Cir. 2012) (cleaned up and citation omitted) ("The mere reproduction of a trademark does not

---

[12] In their briefing, the parties disagree whether the evidence showed that Armadillo or its predecessors sold guitars before the registrations.

constitute trademark infringement if there is no likelihood of confusion."); *see also Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 376 (4th Cir. 1999) (quoting *Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F. Supp. 198, 217–18 (D. Md. 1988)) ("Thus, in contrast to copyright infringement, 'mere reproduction' of a trade dress 'is not an infringement.'"). Infringement lies where an infringer's actions create a likelihood of confusion among potential consumers. *See Nat'l Bus. Forms & Printing*, 671 F.3d at 532.

Conversely, Gibson offered evidence that Armadillo's infringement did not begin until 1997. Gibson played video evidence of Elliot Rubinson, Armadillo's founder, discussing the history of his company at a conference for the National Association of Music Merchants. *See* (Dkt. #512 at p. 1237). In that video, Elliot Rubinson stated that he originally purchased the logo for Dean Guitars and a design unrelated to the Flying V or Explorer shapes in 1997 (Dkt. #512 at pp. 1385–87). Furthermore, Elliot Rubinson also said the Dean Guitars brand was "dormant" until 1997, and he essentially revived the brand at that time (Dkt. #512 at p. 1385).

Accounting for the evidence, the jury could reasonably find that Armadillo did not infringe on Gibson's designs until after Gibson registered its marks. Therefore, Gibson had no obligation to prove secondary meaning for the Explorer and Flying V designs. *See Park 'N Fly*, 469 U.S. at 201–05 (holding incontestable registrations cannot be challenged for being descriptive and lacking secondary meaning). Such a finding would be a reasonable construction of the evidence between the two alternatives the jury was given, and the Court will not second guess a potential basis for the jury's decision. *See Boh Bros. Const. Co.*, 731 F.3d at 452. The evidence supports Gibson having valid marks in its Explorer and Flying V designs.

As a final point, an issue raised by the parties' briefing must be addressed—even if Defendants do not expressly touch on the issue themselves. In their pending motion, Defendants

have not urged the Court to treat Dean Guitars's original sales of the Dean V and Dean Z in 1977 as the date of first infringement. Defendants also have not argued that the Court should treat Tropical Music, another company associated with the Dean Guitars brand, as a predecessor-in-interest to Armadillo or that Tropical Music's sales should be attributed as the date of first infringement. Typically, the Court would not address arguments that a party fails to raise in a motion. But, given the arguments' importance in this case, the Court will emphasize a few critical points here.

The Court acknowledges, for example, that Dean Zelinsky and his company, Dean Guitars, first produced models similar, if not identical, to Armadillo's Dean V and Dean Z guitars in 1977. However, Defendants have not asked the Court to treat Dean Zelinsky's company as a predecessor-in-interest at trial or in their motion here. In any event, the record is far from clear on whether it would be proper to do so. Evan Rubinson testified at one point that Dean Zelinsky "sold his business and brand" to Oscar Mederos who operated Tropical Music in the 1990s (Dkt. #512 at p. 1370). Then, Evan Rubinson elaborated that his companies, Armadillo and Concordia, "did not buy Tropical Music" from Oscar Mederos (Dkt. #512 at p. 1371). On top of this, Evan Rubinson never definitively stated whether Armadillo (or Concordia) merely purchased the *brand name* Dean Guitars, or whether Defendants acquired the entire Dean business. *Compare* (Dkt. #512 at p. 1229) (stating that his father "bought the Dean brand in 1995"), *with* (Dkt. #512 at p. 1279) ("[M]y father . . . purchased the Dean business and the Dean brand . . . ."). This inconsistent messaging remains present in Defendants' briefing as well.[13] In other words, the Court is left guessing on if Defendants actually acquired the rights to use the Dean V and Dean Z guitars or if

---

[13] In one sentence, Defendants assert that, "[i]n 1995, the DEAN brand was purchased by Elliot Rubinson," and then just one sentence later, they state that "Elliot Rubinson purchased the DEAN brand and business . . . ." (Dkt. #561 at p. 49).

Defendants simply attached the brand name "Dean Guitars" to its own imitations of guitar shapes that previously entered the marketplace. Based on this record, an ownership chain linking Defendants with either Dean Zelinsky's company or Tropical Music is far from certain.

Furthermore, the Court has not found a single case, and Defendants have cited none, where a defendant successfully tacked its date of first infringement to that of another company's without a showing that the latter company was a predecessor-in-interest. Similarly, the Court cannot find a case where a defendant successfully tacked its own infringement onto that of another company's when the defendant essentially restarted production on an infringing product.

In short, the details are nebulous—at best—on what interest Defendants actually acquired in Dean Guitars. And the case law is equally ambiguous on what should be done here. The Court will not wade into these murky waters and declare certain companies as predecessors-in-interest, or that another date could qualify as the date of first infringement, when Defendants never ask the Court to do so. As stated previously, the jury was free to conclude from the evidence that Armadillo's infringement did not begin until after the relevant marks were registered. The marks cannot be assailed for lacking secondary meaning now due to their incontestability. Therefore, Gibson has valid marks.

### d.   The ES Body Shape

Next, Defendants contend the jury unreasonably concluded the ES Body Shape acquired secondary meaning. Therefore, Defendants claim they are entitled to judgment as a matter of law, or alternatively, a new trial regarding the ES Body Shape's lack of secondary meaning.

Because the ES Shape is only registered on the USTPO's Supplemental Register, Gibson had no presumption that its design was valid. *See T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 909 (S.D. Tex. 2014); *see also ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1288 (Fed. Cir. 2010) (citations omitted) ("Federal registration on the Principal

Register provides a presumption of the mark's validity . . . Registration of a mark on the Supplemental Register, however, does not."). Thus, Gibson carried the burden of demonstrating secondary meaning in the ES Shape. *See Wal-Mart Stores*, 529 U.S. at 216 (holding that a product's design is distinctive only upon a showing of secondary meaning).

"Secondary meaning occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008) (cleaned up) (quoting *Wal-Mart Stores*, 529 U.S. at 211). On the whole, the secondary-meaning inquiry is an empirical one that examines whether a trademark has been altered in the minds of consumers. *Amazing Spaces*, 608 F.3d at 248 (citations omitted). Typically, the "burden of demonstrating secondary meaning 'is substantial and requires a high degree of proof.'" *Nola Spice Designs*, 783 F.3d at 544 (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 567 (5th Cir. 2005)). At bottom, however, "secondary meaning in a question of fact," unless the record compels a finding that the relevant product design failed to acquire secondary finding. *Id.* (citations omitted). The Fifth Circuit considers seven factors to determine secondary meaning:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress or mark.

*Id.* (internal brackets omitted) (quoting *Amazing Spaces*, 608 F.3d at 248). No factor alone proves secondary meaning, but "in combination they may establish the necessary link in the minds of consumers between a product and its source." *Id.* (internal quotation marks and citation omitted).

With *Converse* serving as a guide, the Court instructed the jury that it must find that Gibson's ES Body Shape acquired secondary meaning before Armadillo first used its LUNA Athena 501 Guitar—the guitar that allegedly infringed the ES Body Shape (Dkt. #492 at p. 17).

31

*See also Converse*, 909 F.3d at 1117 (holding party must prove design acquired secondary meaning before first infringement). Unequivocally, the record shows that the LUNA Athena 501 was released into the marketplace in 2010. *See* (Dkt. #512 at p. 1299); *see also* (Dkt. #526 at p. 2546) (Gibson's counsel acknowledging 2010 as relevant date). Thus, the jury had to find the ES Shape acquired secondary meaning before that year. Affording deference to the jury's verdict, the Court finds there was sufficient evidence demonstrating the ES design has secondary meaning.

As to the first factor, the length and manner of the use of the mark, Defendants concede this factor favors a finding of secondary meaning. Gibson used the ES Shape for over fifty years before the LUNA Athena 501, suggesting that the shape had secondary meaning. *See Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1086–87 (7th Cir. 1988) (holding use of mark for fifty years was strong indication of secondary meaning), *abrogated on other grounds by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020). Time alone is often not a strong indicator of secondary meaning, *see Nola Spice Designs*, 783 F.2d at 544, but case law often deals with periods far shorter than fifty years. *Cf. Amazing Spaces*, 608 F.3d at 248 (holding absence of secondary meaning despite use of mark for ten years); *Bank of Tex. v. Commerce Sw., Inc.*, 741 F.2d 785, 788 (5th Cir. 1984) (holding absence of secondary meaning despite use of mark for nine years). Furthermore, this was not the only factor that Gibson showed favorable evidence on.

On the volume of sales factor, Gibson produced sales records relating to its ES guitars dating back to 2011. Revenue for Gibson's ES guitars totaled over $13 million in 2011 alone. The magnitude of sales here also supports a finding of secondary meaning. *Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings LLC*, 434 F. Supp. 3d 473, 484–85 (E.D. Tex. 2020) (finding revenues over three and four million dollars supported secondary meaning). Though

Gibson had no sales figures before 2011, the jury was free to conclude that the sales volumes would likely be similar leading up to 2010, and it could reasonably find in Gibson's favor on this point. *See Can't Live Without It, LLC v. ETS Express, Inc.*, 373 F. Supp. 3d 434, 442–43 (S.D.N.Y. 2018) (allowing jury to examine evidence of sales after defendant entered market to determine if secondary meaning existed).

The fourth factor for secondary meaning looks to the nature of the use of the mark or trade dress in newspapers and magazines. *Nola Spice Designs*, 783 F.3d at 544. This factor can be "properly understood as referring to the use of the mark in the media generally." *T-Mobile US*, 991 F. Supp. 2d at 905. Again, Gibson produced evidence on this factor as well. For instance, Gibson elicited evidence that special-interest books have been written about its guitars, *see generally* (Dkt. #517 at p. 2027), and the ES Body Shape had been featured in publications, television shows, and films. *See, e.g.*, (Dkt. #505 at pp. 325–415). The record reflects that there was favorable evidence on this factor as well.

Lastly, in terms of advertisements, Gibson put on evidence for this factor as well. From 2011 to the present, Gibson averaged $20 million annually in advertising spending. While "spending substantial amounts of money" does not create a mark in and of itself, these extensive efforts can guide a secondary-meaning inquiry if the advertising shows "an effectiveness in altering the meaning of the mark to the consuming public." *Nola Spice Designs*, 783 F.3d at 544–45 (cleaned up) (citations omitted). And the record shows that to be the case. Specifically, Gibson has prominently advertised its guitars, including the ES Shape, at trade shows, in magazines, and through other media channels. Furthermore, Gibson has signed exclusive licensing agreements with certain musicians to use their products in an effort to gain notoriety. Coupling these advertising efforts with the successful revenue associated with the ES Shape, the jury could have

reasonably concluded that Gibson's marketing and advertising efforts demonstrated secondary meaning. *See Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 191 (5th Cir. 2018) ("The effectiveness of this advertising is evident from the success of product sales . . . .").

While Defendants insist the jury's finding was erroneous, the record simply does not show that to be the case. Evidence existed on at least four of the secondary-meaning factors in this case, and it was a triable issue of fact for the jury to determine whether Gibson's ES Shape acquired secondary meaning. The Court cannot say the jury's finding was erroneous or against the great weight of the evidence. For example, in *Viacom International*, the Fifth Circuit held that a trademark acquired secondary meaning as a matter of law when the four factors enumerated above weighed in favor of secondary meaning. *Id.* at 191. The Court does not even go as far as to say that is the case here; rather, the jury could reasonably conclude that secondary meaning existed based on the evidence.

Defendants contend that the jury could not find secondary meaning because Gibson failed to produce consumer-survey evidence or direct consumer testimony. For this proposition, they cite the Fifth Circuit's decision in *Unified Buddhist Church of Vietnam v. Unified Buddhist Church of Vietnam*, 838 F. App'x 809, 814 (5th Cir. 2020). But this argument is unavailing because *Unified Buddhist Church of Vietnam* is distinguishable. In that case, the Fifth Circuit determined that an asserted mark had not acquired secondary meaning because only one factor, continued use of the asserted mark, weighed in favor of secondary meaning. *Id.* at 814. Thus, *Unified Buddhist Church of Vietnam* stands in opposition to the case at hand where multiple factors support a finding of secondary meaning. To be sure, the Fifth Circuit did highlight the importance of consumer-survey evidence and reaffirmed its position that consumer surveys are "the most direct and persuasive way of establishing secondary meaning." *Id.* (internal quotation marks omitted) (quoting *Amazing*

*Spaces*, 608 F.3d at 248). But the Fifth Circuit has never required consumer surveys in the secondary-meaning context. In *Viacom International*, for example, the plaintiff failed to introduce direct consumer testimony or a consumer survey. 891 F.3d at 191. Yet, the Fifth Circuit still found secondary meaning as a matter of law. *Id.*

Like *Viacom International*, Gibson presented favorable evidence on the other secondary-meaning factors in this case. *See id.* As such, the Court does not find the jury's verdict to be against the great weight of the evidence or clearly erroneous whatsoever. The jury did not err in finding the ES Body Shape was a valid mark.[14]

### B. Lack of Evidence Regarding the Jury's Finding of Confusion

The Court turns to Defendants' arguments for why the jury could not possibly find trademark infringement or counterfeiting in this case. Defendants argue that the jury's finding was clearly erroneous, or at least against the great weight of the evidence, because the evidence does not demonstrate a likelihood of confusion between Gibson's and Defendants' relevant guitar shapes.[15]

---

[14] While not mentioned in the analysis here, Ericksen's study also may be helpful in finding secondary meaning. At the conclusion of his study, Ericksen testified that over fifty percent of consumers identified the ES Shape as a "brand shape" (Dkt. #507 at p. 844). Ericksen did not inquire which brand the mark was identified with, but it is unclear whether he would need to do so. For the purposes of secondary meaning, courts routinely have mentioned that the buyer must be looking for "some symbol which he thinks identifies a single, albeit anonymous source." *Bd. of Supervisors of LA State Univ. v. Smack Apparel Co.*, 438 F. Supp. 2d 653, 657 (E.D. La. 2006) (internal quotation marks omitted) (citation omitted) *aff'd sub nom. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465 (5th Cir. 2008); *accord Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1203 (Fed. Cir. 1994); *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995). The Court does not rely upon Ericksen's study here, however, because other factors support the jury's finding. Furthermore, the relevance of Ericksen's study is diminished by the fact that the relevant date of infringement was well before the study took place.

[15] Though Defendants briefly mention the jury's infringement and counterfeiting findings on the HUMMINGBIRD word mark, they do not actually argue that there could be no likelihood of confusion for this mark. Instead, they focus the entirety of their argument on the guitar shapes in this case. *See* (Dkt. #561 at pp. 13–22); *see also* (Dkt. #561 at p. 22) ("Applied properly, the Digits Factors test establishes that no reasonable juror could have found confusion, and that Armadillo and Concordia are consequently entitled to a judgment that they neither infringed nor counterfeited *any of the guitar shapes at issue as a matter of law*.") (emphasis added). Because Defendants did not adequately brief the confusion issue for the HUMMINGBIRD word mark, the Court does not address the jury's findings.

Trademark infringement claims require a plaintiff to prove (1) ownership in a valid trademark and (2) that infringement occurred due to a likelihood of confusion. *Smack Apparel Co.*, 550 F.3d at 474 (citation omitted).[16] A likelihood of confusion exists when "the defendant's use of the mark 'creates a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship' of the product at issue.'" *Id.* at 478 (cleaned up) (quoting *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663 (5th Cir. 2000)); *see also* 15 U.S.C. § 1125(a)(1)(A). Likelihood of confusion is a question of fact. *Id.* at 474.

In determining likelihood of confusion, the "digits of confusion" are considered, which include "(1) strength of the mark; (2) mark similarity; (3) product or service similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers." *All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 508 (5th Cir. 2018) (citations omitted). The digits of confusion are non-exhaustive and should be flexibly applied. *Springboards To Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 805, 812 (5th Cir. 2019). For that reason, "a finding of a likelihood of confusion does not even require a positive finding on a majority" of the digits of confusion. *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) (citing *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)).

Contextualizing Gibson's case is important here. Gibson does not necessarily claim that consumers believe they are buying a Gibson guitar every time a person purchases Defendants' products. Instead, Gibson brought its claims for trademark infringement, at least in part, on a theory that consumers may be confused as to the approval, affiliation, or sponsorship of the infringing

---

[16] The likelihood-of-confusion analysis under federal law is applicable to Texas law as well. *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 637 (N.D. Tex. 2009) (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998) ("A determination of a likelihood of confusion under federal law is sufficient to prove trademark infringement under Texas law."); *see also Amazing Spaces*, 608 F.3d at 235 n.7.

guitars. In other words, consumers may think the infringing guitars were associated, sponsored by, or affiliated with Gibson, when they actually were not. *See Smack Apparel Co.*, 550 F.3d at 478; 15 U.S.C. § 1125(a)(1)(A) (allowing claims for trademark infringement where defendant's use "is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods . . . .").

After reviewing the record, the jury's verdict on infringement will go undisturbed. At bottom, Defendants have essentially conceded four of the digits in this case but argue the other digits should be given more weight here. But that is contrary to relevant law. *See Elvis Presley Enters.*, 141 F.3d at 194. There is sufficient evidence to support the jury's verdict that a likelihood of confusion exists.

### i.   Type of Trademark

The first digit of confusion, the type of trademark, "refers to the strength of the senior mark." *Id.* at 478–79 (citing *Elvis Presley Enters.*, 141 F.3d at 201). If the senior mark is strong, there is a greater chance that a likelihood of confusion exists. *Id.* at 479. Here, "[t]wo separate considerations are relevant—the conceptual strength and the commercial strength of the mark." *Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*, 397 F. Supp. 3d 847, 860 (N.D. Tex. 2019); *see also Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 290 (5th Cir. 2020) (citation omitted) (explaining the two relevant determinations for strength of the mark).

Conceptual strength focuses on the distinctiveness of the mark and seeks to place marks on the *Abercrombie* spectrum—the same test mentioned above. *Future Proof Brands*, 982 F.3d at 290. The *Abercrombie* test differs in its strength inquiry, though, because "suggestive marks do not always make the cut." *Id.* Furthermore, even a mark's placement on the spectrum may be inconclusive. *Id.* As the Fifth Circuit has explained, descriptive marks can become strong through "vigorous promotion," and arbitrary marks that are "not well known in the market" can be weak. *Id.* (internal quotation marks omitted) (citation omitted). But, as noted above, the *Abercrombie* test

is extremely difficult to apply to marks featuring product designs or shapes. *See, e.g.*, McCarthy, *supra*, § 11.2 ("The spectrum of descriptive, suggestive, arbitrary, and fanciful was created to categorize word marks. It is not suitable for non-word designations, such as shapes and images, and trade dress such as package and product design.").

Meanwhile, commercial strength considers the standing of the mark in the marketplace. *Am. Rice*, 518 F.3d at 330. On this consideration, relevant factors include the length and manner of the mark's use, the volume of sales associated with the mark, the amount and manner of advertising of the mark, consumer-survey evidence regarding market recognition, and third-party use of similar marks. *Firebirds Int'l*, 397 F. Supp. 3d at 861–62 (citations omitted).

### a.   ES Body Shape

The Court finds that the first digit of confusion at least strongly supports a likelihood of confusion for the ES Body Shape. The jury's finding that the ES Body Shape has secondary meaning is significant because it means the mark is strong. *See Denbra IP Holdings, LLC v. Thornton*, 521 F. Supp. 3d 677, 687 (E.D. Tex. 2021) (citing *Viacom Int'l*, 891 F.3d at 193) ("A mark that has acquired distinctiveness through secondary meaning weighs in favor of finding a likelihood of confusion under the first digit.").

### b.   Other Guitar Shapes

When it comes to the other guitar designs at issue, their strength is less palpable. For example, Defendants put forth evidence that companies manufacture guitars that feature similar designs to the SG, Flying V, and Explorer Body Shapes, as well as the Dove Wing Headstock. Courts have been cautious to assign strength to marks that are subject to extensive third-party use. *E.g.*, *Springboards*, 912 F.3d at 815 ("Extensive third-party use of a term throughout the market suggests that consumers will not associate the junior mark's use with the senior mark user."). Moreover, while not required to, Gibson did not produce a consumer survey that consumers

associate its marks with its brand, which diminishes Gibson's ability to prove the strength of the relevant marks. *See Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 152 (S.D.N.Y. 2022) (citations omitted) (finding failure to conduct survey showing consumers' association with mark and company to weigh against strength of mark, especially considering the "significant resources" of the company). This was an especially inauspicious decision when Defendants' expert, Hal Poret, testified that consumers do not associate Armadillo's relevant designs with Gibson. *See* (Dkt. #524 at pp. 2270–89).

At the same time, though, the SG Body Shape, Dove Wing Headstock, Flying V Body Shape, and Explorer Body Shape all have incontestable registrations, which suggests strength. *See Am. Rice*, 518 F.3d at 330–31 (finding incontestable registration supported strength of mark). But, "[i]ncontestable status does not make a weak mark strong." *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986). And, broadly speaking, product designs are generally not inherently distinctive. *Wal-Mart Stores*, 529 U.S. at 212 ("It seems to us that design, like color, is not inherently distinctive."). However, the Court cannot overlook the commercial strength of the SG Body Shape, Dove Wing Headstock, Flying V Body Shape, and Explorer Body Shape. Undisputedly, the marks have been a central component of Gibson's business for decades, and the designs have been promoted extensively to the tune of significant commercial success, including millions of dollars in revenue for each shape. In the end, this is circumstantial evidence of the marks' strength, and the record also shows the weaknesses of the relevant marks.

Based on this record, the Court concludes that the record supports a finding that the ES Body Shape is a strong mark. But, for the other relevant marks, the evidence does not point in one direction. In other words, there is a genuine dispute of a material fact as to this digit, and the jury had to consider and weigh the evidence presented by the parties.

### ii.    Similarity of the Marks

"The similarity of the marks in question is determined by comparing the marks' appearance, sound, and meaning." *Elvis Presley Enters.*, 141 F.3d at 188 (citation omitted). The relevant inquiry is "whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association." *Future Proof Brands*, 982 F.3d at 295 (internal quotation marks omitted) (quoting *Xtreme Lashes*, 576 F.3d at 228). In conducting this analysis, courts "give more attention to the dominant features of a mark." *Xtreme Lashes*, 576 F.3d at 228 (citation omitted). And the marks must be considered "in the context that a customer perceives them in the marketplace . . . ." *Id.* (cleaned up) (citations omitted).

Tellingly, Defendants do not dispute that the relevant marks, meaning the relevant guitar shapes, were substantially similar to one another. But they aver this factor *favors them* because the relevant guitars often included house marks, which are product labels that identify the name of a manufacturer. The argument goes that, even if the marks themselves are identical, consumers would not find the marks similar because Defendants' guitars have a "DEAN" or "LUNA" mark on them. Therefore, the jury could not reasonably find this factor weighed in favor of Gibson. And Defendants even suggest that a likelihood of confusion cannot exist at all based on this digit alone.[17]

However, the similarity inquiry hinges, "not on whether the two marks are identical in every respect, but on 'whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two users *are somehow*

---

[17] Again, the Court wants to emphasize that Defendants have not argued that the marks themselves are dissimilar. They focus their arguments here on the notion that the presence of house marks elsewhere on the guitar distinguish the marks at issue.

*associated.*'" *All. for Good Gov't*, 901 F.3d at 511 (5th Cir. 2018) (emphasis added) (quoting *Elvis Presley Enters.*, 141 F.3d at 201). Just because consumers may see a DEAN or LUNA house mark on a guitar with a substantially similar mark, does not mean consumers might not confuse Defendants' relevant marks as being associated with, or sponsored by, Gibson. *See id.* The jury was free to conclude that.

Undeterred, Defendants call attention to *Sno-Wizard Manufacturing, Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 428–29 (5th Cir. 1986). Relying on this decision, they argue that the presence of house marks automatically negates a finding of any similarity between the products or that a likelihood of confusion existed in this case. The *Sno-Wizard* court did note that "the presence of [a company's] name on the product goes far to eliminate confusion of origin," particularly with higher-priced items. *Id.* (internal quotation marks omitted) (quoting *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 309 (2d Cir. 1972)). But the court also cabined its decision, stating that "the labeling of a product will not always negate a likelihood of confusion." *Id.* Simply put, *Sno-Wizard* did not create a bright-line rule. *See id.*

Furthermore, in *Sno-Wizard*, the court was specifically dealing with an infringement claim as to the *source* of the product. *Id.*  Here, Gibson pursued a claim of infringement on the grounds that consumers may be confused as to the source, affiliation, sponsorship, or approval of either party's products. *See* (Dkt. #492 at p. 13). As a result, the Court is unpersuaded that the presence of a house mark automatically negates the similarity between two marks. *See Maker's Mark Distillery*, 679 F.3d at 422 (cleaned up) ("[T]he presence of a house mark, as the district court correctly noted, is more significant in a palming off case than in an association case[,] when the two products are related enough, one might associate with or sponsor the other and still use their own house marks."). Relatedly, Gibson has produced evidence in this case that it owns multiple

brands associated with its company, and sometimes consumers are unaware that an affiliated brand is under Gibson's corporate umbrella (Dkt. #505 at p. 388) (testimony of Aljon Go) ("In my experience, not everyone is aware that Epiphone is a sub[-]brand of Gibson, but we are working on it."). Because Gibson sells its guitars under multiple brands, and even sells its trademarked shapes here under one of its own brands, Epiphone, this also erodes at Defendants' contention that a house mark eviscerates a finding of similarity. *See id.* (holding house marks did not undercut finding of similarity in part because evidence "indicate[d] that many consumers are unaware of the affiliations between brands of distilled spirits").

To summarize, the jury was "free to conclude that the display of house brands is insufficient to prevent a likelihood of confusion." *S. Snow Mfg. Co., Inc. v. SnoWizard Holdings, Inc.*, 567 F. App'x 945, 956 (Fed. Cir. 2014). Therefore, the jury could have found that this factor weighs in favor of a likelihood of confusion.

### iii.    Similarity of the Products

Moving on, the third digit of confusion examines "the similarity between the products and services provided by the defendant and plaintiff." *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 505 (5th Cir. 1980); *see also All. for Good Gov't*, 901 F.3d at 511. "The greater the similarity between the products and services, the greater the likelihood of confusion." *Xtreme Lashes*, 576 F.3d at 229 (quoting *Exxon*, 628 F.2d at 505). This factor once again favors Gibson—both sides engage in the same business of selling guitars and target similar consumers.

### iv.    Identity of Retail Outlets and Purchasers

When there is greater overlap "between the outlets for, and consumers of, the services," the greater the chance for potential of confusion. *All. for Good Gov't*, 901 F.3d at 511. Here, the two parties share almost the exact same channels for selling their products and are seeking to sell to the same consumers. Therefore, the fourth digit of confusion favors Gibson.

### v.   Advertising Media Identity

Gibson also presented strong evidence on the advertising digit of confusion. This digit "considers the degree of overlap in the marketing approaches of the plaintiff and the defendant." *T-Mobile US*, 991 F. Supp. 2d at 920. Both parties share similar advertising approaches and promote their products in similar ways. Accordingly, the digit weighs towards a likelihood of confusion as well.

### vi.   Defendants' Intent

On the digit of intent, one examines whether the defendant intended to derive benefits from the plaintiff's reputation. *Viacom Int'l*, 891 F.3d at 195. While intent is unnecessary for a finding of a likelihood of confusion, it "may alone be sufficient to justify an inference that there is a likelihood of confusion." *Smack Apparel*, 550 F.3d at 481 (citation omitted).

Defendants argue this digit should weigh in their favor because there was no evidence of intent in this case. Admittedly, the Fifth Circuit does not have a clear stance on this point. In most decisions, the court has held that an absence of intent means "this factor is neutral." *Viacom Int'l*, 891 F.3d at 195 (collecting cases). But Defendants' view has some support as well. *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 456 (5th Cir. 2017) (holding absence of intent "weighs against finding a likelihood of confusion"); *see also Future Proof Brands*, 982 F.3d at 296 (discussing court's inconsistent language on this factor).

It is unnecessary to decide which view is correct here. Even assuming this factor leans towards Defendants, sufficient evidence exists on the other digits in this case, so a likelihood of confusion finding is still permissible.

### vii.   Actual Confusion

The seventh digit considers actual confusion. "Evidence that consumers have been actually confused in identifying the defendant's use of a mark as that of the plaintiff may be the best

evidence of a likelihood of confusion." *Smack Apparel*, 550 F.3d at 483. In most cases though, evidence of actual confusion "is not necessary for a finding of a likelihood of confusion." *Id.* That said, the "absence of, or minimal, actual confusion . . . over an extended period of time of concurrent sales weighs against a likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 204 (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987)).

Essentially, Defendants argue that the lack of evidence on actual confusion should be dispositive for Gibson's trademark infringement claims. But that is not the law in this Circuit. *See Smack Apparel*, 550 F.3d at 483. Defendants aver this case is different, however, because both parties have sold similarly shaped guitars and headstocks for an extended time period. For support, Defendants place great emphasis on *Amstar Corp. v. Domino's Pizza* where the court found there was no likelihood of confusion. 615 F.2d 252, 263–65 (5th Cir. 1980). However, *Amstar* is distinguishable.

In *Amstar*, the Fifth Circuit reasoned that there was "a presumption against a likelihood of confusion" because the plaintiff provided only three instances of actual confusion when the parties had been engaged in extensive sales under their respective marks for nearly fifteen years. *Id.* at 263. In the end though, the Fifth Circuit did not find that this digit of confusion was dispositive. *Id.* at 264. The court instead found that no likelihood of confusion could exist based on a combination of several different factors, including the mark's lack of strength and the "marked dissimilarities between plaintiff and defendants in trademark design, products, retail outlets, purchasers, and advertising." *Id.* at 264–65. Accordingly, *Amstar* does not support Defendants' position that a lack of actual confusion must compel a different result here, particularly when

multiple factors support a likelihood of confusion. Given the presence of other digits of confusion in this case, Defendants' argument is not well-taken.[18]

### viii.    Care Exercised by Consumers

The degree of care exercised by consumers can minimize a likelihood of confusion when the evidence shows that consumers exercise greater care in their potential purchasing decisions. *Smack Apparel Co.*, 550 F.3d at 483. Consumers picking between the parties' products are selecting products at higher price points. As both sides agree, this factor should have favored Defendants. But this factor is not dispositive here. *See Am. Rice*, 518 F.3d at 329 (noting the absence or presence of one digit of confusion is not dispositive on a claim); *see also Xtreme Lashes*, 576 F.3d at 231 (citing *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 595–96 (5th Cir. 1985)) ("[A] high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar."). So, the Court will not credit this factor with overwhelming weight and discard the jury's verdict.

### ix.    Summary of Digits of Confusion

The likelihood of confusion is a fact-intensive inquiry, and the jury's verdict will stand absent a finding that it was insufficient as a matter of law or against the great weight of the evidence. Here, Gibson produced favorable evidence on at least three digits of confusion in this case, and more than likely a fourth. In the case of the SG Body Shape, at least four digits favored a finding of a likelihood of confusion.

"[A] finding of a likelihood of confusion 'need not be supported by a majority' of the digits and each digit 'may weigh differently'" in the jury's view. *Future Proof Brands*, 982 F.3d at 298

---

[18] The Court notes that Gibson did provide some evidence of actual confusion, but it was relatively limited. In line with *Amstar*, the Court is unsure whether it would be proper to assign substantial weight to this evidence when both companies have extensively sold their products for some period of time. The Court does not address this possibility because other evidence supports the jury's verdict.

(quoting *Streamline Prod. Syd.*, 851 F.3d at 458). Maybe another jury would have sided with Defendants. This one did not. There is not a complete absence of evidence to support the jury's verdict on infringement, and thus, the verdict is acceptable. *See Streamline Prod. Sys.*, 851 F.3d at 458 ("Because there is not a complete absence of evidence to support the jury's finding that there was a likelihood of confusion—and that the mark was legally protectable—we conclude there is sufficient evidence to support the jury's finding of infringement.").

### C.  Counterfeiting Claim and Lack of Evidence to Support Jury's Finding

In addition to trademark infringement, Gibson sued Armadillo for trademark counterfeiting under 15 U.S.C. § 1114. The jury found that Armadillo sold or marketed a counterfeit of the following Gibson Trademarks: The Flying V Body Shape, the Explorer Body Shape, the SG Body Shape, and the HUMMINGBIRD word mark. Defendants argue that Gibson's counterfeiting claims fail as a matter of law because Armadillo's relevant guitars bear house marks that distinguish them from Gibson's products. Alternatively, they argue that the Court erred in not replicating marketplace conditions that allowed the jury to compare the relevant marks in marketplace conditions. The Court disagrees with both arguments.

#### i.    Guitars with House Marks

Under the Lanham Act, a party may sue another for using in commerce any "counterfeit . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or as to deceive . . . ." 15 U.S.C. § 1114(a). Counterfeiting is a subset of trademark infringement that targets particularly egregious infringement. As one court stated, it is "the 'hard core' or 'first degree' of trademark infringement." *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012) (quoting 4 McCarthy on Trademarks and Unfair Competition § 25.10); *Springboards*, 912 F.3d at 818 (citation omitted). If a plaintiff prevails on

46

a counterfeiting claim, the Act opens a wider range of civil penalties. *See* 15 U.S.C. §§ 1116(d), 1117; *see also Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1078 (9th Cir. 2020).

Naturally, this begs the question: What constitutes a "counterfeit"? The Lanham Act defines a "counterfeit" as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. However, "spurious" and "substantially indistinguishable" are left undefined. *Id.*

Here, Defendants argue that Gibson's counterfeiting claims fall flat because the relevant guitars displayed house marks indicating that they were not manufactured by Gibson. Specifically, they assert that the relevant guitars had other house brands that indicated that they were produced by a company other than Gibson, so Armadillo cannot be liable. In other words, Defendants contend that, although the marks Armadillo used were substantially indistinguishable (or even identical) to Gibson's, Armadillo cannot be held liable for trademark counterfeiting because the *products* (i.e., the guitars) had house marks.

They marshal a line of cases for this view, but the most analogous one involved Gibson as a plaintiff. *Gibson Brands*, 2016 WL 7479317, at *7. In *Gibson Brands*, Gibson sued another guitar manufacturer on multiple trademark-related claims, including counterfeiting. *Id.* at *1. On the parties' competing motions for summary judgment, the district court held that Gibson's counterfeiting claims could not survive as a matter of law. *Id.* at *7. The court reasoned that "no rational jury could find that a particular body shape or headstock stamped with a different guitar brand is a counterfeit" when the defendant's guitar shapes and headstocks displayed house marks that indicated they came from a different source. *Id.* Notably, the court was cautious to find counterfeiting in this context because finding that "anything less than an 'identical' or 'substantially indistinguishable' product can give rise to a counterfeit claim would risk rendering

47

'all trademark infringement claims counterfeiting claims.'" *Id.* (quoting *Adams*, 2013 WL 1444335, at *7). Other courts have followed this approach. They have found that, even if the marks themselves are nearly identical on a product, the context of the entire product featuring the mark may preclude a counterfeiting claim. *Audemars Piguet Holding S.A. v. Swiss Watch Int'l, Inc.*, No. 12-CIV-5423-LAP, 2015 WL 150756, at *2 (S.D.N.Y. Jan. 12, 2015) (finding trademark infringement but not counterfeiting because defendants' use of the mark was not "spurious" due to product's other distinctive features); *Associated Gen. Contractors of Am. v. Stokes*, No. 1:11-CV-795 GBL/TRJ, 2013 WL 1155512, at *6 (E.D. Va. Mar. 19, 2013) (same); *Ill. Tool Works Inc. v. J-B Weld Co., LLC*, 469 F. Supp. 3d 4, 10–11 (D. Conn. 2020) (same).

Unfortunately, it appears not a single court in the Fifth Circuit has addressed the argument raised by Defendants, or for that matter, the line of cases utilized by them. And from the Court's perspective, these decisions create tension between two certain concepts. On the one hand, counterfeiting is "hard core" infringement that "seeks to trick the consumer into believing he or she is getting the genuine article, rather than a 'colorable imitation.'" *Guess Am., Inc.*, 868 F. Supp. 2d at 242. Thus, looking at the entire product could be consistent with the purpose of the Lanham Act's counterfeiting provisions. *See id.* However, an analytical approach that looks towards the entire product skimps over the Lanham Act's plain language. Specifically, the Act defines "counterfeit" as a *mark*—making no reference to the product as a whole. *See* 15 U.S.C. § 1127; *see also Arcona*, 976 F.3d at 1078 n.3 (recognizing issue of district courts construing § 1127 "to allow a court to look beyond the mark and examine the product as a whole in determining" whether there is a "spurious mark").

Perhaps these cases can be reconciled under the Lanham Act's text, and the Court finds the Second Circuit's decision in *Tiffany & Co. v. Costco Wholesale Corp.* instructive on this point.

971 F.3d 74, 91–95 (2d Cir. 2020). In that case, the plaintiff sued the defendant for counterfeiting a registered word mark. *Id.* at 80–81. The Second Circuit vacated the district court's decision to grant summary judgment in favor of the plaintiff's claim—finding that a reasonable juror could conclude a likelihood of confusion did not exist. *Id.* at 95. In dicta, however, the court suggested that counterfeiting might not apply in the case. *See id.* at 95 n.18. The court noted that "it is likely inappropriate to impose liability for trademark counterfeiting when a defendant is able to establish . . . that it used a term identical to the registered mark otherwise than as a mark." *Id.* Under § 1127, for something to qualify as "counterfeit," the material "must be a 'spurious mark.'" *Id.* And the plain meaning of a "spurious" mark is one that is "'fake' and 'deceptively suggests an erroneous origin.'" *Id.* (internal brackets omitted) (quoting *Spurious*, BLACK'S LAW DICTIONARY (11th ed. 2019)). Therefore, the court "fail[ed] to see how a term can be a 'fake' mark if it is not actually *used* as a mark, or how a term can 'deceptively suggest an erroneous origin' if it is not used as a means to indicate origin in the first place." *Id.* (emphasis in original) (citing 15 U.S.C. § 1127). While a term *not* used as a mark may still create confusion under 15 U.S.C. § 1125(a)(1)(A), and thus constitute trademark infringement, that usage may not rise to the level of a "counterfeit" under § 1127. *Id.* This is because, under Second Circuit precedent, § 1125 does not require a plaintiff to establish confusion as to source, or even that a defendant used the allegedly infringing material as a mark, to establish trademark infringement. *Id.* (citations omitted).[19]

      The Court sees consistency between the cases cited by Defendants and the legal analysis offered by the Second Circuit. For instance, the ultimate outcome in the cited cases can be justified

---

[19] The Second and Sixth Circuits appear to be at odds about whether trademark infringement can proceed under § 1125 if the defendant did not use the material as a mark. *Compare Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013), *with Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 859 (6th Cir. 2018). That said, the Sixth Circuit's approach has been criticized by the two other circuits who have addressed the issue, as well as the leading treatise on the subject. *Sazerac Brands*, 892 F.3d at 859 (collecting cases from Second and Fourth Circuits and citing 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23.11.50 (5th ed. 2018)). The Court takes no position on this issue as the parties have not addressed the subject.

on the grounds that the defendants' marks did not rise to the level of being "spurious" under the Lanham Act, or alternatively, the defendants did not use the term, symbol, or other material as their own mark.

Respectfully, however, the Court disagrees with Defendants' line of cases and how they arrived at their conclusions by looking at the entire product. The relevant analysis has no place under § 1127. Again, the section defines a counterfeit by comparing the *marks* at issue, not the products on which they appear. 15 U.S.C. § 1127. Accordingly, the approaches used in the cases cited by Defendants run afoul of the statute's plain language.

To be sure, the Court understands that marks must be compared as they appear in the marketplace; they cannot be compared simply as they appear on their registration sheets. *E.g.*, *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 532 (2d Cir. 1983). In fact, that is exactly what the jury was instructed to do in this case. *See* (Dkt. #492). That does not change the counterfeit definition under § 1127, which explicitly tells courts and factfinders to compare marks—not products. Defendants ask the Court to ignore the statute's plain text in conducting its analysis. It will not.

Which takes the Court to the case at bar. The marks at issue in this case are the relevant guitar shapes, word marks, or headstocks. The marks are not the guitars. Thus, Defendants' argument that Armadillo has not produced a "counterfeit" because its guitars differ—and not its marks—is unavailing. Such an approach is clearly inconsistent with the Lanham Act's counterfeit definition, and the Court will not entertain this argument.

On a final note, the Court will specifically address two cases Defendants rely on for their argument that differences in the overall product, as compared to a mark, defeat a counterfeiting claim as a matter of law. The first is the Fifth Circuit's decision in *Springboards to Education, Inc.*

*v. Houston Independent School District*. 912 F.3d 805. In *Springboards*, the Fifth Circuit held that the plaintiff could not sustain a counterfeiting claim, but only because the digits of confusion did not favor a finding of a likelihood of confusion. *Id.* at 818. The same reasoning applied to Defendants' second case, *Arcona, Inc. v. Farmacy Beauty, LLC*. 976 F.3d at 1078–81. There again, the Ninth Circuit held the plaintiff's counterfeiting claim could not survive summary judgment because there was no likelihood of confusion. *Id.* at 1080–81.

These two cases are unpersuasive here. Neither case addressed Defendants' argument, and they specifically held that counterfeiting did not exist because a jury could not rationally find a likelihood of confusion. Indeed, the *Arcona* court expressly decided *not* to rule on the exact argument Defendants make here. *Id.* at 1079 n.3. As discussed above, the Court believes the jury did not clearly err in its decision that a likelihood of confusion existed, and its verdict was not against the great weight of the evidence in this case. Accordingly, these cases carry no weight in this context.

Defendants' argument that there cannot be counterfeiting as a matter of law when the *products'* other features differ has no basis in the text of the Lanham Act's counterfeit definition. As such, the Court rejects this ground for judgment as a matter of law, or a new trial, or to alter the Final Judgment.[20]

### ii.    Failure to Replicate Marketplace Conditions

The alternative argument raised by Defendants is also unconvincing. Boiled down, Defendants claim that the jury's verdict is insufficient because the jury relied on side-by-side

---

[20] Importantly, Defendants have not tried to argue that their shapes or even the HUMMINGBIRD word mark may differ in some way. Nor have they argued in their motion that they did not use their shapes as "marks." *See Tiffany & Co.*, 971 F.3d at 95 n.18. And lastly, Defendants have not argued that the use of their marks cannot be considered "spurious" under § 1127. It is not the Court's duty to raise arguments on a party's behalf, and it will not address these potential avenues here.

comparisons between the relevant marks for the purposes of the counterfeiting claims instead of comparing the marks as they appeared in the marketplace. Besides Defendants' conclusory statements, there is no evidence that happened in this case.

The jury here was specifically instructed to consider the marks in the marketplace (Dkt. #492 at p. 14) ("When determining whether a mark is considered counterfeit, it should be compared with the registered mark as it appears in the actual market."). There is no reason to think that did not occur. As Defendants acknowledge in their motion, they submitted evidence showing how the marks were displayed in the marketplace (Dkt. #561 at p. 25). Gibson did so as well. The jury had the opportunity to consider that evidence in evaluating whether the marks were similar when it came to Gibson's counterfeiting claims. And the Court will not presume that the jury did not consider this evidence, or the Court's instructions, without evidence to the contrary. *E.g.*, *United States v. Velasquez*, 881 F.3d 314, 341 (5th Cir. 2018) (citations omitted) (stating general rule that juries are presumed to follow instructions and apply evidence to each defendant).

Defendants' cited authority takes them no further. For example, Defendants rely on *Elvis Presley Enterprises*, *Inc. v. Capece* in support of their argument here. 141 F.3d at 197–98. There, the Fifth Circuit found that a district court erred in a bench trial when it failed to consider "highly probative evidence of the meaning of the mark as the public encounters it in commerce . . . ." *Id.* The Court does not disagree with that proposition. But there is no evidence in this case that the jury failed to follow the instructions it was given—to consider the marks as they appear in the marketplace—and the jury had evidence in the record to consider marketplace conditions. Likewise, in *Sun-Fun Products, Inc. v. Suntan Research & Development Inc.*, the Fifth Circuit warned that the "fact that the litigating trademarks appear side by side in the judicial solemnity of the courtroom is by itself enough of a falsification of actual market conditions to defy realistic

appraisal." 656 F.2d 186, 189 (5th Cir. 1981) (quoting 3 R. CALLMAN, THE LAW OF UNFAIR COMPETITION TRADEMARKS AND MONOPOLIES § 82.2(b)(3) (3d ed. 1969)). And so, the court observed that "[j]udges, therefore, must attempt to pierce this patently unreal situation and refer to the operative facts behind the scene." *Id.* (quoting CALLMAN, *supra*, § 82.2(b)(3)). That is exactly what the Court did in this case, instructing the jury to consider how the marks appear in the marketplace and allowing the parties to submit evidence to be considered in line with that instruction.

There is no merit in this "side-by-side" argument presented by Defendants. The Court presumes the jury followed its instructions and the evidence submitted in this case, and Defendants have offered no evidence to rebut that presumption. For these reasons, this basis for relief is insufficient.

## II.    Evidentiary Decisions

Along with the issues discussed previously, Defendants also move for a new trial based on several evidentiary decisions at trial. Errors in admitting or excluding evidence are generally not grounds for a new trial. *Baisden*, 693 F.3d at 508 (citing FED. R. CIV. P. 61). "In order to vacate a judgment based on an error in an evidentiary ruling, 'this court must find that the substantial rights of the parties were affected.'" *E.E.O.C. v. Manville Sales Corp.*, 27 F.3d 1089, 1093 (5th Cir. 1994) (quoting *Carter v. Massey–Ferguson, Inc.*, 716 F.2d 344, 349 (5th Cir. 1983)). "An error does not affect substantial rights 'if the court is sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict.'" *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 361 (5th Cir. 1995) (quoting *Manville Sales Corp.*, 27 F.3d at 1094). Incorrect evidentiary rulings that do not affect a party's substantial rights are harmless error. *Huss v. Gayden*, 571 F.3d 442, 453 (5th Cir. 2009) (citing St. *Martin v. Mobil Expl. & Producing U.S. Inc.*, 224 F.3d 402, 405 (5th Cir. 2000)).

Defendants complain of five different evidentiary decisions at trial that they claim affected their substantial rights. None suffice for a new trial because the Court did not err, or alternatively, any error did not affect Defendants' substantial rights.

### A.  Side-By-Side Argument

First, Defendants argue the Court erred by allowing Gibson to show the parties' guitars side by side during trial because the relevant marks must be compared as they appear in the marketplace under Gibson's trademark claims. *See Xtreme Lashes,* 576 F.3d at 228 (citation omitted) (stating that, when determining similarity of two marks for purposes of likelihood of confusion, courts should not put a focus on the marks' distinguishable features in the context of a courtroom but how they appear in actual market conditions). This argument is nonsensical.

The reality is that Gibson *did* present how the marks appear in the marketplace when it held the guitars side by side. The infringed marks here, the shapes, a headstock, and a word mark, appear in the marketplace on the guitars the parties sell. So, when Gibson presents the guitars together, that is precisely how marks look to consumers when they compare them. *See Sun-Fun Prods.,* 656 F.2d at 190 (comparing overall appearance of logos when deciding similarity of marks). The Court did not err in allowing Gibson to present the guitars side by side.

At any rate, the record is also replete with examples of how the marks actually appear when consumers shop for them, including examples of online sales and pictures of the stores where consumers buy the guitars. As the Court explained above, the jury was instructed to consider the marks in the context of how they are viewed in the market. A new trial is unwarranted based on the Court's evidentiary decision here.

## B.  Summary Charts

Defendants also argue that Gibson improperly relied on a number of summary charts without admitting the underlying evidence in violation of Federal Rule of Evidence 1006. The argument is not well-taken.

Rule 1006 provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the original or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

FED. R. EVID. 1006. Defendants do not dispute that Gibson's charts summarized voluminous records or that they failed to receive the underlying records. Rather, they posit that Gibson failed to admit the documents that the charts summarized, and as a result, the Court erred in admitting the charts. But the Fifth Circuit has squarely rejected this argument. *United States v. Jones*, 664 F.3d 966, 976 (5th Cir. 2011) (citation omitted) ("The Appellants' objection was that for a summary to be admitted, all of the evidence that the summary intends to summarize must also be admitted. This is incorrect."); *see also United States v. Smith*, 822 F.3d 755, 759 (5th Cir. 2016) (holding that the Government did not need to offer underlying phone records when chart summarized voluminous phone records). Accordingly, this ground for a new trial is meritless.

## C.  Rulings on Gibson's Motions in Limine Six and Seven

Additionally, Defendants argue they were prejudiced when the Court granted Gibson's motions in limine numbers six and seven. In Gibson's motions in limine, it argued that Defendants should be precluded from presenting any arguments or evidence relating to advertisements or sales of third-party guitars prior to 1992 and from 1997 to 2014 or any evidence of advertising or sales of Dean guitars prior to 1997. Gibson's argument was based on the notion that Defendants did not enter the marketplace until 1997, as discussed above. The Court granted the motions, reasoning

that third-party guitar sales before 1992 would be of little probative value when Defendants did not officially enter the marketplace until 1997 (Dkt. #473); (Dkt. #476). Still, Defendants were allowed to introduce evidence of Dean Guitars's original sales in the 1970s based on Defendants' theory that they were Dean Guitars's successors-in-interest (Dkt. #476).

Now, Defendants simply reframe their contentions that the Court erred in its original evidentiary decision. However, no new arguments have been raised that change the Court's original position. For the reasons discussed in its prior orders, the Court does not think this evidence was relevant to the claims at issue in this case. Accordingly, this ground for new trial is denied.

### D.   Testimony Relating to Previous Trademark Trial and Appeal Board Case

On another ground for new trial, Defendants point to the testimony of Gibson's witness Jason Davidson. Davidson provided prejudicial testimony, Defendants argue, because he impermissibly testified about the merits of a 2009 Trademark Trial and Appeal Board ("TTAB") case that involved Gibson and Defendants. In that case, Defendants attempted to register their DEAN Evo headstock, and Gibson contested the registration. Before trial, Defendants moved to exclude the evidence as to the likelihood-of-confusion aspect of Gibson's infringement claim. And the Court granted the motion, instructing the parties to approach if any party desired to introduce evidence relating to the TTAB case for the purposes of laches.

During trial, Gibson sought to introduce evidence relating to the TTAB case through Davidson's testimony. The Court sustained Defendants' objection, but it allowed Gibson to state that it had a previous conflict with the USPTO in 2009, or that Gibson had challenged a registration application for the DEAN Evo headstock previously.

Defendants challenged Davidson on cross-examination, seeking to gain an admission that Gibson did not ask Defendants to stop making their headstock until 2019. In other words, while

Gibson may have contested the DEAN Evo headstock's registration in 2009, the company did not actually complain of Defendants' infringement until much later. Here, Defendants desire a new trial because Davidson briefly touched on the merits of the 2009 case involving the parties. Specifically, the exchange went as follows:

> Counsel: Gibson sued Armadillo over the alleged—this headstock in 2019, correct?
>
> Davidson: Yes.
>
> Counsel: Before that, you are not aware of them ever objecting to the use of this headstock on the Dean guitars, right?
>
> Davidson: Yes—no, we did object to it. In—I think it was in 2009, sometime in the 2000s when Dean filed for a trademark on that headstock, Gibson objected to it, to the trademark board.
>
> Counsel: But you never asked Dean to stop using this headstock.
>
> Davidson: The trademark appeal board, the USPTO, ruled in Gibson's favor and said that . . . Gibson could not use—or Dean should not use that headstock.
>
> Counsel: The first time you asked Dean to stop making this shape was in 2019, right?
>
> Davidson: No. Again, it goes back to the trademark and appeal board. Gibson objected to Dean's registration attempt on this headstock shape in 2004, and the 2009 ruling stated the opinion of the trademark board was that the Dean headstock was too similar to the Gibson headstock and they agreed with Gibson that it should not be used. And that makes no sense why Dean continued to use it.
>
> Counsel: Your Honor, that was not my question. I move to strike as nonresponsive.
>
> Court: Overruled.

(Dkt. #505 at pp. 586–587). Defendants classify the Court's decision to overrule their final objection as prejudicial error because it allowed the merits of the 2009 TTAB decision to be heard by the jury. The Court does not see it that way.

Defendants asked the Court to remedy any prejudice caused by Davidson's offhanded comment regarding the merits of the 2009 case. Defendants could have requested a curative

instruction or a mistrial on the basis that the merits of the decision would infect the jury's decision making. Defendants did not, which suggests a lack of prejudice here. Furthermore, and as a general matter, evidence of the TTAB case only related to the laches issue in this case. Indeed, the jury was specifically instructed not to consider the TTAB case for any other reason. And, Defendants prevailed on their laches claim involving the DEAN Evo Headstock. Because the TTAB decision was meant to help Gibson in the first place on laches, and yet Defendants still prevailed, there is no indication that Defendants were prejudiced by Davidson's brief comment. Therefore, the Court finds no prejudicial error here based on Davidson's testimony.

### E.  Testimony From Kurt Schuettinger

For their final argument regarding evidence warranting a new trial, Defendants contend that Kurt Schuettinger ("Schuettinger") testified in a misleading and incorrect way. This request is a bit puzzling. One, Schuettinger was not a witness at trial. He was one of Gibson's attorneys.

But, in any event, the Court will assume that Defendants are referring to George Gruhn's ("Gruhn") testimony because his testimony is included on the transcripts Defendants have cited. That said, Defendants have made no effort generally to explain how Gruhn's testimony was false or misleading or what harm they suffered from his testimony. With no articulation whatsoever of what harm occurred, the Court refuses to assume Defendants suffered prejudice here. Therefore, this ground for a new trial is also denied.

### III.  The Court's Permanent Injunction

Lastly, Defendants ask the Court to revisit its permanent injunction because, in essence, it did not adequately balance the parties' interests based on the facts of this case. After reviewing the record, the Court disagrees, and it will not stray from its prior decision with regards to the permanent injunction. Moreover, the Court's opinion is not changed by the fact that Defendants

moved under multiple other Federal Rules of Civil Procedure besides Rule 59(e), including Rule 60 and Rule 52(b).

Furthermore, Defendants submit the Court should have made express findings of fact when it entered the permanent injunction in the Final Judgment pursuant to Rule 52(a). But, the Fifth Circuit has clearly stated that, while "Rule 52(a) does require a district court to make [findings of fact or conclusions of law], these requirements are only imposed when a trial is heard without a jury or when a court is issuing an interlocutory order." *Dresser-Rand Co.*, 361 F.3d at 847. In that vein, a "request for a permanent injunction at the conclusion of a jury trial does not trigger this rule." *Id.* Therefore, this argument fails. *See id.*

## CONCLUSION

It is therefore **ORDERED** that Defendants' Omnibus Posttrial Motion for Relief (Dkt. #561) is hereby **DENIED**.

**IT IS SO ORDERED.**

**SIGNED this 6th day of April, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE