# ATTACHMENT A

## **FINAL INSTRUCTIONS TO THE JURY**

**MEMBERS OF THE JURY**:

Instruction No. 1-General Instruction.[1]

It is my duty and responsibility to instruct you on the law you are to apply in this case. The law contained in these instructions is the only law you may follow. It is your duty to follow what I instruct you the law is, regardless of any opinion that you might have as to what the law ought to be.

If I have given you the impression during the trial that I favor either party, you must disregard that impression. If I have given you the impression during the trial that I have an opinion about the facts of this case, you must disregard that impression. You are the sole judges of the facts of this case. Other than my instructions to you on the law, you should disregard anything I may have said or done during the trial in arriving at your verdict.

You should consider all of the instructions about the law as a whole and regard each instruction in light of the others, without isolating a particular statement or paragraph.

---

[1] The instructions proposed here that are not specific to this case are almost entirely the Court's similar instructions from the first trial (DKT #492) as modified by recently adopted Fifth Circuit Trademark Pattern Jury Instructions. Changes from the original instructions are noted and explained via footnote. Unchanged instructions not specific to this case are not footnoted with legal authority, as Gibson believes them to be non-controversial.

The other general change throughout the instructions results from Gibson including within its verdict form questions a direction to the instructions that apply to that question. The thought is that the instructions are a short textbook on trademark law that would be difficult for lawyers to apply, let alone laymen. More directed instructions will help the jurors find the applicable law. By doing so, the verdict form also eliminates the uncertainty about the law applying. For instance, if the jury is looking at a "willful infringement" instruction, it is on that question, only because it answered "yes" to an infringement for at least one trademark; if it had answered no for all the trademarks, the form would have instructed the jury to skip "willful infringement." Thus, the traditional lead-in to a second question, "If you found that Armadillo…" is unnecessary and has been eliminated, with conforming changes for similar situations throughout the form and instructions.

The testimony of the witnesses and other exhibits introduced by the parties constitute the evidence.  The statements of counsel are not evidence; they are only arguments. It is important for you to distinguish between the arguments of counsel and the evidence on which those arguments rest.

What the lawyers say or do is not evidence.  You may, however, consider their arguments in light of the evidence that has been admitted and determine whether the evidence admitted in this trial supports the arguments.  You must determine the facts from all the testimony that you have heard and the other evidence submitted.  You are the judges of the facts, but in finding those facts, you must apply the law as I instruct you.

You are required by law to decide the case in a fair, impartial, and unbiased manner, based entirely on the law and on the evidence presented to you in the courtroom.  You may not be influenced by passion, prejudice, or sympathy you might have for the plaintiff or the defendant in arriving at your verdict.

Instruction No. 2-Burden of Proof.

There are two standards of proof that you may be asked to apply in this case. You will be instructed to answer some questions based upon a "preponderance of the evidence." To establish by a preponderance of the evidence means to prove something is more likely so than not so.  Let me give you the example I gave at the beginning of the trial.  Take the evidence and imagine that it is equally balanced on a scale so that both sides of the scale are even.  Now, take a feather and add it to one side of the scale so that the scale tips ever so slightly in that direction.  That is a preponderance of the evidence.

If you find that the party asserting a claim has failed to prove any element of its claim by a preponderance of the evidence, then it may not recover on that claim.

You will be instructed to answer some questions based on "clear and convincing evidence." Clear and convincing evidence means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

<u>Instruction No. 3-Evidence</u>.

The evidence you are to consider consists of the testimony of the witnesses, the documents and other exhibits admitted into evidence, and any fair inferences and reasonable conclusions you can draw from the facts and circumstances that have been proven.

Generally speaking, there are two types of evidence. One is direct evidence, such as testimony of an eyewitness. The other is indirect or circumstantial evidence. Circumstantial evidence is evidence that proves a fact from which you can logically conclude another fact exists. As a general rule, the law makes no distinction between direct and circumstantial evidence but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overruled the objection, the question may be answered or the exhibit received. If I sustained the objection, the question cannot be answered, and the exhibit cannot be received. Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been. Sometimes I may have ordered that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you are deciding the case, you must not consider the stricken evidence for any purpose.

<u>Instruction No. 4-What is Not Evidence</u>

Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

1. Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of the facts controls.

2. Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

3. Testimony that is excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence only for a limited purpose, you must do so and you may not consider that evidence for any other purpose.

Anything you may see or hear or have seen or head when the Court was not in session is not evidence. You are to decide the case solely on the evidence received at trial.

<u>Instruction No. 5-Illustrative Aids</u>.[2]

Some documents have been presented to you as illustrations. Illustrative aids are a party's description, picture, PowerPoint presentation or slide, or model to describe something involved in the trial. If your recollection of the evidence differs from the exhibit, rely on your recollection.

---

[2] Gibson changed the reference from "demonstrative" to "illustrative" to conform to the language of Fed. R. Evid. 107.

Instruction No. 6- Charts and Summaries.

Certain charts and summaries have been shown to you solely to help explain or summarize the facts disclosed by the books, records, videos, and other documents that are in evidence. These charts and summaries are not evidence or proof of any facts other than the existence of the items summarized. You should determine the facts from the evidence.

Instruction No. 7-Witnesses.[3]

An important part of your job will be making judgments about the testimony of the witnesses, including the representatives of Gibson, Armadillo, and Concordia who testified in this case. You should decide whether you believe all or any part of what each person had to say, and how important that testimony was.

You alone are to determine the questions of credibility or truthfulness of the witnesses. In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case that he or she may have, and the consistency or inconsistency of his or her testimony considered in the light of the circumstances. Has the witness been contradicted by other credible evidence? Has he or she made statements at other times and places contrary to those made here on the witness stand? You must give the testimony of each witness the credibility that you think it deserves.

Even though a witness may be a party to the action and therefore interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence, if you believe the testimony.

---

[3] Gibson omitted the instruction regarding Interrogatories that normally precedes instruction on witnesses under the belief that no interrogatories will be used as evidence and, therefore, the reference may be confusing.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed; witnesses are not counted. The test is not the relative number of witnesses, but the relative convincing force of the evidence. The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all of the other evidence, you believe that witness

Instruction No. 8- Expert Witnesses.

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field—he or she is called an expert witness—is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely on it.

Instruction No. 9- Testimony of a Corporate Representative.

Several of the witnesses called to testify did so as representatives of a corporation. The lawyers and I referred to these witnesses as either "30(B)(6) witnesses" or "corporate representative witnesses." Generally, testimony must be offered by a witness who has personal knowledge of the facts he or she is testifying to. In the case of a corporation, however, there may be no one person who has personal knowledge of facts relevant to the case. The rules of civil procedure allow the parties to ask for a witness who can speak to the corporation's knowledge of particular facts that may fall into that category. In response, the corporate witness must testify about information known or reasonably available to the organization.[4] A witness testifying on behalf of a corporation is not obligated to provide the legal contentions of the parties.[5]

---

[4] Fed. R. Civ. P. 30(B)(6).

[5] *Atwood v. Union Pacific R.R. Co.*, 8:21CV394, 2022 WL 17585893, *8 (D. Del. Dec. 12, 2022, Mag. Judge C. Zwart).

Instruction No. 10- Impeachment by Witness's Inconsistent Statement.

In determining the weight to give to the testimony of a witness, consider whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony given at the trial.

A simple mistake by a witness does not necessarily mean that the witness did not tell the truth as he or she remembers it. People may forget some things or remember other things inaccurately. If a witness made a misstatement, consider whether that misstatement was an intentional falsehood or simply an innocent mistake. The significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

Instruction No. 11- Previous Testimony.[6]

Certain testimony in the case has been presented to you via the reading or video of witnesses testifying previously. This previous testimony is the sworn, recorded answers to questions a witness was asked in advance of this trial. Previous testimony is entitled to the same consideration as if the witness had been present and had testified from the witness stand in court.

Instruction No. 12- Limiting Instructions.[7]

When testimony or an exhibit is admitted for a limited purpose, you may consider that testimony or exhibit only for the specific limited purpose for which it was admitted. **[Insert all or an example of limiting instructions actually given during trial].**

Instruction No. 13- Use of Notes.

---

[6] As some witnesses may be presented through the reading of their testimony at the first trial, "deposition" was not technically correct. Gibson changed the phrase to "prior testimony" and made conforming changes in the paragraph.

[7] Gibson anticipates the Court either giving an example or reiterating the limiting instructions given during trial but refrains from predicting what those instructions will be.

Remember at all times, you are the judges of the facts. You have been allowed to take notes during this trial. Any notes that you have taken during this trial are only aids to your memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

Instruction No. 14- Regarding Juror Questions.

As I told you in my preliminary instruction, I have given you the opportunity to give written questions anonymously after a witness testified when you had an important question of the witness that was strictly limited to the substance of the witness's testimony.  Remember that I asked you not to be offended if I did not present your question to be answered by the witness.  You should not speculate on the answer to any unasked question, and you should not speculate on or consider any facts or events outside the testimony and exhibits you have heard and seen in this courtroom.

Instruction No. 15- No Inference from Filing Suit.

The fact that a person brought a lawsuit and is in court seeking damages creates no inference that the person is entitled to a judgment.  Anyone may make a claim and file a lawsuit. The act of making a claim in a lawsuit, by itself, does not in any way tend to establish that claim and is not evidence.

Instruction No. 16- Bias and Corporate Parties.

Do not let bias, prejudice, or sympathy play any part in your deliberations.  A corporation and all other persons are equal before the law and must be treated as equals in a court of justice.

Instruction No.17- Statement of the Case.

In this lawsuit, Plaintiff Gibson Inc., who I may refer to as "Gibson," seeks monetary damages against Defendants Armadillo Distribution Enterprises, Inc. and Concordia Investment Partners, LLC, who I may refer to as "Armadillo" and "Concordia," respectively.

Gibson claims rights in seven trademarks. Four of the trademarks are for guitar body shapes: (1) the Flying V Body Shape, (2) the Explorer Body Shape, (3) the ES Body Shape, and (4) the SG Body Shape.[8] Gibson also claims rights in the Dove Wing Headstock. Finally, Gibson claims rights in two word trademarks: (1) Hummingbird; and (2) Flying V.

I will refer to all seven trademarks collectively as the "Gibson Trademarks." At times, though, I will refer to the individual trademarks as:

1. The "Flying V Body Shape" trademark;[9]
2. The "Explorer Body Shape" trademark;
3. The "ES Body Shape" trademark;
4. The "SG Body Shape" trademark;
5. The "Dove Wing Headstock" trademark;
6. The "Hummingbird" wordmark; and
7. The "Flying V" wordmark.

When addressing groups of trademarks, I will refer to the four body shape trademarks and the Dove Wing Headstock shape as the "Gibson Shapes" trademarks.[10] By contrast, I will refer to the words Hummingbird and Flying V as the "Gibson Wordmarks."

Gibson contends Armadillo violated, and continues to violate, trademark law by manufacturing, offering to sell, and selling guitars displaying marks that are identical or

---

[8] Gibson shortened the defined terms by leaving out "design."

[9] The defined terms used for the trademarks have been shortened for simplicity's sake.

[10] Gibson included the Dove Wing Headstock in the group of shapes, contrary to the first instructions.

confusingly similar to the Gibson Trademarks. Gibson argues that this alleged conduct violated the Lanham Act in two ways: (1) by unfairly competing in the marketplace through the infringement of the Gibson Trademarks and (2) by counterfeiting six of the Gibson Trademarks (specifically, the Flying V, Explorer, and SG body shapes, the Dove Wing Headstock, and both Gibson Wordmarks). Gibson also contends Concordia contributed to Armadillo's alleged unfair competition by trademark infringement and counterfeiting.

Armadillo and Concordia deny Gibson's contentions. Armadillo and Concordia contend that their offer and sale of guitars does not violate the Lanham Act because ordinary consumers are not likely to be confused. Armadillo and Concordia also claim that Gibson's trademarks for the Flying V Body Shape, the Explorer Body Shape, The SG Body Shape, and the ES Body Shape are unenforceable and should be cancelled because those trademarks are generic.[11] Armadillo and Concordia also contend Gibson's trademark claims are barred by laches, an equitable defense that precludes recovery where there has been an inexcusable delay that results in prejudice to the defendant. I will explain what the laches and genericness defenses entail in more detail later in my instructions.

Armadillo and Concordia filed counterclaims against Gibson for cancellation of four of the Gibson Shapes (the Flying V Body Shape, the Explorer Body Shape, the ES Body Shape, and the SG Body Shape) on the grounds that these shapes are generic.[12] Armadillo brought counterclaims against Gibson for intentional interference with existing and prospective contracts and business relations.

---

[11] This section has been slightly changed to reflect the fact that defendants do not assert genericness against the headstock or the wordmarks. See DKT #s 77 & 80 (Defendants' live pleadings).

[12] Gibson listed the shapes for which cancellation is sought affirmatively rather than listing the Dove Wing Headstock by exception.

Instruction No. 18- General Trademark Principles.[13]

Instruction No. 18(A)- Purpose of Trademark Law.

The trademark laws balance three goals: (1) protecting the public from being misled about the nature and source of goods and services, so that the consumer is not confused or misled in the market; (2) protecting the rights of a business to identify itself to the public and its reputation in offering goods and services to the public; and (3) protecting the public interest in fair competition in the market.

The balance of these policy objectives varies from case to case because the policy goals may conflict. Accordingly, each case must be decided by examining its specific facts and circumstances, of which you are to judge.

Let me start by giving a brief explanation of the legal terminology you will hear throughout my instructions.

Instruction No. 18(B)-Trademark Definitions.

A trademark is a word, a name, a symbol, a device, or a combination of them that indicates the source of goods or services. A shape can be a trademark.[14] Essentially, a trademark identifies a

---

[13] This instruction gives a more robust lesson on trademark law than the instructions from the previous trial. There are experienced trademark lawyers on each side of the case with different perspectives on the procedures and reliability of the USPTO. Juror questions throughout the trial demonstrate a concern about a variety of issues that involve trademark law. The jury should have a neutral and correct statement explaining what a trademark is, why a trademark gets registered, how a trademark gets registered, how a trademark gets maintained, and what it means to hold a trademark when involved in a lawsuit.

[14] The sentence footnoted has been added to the last trial's instruction. The assertion is a correct statement of the law. *Nola Spice Designs, L.L.C. v. Haydel Enterp., Inc*., 783 F.3d 527, 538 (5th Cir. 2015) (noting that design mark in the shape of a dog could be eligible for trademark protection); *see also, Vox Amplification. Ltd. v. Meussdorffer,* 50 Supp.3d 355, 367 (E.D.N.Y. 2014) (Holding guitar body shapes can be a valid trademark). That a shape can either be a symbol, a device, or a combination of the two is clear under the law. The same is not intuitively obvious to a layperson. The jury should not be uncertain whether the shapes *can be* a trademark, instead

brand and signifies that all goods bearing the trademark derive from a single source. The owner of a trademark has the right to exclude others from using an identical or similar mark that is likely to cause confusion in the marketplace to ordinary consumers. A business that uses another's trademark may be liable for damages.

Instruction No. 18(C)-Trademark Ownership.

Ownership of a trademark is established by use, not by registration. The first one to use a trademark is generally held to be the "senior" user and may be entitled to stop others from using the protectable mark or one that is confusingly similar to it. Rights in a trademark are obtained only through commercial use of the mark.

A trademark is "used" in connection with goods when the good is transported or sold in commerce, and the trademark is attached to or contained in the product or placed on the product's label or container, or if that is not practical, placed on documents associated with the goods or their sale.

Instruction No. 18(D)- Unregistered Trademarks and Common Law Rights.

As mentioned, one gains a trademark by using the trademark rather than by registering the trademark. In other words, a federal trademark registration means that the USPTO has formally recognized that a trademark developed by a person or entity is valid and owned by the trademark holder.[15] As described more fully below in Instruction No. 18(E)- (H), federal registration conveys several important benefits, including the fact that the trademark becomes part of a national database of trademarks.

---

they should focus on whether the shapes *are a* trademark. Gibson also changed the reference to a trademark holder from a person" to a "business" to fit the facts of the case.

[15] *See generally*, *Matal v. Tam*, 582 U.S. 218, 225-227, 137 S.Ct. 1744, 1753, 198 L.Ed.2d 366 (2017).

Registration, however, is not a requirement to enforce a trademark.[16] Instead, owners of an unregistered trademark can enforce "common law" trademark rights.[17] To enforce a "common law trademark," the owner must prove that a valid trademark exists in the first place and that he or she owns that trademark. One of the key differences between a common-law trademark and a registered trademark is that the owner of a registered trademark may either not have to prove the validity of his or her mark or, if proof is required, the burden in the case is on the defendant to disprove the trademark's validity.

<u>Instruction No. 18(E)- Trademark Application Process</u>.[18]

The United States Patent and Trademark Office ("USPTO") registers trademarks on one of two registers- the "Principal Register" or the "Supplemental Register."[19] As a result of registration on either register, a trademark appears in a searchable database open to the public.[20] The USPTO registered the Gibson Trademarks other than the ES Body Shape trademark on the Principal Register. The USPTO registered the ES Body Shape trademark on the Supplemental Register.

Registration on either register results from the same process. The owner of a trademark files an application with the USPTO.[21] The USPTO assigns an examining attorney to review the

---

[16] *Id.*

[17] *Id.*

[18] This subsection is the first with any significant difference as compared to both the prior instruction and Defendants' proposed instruction. The purpose of this difference is for the Court to provide a fuller, but still neutral, description of the trademark process. While the pattern instruction is sufficient in most instances, there is a heated disagreement in this matter as to the finality the jury should accord Gibson's Principal Registry registrations. While the jury can decide that issue, it deserves to know how registrations are obtained, maintained and canceled.

[19] Compare 15 U.S.C. § 1051 and § 1091.

[20] https://tmsearch.uspto.gov/search/search-information.

[21] 15 U.S.C. § 1051.

application.[22] If the examining attorney determines that the trademark should not be registered, the USPTO issues a letter to the applicant explaining the basis for its decision and allowing the applicant to respond and/or amend or supplement the application.[23]

If the examining attorney raises no objection to the registration or if the applicant overcomes the examining attorney's objection(s) through amendment or supplementation, the USPTO publishes the fact of the application in the Trademark Official Gazette.[24] Any person or entity who believes its rights may be prejudiced if the USPTO registers the applicant's trademark has 30 days from the date of publication in the Trademark Official Gazette to file either an opposition to the application or to request additional time to file an opposition.[25]

If the USPTO receives a timely filed opposition to an application, it refers the matter to the Trademark Trial and Appeal Board (the "TTAB") to consider the opposition.[26] A TTAB proceeding is like a proceeding in federal court, but no jury is involved.[27] The TTAB issues a decision as to whether the USPTO should register the trademark considering the objection(s) raised by the opposition.[28]  Either party may appeal the TTAB's decision to a federal court.[29]

---

[22] 15 U.S.C. § 1062(a).

[23] 15 U.S.C. § 1062(b).

[24] 15 U.S.C. § 1062(a).

[25] 15 U.S.C. § 1063.

[26] 15 U.S.C. § 1067(a).

[27] *See generally*, Trademark Trial and Appeal Board Manual of Procedure § 102.03 ("An inter partes proceeding before the [TTAB] is similar to a civil action in federal court.").

[28] 15 U.S.C. § 1068.

[29] 15 U.S.C. § 1071.

If no opposition is received or if the TTAB determines the trademark should be registered despite the objections in an opposition, a series of administrative steps take place.[30] Assuming the applicant meets the requirements imposed by these administrative steps, the USPTO registers the trademark on either the Principal Register or Supplemental Register and publishes that fact.[31] Registration on the Principal Register is a determination by the USPTO that:

1.      That the trademark is being used in commerce or that the applicant has a bona fide intent to use the trademark in commerce; and

2.      That the trademark is distinctive enough that it serves as a source identifier for the goods bearing the trademark.[32]

A trademark that is generic cannot be distinctive. Therefore, the USPTO will refuse registration of a trademark it believes is generic.[33]

Alternatively, registration on the Supplemental Register occurs when the USPTO finds that:

1.      That the trademark is being used in commerce; and

2.      That the trademark is capable of being distinctive.[34]

Unlike registration on the Principal Register, a Supplemental Registration does not mean that the trademark is then serving as a source identifier, only that the trademark could serve that

---

[30] 15 U.S.C. §§ 1057-1059.

[31] USPTO Timeline from Application to Final Publication can be found here.

[32] *See e.g., Matal,* 582 U.S. at 226-27.

[33] *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985).

[34] *E.T. Browne Drug Co., Cococare Products, Inc.* 538 F.3d 185, 202 (3d Cir. 2008) (citing *In re Bush Bros. & Co.,* 884 F.2d 569, 570 (Fed. Cir. 1989)).

purpose if it acquires secondary meaning. As a generic word, phrase, symbol, device, or shape, however, can not acquire secondary meaning. Thus, if the USPTO believes the trademark for which registration is sought to be generic, it will refuse registration on the Supplemental Register also.[35]

Instruction N. 18(F)- Generic.

A generic term is one which identifies a genus or class of things or services, of which the particular item in question is merely a member.  An example of a generic word is "fish." "Fish" is a generic term which applies with equal force to sole, haddock, perch, salmon, bass and carp.[36] A shape or product design may be generic if it is too generalized, if it is the basic form for a type of product, or if it is so common in the industry that it does not identify any particular source.[37] A shape is not generic if it is stylized so that prospective purchasers of goods or services are likely to differentiate it from other, similar symbols or designs.[38] Whether a claimed trademark is generic is viewed from the perspective of a member of the relevant public.[39]

---

[35] *Real Foods Pty Ltd. v. Frito-Lay North America, Inc*., 906 F.3d 965, 972 (Fed. Cir. 2018).

[36] *See, e.g., Union Nat'l Bank of Texas, Laredo v. Union Nat'l Bank of Texas, Austin*, 909 F.2d 839, 845 (5th Cir. 2014). Gibson notes that its instruction is an abstract statement of the law (the sentence is a direct quote from the cited case) rather than providing an example of terms that have been found generic, as was done in the original instruction and is offered by the defendant. Using examples invites argument and comparison to those cases which have important distinctions. Moreover, if the Court is going to give an example of shapes that are generic, it must also give examples of shapes that are not generic. Doing so overcomplicates the issue and can only be argued to the jury by explaining the other cases.

[37] *Big Island Candies, Inc. v. Cookie Corner*, 269 F.Supp.2d 1236, 1243-44 (D. Hi. 2003). One of the primary analytical difficulties in the case is using law developed around wordmarks in a case involving marks primarily protecting product design. The cited case does the best job of summarizing genericness in the product design context that Gibson could find.

[38] *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 245-46 (5th Cir. 2010). As noted above, any explanation of what *is* generic should be balanced by an example of what *is not* generic.

[39] *In re Cordua Restaurants, Inc*., 823 F.3d 594, 604-05 (Fed. Cir. 2016).

<u>Instruction No. 18(G)- Maintenance of a Registered Trademark</u>.

To maintain a trademark on either register, the trademark owner must take certain steps to inform the USPTO of the trademark's status.[40] For the first five years that a trademark is registered on the Principal Register, a person or entity who believes it may be injured by reason of the trademark's registration may file with the USPTO or in federal court a Petition for Cancellation on any ground.[41] If the objecting party is successful in proving its Petition, the trademark is removed from the register it is on.[42]

After a trademark has been registered on the Principal Register for five years, a person or entity can seek cancellation of that trademark based only on limited reasons.[43] If after that five-year period the trademark has been shown to be free from a judgment or a current proceeding that would place the status of the trademark in doubt, the trademark receives "incontestable status."[44] An incontestable trademark is conclusive evidence of its validity and ownership and generally can only be attacked based on current deficiencies in the trademark.[45] However, a generic mark can never be incontestable.[46]

---

[40] 15 U.S.C. § 1058.

[41] 15 U.S.C. § 1064(1).

[42] *Bacardi & Company Ltd. v. United States Patent & Trademark Office*, 104 F.4th 527, (4th Cir. 2024).

[43] Compare 15 U.S.C. § 1064(1) (no restriction on cancellation) and 15 U.S.C. § 1064(3) (limited bases for cancellation).

[44] 15 U.S.C. § 1065.

[45] *See* 15 U.S.C. § 1115(b) (incontestable trademarks can still be challenged for current abandonment, use with permission, current anti-trust violations, current functionality, and equitable defenses).

[46] 15 U.S.C. § 1065(4).

In contrast to the protections afforded for trademarks on the Principal Register, a trademark on the Supplemental Register can be challenged for any reason that would demonstrate the invalidity of the trademark or lack of ownership of the trademark at any time.[47]

Instruction No. 18(H)-The Market for a Trademark.[48]

The "market" for the Gibson Trademarks is the United States.

Instruction No. 19-Gibson's Unfair Competition by  Infringement Claim

Instruction No. 19(A)- Required Elements.

Throughout this inquiry, you must consider each of Gibson's trademarks individually. Gibson asserts its Trademark Infringement Claim against Defendant Armadillo. To prevail on its infringement claim, Gibson  must prove by a preponderance of the evidence:

1.    Gibson owns a valid trademark;
2.    Armadillo's goods create a likelihood of confusion as to their source, affiliation or sponsorship.[49]

Instruction No. 19(B)- Proving a Valid Trademark

Applying the general principles discussed in Instruction No. 18, the Court notes that Gibson offered and the Court admitted trademark registrations purportedly on the Principal Register for six trademarks: (1) The Flying V Body Shape; (2) The Explorer Body Shape; (3) The SG Body

---

[47] 15 U.S.C. § 1064 (preamble limits application of the section to marks on the principal register); *see also* 37 C.F.R. §2.111 (Describing petitions for cancellation).

[48] This instruction was shortened for clarity.

[49] This instruction shortens the previous statement of required elements to conform to language of the most recent Fifth Circuit cases. Gibson believes these recent cases are also superior in that the language is plainer and avoids redundancies. Rex Real Estate, 80 F.4th 607, 616 (5th Cir. 2023); *Whirlpool Corp. v. Shenzhen Sanlida Tech*., 80 F.4th 536, 543 (5th Cir. 2023) (citing *Nola Spice*, 783 F.3d at 536).

Shape; (4) The Dove Wing Headstock; (5) The Hummingbird Wordmark; and (6) the Flying V Wordmark.  Gibson offered evidence that the ES Body Shape is on the Supplemental Register.

Armadillo and Concordia contend that Gibson's trademarks for the Flying V Body Shape, the Explorer Body Shape, and the SG Body Shape, are invalid because those shapes have become generic.[50] Separately, Armadillo and Concordia deny that the ES Body Shape is valid and demand that Gibson prove that registration's validity in all respects.

To the extent that the date of first use of any of the trademarks by Armadillo is an issue, you are instructed that Armadillo's use of the trademarks began, at the earliest, in 1996. In other words, you should not attribute to Armadillo the use of the trademarks, if any, by the Dean Zelinsky companies or by Tropical Music.

Because there are different burdens of proof that apply to the validity of each of the trademarks, I will discuss them grouped by the applicable burden of proof.

*The Dove Wing Headstock, the Flying V Wordmark, and the Hummingbird Wordmark*

Because each of these trademarks have incontestable status and have not been challenged for genericness, Gibson has established these three trademarks are valid as a matter of law.

*The Flying V Body Shape, The Explorer Body Shape, and the SG Body Shape*[51]

---

[50] Defendants may actually be asserting that the three body shape trademarks on the principal register are invalid because they were invalid at the time of registration rather than having become generic since the time of registration. As explained in Gibson's trial brief, that is not a theory they can assert under the law. Gibson phrases the defendants' challenge in that light.

[51] Gibson notes that in the first trial's jury charge, the Court submitted a conditional instruction on validity for the Flying V and Explorer Body Shapes. The condition was if defendants could show prior use, the Flying V and Explorer Shapes would not have the evidentiary presumptions from the Principal Register. Gibson does not believe any law or facts support the prior use argument, and therefore, there should be no conditional instruction as to the Flying V and Explorer Body shapes. *See* Attachment C for a fuller explanation. If a prior use condition is included, however, that condition would allow the jury to evaluate the Flying V and Explorer Body Shapes in the same manner as the ES Body Shape.

These trademarks have incontestable status, but Armadillo and Concordia can overcome the validity of the trademark registrations by demonstrating that one or more of the Body Shapes are generic. You measure genericness at the time of the alleged infringement.[52] Armadillo and Concordia bear the burden of proof of convincing you by a preponderance of the evidence that the shapes are generic. *See* Instruction Number 2 for an explanation of the burden of proof and Instruction Number 18(G) for an explanation of generic. As a reminder, you are to consider the shapes individually.  The only basis on which you can find the Flying V Body Shape, the Explorer Body Shape, or the SG Body Shape to be invalid is genericness. By itself, the expiration of Gibson's former design patents for its trademark shapes neither supports nor detracts from the validity of Gibson's trademark registrations.[53]

*The ES Body Shape*

As the ES Body Shape is on the Supplemental Register, there is no presumption of validity for the ES Body Shape. Thus, Gibson bears the burden of proof of proving the validity of the ES Body Shape Trademark by a preponderance of the evidence. The ES Body shape is valid if it is non-functional and distinctive.[54] A generic shape cannot be distinctive, and therefore, genericness would defeat validity.[55] By itself, the expiration of Gibson's former design patent for The ES Body Shape neither supports nor detracts from the validity of Gibson's trademark registrations.[56] If non-

---

[52] *See* Attachment D.

[53] *See* Attachment B.

[54] *New England Butt Co. v. International Trade Comm'n,* 756 F.2d 874, 877 (Fed. Cir. 1985).

[55] *Igloo Corp. v. Brantex, Inc., 202 F.3d 814, 816* (5th Cir. 2000) (quoting *Sugar Busters, LLC v. Brennan,* 177 F.3d 258, 268 (5th Cir.1999)).

[56] *See* Attachment B.

generic, Gibson can prove the ES Body Shape to be distinctive and, therefore, valid in one of two ways. The shape can either be "inherently distinctive," or the shape can have acquired "secondary meaning."[57]

For a shape to be inherently distinctive, you should consider:

1.     whether it was a "common" basic shape or design;
2.     whether it was unique or unusual in a particular field;
3.     whether it was a mere refinement of a commonly adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or
4.     whether it was capable of creating a commercial impression distinct from accompanying words.[58]

For a shape to acquire secondary meaning in the minds of the relevant public, the primary significance of the trademark is to identify the source of the product rather than the product itself. In other words, Gibson must show that the primary significance in the minds of the prospective consumers is not the product itself but the identification of the product with a single source, regardless of whether ordinary consumers know who or what that source is.[59]

When you are determining secondary meaning, consider the following factors:

1.     Length, manner, and geographic use of the mark;
2.     Volume of sales;

---

[57] *Nola Spice* 783 F.3d at 540-31 (5th Cir. 2015) *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.2d 225, 240-44 (5th Cir. 2010); and *M3 Girl Designs, LLC v. Blue Brownies, LLC*, 2012 WL 12885634, * 2 (N.D. Tex. June 1, 2012, J. Furgeson).

[58] This portion of the proposed instructions is taken from *Seabrook Foods, Inc. v. Barwell Foods, Inc.*, 568 F.2d 1342, 1344 (C.C.P.A. 1978) as further discussed in *Amazing Spaces, Nola Spice,* and *M3 Girl Designs, supra*.

[59] The first instruction had this sentence immediately before the list of factors: *Unless you find that the preponderance of the evidence shows that a significant number of the consuming public associates the ES Body Shape with a single source, then you cannot find that it has acquired secondary meaning.* Gibson believes that statement is redundant of the two sentences before it and places undue emphasis on a manner to find against Gibson.

3.    Amount and manner of advertising;
4.    Nature of use of the mark in newspapers and magazines;
5.    Consumer survey evidence;
6.    Direct consumer testimony;
7.    Armadillo's intent in allegedly copying the mark.[60]

The presence or absence of any particular factor should not necessarily resolve whether a trademark has acquired secondary meaning.[61]

Instruction No. 18(C)-Same or Similar Mark

Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features, but you can give more attention to the dominant features of a product. The inquiry focuses, not on whether two products are identical in every respect, but on whether, under the circumstances of the use, the trademarks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated.[62]

Instruction No. 19(D)- Likelihood of Confusion

As to any of the trademarks that you have found valid and for which Armadillo used a similar trademark without Gibson's consent, you must consider whether Gibson has proven that Armadillo's use of that trademark, or a similar trademark, when used in commerce is likely to

---

[60] *Appliance Liquidation Outlet, LLC v. Axis Supply Corp.,* 105 F. 4th 362, 376-77 (5th Cir. 2024) (internal citations omitted).

[61] The previous instructions included an explanation for two of the seven factors- length of time and promotion/advertising efforts. By explaining just two of the seven (and only stating what would not count towards secondary meaning), the instruction overemphasizes the two explained factors and provides a roadmap to a result rather than a factual finding. Gibson believes the factors are everyday terms that jurors will understand without further explanation. Therefore, Gibson removed the explanations for the length of time and promotion/advertising. But if explanation is warranted, it should be balanced and supplied for all seven factors.

[62] Adapted from *Alliance for Good Government v. Coalition for Good Government,* 901 493 F.3d 510-11 (5th Cir. 2018) (internal citations omitted).

cause confusion, or a mistake, or to deceive as to the affiliation, connection, or association of Armadillo and Gibson or as to the origin, sponsorship, or approval of Armadillo's goods.[63]

In making this evaluation you compare the use of the trademark in the context of the product being marketed or sold.[64] Gibson must prove by a preponderance of the evidence that confusion is probable, not a mere possibility, to establish trademark infringement.[65] Probable does not mean more than 50% of consumers will likely be confused. On the other hand, the likelihood of confusion does not arise if only a few consumers will be confused. Instead, the test is whether an appreciable number of consumers are likely to be misled, or simply confused, as to the source of the goods in question.[66]

When determining whether Armadillo's use creates a likelihood of confusion, you may consider all the evidence presented, particularly evidence relevant to the non-exhaustive list, which follows below. No single factor or consideration is determinative, and Gibson need not prove that

---

[63] The previous instruction had a slightly different phrasing that puts a gloss on the statute. Gibson inserted the statutory language. See 15 U.S.C. § 1125(a)(1). Gibson's idea is to state the primary inquiry as the statute requires and then provide subsidiary instructions. This approach makes the statutory language paramount.

[64] *Id.* (Statute measures the use of "goods or services").

[65] In the prior instruction, there was a sentence preceding this one discussing actual confusion and initial interest confusion. Actual confusion is one of the factors, and the discussion as to what constitutes actual confusion is more appropriate within the factor as opposed to the general discussion of the likelihood of confusion. Therefore, Gibson moved those concepts to the actual confusion factor.

[66] Gibson added language clarifying that its burden does not extend to proving a majority of consumers must be confused, which would be a possible reading of the idea that confusion must be "probable" to be likely. *Western Publishing Co. v. Rose Art Indus., Inc.*, 910 F.2d 57, 59 (citing *Charles of the Ritz Group Ltd. v. Quality King Distribs., Inc.,* 832 F.2d 1317, 1321 (2d Cir. 1987) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)); *accord Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988).

all, or even most, of the factors listed below are present in any particular case to be successful. are You are not limited to consideration of only these factors.   The presence or absence of any particular factor should not necessarily resolve whether there was a likelihood of confusion.

The factors you should consider include, but are not limited to, the following:

1. Type of mark allegedly infringed;
2. Similarity between the two marks;
3. Similarity of the products;
4. Identity of retail outlets and purchasers;
5. Identity of advertising media used;
6. Armadillo's intent;
7. Evidence of actual confusion; and
8. Care exercised by potential customers.[67]

I will now give you additional information about these factors.

1.    **Type of Mark Infringed**.[68]  The type of mark refers to the strength of each alleged mark.  If the mark is suggestive then it is entitled to more protection.  You should analyze two factors when determining the type of mark: (1) the mark's position along the spectrum of distinctiveness (conceptual strength), and (2) the standing of the mark in the marketplace (commercial strength).

The first factor requires you to measure how unique the shape is with particular attention paid to the field in which the shape is sold. The further from the public's perception of a common guitar body shape; the absence of predecessor guitar shapes from which a particular shape derived;

---

[67] *Rex Real Estate 1, l.P. v. Rex Real Estate Exchange, Inc*., 80 F.4th 607, 620 (5th Cir. 2023).

[68] The explanation of this factor in the previous instruction was directly linked to the *Abercrombie* test and its explanation of levels of distinctiveness for word marks. If the Court substitutes the *Seabrook* test as Gibson advocates, the previous instruction does not make sense. *Amazing Spaces,* 608 F.3d at 240-44. Accordingly, Gibson's proposed language adapts the *Seabrook* factors in the same way the caselaw adapts the *Abercrombie* factors. If the Court believes *Abercrombie* is the appropriate test for the conceptual strength of mark, the previous instruction should be used.

and a strong likelihood that the uniqueness of the shape could create a commercial impression without using words tend to make the trademark stronger. The reverse is also true. The closer to the public's perception of a common guitar body shape; the presence of predecessor guitar shapes from which a particular shape derived; and a weak likelihood that the uniqueness of the shape could create a commercial impression without using words tend to make the trademark weaker.

The second factor refers to the mark's standing in the marketplace. Among the things you may consider are the length and manner of use; the volume of sales associated with the mark; the amount and manner of advertising of the mark; consumer-survey evidence regarding market recognition; and third-party use of similar marks.  The greater number of more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion.

2.    **Similarity of Marks**.[69]  Mark similarity is determined by comparing the appearance, sound, or meaning of the two marks.[70]  The marks should be considered in the context of how the consuming public would find them in the marketplace.  The greater the similarity between the marks, the greater the likelihood of confusion.  Conversely, the greater the dissimilarity between the marks, the less likely there is a likelihood of confusion.

3.    **Similarity of Goods**.  The greater the similarity between the products sold by Gibson and by Armadillo, the greater the likelihood of confusion.  Conversely, where the products sold by Gibson and Armadillo are not similar, a likelihood of confusion is less likely.

4.    **Identity of Retail Outlets and Purchasers**.  The greater the overlap that exists between the retail outlets and purchasers of Gibson's and Armadillo's products, the greater the likelihood of confusion.  Conversely, where there is little overlap between the

---

[69] Factors 2 through 6 are unchanged from the previous instruction.

[70] Gibson changed the "And" in this sentence to "or" because the "sound" or "meaning" of the mark do not appear to apply with much force to shape marks.

retail outlets and purchasers of Gibson and Armadillo's products, a likelihood of confusion is less likely.

5.    **Identity of Advertising Media Used**. The greater the overlap that exists between the advertising media used by Gibson and Armadillo, the greater the likelihood of confusion. Conversely, where there is little overlap between the advertising media used by Gibson and Armadillo for their products, a likelihood of confusion is less likely.

6.    **Armadillo's Intent**.    Evidence that a defendant adopted its accused trademarks/trade dress with the intent to cause actual confusion between its products and the plaintiff's products weighs in favor of a likelihood of confusion.  Mere knowledge of the plaintiff's trademarks/trade dress does not amount to an intent to deceive.

7.    **Actual Confusion**.[71]  Evidence of actual confusion is not necessary to a finding of likelihood of confusion. If there is evidence that consumers have confused Armadillo's shapes or words for a Gibson trademark, this is the best evidence of a likelihood of confusion.

Actual confusion only means that potential consumers have confused the products at issue, not that they have purchased one company's product believing they had purchased the other company's product.[72]  There are four scenarios that may qualify as actual

---

[71] Gibson's proposed instruction on "actual confusion" significantly differs from the version used in the last trial. First, as noted, the last instruction split the discussion of confusion concepts between the introduction to the list of eight factors and the actual confusion factor itself. Holding all the concepts that relate to what constitutes actual confusion in one place increases the odds of the jury correctly applying the concept. Second, one of the headline arguments defendants offer is that "there is no evidence-zero-of actual confusion." Charitably, the only thing the defendants' counsel could mean by that oft-repeated statement was that there was no evidence of "point of sale confusion." But it is clear that the term "actual confusion" encompasses much more than point of sale confusion. The jury should be so instructed to avoid being misled.

[72] *See Appliance Liquidation,* 105 F.4th at 380-81 *and Elvis Presly Enterprises, Inc. v. Capece,* 141 F3d 188, 203-04 (5th Cir. 1998) ("Infringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed …").

confusion-"Point of Sale confusion"; "Initial Interest Confusion"; "User Confusion," and "Post Sale Confusion."

Point of Sale Confusion would occur if a customer purchased an Armadillo guitar believing that Gibson was the source, was affiliated with, or sponsored the guitar because it bore a Gibson Trademark. Initial Interest confusion means that Armadillo's alleged use of a Gibson trademark sparked an interaction between Armadillo and a potential Gibson customer. The fact that the customer in that scenario later realized that the Armadillo guitar had no relationship with Gibson does not negate the confusion.[73] User Confusion would occur if a person who might influence the purchasing decisions of others used an Armadillo guitar bearing a Gibson Trademark.[74] In Post Sale Confusion, an original sale of an Armadillo Guitar with one of the Gibson Trademarks is made to a purchaser who knows the guitar is not connected with Gibson in anyway. Other consumers lacking the knowledge that the first buyer had come to believe that Gibson guitars with that trademark are less scarce or of lesser quality than they actually are.[75]

Evidence of actual confusion must be more than a fleeting misunderstanding; instead it must show that the confusion likely swayed purchasers.[76]

8. **Degree of Care Exercised by Potential Consumers**.[77] More sophisticated buyers,

---

[73] *Elvis Presley Enterprises*, 141 F.3d at 204.

[74] *See Springboards to Education, Inc. v. Houston Ind. School Dist.,* 912 E. 3d 805, 813 (5th Cir. 2019) (citing 4 McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed. 2018 update) and *Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 718 (Fed. Cir. 1992)).

[75] *Id.*

[76] *Appliance Liquidation*, 104 F.4th at 381-82.

[77] This factor remains the same as described in the instruction from the first trial.

or purchasers of more sophisticated products, are likely to be more careful and discriminating when purchasing those products.  Consequently, such purchasers may be less likely to be confused by similarities between two trademarks.  On the other hand, confusion is more likely if the potential buyers of the products in question are less sophisticated or if the products in question are impulse items or are inexpensive.

The eight factors discussed above are not to be considered in isolation or in the abstract. Rather, you must consider them in the circumstances and context peculiar to this case.  First, you must consider the application of each factor in light ofthe specific circumstances of the case, for example, who is advertising the marked products, in connection with what merchandise, and other facts particular to this case.  Second, you must consider the marks in the context that a customer perceives them in the market, which includes their presentation in advertisements, if any, packaging, stores, and so on.  In addition to these eight factors, the particular context in which the mark appears must receive special emphasis.

<u>Instruction No. 20- Willful Infringement</u>.

Trademark infringement is willful if it is done voluntarily and intentionally and with the specific intent to cause confusion, mistake, or to deceive.  Armadillo must have had a subjective belief that it was committing trademark infringement.[78]  Gibson bears the burden of proving willfulness by a preponderance of the evidence.

<u>Instruction No. 21- Contribution to Unfair Competition via Infringement</u>

For Concordia to be liable to Gibson for contributory infringement, Gibson must prove by a preponderance of the evidence that:

1.    Concordia intentionally induced or caused Armadillo to infringe Gibson's asserted

---

[78] *Appliance Liquidation Outlet,* 105 F.4th at 384-85.

trademarks or trade dress; or

2.      Concordia knew or had reason to know Armadillo was infringing the Gibson Trademarks but continued to supply its products to Armadillo.[79]

Instruction No. 22- Computation of Armadillo's Profits

If you have found liability for the infringement of any of the Gibson Trademarks, you are instructed that the parties have agreed that the amount of profits Armadillo earned from sales of products accused of infringing each specific mark from October 1, 2017, to the present is the amount indicated below.

The Flying V Body Shape:      $      66,621.49

The Explorer Body Shape:      $      76,391.69

The ES Body Shape:            $       3,123.03

The SG Body Shape:            $      19,905.47

The Dove Wing Headstock:      $1,395,437.33

The Hummingbird Wordmark: $      4,551.80

The Flying V Wordmark:        $        928.77

You are further instructed that you may award damages for the portion of Armadillo's profits you attribute to the trademark, as contrasted with other attributes and features of the guitars, but only for a shape corresponding to a trademark for which you answered "Yes" in Question Number 4.

Instruction No. 23- Counterfeiting.

Gibson alleges Armadillo is liable for trademark counterfeiting of the Flying V Body Shape

---

[79] *See Inwood Laboratories, Inc. v. Ives Laboratories, Inc*., 456 U.S. 8444, 853-54, 102 S.Ct. 2182, 2188-89, 72 L. Ed. 2d 505 (1982).

Design Trademark, the Explorer Body Shape Design Trademark, the SG Body Shape Design Trademark, the Dove Wing Headstock, and the HUMMINGBIRD and FLYING V word trademarks. A counterfeit is a "spurious mark that is identical with, or substantially indistinguishable from, a registered mark."[80] When determining whether a mark is considered counterfeit, it should be compared with the registered mark as it appears in the actual market.

Gibson has the burden of proving the following elements[81] by a preponderance of the evidence: (1) its trademarks are listed on the Principal Register; (2) Armadillo used a counterfeit of that trademark in an infringing product; and (3) the use of the counterfeit was likely to cause confusion.[82]

<u>Instruction No. 24-Intentional Counterfeiting</u>

Intent is a conscious purpose or objective.[83] In this instance, to find intentional counterfeiting, you must determine that a preponderance of the evidence demonstrates Armadillo meant to include within its product or advertising a shape, word, or phrase that Armadillo knew to be identical or

---

[80] 15 U.S.C. §1127.

[81] Gibson notes that the instruction submitted by Armadillo and Concordia imposes a requirement that the counterfeiting must be intentional. There is no *mens rea* requirement for civil counterfeiting liability on a product. 15 U.S.C. § 1114 (1)(a). Instead, the statute requires an intentional finding if the counterfeit is used on packaging or labeling (15 U.S.C. § 1114 (1)(b)) The statute also conditions the award of treble actual damages on a finding of intentionality and purpose. 15 U.S.C. § 1117(B)(1). On the other hand, there is no intentionality requirement to award statutory damages. 15 U.S.C. § 1117(C). Thus, while Armadillo's mental state might impact the type of recovery to which Gibson is entitled, it is not a necessary element to the fact of counterfeiting. Intentionality must be inquired about separately from the base counterfeit liability finding. *See Pebble Beach Co. v. Tour 18 Limited,* 155 F.3d 556, 554 n.22 (5th Cir. 1998) (recognizing the distinction described above).

[82] 15 U.S.C. §1114; *see also, e.g., Ford Motor Co. v. Money Markers Automotive Surplus, Inc*., 2005 WL 2464715, *2 (D. Neb. Sept. 14, 2005, J. Barrtailion).

[83] Black's Law Dictionary.

31

substantially indistinguishable from a Gibson trademark.[84]

Instruction Number 25-Willful Counterfeiting

Willfulness is the intent to do an act coupled with the knowledge that the act is wrong. To establish willfulness, Gibson must show a preponderance of the evidence demonstrating that Armadillo meant to use a word or shape in connection with its guitars that Armadillo knew to be identical to or substantially indistinguishable from a Gibson trademark and that Armadillo either knew or consciously disregarded the fact that using the word or shape in that manner would infringe on Gibson's trademark rights.[85]

Instruction No. 26- Counterfeiting Damages[86]

Statutory damages are damages established by Congress in the Lanham Act. You may award statutory damages between $1,000 and $200,000 for each trademark that Gibson proves Armadillo used, for each type of goods sold, offered for sale, or distributed.

If you find Gibson has proved Armadillo knew the trademark it used was a counterfeit mark, you may award additional statutory damages. It is not necessary that Armadillo knew that the mark was registered by Gibson, only that Armadillo knew that the trademark was the same or substantially indistinguishable from any of the Gibson Trademarks.

If Gibson proves Armadillo's use of the counterfeit trademark was willful, then you may, but are not required to, increase the statutory damage award to a maximum of $2,000,000 per type of good sold, offered for sale, or distributed.

---

[84] *Cf., Turtle Island Foods, S.P.C. v. Strain*, 65 F. 4th 211, 216-18 (5th Cir. 2023) (Intentional does not mean an intent to violate the statute being challenged on constitutional grounds).

[85] *See United States v. Martinez*, 999 F.2d 1579 at *6 (5th Cir. 1993) (Appx) ("… [W]illful means the intentional violation of a known legal duty.").

[86] This instruction repeats the instruction from the first trial for statutory damages, except for the conforming change resulting from attaching specific instructions to jury questions.

Instruction No. 27- Contribution to Counterfeiting

For Concordia to be liable to Gibson for contributory infringement, Gibson must prove by a preponderance of the evidence that:

3.      Concordia intentionally induced or caused Armadillo to counterfeit Gibson's asserted trademarks; or

4.      Concordia knew or had reason to know Armadillo was counterfeiting the Gibson Trademarks but continued to supply its products or services to Armadillo.[87]

Instruction No. 28- Intentional Contribution to Counterfeiting

Concordia intentionally contributed to Armadillo's alleged counterfeiting if you find from a preponderance of the evidence that Concordia provided Armadillo with goods or services necessary to the counterfeiting with the intent that Armadillo would use the goods or services to commit the counterfeiting.[88]

Instruction No. 29-Willful Contribution to Counterfeiting

Willfulness is the intent to do an act coupled with the knowledge that the act is wrong. To establish willful contribution, Gibson must show a preponderance of the evidence demonstrating that Concordia provided goods or services to Armadillo, knowing or consciously disregarding the fact that Concordia's goods or services would be used in a manner that would result in counterfeiting of Gibson's trademark.[89]

---

[87] *See Inwood Laboratories, Inc. v. Ives Laboratories, Inc*., 456 U.S. 8444, 853-54, 102 S.Ct. 2182, 2188-89, 72 L. Ed. 2d 505 (1982). Inwood speaks to the standard for contribution to an infringement, but Gibson cannot discern any reason that would make the test inapplicable to counterfeiting.

[88] 15 U.S.C. § 1117(b)(2).

[89] *See United States v. Martinez*, 999 F.2d 1579 at *6 (5th Cir. 1993) (Appx) ("… [W]illful means the intentional violation of a known legal duty.").

<u>Instruction No. 30- Contribution to Counterfeiting Damages</u>[90]

As instructed above with regard to Armadillo's counterfeiting, statutory damages are damages established by Congress in the Lanham Act. You may award statutory damages between $1,000 and $200,000 for each trademark that Gibson proves Armadillo used, for each type of goods sold, offered for sale, or distributed.

If you find Gibson has proved Armadillo knew the trademark it used was a counterfeit mark, you may award additional statutory damages. It is not necessary that Armadillo knew that the mark was registered by Gibson, only that Armadillo knew that the trademark was the same or substantially indistinguishable from any of the Gibson Trademarks.

If Gibson proves Armadillo's use of the counterfeit trademark was willful, then you may, but are not required to, increase the statutory damage award to a maximum of $2,000,000 per type of good sold, offered for sale, or distributed.

<u>Instruction No. 31- Laches</u>[91]

If you find that Armadillo infringed or counterfeited any valid trademark owned by Gibson, you must also determine whether Defendants have proven by a preponderance of the evidence that:

1.    Gibson delayed in asserting its trademark right;

2.    Gibson lacks an excuse for the delay; and

3.    The delay caused undue prejudice to Armadillo and/or Concordia.

*Delay*

The length of delay, for purposes of laches, depends on the circumstances.  The period of delay begins when the trademark holder knew or should have known of the infringement and

---

[90] This instruction repeats the instruction from the first trial for statutory damages, except for the conforming change resulting from attaching specific instructions to jury questions.

[91] This instruction remains the same from the first trial.

generally ends when the trademark owner files suit. For purposes of delay, you may consider whether the trademark owner has made an objection to the infringement, for example, in the form of a cease-and-desist letter. However, the period of delay continues to run if an owner objects but does not sue within a reasonable time after making the objection.

*Lack of Excuse*

A delay in asserting trademark rights may be excused where the unlicensed user begins to use the trademark in the market, and later modifies or intensifies its use of the trademark to the effect that the unlicensed user significantly impacts the trademark owner's goodwill and business reputation, so that the unlicensed user is placed more squarely in competition with the trademark owner. The mark owner need not sue until the harm from the unlicensed user's use of the mark looms large. Thus, the significant increase in the scope of the unlicensed user's business, rather than reliance on the same general business model, a trademark owner's possible excuse.

*Undue Prejudice*

An unlicensed user is unduly prejudiced when, in reliance on the trademark owner's unexcused delay in filing suit, the user makes major business investments or expansions that depends on the use of the marks; these investments and expansions would suffer appreciable loss if the marks were enforced; and this loss would not have been incurred had the trademark owner enforced its rights earlier. Prejudice also occurs where the trademark owner's unexcused delay has resulted in the loss of relevant evidence, including the death of witnesses, the loss of documents, or faded witness memories because of the passage of time. The amount of prejudice suffered may vary with the length of the delay.

Instruction No. 32- Unclean Hands[92]

Defendants may not assert their laches defense if Defendants have "unclean hands." Gibson must prove, by a preponderance of the evidence, that Armadillo and/or Concordia knowingly intended to use the Gibson Trademarks for the purpose of deriving benefit from Gibson's goodwill.

Unclean hands may be found only where the unlicensed user "subjectively and knowingly" intended to cause mistake or to confuse or deceive buyers. Mere awareness of a trademark owner's claim to the same mark does not amount to having unclean hands nor establishes bad intent necessary to preclude a laches defenses. The owner of the trademark must demonstrate that at the time the unlicensed user began using the marks or sometime thereafter, said unlicensed user knowingly and intentionally did so with the bad faith intent to benefit from or capitalize on the mark owner's goodwill.

Instruction No. 33- Generic[93]

A generic term is one which identifies a genus or class of things or services, of which the particular item in question is merely a member. An example of a generic word is "fish." "Fish" is a generic term which applies with equal force to sole, haddock, perch, salmon, bass and carp. A shape or product design may be generic if it is too generalized, if it is the basic form for a type of product, or if it is so common in the industry that it does not identify any particular source. A shape is not generic if it is stylized so that prospective purchasers of goods or services are likely to differentiate it from other, similar symbols or designs. Whether a claimed trademark is generic is viewed from the perspective of a member of the relevant public.

Instruction No. 34- Tortious Interference

---

[92] This instruction remains the same from the first trial.

[93] This instruction repeats the instruction for genericness in the infringement analysis. As such, the legal authority is not repeated.

To succeed on its claim that Gibson tortiously interfered with Armadillo's prospective business relationships, Armadillo must prove by a preponderance of the evidence that there was:

1.    A reasonable probability existed that Armadillo would have entered into a contractual or business relationship with a third party;

2.    A willful and intentional act of interference with the formation of the contractual or business relationship by Gibson;

3.    Gibson's conduct was independently tortious or unlawful;

4.    Gibson's proximately caused Armadillo injury; and

5.    Gibson's conduct caused actual damages or loss to Armadillo.

Instruction No. 35- Justifiable Interference

If you find Gibson tortiously interfered with Armadillo's prospective business relations, you must determine if Gibson was justified in doing so.  Justification is an affirmative defense to tortious interference with prospective business relations.  Gibson must prove, by a preponderance of the evidence, that it was justified in interfering by the exercise of either:

1.    its own legal rights; or

2.    a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken.

Instruction No. 36- Tortious Interference Damages

Even though I am instructing you on monetary damages, this should not be taken to mean that I believe Gibson is liable for the claims brought or that such damages are appropriate.  These are issues for you to resolve under the instructions I have given you should you decide that Armadillo is entitled to recover.

Damages for a claim means the amount of money which will reasonably and fairly

compensate Armadillo for any injury you find was caused by Gibson's tortious interference. Armadillo has the burden of proving its actual damages for each claim by a preponderance of the evidence.

It is for you to determine what damages, if any, have been proved.

Your award must be based upon evidence and not upon speculation, guesswork or conjecture. It is your task first to decide whether each party is liable.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

If you find for Armadillo on Armadillo's tortious interference with prospective business relations claim, you must determine what, if any, damages Armadillo is entitled to as a result of Gibson's interference. Damages for interference with prospective business relations include the prospective contract's or business relationship's benefit and consequential losses.

Instruction No. 37- Malice

"Malice" means:

(a)    a specific intent by a party to cause substantial injury or harm to the other party or

(b)    an act or omission by a party,

• which, when viewed objectively from the standpoint of that party at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

• of which the party had actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights,

safety, or welfare of others.

Instruction No. 38- Exemplary Damages

If you decide to award exemplary damages, you should consider the following factors in deciding the amount:

1.    The nature of the wrong.

2.    The character of the conduct involved.

3.    The degree of culpability of the responsible party.

4.    The situation and sensibilities of the parties concerned.

5.    The extent to which such conduct offends a public sense of justice and propriety.

6.    The net worth of the responsible party.

The amount of any exemplary damages award should bear a reasonable relationship to the harm caused to Gibson. You may assess exemplary damages against Defendants, or you may refuse to impose exemplary damages. The amount of any exemplary damages award should bear a reasonable relationship to the harm caused to Armadillo.

Instruction Number 39- Duty to Deliberate.

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges—judges of the facts. Your only interest is to seek the truth from the evidence in the case. Do not let bias, prejudice, or sympathy

play any part in your deliberations. This case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. A corporation is entitled to the same fair trial at your hands as a private individual and should be treated as such. The law is no respecter of persons; all persons, including corporations and other organizations, stand equal before the law, and are to be dealt with as equals in a court of justice.

When you retire to the jury room to deliberate on your verdict, you will take this charge with you, as well as exhibits that the court has admitted into evidence. When you go to the jury room, the first thing that you should do is select one of you as your Foreperson, who will help to guide your deliberations and will speak for you here in the courtroom. The Foreperson should read, or have another juror read, these instructions to the jury. You should then begin your deliberations.

If you recess during your deliberations, follow all of the instructions that the Court has given you on your conduct during the trial. Do not discuss the case unless all jurors are present in the jury room.

After you have reached your unanimous verdict, your Foreperson must fill in your answers to the written questions and sign and date the verdict form. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question.

If you want to communicate with me at any time, please give a written message or question to the court security officer, who will bring it to me. I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally.

The presiding juror or any other juror who observes a violation of the Court's instructions

shall immediately warn the one who is violating the same and caution the juror not to do so again.

After you have reached a verdict, you are not required to talk with anyone about the case unless the court orders otherwise. You may now retire to the jury room to conduct your deliberations.

## JURY VERDICT FORM

**Question Number 1-Unfair Competition Through False Designation of Origin:**

Answer "Yes" or "No" for each Gibson Trademark. Refer to Instruction Numbers 18-19 for an explanation of unfair competition through infringement.

Do you find by a preponderance of the evidence that Armadillo engaged in unfair competition by using in commerce a good with a shape or word that infringed a Gibson trademark in a manner that creates, when viewed in its entirety, a likelihood of confusion about the source, affiliation, or sponsorship of Armadillo's products?[94]

The Flying V Body Shape: _____

The Explorer Body Shape: _____

The ES Body Shape: _____

The SG Body Shape: _____

The Dove Wing Headstock: _____

The Hummingbird Wordmark: _____

The Flying V Wordmark: _____

**If you answer "Yes" for any trademark, proceed to Question Number 2. If you answer "No" for each trademark, proceed to Question Number 14.**

---

[94] Question Number 1 was altered slightly from the same question in the last trial to include a reference to a "good." The change results in a question that more closely tracks the language of 15 U.S.C. § 1125(1), which specifically references "goods" or "services."

**Question Number 2- Willful Infringement:**

Answer only for a trademark you answered "Yes" in Question Number 1. If you answered "No" for a trademark in Question Number 1, do not answer for that trademark in this question. Refer to Instruction Number 20 for an explanation of willful.

Do you find by a preponderance of the evidence that the infringement you found in your answer to the previous question was willful?

The Flying V Body Shape:        _____

The Explorer Body Shape:        _____

The ES Body Shape:        _____

The SG Body Shape:        _____

The Dove Wing Headstock:        _____

The Hummingbird Wordmark:        _____

The Flying V Wordmark:        _____

**Proceed to Question Number 3.**

**Question Number 3-Contribution to Infringement:**

Answer only for a trademark you answered "Yes" in Question Number 1. If you answered "No" for a trademark in Question Number 1, do not answer for that trademark in this question. Refer to Instruction Number 21 for an explanation of contribution.

Do you find by a preponderance of the evidence that Concordia contributed to Armadillo's conduct in infringing Gibson's trademarks?

The Flying V Body Shape:        _____

The Explorer Body Shape:        _____

The ES Body Shape:        _____

The SG Body Shape:        _____

The Dove Wing Headstock        _____

The Hummingbird Wordmark:        _____

The Flying V Wordmark:        _____

**Proceed to Question Number 4.**

**Question Number 4- Infringement Damages:**

Answer in dollars and cents, if any, for each trademark you answered "Yes" in question Number 1. If you answered "No" to a trademark in Question Number 1, do not provide an answer for that trademark in this question. Refer to Instruction Number 22 for an explanation of the computation of profit.

What amount of Armadillo's profits, if any do you find from a preponderance of the evidence is attributable to the infringement of a Gibson trademark?

The Flying V Body Shape:          _____

The Explorer Body Shape:          _____

The ES Body Shape:          _____

The SG Body Shape:          _____

The Dove Wing Headstock          _____

The Hummingbird Wordmark:          _____

The Flying V Wordmark:          _____

**Proceed to Question Number 5.**

**Question Number 5- Counterfeiting:**

Answer only for a trademark you answered "Yes" in Question Number 1. If you answered "No" for a trademark in Question Number 1, do not answer for that trademark in this question. Refer to Instruction Number 23 for an explanation of counterfeiting.

Do you find from a preponderance of the evidence that Armadillo sold or marketed a counterfeit of a Gibson trademark listed below?

The Flying V Body Shape:        _____

The Explorer Body Shape:        _____

The SG Body Shape:        _____

The Dove Wing Headstock        _____

The Hummingbird Wordmark:    _____

The Flying V Wordmark:        _____

**If you answer "Yes" for any trademark, proceed to Question Number 6. If you answered "No" for each trademark or were not required to give an answer, proceed to Question Number 12.**

**Question Number 6- Intentional Counterfeiting:**

Answer only for a trademark you answered "Yes" in Question Number 5. If you answered "No" for a trademark in Question Number 5, do not answer for that trademark in this question. Refer to Instruction Number 24 for an explanation of intentional counterfeiting.

Do you find by a preponderance of the evidence that the counterfeiting you found in your answer to the previous question was intentional?

The Flying V Body Shape:          _____

The Explorer Body Shape:          _____

The SG Body Shape:          _____

The Dove Wing Headstock:          _____

The Hummingbird Wordmark:          _____

The Flying V Wordmark:          _____

**If you answered "Yes" to any trademark, proceed to Question Number 7. If you answered "No" or were not required to provide an answer for every trademark listed, proceed to Question Number 8.**

**Question Number 7- Willful Counterfeiting:**

Answer only for a trademark you answered "Yes" in Question Number 6. If you answered "No" for a trademark in Question Number 6, do not answer for that trademark in this question. Refer to Instruction Number 25 for an explanation of willful.

Do you find by a preponderance of the evidence that the counterfeiting you found in your answer to Question Number 5 was willful?

The Flying V Body Shape:        _____

The Explorer Body Shape:        _____

The SG Body Shape:        _____

The Dove Wing Headstock:        _____

The Hummingbird Wordmark:        _____

The Flying V Wordmark:        _____

**Proceed to Question Number 8.**

**Question Number 8- Counterfeiting Damages:**

Answer in dollars and cents only for those trademarks for which you answered "Yes" in response to Question Number 5. If you answered "No" for a trademark in response to Question Number 5, or were not required to provide an answer, do not provide an answer for that trademark in response to this question. Refer to Instruction Number 26 for an explanation of the factors to consider in determining counterfeiting damages.

What sum of money, if any, do you find is a just and equitable award for Armadillo's counterfeiting of Gibson's trademarks?

The Flying V Body Shape:        _____

The Explorer Body Shape:        _____

The SG Body Shape:        _____

The Dove Wing Headstock        _____

The Hummingbird Wordmark:        _____

The Flying V Wordmark:        _____

**Proceed to Question Number 9.**

**Question Number 9- Contribution to Counterfeiting:**

You should provide an answer only for the trademarks you answered "Yes" in Question Number 5. If you answered "No" for a trademark in Question Number 5 or were not required to answer for that trademark, do not provide an answer for that trademark in this question. Refer to Instruction Number 27 for an explanation of contribution to infringement and counterfeiting.

Do you find by a preponderance of the evidence that Concordia contributed to Armadillo's conduct in counterfeiting Gibson's trademarks?

The Flying V Body Shape:          _____

The Explorer Body Shape:          _____

The SG Body Shape:          _____

The Dove Wing Headstock          _____

The Hummingbird Wordmark:     _____

The Flying V Wordmark:          _____

**If you answered "Yes" for any trademark, proceed to Question Number 10. If you answer "No" to each trademark for which an answer is required, proceed to Question Number 11.**

**Question Number 10- Damages for Contribution to Counterfeiting:**

Answer in dollars and cents only for those trademarks for which you answered "Yes" in response to Question Number 9. If you answered "No" for a trademark listed in Question Number 9 or were not required to provide an answer, do not answer for that trademark in this question. Refer to Instruction Number 30 for an explanation of the factors to consider in determining counterfeiting damages.

What sum of money, if any, do you find is a just and equitable award for Concordia's contribution to Armadillo's counterfeiting of Gibson's trademarks?

The Flying V Body Shape:        _____

The Explorer Body Shape:        _____

The SG Body Shape:        _____

The Dove Wing Headstock        _____

The Hummingbird Wordmark:        _____

The Flying V Wordmark:        _____

**Proceed to Question Number 11.**

**Question Number 11- Willful Contribution to Counterfeiting:**

If you answered "No" for a trademark listed in Question Number 9 or were not required to provide an answer, do not answer for that trademark in this question. Refer to Instruction Number 29 for an explanation of the factors to consider in determining counterfeiting damages.

What sum of money, if any, do you find is a just and equitable award for Concordia's contribution to Armadillo's counterfeiting of Gibson's trademarks?

The Flying V Body Shape:      _____

The Explorer Body Shape:      _____

The SG Body Shape:      _____

The Dove Wing Headstock      _____

The Hummingbird Wordmark:   _____

The Flying V Wordmark:      _____

**Proceed to Question Number 12.**

**Question Number 12-Laches:**

Answer this Question only for a Gibson trademark for which you gave a "Yes" answer in either Question Number 1 or Question Number 5. Refer to Instruction Number 31 for an explanation of delay, excuse, and undue prejudice.

Do you find, by a preponderance of the evidence, that (1) Gibson delayed in asserting its trademark rights, (2) the delay was inexcusable, and (3) Gibson's delay caused undue prejudice to Armadillo and Concordia?

The Flying V Body Shape:            _____

The Explorer Body Shape:           _____

The ES Body Shape:                 _____

The SG Body Shape:                 _____

The Dove Wing Headstock            _____

The Hummingbird Wordmark:          _____

The Flying V Wordmark:             _____

**If you answered "Yes" for any trademark, proceed to Question Number 13. If you answered "No" for all trademarks, proceed to Question Number 14.**

**Question Number 13-Unclean Hands:**

Answer "Yes" or "No" only for those trademarks you answered "Yes" for in Question Number 13. If you answered "No" for a trademark in Question Number 13 or were not required to give an answer, do not answer for that trademark in this question. Provide a separate answer for each defendant. Refer to Instruction Number 32 for an explanation of unclean hands.

Do you find, by a preponderance of the evidence, that Armadillo and Concordia acted with unclean hands in the infringement or counterfeiting of Gibson trademark(s)?

**For Armadillo:**

The Flying V Body Shape:        _____

The Explorer Body Shape:        _____

The ES Body Shape:        _____

The SG Body Shape:        _____

The Dove Wing Headstock        _____

The Hummingbird Wordmark:        _____

The Flying V Wordmark:        _____

**For Concordia:**

The Flying V Body Shape:        _____

The Explorer Body Shape:        _____

The ES Body Shape:        _____

The SG Body Shape:        _____

The Dove Wing Headstock        _____

The Hummingbird Wordmark: _____

The Flying V Wordmark: _____

**Proceed to Question Number 14.**

**Question Number 14- Generic:**

Answer this Question only for the following trademarks and only if you answered Question Number 1 "No" regarding the same trademark. If you answered "Yes" for a trademark in Question Number 1, do not provide an answer for that trademark in this question. Refer to Instruction Number 33 for an explanation of generic.

Do you find by a preponderance of the evidence that a Gibson trademark is generic?

The Flying V Body Shape:  _____

The Explorer Body Shape:  _____

The ES Body Shape:  _____

The SG Body Shape:  _____

**Proceed to Question Number 15.**

**Question Number 15-Tortious Interference**

Answer "Yes" or "No." Refer to Instruction Number 34 for an explanation of tortious interference.

Do you find from a preponderance of the evidence that Gibson tortiously interfered with Armadillo's prospective business relations(s).

Answer: _____

**If you answered "Yes," proceed to Question Number 16. If you answered "No," do not answer any other questions. Please proceed to the last page to sign and date the Jury Verdict.**

**Question Number 16- Justifiable Reliance**

Answer "Yes" or "No." Refer to Instruction Number 35 for an explanation of justifiable reliance.

Do you find from a preponderance of the evidence that Gibson justifiably interfered with Armadillo's prospective business relations(s).

Answer: _____

**If you answered "No," proceed to Question Number 17. If you answered "Yes," do not answer any other questions. Please proceed to the last page to sign and date the Jury Verdict.**

**Question Number 17-Tortious Interference Damages**

Answer this question only if you answered both "Yes" in response to Question number 15 and "No." If you answered 'No' in response to Question Number 15 or if you answered "Yes" in response to Question Number 16, do not answer this question.

Answer in dollars and cents, if any. Refer to Instruction Number 36 for an explanation of tortious interference damages.

What sum of money, if paid now and in cash, would compensate Armadillo for Gibson's tortious interference?

Answer: _____

**Proceed to Question Number 18.**

**Question Number 18- Malice**

Answer this question only if you answered both "Yes" in response to Question number 15 and "No." If you answered 'No' in response to Question Number 15 or if you answered "Yes" in response to Question Number 16, do not answer this question.

Answer "Yes" or "No." Refer to Instruction Number 37 for an explanation of malice.

Do you find by clear and convincing evidence that the harm to Armadillo resulted from Gibson's malice?

Answer: _____

**If you answered "Yes," proceed to Question Number 19. If you answered "No," do not answer any other questions. Please proceed to the last page to sign and date the Jury Verdict.**

**Question Number 19- Exemplary Damages**

Answer in dollars and cents, if any. Refer to Instruction Number 38 for an explanation of computing exemplary damages.

What sum of money, if any, if paid now in cash, should be assessed against Gibson and awarded to Armadillo as exemplary damage, if any, for the conduct found in response to Question Number 15?

Answer: _____

**Please sign and date the Jury Verdict.**


Foreperson's Initials: _____    Date: _____