5.      The applied-for mark is not being claimed and has not been claimed in a design or utility patent belonging to Hershey.

*Advertising Expenditures and Sales Success*

6.      Hershey's products embodying the applied-for design are sold throughout all fifty states.  Since 1998 alone, aggregate or total sales to consumers in the United States of chocolate products embodying the applied-for design have exceeded $4 billion.

7.      Hershey heavily advertises and promotes its products embodying the applied-for design.  As of 1986, Hershey Company has spent more than $186 million nationwide in advertising such products.

8.      Hershey's advertisements for products embodying the applied-for design appear in national publications, on national television, on the internet and in several other media outlets.

9.       Many of Hershey's advertisements prominently depict the configuration of its chocolate bar.  In addition, the design's individual segments are featured on many Hershey packages and in other advertising.  Representative samples of such advertising and packages are attached hereto as Exhibit A.

10.     To my knowledge, no advertising concerning Hershey's bars that embody the applied-for design, whether past or present,  have promoted the design of the bar as having utilitarian advantages over any other configuration.

11.     With such widespread and consistent use of the design, and given that Hershey continues to sell its chocolate bar embodying the applied-for design in mass quantities today, Hershey submits that acquired distinctiveness can be readily found.  Based on its tremendous sales success and its significant advertising expenditures, Hershey submits that it has acquired a significant amount of goodwill in the applied-for mark — a fact further confirmed by the

32056968                                  3

secondary meaning survey conducted by Robert L. Klein, submitted herewith, as well as the additional evidence set forth below.

*Attempts To Plagiarize Hershey's Design Mark, and Unsolicited Media Recognition of the Design*

12.    Hershey has, on several occasions, learned of attempts by others to use the applied-for design without permission, and taken steps to enforce its rights in the design. For example, a brownie baking pan described as a "chocolate bar brownie pan" recently was distributed and sold without Hershey's permission by retailer Williams Sonoma. On May 11, 2010, Hershey brought suit against Williams Sonoma for trademark infringement in the United States District Court for the Middle District of Pennsylvania, Civil Action No. 1:10-CV-1011. The parties ultimately resolved the dispute pursuant to the terms of the attached Settlement Agreement (see Exhibit B), pursuant to which Williams Sonoma agreed to pay a license fee in exchange for a limited license of Hershey's design.

13.    Similarly, Hershey's design was copied by another candy company, R.M. Palmer Candy Co. ("R.M. Palmer"), which had produced a chocolate bar with the same configuration as the applied-for design, with the addition of a star in each segment. (*See* Exhibit C a photo of the R.M. Palmer product.) Hershey objected, and, in a conversation with on or around April 27, 2010, R.M. Palmer agreed to cease use of the objected-to design.

14.    The shape and design of Hershey's chocolate bar has also been the subject of favorable unsolicited media recognition. On at least two separate occasions, the design of the bar has been highlighted and recognized by the consuming public.

15.    For example, at the food blog http://bakingbites.com/2009/01/chocolate-bar-brownie-pan, a website devoted to baking and cooking, the author describes the brownie pan sold by Williams Sonoma (which does *not* include the HERSHEY'S trademark) as "use[ing] the

32056968                                    4

119032

iconic look of the chocolate candy bar." The writer associates the appearance of the pan's brownies with the "iconic look" of Hershey's chocolate bars, stating that "[w]hether you're a fan of Hershey's chocolate bars or not, it's design is undeniably a classic confectionery icon: a flat, rectangular bar divided up into bite-sized pieces. . ." A printout from this website is attached as Exhibit D.

16.    The Williams Sonoma brownie pan was featured on another blog, found at http://www.chocolateysprinkles.com/2009/06/01/williams-sonoma/, in which the author announces his excitement for the Williams Sonoma brownie pan and observes that "It's like a Hershey's bar with individual brownies." A printout from this website is attached as Exhibit E.

17.    The configuration of Hershey's chocolate bar is also called to mind by others in connection with goods in a variety of other contexts. For example, one writer likened the size of a "silver metal slug" that is produced by a typesetting machine to "the size and shape of a Hershey's chocolate bar," while another reporter noted that posters for the Dave Matthews Band, that are "designed to look like a Hershey chocolate bar," were for sale. Copies of these articles, and a picture of the Dave Matthews Band poster referenced in the second article, are attached as Exhibit F.

**Federal Trademark Registration of the Well-Known Design of the Famous HERSHEY'S Chocolate Bar (with the word "HERSHEY'S")**

18.    Hershey owns an existing registration, Registration No. 3668662, for a design and word mark in class 30, that consists of the subject design mark, plus letters spelling 'Hershey's' in each recessed panel." *See* Exhibit G. The only difference between the applied-for mark and this existing registration is the inclusion of the word "HERSHEY'S" on each chocolate bar segment; that is, the prior registration covers *both* the word "HERSHEY'S" and the design of the

119033

bar. The Trademark Office did not require Hershey to disclaim the design elements of the mark in Registration No. 3668662.

**Hershey's Chocolate Bar Design is Not Functional and Other Chocolate Bars Exist in a Variety of Configurations**

19.    As set forth in the accompanying declaration of Volker Kramer, Hershey's applied-for design is not functional. As Mr. Kramer explains, there are many equally feasible designs used by other chocolate bars which do not feature most or all of the characteristics at issue in Hershey's application, which is significant evidence of the applied-for mark's non-functionality. For example, there are several other chocolate candy bars that are unsegmented, or that have segments that are different in shape, size, configuration and/or proportion than those of the Hershey design, and/or that have segments that do not include recessed panels or raised edges. Bars that exist in a variety of configurations are plentiful, as evidenced by the record. *See* Kramer Decl., Ex. B. Indeed, other chocolate bars manufactured and sold by Hershey, such as Hershey's Dagoba Organic Chocolate bar (an image of which is attached to the November 24, 2009 Office Action), use very different designs than the applied-for mark.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 23, 2010              By: _____

                                        Lois B. Duquette

                                        Assistant General Counsel – Global
                                        Intellectual Property for The Hershey
                                        Company & Assistant Secretary of Hershey
                                        Chocolate & Confectionery Corporation

# EXHIBIT A

119035

Exhibit 1



2 East 48th Street, New York 10017

Client:        HERSHEY CORPORATION
Product:       MR. GOODBAR
Title:         "PEANUTS & CHOCOLATE"
Comm'l No.:    XHKG1013 (:30C)



TEEN-AGE VOICE: This is a big fat crunchy Mr. Goodbar peanut.



When you take dozens of them and surround them with chocolate,



you've got to make sure . . .



the chocolate taste doesn't get lost in the peanut taste.



They make sure — with Mr. Goodbar.



They use a special chocolate — Hershey's chocolate . . .



to go with all those peanuts.



And you know how chocolatey that is.



Big fat crunchy peanuts.



Chocolatey Hershey's chocolate.



So with Mr. Goodbar . . .



the chocolate taste doesn't get lost in the peanut taste. Mmmmmm.

Exhibit 2

# Ogilvy & Mather

2 East 48th Street, New York 10017

Client: HERSHEY CORPORATION
Product: MILK CHOCOLATE
Title: "ANIMATED FACES"
Commercial No.: OM27-0113-60C



MUSIC: INTRO
SINGER: There's nothing like the face...



of a kid eating a Hershey bar.



There's nothing like it you'll ever see.



A face as happy as it can be.



There's nothing like the face of a kid...



When he's munchin' on the greatest taste around.



Hershey—the great American chocolate bar.
ANNCR (VO): The Hershey bar.



It's got something no other chocolate bar has.



Hershey's chocolate.



Pure milk chocolate.



That's why no other chocolate bar tastes...



quite like a Hershey bar. Hershey—



The Great American Chocolate Bar.



SINGER: There's nothing like the face of a kid...



When he's munchin' on the greatest taste around.



Hershey—the Great American Chocolate Bar.



119037

Exhibit 3

# Ogilvy & Mather

2 East 48th Street, New York 10017

Client:        HERSHEY CORPORATION
Product:     MR. GOODBAR
Title:         "MAGICIAN"
Comm'l No.: XHKG5033 (:30C)



(SILENT)



SFX: (MUSIC IN — UNDER & THROUGHOUT)
SINGER: (VO): Oh, Mr. Goodbar.
Your chocolate taste . . .



doesn't get lost in the peanut taste.



Because you're packed with peanuts.



And Hershey's chocolate.



Lots of peanuts.



And Hershey's chocolate.



Munchy peanuts.



And Hershey's chocolate.



Crunchy peanuts.



And Hershey's chocolate.



Mr. Goodbar,



your chocolate taste doesn't get lost . . .



in the peanut taste.



119039





**Make Every Occasion a S'mores Occasion**



**FREE\* Customized Photo Calendar or Mug Offer!**

**You could win all new HERSHEY'S Drops. Enter now!**

**Heart-warming Winter Treats**

119042



119043



119044



119045



119046









119050







119053



# EXHIBIT B

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement"), dated as of July 12, 2010, is entered into by and between The Hershey Company, a Delaware corporation with a place of business at 100 Crystal A Drive, Hershey, Pennsylvania 17033 and Hershey Chocolate & Confectionery Corporation, a Delaware corporation with a place of business at 4860 Robb Street, Wheat Ridge, Colorado 80033 (collectively referred to as "Hershey"), on the one part, and Williams Sonoma, Inc., a California corporation with a place of business at 3250 Van Ness Avenue, San Francisco, California 94109 ("WSI"), regarding WSI's marketing and sale of its chocolate bar brownie pan, the configuration of which Hershey has asserted infringes and dilutes the trade dress of Hershey's claimed Chocolate Bar Design Mark described herein.

**WHEREAS**, Hershey claims to have used for many years a product configuration of a chocolate bar that consists of, *inter alia*, a rectangle containing twelve equally-sized recessed rectangular panels arranged in a 4x3 format (the "claimed Chocolate Bar Design Mark"), variations of which are described by United States Trademark Registration No. 3,668,662 and United States Trademark Application Serial No. 77,809,223, and examples of which are attached as Exhibit A hereto; and

**WHEREAS**, WSI has distributed and sold in the United States a baking pan that WSI describes as a "chocolate bar brownie pan" (the "WSI Product"), which is depicted in Exhibit B hereto); and

**WHEREAS**, on May 11, 2010, in the United States District Court for the Middle District of Pennsylvania, Hershey commenced Civil Action No. 1:10-CV-1011 (the "Litigation") against WSI, alleging, *inter alia*, that WSI's distribution and sale of the WSI Product infringes and dilutes Hershey's claimed Chocolate Bar Design Mark, and alleging claims for, *inter alia*,

trademark infringement, false designation of origin, trademark dilution and unfair competition relating to the use of the product configuration of the WSI Product; and

**WHEREAS**, WSI denies the foregoing assertions made against it by Hershey and denies that its alleged conduct violates Hershey's claimed rights or infringes or dilutes any trademark or trade dress; and

**WHEREAS**, the parties hereto wish to resolve their dispute and to terminate the Litigation pursuant to the terms of this Agreement, as set forth herein;

In consideration of the mutual representations, warranties and promises recited herein, the parties hereto agree as follows:

1.      WSI represents and warrants that after the date of this Agreement, it will distribute or sell no more than 7,500 units of the WSI Product, which units it shall distribute or sell pursuant to this Agreement and the attached license agreement.

2.      Hershey hereby grants WSI a nonexclusive, nontransferable license in the form attached as Exhibit C to use the claimed Chocolate Bar Design Mark as assertedly embodied in the WSI Product in connection with the distribution and sale in the United States of no more than 7,500 units of the WSI Product from the date of this Agreement through and including January 15, 2011. In consideration for the foregoing license and the other covenants set forth herein, WSI will pay Hershey, simultaneously with the execution of this Agreement, a licensing fee of $2,000 (two thousand dollars).

3.      WSI agrees that any WSI products sold under this license shall have been manufactured in accordance with the same quality standards as the units of WSI Product previously distributed by WSI, and that such products shall be advertised and promoted in a similar manner and in similar channels as WSI has previously used for WSI Product. If Hershey

has reasonable grounds for believing that this provision has been breached, upon written request by Hershey, WSI shall provide Hershey with a sample of the WSI Product and with representative samples of catalogs and packaging materials for the WSI Product.

    4.    Simultaneously with the execution of this Agreement, the parties shall execute the License Agreement attached as Exhibit C hereto (the "License Agreement").

    5.    WSI agrees that all use of the claimed Chocolate Bar Design Mark by WSI shall inure to the benefit of and be on behalf of Hershey, with the understanding that Hershey makes no claim to and will receive no benefit from other trademarks that are used in conjunction with the WSI Product.  WSI agrees that nothing in this Agreement or the License Agreement shall give WSI any right, title or interest in the Chocolate Bar Design Mark other than the right to use that mark in accordance with this Agreement and the License Agreement.  In connection with the WSI product and the License Agreement, WSI agrees that it will not attack the title of Hershey to the claimed Chocolate Bar Design Mark or attack the validity of the license granted herein and in the License Agreement.

    6.    Except as provided herein, WSI shall cease all use of, and all advertising, promotion, distribution and sale of any WSI Product.

    7.    Notwithstanding anything to the contrary in this Agreement or otherwise, Hershey reserves all rights to challenge any alleged use by WSI (other than in connection with the distribution and sale of the WSI Product as permitted by this Agreement) of the claimed Chocolate Bar Design Mark or any advertising, distribution or sale by WSI of any products bearing or embodying the claimed Chocolate Bar Design Mark or any design confusingly similar thereto.

119058

8.     WSI reserves the right to make and sell any product except as explicitly agreed in this Agreement and does not concede that any of Hershey's claimed registered or common law marks would apply to such products.  Notwithstanding the foregoing, WSI hereby agrees not to challenge or contest in any manner whatsoever, the validity of and Hershey's ownership of:

        a.     United States Trademark Registration No. 3,668,662 or the mark embodied by that registration; or

        b.     in the event that United States Trademark Application Serial No. 77,809,223 matures into a registration, the registration resulting therefrom, or the mark embodied in that registration.

WSI further agrees not to challenge or oppose in any manner the maturation to registration of United States Trademark Application Serial No. 77,809,223.

9.     In consideration of the representations, warranties and covenants by WSI contained herein, within five business days after execution of this Agreement and receipt of the payment by WSI provided for in Paragraph 2, Hershey will file a voluntary dismissal with prejudice, with each party to bear its own costs and attorneys' fees, of the action titled *The Hershey Company and Hershey Chocolate & Confectionery Corporation v. Williams Sonoma, Inc.*, No. 1:10-CIV-1011, that is pending in the United States District Court for the Middle District of Pennsylvania.

10.     Except for any breach or violation, or claim of breach or violation, of this Agreement or the License Agreement, the parties each release and forever discharge each other, and each of their respective officers, directors, agents, servants, employees, attorneys, affiliates, subsidiaries, suppliers, customers, successors and assigns, from any and all claims, actions and causes of action concerning or in any way relating to the marketing of the WSI Product depicted in Exhibit B hereto.  This specifically excludes from the release any claims related to other

119059

products sold by WSI.  The parties represent, warrant and agree that they have been fully advised by their respective attorneys regarding the contents of Section 1542 of the Civil Code of California.  Section 1542 reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

The parties expressly waive and relinquish all rights and benefits under the above section, and any similar law or common law principle of similar effect in any jurisdiction with respect to the released claims.

11.     The existence and terms of this Agreement are confidential and shall be maintained in strict confidence by the parties, except to the extent that disclosure is required by an order of a court of competent jurisdiction or otherwise required by law.  Notwithstanding the foregoing, (a)  disclosure to the parties' legal/tax/financial advisors is permitted; and (b) disclosure is permitted to the extent necessary to respond to legitimate discovery requests, provided that such disclosure is designated as confidential pursuant to the terms of an appropriate protective order.  Hershey may also disclose, during the pendency of the license, the fact that WSI's sale of the WSI Product is under license by Hershey, solely to third parties that Hershey has asserted are infringing the Chocolate Bar Design Mark, but shall not disclose this Agreement or the License Agreement except in discovery as set forth above. WSI agrees that Hershey may submit an executed version of the License Agreement to the United States Patent & Trademark Office to the extent Hershey deems it reasonably necessary to do so in connection with its efforts to register its rights in the Chocolate Bar Design Mark, including without limitation in connection with the pending United States Trademark Application Serial No. 77,809,223.  The parties agree that they will not comment to the press if there are inquiries about the litigation or

Hershey's claims and that they will not disclose to anyone, directly or indirectly, that the License Agreement is publicly filed – if it is – with the United States Patent & Trademark Office.

12.    This Agreement contains the entire agreement between the parties pertaining to the subject matter of this Agreement, and supersedes all prior or contemporaneous agreements, understandings and negotiations, whether written or oral, between the parties on or with respect to the issues addressed herein.  This Agreement may not be waived, altered, modified, changed, amended, rescinded or terminated except by an instrument in writing signed by an authorized representative of each of the parties hereto.  In reaching this Agreement, none of the parties to the Agreement have relied on any representation by any of the other parties to the Agreement or any attorney, agent or representative for any of the other parties to the Agreement, except as set forth herein.

13.    The failure of a party to insist upon strict adherence to any term or obligation of this Agreement shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or obligation, or any other term or obligation, of this Agreement.

14.    The parties agree that any ambiguity in this Agreement is not to be construed against any party to this Agreement on the grounds that such party drafted the Agreement, but shall be construed as if all parties jointly prepared this Agreement and any uncertainty or ambiguity shall not on that ground be interpreted against any one party.

15.    In the event of a conflict between the terms of this Agreement and the terms of the License Agreement, this Agreement shall govern.

16.    This Agreement shall be governed and construed under the laws of New York, without regard to its choice of law rules or conflict of law provisions, and any lawsuit brought to

119061

enforce this Agreement or the License Agreement shall be brought in the United States District Court for the Southern District of New York. The parties hereby submit to personal jurisdiction in the United States District Court for the Southern District of New York with respect to any such lawsuit brought to enforce this Agreement or the License Agreement.

17.    This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their successors, affiliates and assigns.

18.    The parties hereto are executing this Agreement of their own free will and on the advice and recommendation of their own independently selected counsel. Hershey expressly acknowledges that WSI has not made any promises, agreements, or representations to it, whether written or oral, except as expressly set forth in this Agreement, including, but not limited to, any promises, agreements or representations inconsistent with the terms of this Agreement. WSI expressly acknowledges that Hershey has not made any promises, agreements or representations to it, whether written or oral, except as expressly set forth in this Agreement, including, but not limited to, any promises, agreements or representations inconsistent with the terms of this Agreement.

19.    If any of the provisions, terms, clauses, or waivers or releases of claims or rights contained in this Agreement are declared illegal, unenforceable or ineffective in a legal or other forum or proceeding, such provisions, terms, clauses or waivers and releases of claims or rights shall be deemed severable, such that all other provisions, terms, clauses or waivers and releases of claims and rights contained in this Agreement shall remain valid and binding upon all parties to the Agreement.

20.    Each of the persons signing this Agreement represents and warrants that they have authority to bind their respective party or parties to this Agreement.

21.     This Agreement may be executed in counterpart by original or facsimile signatures with the same force and effect as though the same document has been executed by all parties.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date written above.

THE HERSHEY COMPANY                         WILLIAMS SONOMA, INC.

By _____                  By _____
   Susan M. Angele                              [name]
   Vice President, Deputy General Counsel       [title]
   and Chief Governance Officer

HERSHEY CHOCOLATE &
CONFECTIONERY CORPORATION

By _____
   Lois B. Duquette
   Assistant Corporate Secretary

31989480_V8                                  8

119063

21.    This Agreement may be executed in counterpart by original or facsimile signatures with the same force and effect as though the same document has been executed by all parties.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date written above.

THE HERSHEY COMPANY

By _____
    Susan M. Angele
    Vice President, Deputy General Counsel
    and Chief Governance Officer


HERSHEY CHOCOLATE &
CONFECTIONERY CORPORATION


By _____
    Lois B. Duquette
    Assistant Corporate Secretary

WILLIAMS-SONOMA, INC.

By _____
    Richard Harvey
President, Williams-Sonoma Brand

EXHIBIT A





21

119065

## EXHIBIT B

WSI Product



119066

**EXHIBIT C**

**Trademark License Agreement**

THIS AGREEMENT, effective as of the 12th day of July, 2010, by and between: Hershey Chocolate & Confectionery Corporation, a Delaware corporation with a place of business at 4860 Robb Street, Wheat Ridge, Colorado 80033 (hereinafter called "Licensor"), and Williams Sonoma, Inc., a California corporation with a place of business at 3250 Van Ness Avenue, San Francisco, California 94109 (hereinafter called "Licensee").

WHEREAS, Licensor represents it is the owner of the trademarks (hereinafter called "Marks") and registrations and applications therefore set forth in Exhibit 1 hereto;

WHEREAS, Licensee is desirous of using the Marks in connection with its business;

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises hereinafter set forth, and for valuable consideration, the receipt and sufficiency of which Licensor hereby acknowledges, the parties agree as follows:

I.    GRANT OF LICENSE

Licensor grants to Licensee a nonexclusive, nontransferable license to use the Marks in connection with Licensee's "chocolate bar brownie pan" product (the "WSI Product"), and Licensee accepts the license subject to the following terms and conditions.

II.    OWNERSHIP OF MARKS

Licensee agrees that it will do nothing inconsistent with Licensor's ownership of the Marks and that all use of the Marks by Licensee shall inure to the benefit of and be on behalf of Licensor.  Licensee agrees that nothing in this License shall give Licensee any right, title or interest in the Marks other than the right to use the Marks in accordance with this License and Licensee agrees that it will not attack the title of Licensor to the Marks or attack the validity of this License.

III.    QUALITY STANDARDS

Licensee agrees that the nature and quality of all goods sold by Licensee under the Marks and all related advertising, promotional and other related uses of the Marks by Licensee shall conform to standards set by Licensor, and shall be maintained at at least as high a standard as previously maintained by Licensee in connection with the WSI Product.

IV.    QUALITY MAINTENANCE

Licensee agrees to cooperate with Licensor in facilitating Licensor's control of such nature and quality, to permit reasonable inspection of Licensee products sold under the Marks,

23

119067

and to supply Licensor with specimens of uses of the Marks and a sample WSI Product upon reasonable request. Licensee shall comply with all applicable laws and regulations pertaining to the sale, distribution and advertising of goods and services covered by this License.

V.    INFRINGEMENT PROCEEDINGS

Licensor shall have the sole right and discretion to bring infringement or unfair competition proceedings involving the Marks.

VI.    TERM

This Agreement shall continue in force and effect until January 15, 2011, unless renewed by mutual agreement of the parties by signed writing.

VII.    TERMINATION FOR CAUSE

Licensor shall have the right to terminate this Agreement upon thirty (30) days' written notice to Licensee in the event of any affirmative act of insolvency by Licensee, or upon the appointment of any receiver or trustee to take possession of the properties of Licensee or upon the winding-up, sale, consolidation, merger or any sequestration by governmental authority of Licensee, or upon breach of any of the provisions hereof by Licensee.

VIII.    EFFECT OF TERMINATION

Upon termination of this Agreement Licensee agrees to immediately discontinue all use of the Marks on the WSI Product, and that all rights in the Marks and the goodwill connected therewith shall remain the property of Licensor.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

HERSHEY CHOCOLATE &                    WILLIAMS SONOMA, INC.
CONFECTIONERY CORPORATION

By _____            By _____
   Lois B. Duquette                       Name:
   Assistant Corporate Secretary          Title:

119068

and to supply Licensor with specimens of uses of the Marks and a sample WSI Product upon reasonable request. Licensee shall comply with all applicable laws and regulations pertaining to the sale, distribution and advertising of goods and services covered by this License.

V.    INFRINGEMENT PROCEEDINGS

Licensor shall have the sole right and discretion to bring infringement or unfair competition proceedings involving the Marks.

VI.    TERM

This Agreement shall continue in force and effect until January 15, 2011, unless renewed by mutual agreement of the parties by signed writing.

VII.    TERMINATION FOR CAUSE

Licensor shall have the right to terminate this Agreement upon thirty (30) days' written notice to Licensee in the event of any affirmative act of insolvency by Licensee, or upon the appointment of any receiver or trustee to take possession of the properties of Licensee or upon the winding-up, sale, consolidation, merger or any sequestration by governmental authority of Licensee, or upon breach of any of the provisions hereof by Licensee.

VIII.    EFFECT OF TERMINATION

Upon termination of this Agreement Licensee agrees to immediately discontinue all use of the Marks on the WSI Product, and that all rights in the Marks and the goodwill connected therewith shall remain the property of Licensor.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

HERSHEY CHOCOLATE &                    WILLIAMS SONOMA, INC.
CONFECTIONERY CORPORATION


By _____            By _____
    Lois B. Duquette                        Richard Harvey
    Assistant Corporate Secretary            President, Williams-Sonoma Brand

24

**EXHIBIT 1 to License Agreement**

U.S. Trademark Registration No. 3,668,662
United States Trademark Application Serial No. 77,809,223





25

119070

# EXHIBIT C

119071



Image of RM Palmer product.docx

# EXHIBIT D

119073





Follow on Twitter

Subscribe by RSS

search...



# Chocolate Bar Brownie Pan

JANUARY 30, 2009     GEAR AND GADGETS, SWEET STUFF     6 COMMENTS          retweet



Whether you're a fan of Hershey's chocolate bars or not, it's design is undeniably a classic confectionary icon: a flat, rectangular bar divided up into bite-sized pieces that are easy to snap off. I don't know that Hershey's was the first chocolate maker to use this design, but it is the one that is certainly the most well known for it. Williams Sonoma is currently carrying a Chocolate Bar Brownie Pan that uses the iconic look of the chocolate candy bar to make brownies look even more chocolaty than they are to begin with.

The pan, which is made by NordicWare, is heavy duty cast aluminum and measures 13.5" x 6.5" x 1.5". It will work for a recipe scaled to a standard 9×13-inch pan. This pan will work best for denser recipes, like brownies (as the name of the pan suggests), fudge or flourless chocolate cake. Other cakes, while they will still bake up just fine, will not be left with as distinct an impression of the candy bar design and details will be more difficult to make out, even though the nonstick finish of the pan should help the cake release easily.



## Related Posts

*NO RELATED POST*

## Share This Article

SHARE ON FACEBOOK

TWEET THIS!

SAVE TO DELICIOUS

DIGG IT!



Ads by Google
Chocolate Cake
Brownie
Pan No by Name
Pan

## CATEGORIES

Baking (420)

Contests (34)

Cooking (89)

Drinks (29)

Featured (6)

Featured Holiday (6)

Food News (59)

Foodies and Chefs (190)

Fruits and Veggies (33)

Gear and Gadgets (307)

Holidays (184)

Magazines & Cookbooks (185)

New Products (40)



Advertise | BlogHer Privacy Policy

More from BlogHer

**Thanksgiving Popcorn!**

**Preserved Pears Recipe**

**Walnut and Date Cookies**

More from iVillage



**Product Reviews** (121)

**Recipes** (1075)

**Breads – Quick Breads** (59)

**Breads – Yeast Breads** (92)

**Breakfasts** (136)

**Cakes** (123)

**Cakes – Cheesecake** (18)

**Cakes – Cupcakes** (51)

**Cakes – Frosting** (56)

**Candies** (22)

**Chocolate** (231)

**Coffee Cake** (19)

**Cookies** (165)

**Cookies – Bar Cookies and Brownies** (57)

**Crisps and Other Fruit Desserts** (55)

**Dessert Sauces** (15)

**Drinks** (34)

**Frozen Desserts** (37)

**Muffins** (52)

**Pastries** (17)

**Pie and Tart Crusts** (29)

**Pies** (41)

**Puddings, Custards and Mousses** (39)

**Sauces** (9)

**Savory Main Dishes** (56)

**Savory Side Dishes and Salads** (48)

**Savory Snacks, Dips and Sauces** (44)

**Savory Soups** (15)

**Scones** (24)

**Souffles** (9)

**Tarts** (20)

**Restaurants** (39)

**Savory Stuff** (47)

**Stores and Shopping** (23)

**Sweet Stuff** (244)

**Travel** (71)

**Uncategorized** (34)

**Vegan** (31)

Vegan Feast Kitchen

Veggie Venture

Wednesday Chef

YumSugar



**NON FOOD SITES**

Boing Boing

Consumerist

Cute Overload

Not Martha

TRR Sporthorses

HOME   ABOUT BAKING BITES   BLOGROLL   FAQ   RECIPE INDEX   THE BAKING BITES COOKBOOK

BROWSE CATEGORIES:

BAKING   CONTESTS   COOKING   DRINKS   FEATURED   FEATURED HOLIDAY   FOOD NEWS   FOODIES AND CHEFS   FRUITS AND VEGGIES   GEAR AND GADGETS   HOLIDAYS   MAGAZINES & COOKBOOKS   NEW PRODUCTS   PRODUCT REVIEWS   RECIPES   RESTAURANTS   SAVORY STUFF   STORES AND SHOPPING   SWEET STUFF   TRAVEL   UNCATEGORIZED   VEGAN

THEME DESIGNED BY WPZOOM.

COPYRIGHT © 2010 BAKING BITES. ALL RIGHTS RESERVED.

GRAB OUR RSS FEED        FOLLOW US ON TWITTER

# EXHIBIT E

119078

Williams-Sonoma « Caro's Ramblings                                    http://www.chocolateysprinkles.com/2009/06/01/williams-sonoma/



# Caro's Ramblings

*never be afraid of anything with chocolate sprinkles*

**01 Jun**

o

## Williams-Sonoma

### Blog Pages

- About
- Awesome Albums
- Fun Signs
- Good Reads

### Blogs I Read

- Danielle's Travels
- EmmieBee
- Fictitional Life of Penney
- Jess Loves Cupcakes
- Kate's Eurotrip
- krust gone wild
- Ninjas Ate My Lunch...
- The Simmons
- Zigzo Zlinks

### Sites That Entertain Me

- Cafferty File
- f my life
- Fail Blog
- Lolcats
- matt, liz and madeline
- Snacks and Shit
- Texts From Last Night
- The Guild
- The Onion
- Tomatoes Are Evil
- Trailer Park Boys
- Work Doesn't Suck

### Categories

- animals

119079

Williams-Sonoma « Caro's Ramblings                    http://www.chocolateysprinkles.com/2009/06/01/williams-sonoma/



Leave a Reply

I had the pleasure of visiting Williams-Sonoma this weekend and I'm absolutely in LOVE with all of the items there. Let's start with the Sandwich Cookie Cake Pan. What's not to like? You end up with 2 cakes with frosting in the middle...a cake sandwich. YUM.



Then there's The Great Cupcake Pan. I know a few people that own this, but have never had the pleasure of feasting on the end result! Maybe I'll just have to bake myself a giant cupcake cake?



I can't just get cake pans; gotta do the brownies too!! The Chocolate Bar Brownie Pan:



==It's like a Hershey's bar with individual brownies. I'm totally digging this!== And the Gift Cakelet Pan...



Mini cakes. They look like little presents waiting for me to devour them. How can I resist? Especially when Williams-Sonoma makes my life 100x easier by selling the cake and brownie mixes right there!! I've never had a Sprinkles cupcake but I hear they're quite fabulous. Williams-Sonoma carries a variety of flavors of mixes, including Red Velvet (my favorite), dark chocolate (yes please!), vanilla, lemon, and banana.

Can someone please put me out of my misery and present me with a cupcake? I'm dying after looking at all this!

Posted by Caro in discoveries, food, rants and raves, shopping | Trackback



baby
clothes
cool
discoveries
dreams
family
fears
food
fun
hilarious
interesting
Life
money
music
news
random
rants and raves
shoes
shopping
sports
THE trip 2009
things to do
travel
tv
videos
weird

## Calendar

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

« May                    Jul »

June 2009

## Archives

January 2010
December 2009
November 2009
October 2009
September 2009
August 2009
July 2009

119080

Williams-Sonoma « Caro's Ramblings                    http://www.chocolateysprinkles.com/2009/06/01/williams-sonoma/



119081

# EXHIBIT F

119082

100215



4 of 445 DOCUMENTS

Copyright 2010 Newstex LLC
All Rights Reserved
Newstex Web Blogs
Copyright 2010 True/Slant
True/Slant

June 17, 2010 Thursday 1:03 PM EST

**LENGTH:** 893 words

**HEADLINE:** Swan Songs: Rudy Lehman's Incredible Linotype Letterpress

**BYLINE:** Matthew Newton

**BODY:**

Jun. 17, 2010 (True/Slant delivered by Newstex) --

Rudy Lehman by Nate Boguszewski. (click to enlarge)

Swan Songs is a three-part narrative series examining the lives and work of Americas vanishing tradesmen.

The front door to Lehman Typesetting"located in Wilkinsburg, a small town outside of Pittsburgh"is either finicky or locked, its hard to tell. I assume the former to be true and set to fidgeting with the worn brass handle. A stranger in the same situation might deduce, based on outward appearance alone (sun-bleached sign; deteriorating paint), that the shop has been out of business for years, perhaps even decades. But as I peer through the dust-smeared window, I see the flicker of a ceiling-mounted fluorescent tube light.

Rudy Lehman by Nate Boguszewski. (click to enlarge)

Impatient, I double my efforts to finesse the uncooperative door handle, this time adding more torque to my twisting/pushing motion"which fails except for the fact that I make enough noise to capture the attention of someone inside. Thats when I see a short, white-haired man emerge from behind the shops counter.

oeHey there, says Rudy Lehman, the 72-year-old man who has just opened the front door and is looking at me with what can only be described as sincere skepticism (a reaction I seem to elicit from strangers more often than Id like), oehow can I help you?

I inform him that Im the journalist he spoke to on the phone last week, the one who wants to interview him about his experience working as a typesetter for the past 50 years"a proposal that, over the phone, was met with the response, oeYoure welcome to talk with me, I just dont know how interesting itll be.

Lehmans modesty is not surprising. Hes a polite, soft-spoken man who enjoys routine and seems awkwardly out of place in the 21st century. But the one critical detail hes overlooking, the one that makes his story compelling, is the remarkable fact that hes still operating a typesetting shop"over two decades since computers rendered mechanical-based typesetting almost entirely obsolete.

Restaurant owner realizes sweet dream Sentinel & Enterprise (Fitchburg, Massachusetts) November 5, 2009 Thursday

Rudy Lehman by Nate Boguszewski. (click to enlarge)

Once inside Lehmans shop, my eyes are drawn to a mammoth-sized black machine thats partially obscured by a door leading to the main work room. This mysterious-looking contraption, Lehman informs me, is called a Linotype, and its name does precisely what it infers"it spits out a oeline of type in the form of a metal slug that is then used to print sentences, paragraphs, or entire books on letterpress. When Lehman purchased the Linotype back in 1957, it cost $15,000"a figure that no doubt rivaled the GDP of a small Eastern Bloc country of the time.

To describe the machine as grand would be unfair. More aptly, the Linotype is intimidating in appearance and mystifyingly complex in design.

oeCan you show me how it works? I ask.

oeSure, Lehman says, as he motions for me to come in closer for a demonstration.

He sits down behind a peculiar-looking keyboard and rakes his wide fingers across the neatly lined rows of square metal keys, which are arranged in order of the frequency they occur in the English language (i.e. vowels first, followed by consonants, etc.). As Lehman randomly types, his hands hover over the keys between each strike. The machine is noisy and its small motor chugs to turn the belts and wheels that make its multiple mechanisms work.

Rudy Lehman by Nate Boguszewski. (click to enlarge)

oeCan you hear that? Lehman asks, talking loudly to be heard over the noise of the machine. oeThats the sound of the mats. They drop in from the magazine above and line up here on the assembler to create your text. Hes pointing at a ruler-like ledge several inches above the keyboard. The oemats he refers to (brass matrices that are stamped with a specific letter, font style, and size and notched with key-like teeth that guide them through the machine) make a sound that reminds me of the rhythmic clacking of Connect 4, Milton Bradleys vertical checkers game.

After the mats are lined up to create the desired text, they are thrust into a mold by way of a lever cranked by Lehman. Molten lead from a heated crucible in the machines belly is squeezed into the mold. The mats are then retrieved from the assembler by a thin black metal arm that lowers itself from the left side of the machine. As the arm returns to its former position, the mats are fed back into the magazine atop the Linotype. Lastly, Lehman engages a portion of the machine called the knife block, which cuts and trims the injected lead. Thats when the finished product"a silver metal slug approximately the size and **shape** of a **Hersheys** chocolate **bar**"drops into a galley tray several inches from Lehmans knee.

oeHere it is, he says, showing me the slug as he proudly holds it between his thumb and index finger.

And though I just witnessed the process first hand, it may as well be magic. As I look over at Lehman, whos still holding the slug in his right hand and explaining minute details of the Linotype, his voice vanishes into the background for a moment and I notice hes smiling, happy.

Authors note: A truncated (and heavily edited) version of this article was originally published in Swindle magazine back in 2007. The text that appears here is the original, unedited manuscript and is exclusive to Annals of Americus. All photographs by Nate Boguszewski.

Newstex ID: TRSL-7025-46175669

NOTES: The views expressed on blogs distributed by Newstex and its re-distributors ("Blogs on Demand®") are solely the author's and not necessarily the views of Newstex or its re-distributors. Posts from such authors are provided "AS IS", with no warranties, and confer no rights. The material and information provided in Blogs on Demand® are for general information only and should not, in any respect, be relied on as professional advice. No content on such Blogs on Demand® is "read and approved" before it is posted. Accordingly, neither Newstex nor its re-distributors make any claims, promises or guarantees about the accuracy, completeness, or adequacy of the information contained therein or

Restaurant owner realizes sweet dream Sentinel & Enterprise (Fitchburg, Massachusetts) November 5, 2009 Thursday

linked to from such blogs, nor take responsibility for any aspect of such blog content. All content on Blogs on Demand® shall be construed as author-based content and commentary. Accordingly, no warranties or other guarantees will be offered as to the quality of the opinions, commentary or anything else offered on such Blogs on Demand®. Reader's comments reflect their individual opinion and their publication within Blogs on Demand® shall not infer or connote an endorsement by Newstex or its re-distributors of such reader's comments or views. Newstex and its re-distributors expressly reserve the right to delete posts and comments at its and their sole discretion.

**LOAD-DATE:** June 17, 2010

Page 4



53 of 445 DOCUMENTS

Copyright 2009 The Patriot News Co.
All Rights Reserved
Patriot News (Harrisburg, Pennsylvania)

August 3, 2009 Monday
FINAL EDITION

**SECTION:** YOUR LIFE; Pg. B01

**LENGTH:** 158 words

**HEADLINE:** YOUR TIP SHEET

**BODY:**

Did you attend the Dave Matthews Band concert in Hershey the other week but weren't able to get a souvenir?

You're in luck, provided you have some cash to spend.

For each concert, DMB sells a special, limited edition series of silk-screened posters, designed by Methane Studios.

For the Hershey concert this year, Methane created a poster that mimics the packaging on Reese's peanut butter cups.

Apparently Hershey had a bit of a problem with the band using their candy logo. According to the DMB message board at antsmarching.org, they initially pulled the posters around 3 p.m., only to give the band permission two hours later.

The posters sold for about $35 at the concert, but you'll have to pay quite a bit more if you want one now. Prices on eBay range from $45 to $99.

If that one doesn't suit you, there's always the 2008 poster, which was designed to **look** like a **Hershey** chocolate **bar.** It's currently on sale on eBay for $100.

-- From staff reports

**LOAD-DATE:** August 5, 2009



# EXHIBIT G

119088

**Int. Cl.: 30**

**Prior U.S. Cl.: 46**

Reg. No. 3,668,662

## United States Patent and Trademark Office

Registered Aug. 18, 2009

## TRADEMARK
### PRINCIPAL REGISTER



HERSHEY CHOCOLATE & CONFECTIONERY CORPORATION (DELAWARE CORPORATION)

4860 ROBB STREET, SUITE 204

WHEAT RIDGE, CO 80033

FOR: CANDY, IN CLASS 30 (U.S. CL. 46).

FIRST USE 12-31-1968; IN COMMERCE 12-31-1968.

OWNER OF U.S. REG. NOS. 54,041, 863,592, AND 1,367,943.

THE MARK CONSISTS OF TWELVE (12) EQUALLY-SIZED RECESSED RECTANGULAR PANELS ARRANGED IN A FOUR PANEL BY THREE PANEL FORMAT WITH EACH PANEL HAVING ITS OWN RAISED BORDER WITHIN A LARGE RECTANGLE WITH LETTERS SPELLING "HERSHEY'S" IN EACH RECESSED PANEL.

SEC. 2(F).

SER. NO. 77-581,348, FILED 9-29-2008.

ROBERT C. CLARK JR., EXAMINING ATTORNEY

119089

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant: | Hershey Chocolate & Confectionary Corporation | ) ) ) | Law Office: 116 |
| Serial No.: | 77/809223 | ) ) | Examining Attorney: John Dwyer |
| Filed: | August 20, 2009 | ) ) | |
| Mark: | Miscellaneous Design (Recessed Rectangular Panels) | ) ) ) | |

### DECLARATION OF VOLKER KRAMER

Volker Kramer, being duly sworn, deposes and states:

1.     I declare the following information from my personal knowledge and if called upon to do so, could competently testify to the facts submitted in this declaration.

### Background

2.     I am the owner, President and Chief Execcutive Officer of Agathon GmbH & Co. KG ("Agathon"), based in Bottrop, Germany.   I have held this position for almost ten years.

3.     Agathon is a leading producer of chocolate moulds for large-scale industrial production worldwide and specializes in designing and producing chocolate moulds, a field in which I have worked for many years.  As part of my job, I consult with chocolate manufacturers, including United States manufacturers, concerning the design and development of chocolate moulds for use in the production of chocolate products.

4.     I am familiar with the well-known design of the HERSHEY'S chocolate bar, for which design (without the word "HERSHEY'S") I understand trademark protection is being sought in the United States Patent & Trademark Office in Application No. 77/809223.  That design is depicted in Exhibit A hereto.



32063356.DOC

5.    The design consists of a rectangular candy bar with twelve equally-sized recessed rectangular panels, each of which is of roughly the same proportions as the rectangular bar itself, and which are arranged in a four panel by three panel format with each panel having its own raised border.

6.    As I explain more fully below, this particular candy bar design is not functional, because it is not cheaper to produce and does not result in a better-designed candy bar as compared to numerous other alternative designs.

7.    First, the particular shapes and combination of the design elements comprising the Hershey design do not provide any utilitarian advantage over alternative designs.  For example, if a bar is so divided, the individual segments do not need to be in the shape, size, number, proportions or configuration embodied in Hershey's design.  A segmented bar can have more than 12 segments or less than 12, it could have square or triangular segments instead of rectangular, it could have segments that are not proportional to the bar's overall shape, it could have segments arranged in a different way than four by three, and so on.  Nor is there any need for the segments to have recessed panels or raised edges; many segmented bars do not have these features.  Attached as Exhibit B are examples of various chocolate candy bars that are unsegmented, or that have segments that are different in shape, size, configuration and/or proportion than those of the Hershey design, and/or that have segments that do not include recessed panels or raised edges.

8.    Indeed, in some respects, the Hershey design is less functional than other designs. For example, the tooling and moulds for the framed segments of the Hershey design are more expensive to create than are the tooling and moulds for other chocolate bar designs.

32063356.DOC                      2

119091

9.      Nor does the Hershey design result in lower manufacturing costs as compared to alternative bar designs.

10.      The particular configuration of the Hershey design also is no less costly to manufacture than other alternative segmented bar designs.  A bar with fewer or more than twelve segments, with square or triangular segments, with segments of different proportions, or with segments that do not have recessed panels or raised edges, would be no more costly to manufacture than a bar with the Hershey design.  Put simply, there are many, many other ways that one could design a chocolate bar other than the Hershey design, without giving up any cost or efficiency advantage.  In fact, we manufacture moulds for a number of other companies that are do not involve any greater manufacturing costs than bars using the iconic Hershey design.

11.      I am familiar with innumerable other chocolate bars, besides the HERSHEY'S chocolate bar, that are marketed and sold by other companies and that do not mimic the Hershey design, and which are equally feasible design alternatives.  In light of these many available alternative designs, and based on my experience in the chocolate mould business, it is my opinion that a prohibition on the copying of the design in Hershey's applied-for mark would not limit others' abilities to manufacture functional, desireable chocolate bars in a cost-effective manner.

I declare under                    the laws of *Germany* that the foregoing is true and correct.

32063356.DOC                                    3

Dated: November 23, 2010
Bottrop, Germany

_____
Volker Kramer

_____
Date

4

# EXHIBIT A

119094



119095



EXHIBIT B









119098





119099













Report of Robert L. Klein

in the matter of

Hershey Trademark Application #77809223

**Secondary Meaning
Survey Methodology and Results**

November 22, 2010

Applied Marketing Science, Inc.
303 Wyman Street, Suite 205
Waltham, MA 02451

119103

**Credentials of Robert L. Klein and qualifications as an expert**

I am president and co-founder of Applied Marketing Science, Inc. (AMS) a market research and consulting firm with offices in Waltham, Massachusetts.

I received a Bachelor of Science degree in Mechanical Engineering in 1966 from the Massachusetts Institute of Technology, Cambridge, Massachusetts, and a Master of Science degree in 1968 from the MIT Sloan School of Management. I served as a commissioned officer in the US Public Health Service from 1968 to 1970 and was stationed at the National Institutes of Health in Bethesda, Maryland.

I returned to the Boston area in 1970 to join three former professors in starting Management Decision Systems, Inc. (MDS). I was Senior Vice President responsible for the development of market research models and measurement tools to forecast new product success, to measure the impact of advertising and other promotions, and to help product managers increase the profitability of their brands. In 1985, MDS had 250 employees and offices in the U.S., Europe, and Asia.

In 1985, Information Resources, Inc. (IRI), then the 4th largest market research company in the world, acquired MDS. IRI specialized in the collection and analysis of data generated by supermarket scanners. I became Executive Vice President of IRI with responsibility for custom consulting and market research projects outside the world of consumer package goods.

In 1989, I left IRI to start Applied Marketing Science, Inc. with an MIT professor and a former client as partners. For the past 21 years we have conducted market research on a wide range of both consumer and business products and services. I am the president of AMS and we currently have over 15 employees working out of our office in suburban Boston.

I am a member of the American Society for Quality, the Product Development and Management Association, the Institute for Operations Research and Management Science, and I am a Certified Product Development Professional. For four years I was also a member of the Proof of Confusion Subcommittee of the International Trademark Association.

1

119104

**Background and Objective**

The Hershey Chocolate & Confectionary Corporation (hereafter "Hershey") has filed an application to register the product configuration of its chocolate bar as a trademark (Application #77809223). Specifically, Hershey has applied to register the "configuration of a candy bar that consists of twelve (12) equally-sized recessed rectangular panels arranged in a four panel by three panel format with each panel having its own raised border within a large rectangle." I have been asked by counsel for Hershey to design, field and analyze a market research survey that would measure the extent to which consumers associate the "four panel by three panel" appearance of the candy bar with a single source – that is, has the product configuration acquired "secondary meaning."

My work is on-going and I may extend or revise my opinion should additional information become available.

**Summary of Opinion**

Based on the results of the survey I conducted, it is my opinion that the four by three panel product configuration is widely recognized by relevant consumers, has acquired secondary meaning and functions as a trademark for Hershey. Specifically, 83.8% of relevant consumers associate the four by three brick product configuration with a single source and identify Hershey as that source. After adjusting for guessing and other forms of noise using an appropriate Control Group, the net association of the four by three panel configuration with Hershey is 42.2%. It is my understanding that this "net association" is comparable to levels that courts have held to be probative of secondary meaning.

**Survey Methodology**

The survey was designed in accordance with the relevant factors outlined in the Manual for Complex Litigation (4th edition) published in 2004 by the Federal Judicial Center. These include:

- whether the population was properly chosen and defined;
- whether the sample chosen was representative of that population;
- whether the data gathered were accurately reported;
- whether the data were analyzed in accordance with accepted statistical principles;

2

- whether the questions asked were clear and not leading;
- whether the survey was conducted by qualified persons following proper interview procedures; and
- whether the process was conducted so as to ensure objectivity (*e.g.* that respondents were unaware of the sponsor of the survey and how the results would be used).

**The Universe and Sample Selection**

The appropriate population for measuring secondary meaning consists of the purchasers of the product category in question. In this case that would be purchasers of chocolate candy bars.

In order to reach a representative sample of this population, an Internet survey was developed that identified consumers in the United States who are aged 18 or older and have <u>both</u> purchased a chocolate bar in the past six months <u>and</u> also plan on purchasing a chocolate bar in the next six months.

Internet surveys are an increasingly common form of market research. Over 77.3% of the U.S. population has access to the Internet.[1] The largest corporations use Internet surveys to support multi-million dollar marketing decisions.[2] Courts accept the results of Internet surveys in a wide range of cases.[3,4]

An Internet survey is conducted by contracting with one of the numerous companies that have pre-recruited potential respondents who have indicated their willingness to participate in market research surveys. In this case, I selected e-Rewards, a well-established international market research service firm that maintains a panel of over 3.6 million consumers in the United States. AMS has worked with e-Rewards on a number of other projects and has found them to be a consistently reliable and high quality supplier of qualified survey respondents. As part of e-Reward's panel recruitment process, each potential panel member completes a demographic questionnaire. Using this information, e-Rewards was able to send survey invitations to a population of e-Rewards panel members that mirrored U.S. census demographics in various areas (age, gender, location, etc) (see Appendix C). This invitation included a link to the actual survey which was hosted on a website maintained by Applied Marketing Science, Inc. This link contained an embedded identification number that assured that each respondent

---

[1] http://www.internetworldstats.com/stats14.htm as of June 30, 2010 (viewed 10/6/2010)
[2] According to an annual study conducted by Inside Research®, 46% of the dollars spent for survey research in the U.S. was conducted online in 2010.
[3] Robert H. Thornburg, *Trademark Surveys: Development of Computer-Based Survey Methods*, 4 J. Marshall Rev. Intell. Prop. L. 91 (2005)
[4] Gabriel M. Gelb and Betsy D. Gelb, "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," The Trademark Reporter, Vol. 97, No. 5, Sept-Oct, 2007, p. 1073

3