IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| GIBSON, INC., a Delaware corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | Case No. 4:19-cv-00358-ALM |
| | ) | |
| vs. | ) | |
| | ) | |
| ARMADILLO DISTRIBUTION | ) | |
| ENTERPRISES, INC.; CONCORDIA | ) | |
| INVESTMENT PARTNERS, LLC, | ) | |
| | ) | |
| Defendant/Counterclaim-Plaintiff | ) | |
| | ) | |
| DOES 1 through 10, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF GIBSON, INC.'S RESPONSE IN OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, TO AMEND OR
ALTER THE JUDGMENT, OR FOR A NEW TRIAL UNDER RULES 50(B) AND
59(A, E) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

# TABLE OF CONTENTS

I.  Introduction………………………………………………………………………………..1

II.  Legal Standard and Relevant Facts……………………………………………………7

  A.  Armadillo is Not Entitled to JMOL of No Infringement of the Flying V Body Shape Design, The Explorer Body Shape Design, the Hummingbird Word Mark or the Flying V word mark…………………………………………………………………………..8

    1.  Armadillo is Not Entitled to JMOL of No Infringement by its DEAN V or DEAN Z guitarist Based on Lack of Evidence of Secondary Meaning for Gibson's Unregistered Marks in 1977……………………………………………………………………………..8

      i.  The Fourth Circuit and TTAB disagree with Converse…………………………………15

      ii.  There was more than a scintilla of evidence to show secondary meaning in 1977……….18

    2.  JMOL is Not Warranted for the Two Marks Based on No Likelihood of Confusion…..…21

  B.  The Court Should Not Alter or Amend the Final Judgment to Deny Injunctive Relief because of Gibson's Expired Patents…………………………………………………………22

  C.  The Court Should Not Alter or Amend the Final Judgment or Grant a New Trial Related to Gibson's Flying V®, Explorer®, and SG® Body Shapes…………………………………27

  D.  This Court Should Not Amend the Judgment to Hold No Counterfeiting Nor Should the Court Grant a JMOL or New Trial on Counterfeiting………………………………..…..28

  E.  Defendants are Not Entitled to JMOL on Laches, thus Barring Any Monetary Award or Injunctive Relief……………………………………………………………………………32

  F.  The eBay Factors Are Not Divided or Favor Armadillo…………………………………....37

  G.  If the Court Should Not Grant JMOL that Disgorgement in Limited to $1.00 Nor Should the Court Alter or Amend to Award only $1.00 in Disgorgement…………………………...38

  H.  Defendants are not the Prevailing Party……………………………………………………40

## TABLE OF AUTHORITIES

**Cases.**

*Abraham v. Alpha Chi Omega*

708 F.3d 614, 626 (5th Cir. 2013)………………………………………………………………...33,35

*Am. Rice, Inc. v. Producers Rice Mill, Inc.*

518 F.3d 321, 329 (5th Cir. 2008)………………………………………………………………....17

*Am. Registry of Radiologic Technologists v. Garza*

512 F. Supp. 2d 902, 910 (S.D. Tex. 2007)……………………………………………….…….32

*Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*

550 F.3d 465, 490 (5th Cir. 2008)……………………………………………….………...……36

*Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*

550 F.3d 465, 474 (5th Cir. 2008)……………………………………………………………17,22

*Boltex Mfg. Co., L.P. v. Ulma Piping USA Corp.*

No. 4:17-CV-1400, 2020 WL 598284, at *3 (S.D. Tex. Feb. 7, 2020)…………………………...39

*Bonito Boats, Inc. v. Thuder Craft Boats, Inc.*

489 U.S. 141 (1989)……………………………………………………………………….24

*Cabalcante v. United States*

No. 4:16-cv-964, 2021 WL 2894086, at *1 (E.D. Tex. July 9, 2021)………………………...23,37,38

*Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*

659 F.2d 695, 702 (5th Cir.1981)……………………………………………………………26

*Converse, Inc. v. Int'l Trade Commission Skechers U.S.A., Inc.*

909 F.3d 1110, 1115–19 (Fed. Cir. 2018)……………………………………………………12

*Compco Corp. v. Day-Brite Lighting, Inc.*

376 U.S. 234 (1964)…………………………………………………………………………25

*Dastar Corp. v. Twentieth Century Fox Film Corp.*

539 U.S. 23 (2003)………………………………………………………………………....23

*Federal Deposit Ins. Corp. v. Mijalis*

15 F.3d 1314, 1318 (5th Cir.1994)………………………………………………………………30

*Fuji Kogyo Co., Ltd. v. Pac. Bay Int'l, Inc.*

461 F.3d 675, 683 (6th Cir. 2006)……………………...……………………………………24,25

*General Universal Systems, Inc. v. Lee*

379 F.3d 131, 149 (5th Cir. 2004)…………………………………………...……………...…25

*Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*

668 F.Supp.3d 614 (E.D. Tex. 2023)………………………….………………... *passim*

*Henry Siegel Co. v. M & R International Mfg. Co.*

4 USPQ2d 1154, 1160 (TTAB 1987)……………………………………………...16

*Jones v. Am. Council on Exercise*

No. CV H-15-3270, 2016 WL 6084636, at *4 (S.D. Tex. Oct. 18, 2016)…………………………...17

*Kohler Co. v. Moen Inc.*

12 F.3d 632, 636–37 (7th Cir. 1993)………………………………………………...24,25

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*

43 F.3d 922, 932 (4th Cir. 1995)……………………………………………………6

*Namer v. Broad. Bd. of Governors*

628 F.App'x 910, 914 (5th Cir. 2015)………………………………………………6

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*

469 U.S. 189, 189, 105 S. Ct. 658, 659, 83 L. Ed. 2d 582 (1985)………………………………1

*Peaches Ent. Corp. v. Ent. Repertoire Assocs., Inc.*

62 F.3d 690, 692–93 (5th Cir. 1995)………………………………………………...5

*Perma Ceram Enters. Inc. v. Preco Indus. Ltd.*

23 U.S.P.Q.2d 1134 (T.T.A.B. 1992)………………………………………………16

*Radiator Specialty Co. v. Pennzoil-Quaker State Co.*

207 F. App'x 361, 362 (5th Cir. 2004)………………………………………………36

*Roebuck & Co. v. Stiffel Co.*

376 U.S. 225, 84 S. Ct. 784, 11 L. Ed. 2d 661 (1964)………………………………...25

*Rolex Watch USA, Inc. v. BeckerTime, L.L.C.*

 96 F.4th 715, 723 (5th Cir. 2024)…………………………………………………………....36,37

Russell v. Plano Bank & Tr.

130 F.3d 715, 719 (5th Cir. 1997)…………………………………………………………………30,31

*RXD Media, LLC v. IP Application Dev. LLC*

 986 F.3d 361 (4th Cir. 2021)………………………………………………………………....15

*Safer, Inc. v. Oms Invs., Inc.*

94 U.S.P.Q.2d 1031 (T.T.A.B. 2010)………………………………………………………………17

*S. Constructors Grp., Inc. v. Dynalectric Co.*

2 F.3d 606, 611 (5th Cir. 1993)…………………………………………………………………23

*Schiller v. Physicians Res. Grp., Inc.*

 342 F.3d 563, 567 (5th Cir. 2003)……………………………………………………..23,37,40

*Sequa Corp v. GBJ Corp.*

 156 F.3d 136, 144 (2d Cir. 1998)…………………………………………………………………38

*Tiffany & Co. v. Costco Wholesale Corp.*

 971 F.3d 74, 95 fn 18. (2d Cir. 2020)………………………………………………………....31

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*

 532 U.S. 23, 23, 121 S. Ct. 1255, 1257, 149 L. Ed. 2d 164 (2001)…………………………………24

*U.S. Pat. & Trademark Office v. Booking.com B.V.*

 591 U.S. 549, 140 S. Ct. 2298, 2302, 207 L.Ed.2d 738 (2020)…………………………………..15

**Rules & Statutes**

15 U.S.C.A. § 1115(b)…………………………………………………………...…….*passim*

## I.    INTRODUCTION

The jury found that *beginning in 2017*, Armadillo infringed five of Gibson's *incontestable* trademarks, and that because the infringement involved the use of *marks* that were identical to or substantially identical with the Gibson *marks*, the infringement qualified for the Lanham Act's enhanced remedies as counterfeits. [*See* Jury Verdict Form at Dkt. # 754.] This Court entered judgment on those findings after considering and rejecting the arguments in Armadillo's current motion. [*See* Dkt. # 813.]  Nevertheless, Armadillo now asks the Court to amend the judgment contrary to the jury's findings. [*See* Renewed Motion at Dkt. # 826.] Even rephrased, Armadillo's arguments ask the Court to ignore the emphasized concepts in the first sentence: that the relevant period of infringement began in September 2017; that the marks at issue are "incontestable" and therefore subject to attack only by the means listed in the statute; and that counterfeiting as defined by the statute is about marks, not products. Given that the jury is the arbiter of the facts and that the Court must apply the Lanham Act as written, the Court must deny Armadillo's Renewed Motion.

More specifically, Armadillo mainly attacks the jury's verdict and this Court's judgment enjoining Armadillo's unlawful use of Gibson's incontestable Flying V Body Shape®, Explorer Body Shape®, and SG Body Shape® based on two defenses that Congress foreclosed as legitimate challenges under 15 U.S.C.A. § 1115(b) to incontestable trademarks—*i.e.*, lack of secondary meaning and expired patents.  These two defenses are listed nowhere in 15 U.S.C.A. § 1115(b)(1)-(9).  For ease, Gibson will address Armadillo's legal and factual arguments in the order that Armadillo presented them, but Gibson will first reiterate in this introduction what defenses the Supreme Court and the Lanham Act have eliminated from this case.

**The Supreme Court on Incontestability and Challenges to Secondary Meaning**: There is a Supreme Court case that controls that mandates the denial of Armadillo's primary arguments. In *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 189, 105 S. Ct. 658, 659, 83 L. Ed. 2d 582

(1985), the Supreme Court held an infringer cannot challenge the validity of an incontestable trademark for reasons other than those listed in the Lanham Act at 15 U.S.C. § 1115(b)(1-9). That fundamental concept negates several of Armadillo's grounds through the application of basic logic, but it applies with particular force to Armadillo's attack on secondary meaning because that was the precise issue before the Court.  In that case*,* the district court granted plaintiff an injunction, rejecting the defense that plaintiff's incontestable trademark was unenforceable because it lacked secondary meaning.  *Park 'N Fly, Inc.*, 469 U.S. at 189.  The Court of Appeals reversed, holding that incontestability provides a defense against the cancellation "but may not be used offensively to enjoin another's use."  *Id.*

In reversing the Court of Appeals, the Supreme Court stated that "the Lanham Act nowhere distinguishes between a registrant's offensive and defensive use of an incontestable mark, but, on the contrary, § 33(b)'s declaration that the registrant has an 'exclusive right' to use the mark indicates that incontestable status may be used to enjoin infringement.'" *Id.*  "A conclusion that such infringement cannot be enjoined renders meaningless the 'exclusive right' recognized by the statute.'" *Id.* at 196.

The Supreme Court reasoned that the "language of the Lanham Act also refutes any conclusion that an incontestable mark may be challenged as merely descriptive." *Id.*  "With respect to incontestable marks, however, § 33(b) provides that registration is *conclusive* evidence of the registrant's exclusive right to use the mark, subject to the conditions of § 15 and the [nine] defenses enumerated in § 33(b) itself." *Id.* (italics in original) (bracket nine language added to reflect current language in statute). "Mere descriptiveness is not recognized by either § 15 or § 33(b) as a basis for challenging an incontestable mark." *Id.*

Armadillo's argument that Gibson cannot enjoin the future use of Gibson's incontestable Flying V Body Shape® and Explorer Body Shape® because they lacked secondary meaning almost fifty years ago in 1977 is not one of the nine defenses listed in 15 U.S.C.A. § 1115(b) to incontestable

trademarks.[1] Thus, this Court should rule Armadillo's argument is inapplicable to the facts of this case. *See Park 'N Fly, Inc.*, 469 U.S. at 189 ("This function of the incontestability provisions would be utterly frustrated if the holder of an incontestable mark could not enjoin infringement by others so long as they established that the mark would not be registrable but for its incontestable status.").

**McCarthy on *Park N' Fly* and Secondary Meaning**: "The status of incontestability relates solely to the *validity* of the registered mark." *See* 5 McCarthy on Trademarks and Unfair Competition § 32:155 (5th ed.) *Evidentiary status of incontestable registration—Challenge to strength of an incontestably registered mark.* (emphasis in original). "There is no doubt that the status of an incontestable registration prevents a challenge to the *validity* of the mark based on an argument that the mark is not inherently distinctive and lacks secondary meaning. This is the rule of the *Park 'N Fly* case." *See* 5 McCarthy on Trademarks and Unfair Competition § 32:148 (5th ed.) *Evidentiary Status of incontestable registration—Foreclosed challenges to validity* (emphasis added); *see also Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d 614, 641-42 (E.D. Tex. 2023). McCarthy summarizes *Park N' Fly* foreclosing challenges to secondary meaning to incontestable marks:

> ***Park 'N Fly and the Crucial Distinction Between the Separate Issues of Validity and Infringement***. The Supreme Court's 1985 *Park 'N Fly* decision holds that the validity of the incontestably registered mark cannot be challenged on the ground that the designation is not a valid trademark because it is descriptive and lacks a secondary meaning. *Park 'N Fly* concerned the issue of validity, not infringement. Incontestable status should not prevent defendant from questioning the strength and hence the scope of protection of the mark in determining whether confusion is likely. "Secondary meaning" is an issue of trademark validity: "strength" is an issue of likelihood of confusion and infringement. Trademark "strength" for infringement is *not* the same issue as "secondary meaning." Likelihood of confusion is an issue of infringement, which should not be foreclosed by incontestable status.

---

[1] As demonstrated below, *Park N' Fly's* holding does not eliminate prior use as a defense to an incontestable mark; instead, it limits the prior user by applying more stringent standards and providing lesser relief for the prior user. 15 U.S.C. § 1115 (b)(5). Likely for that reason, Armadillo apparently chose to seek relief under 15 U.S.C. § 1115 (a), as if the marks were not incontestable.

3

*See* 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:155 (5th ed.) *Evidentiary status of incontestable registration—Challenge to strength of an incontestably registered mark.*[2]

In short, "[s]econdary meaning" and trademark "strength" are separate legal concepts. *See* 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:82 (5th ed.). Thus, Armadillo could and did challenge at trial Gibson's incontestable trademark as being weak, but it is foreclosed from challenging that they are not trademarks on account of lacking secondary meaning. *See id.*; *see also Park N' Fly*, 469 U.S. at 189.

As Gibson's Explorer Body Shape® and Flying V Body Shape® are incontestable, Gibson presented *conclusive* evidence at trial pursuant to 15 U.S.C.A. § 1115(b) that they have secondary meaning. *Park 'N Fly* makes clear that Armadillo can only challenge the validity of the Explorer Body Shape® and Flying V Body Shapes® based on one of the nine defenses or defects listed in 15 U.S.C.A. § 1115(b)—and lack of secondary meaning is not one of them. *See* 15 U.S.C.A. § 1115(b)(1)-(9).

**Park N' Fly Applies with Equal Force to the Expired Patent Argument.** While *Park N' Fly* deals specifically with challenges to incontestable marks based on the alleged absence of secondary meaning, its holding is just as strong as to any defense not listed in 15 U.S.C.A. § 1115(b). The Supreme Court repeatedly remarked that Congress: (1) had carefully considered which defenses to include and exclude and (2) if a defense was not included, it cannot be used. 469 U.S. at 190. The expiration of patent is not included and therefore cannot be used as a defense to Gibson's registered marks. *See* 469 U.S. at 190; *see also* 15 U.S.C.A. § 1115(b). The exclusion of expired patents, however,

---

[2] "The purpose of seeking evidence of a secondary meaning is to determine if this designation qualifies as a 'trademark' at all. This is an issue of validity. The issue of strength assumes that there is a mark and seeks to determine if that mark is strong enough such that the accused junior use is likely to cause confusion. This is an issue of infringement.'" *See* 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:82 (5th ed.) *The relation between strength and secondary meaning.*

is not the derogation of public rights that Armadillo argues. That is because most patents cover how a device works—the device's function. Functionality is an included defense under the statute. *See* 15 U.S.C.A. § 1115(b)(8). Thus, using trademark protection to extend the life of a utility patent is always subject to challenge; if the trademark protects only the function that had been the subject of a patent, any challenger can seek to cancel the trademark. Congress could have extended that protection to design patents but choose not to. *Park N' Fly* holds, without ambiguity, that it is not the province of the Court to later question that judgment.

**Armadillo Waived Prior Use and Functionality Defenses to Gibson's Incontestable Marks**: Armadillo cannot convert its arguments to defenses allowed under the incontestability provision. Pursuant to 15 U.S.C.A. § 1115(b), there are nine (9) listed statutory defenses to an allegation of infringement of an incontestable mark. *Id.* One of those (the fifth one) is the prior use defense under 1115(b)(5), but Armadillo never pled that defense or sought to prove it at trial. [*See* Armadillo's Answer to Gibson's Second Amended Complaint, Affirmative Defenses, and Counterclaims at Dkt. # 77.]

If the junior user's use predates the senior user's registration, then the Lanham Act pursuant to 15 U.S.C. § 1115(b)(5) provides a defense if the mark "was adopted without knowledge of the registrant's prior use and has been continuously used by such party . . . from a date prior to registration of the mark . . .." 15 U.S.C. § 1115(b)(5). The rights of a junior intermediate user, however, "apply only for the area in which such continuous prior use is proved." 15 U.S.C. § 1115(b)(5); *see generally,* 3 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26.18[1] (3d ed. 1994) (examining "limited area defense"). "The junior user's area of continuous prior use, which is frozen at the time the senior user obtains registration becomes the junior user's trade territory." *Peaches Ent. Corp. v. Ent. Repertoire Assocs., Inc.,* 62 F.3d 690, 692–93 (5th Cir. 1995) (internal citations omitted.).

The prior use defense is a statutory defense that Congress enacted to balance the nationwide rights granted to a trademark registrant (even if they have never used the mark in, let's say, Texas) with a junior who started innocently using the mark (in let's say, Texas) and used it continuously. *See Id.* 62 F.3d at 692–93. Armadillo, however, never pled this defense nor did it ever try to prove this defense at either trial. [*See* Dkt. # 77.]

Thus, Armadillo waived this defense. *See Namer v. Broad. Bd. of Governors*, 628 F.App'x 910, 914 (5th Cir. 2015) (Namer raised on appeal "he has a 'prior use' defense under 15 U.S.C. § 1115 (b)(5). Because Namer did not sufficiently raise these arguments in the district court, we do not consider them."); *see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 932 (4th Cir. 1995) (classifying the defense set forth in 15 U.S.C.A. § 1115(b)(5), a statutory analogue to the common-law good-faith user defense, as an affirmative defense). Moreover, Armadillo couldn't prove it used the Flying V® and Explorer® marks continuously without knowledge of Gibson's rights. (requiring Armadillo to prove prior use without knowledge of Gibson's first use and requiring Armadillo to prove its continuous use throughout).

The same is true for functionality. As explained above, Armadillo's expired patent theory arises from the idea that the Lanham Act cannot create a "perpetual patent." [*See* Renew Motion at p.8.] The argument ignores, however, several facts. As already discussed, no function can ever be protected by trademark law. *See* 15 U.S.C.A. § 1115(b)(8). Moreover, a non-functional design can only be protected by trademark law if the design has a secondary meaning, is not generic, is being used in commerce, and is not being used to violate the antitrust laws. 15 U.S.C.A. § 1052(f)(Secondary meaning); *15* U.S.C.A. § 1115(b)(7)(Antitrust); 15 U.S.C.A. § 1064(3) (Genericness) & (6)(Use in commerce). Patents face none of these additional requirements. Thus, the "perpetual patent" the Lanham Act grants via operation of the incontestability provision is neither a patent nor is it perpetual. It is always subject to certain defenses. In this case, however, it is subject to the only defenses

Armadillo pled and attempted to prove—genericness.  It is too late to retrofit "expired patents" into one of the allowable defenses under the incontestable provision.

## II.    LEGAL STANDARD AND RELEVANT FACTS

This Court previously identified the applicable legal stands to evaluate Armadillo's Renewed Motion for JMOL, to Alter or Amend, and for a New Trial.[3]  Gibson attempts to apply the standards as stated by the Court. In doing so, Gibson notes that the arguments above dispose of any challenge to Gibson's Incontestable Trademarks based on the absence of secondary meaning or the presence of expired design patents. For completeness' sake, however, Gibson addresses the further fatal defects in Armadillo's arguments.

In its Renewed Motion, Armadillo's main factual premise is that, "[d]uring the years when Gibson abandoned its Explorer and V-style guitar body styles[4], competitors developed the marketplace." [*See* Renewed Motion at p. 10.] Armadillo, however, cites to no evidence to support this apparently important statement. [*See* Motion at Dkt. # 826 at p. 10.]  This case has been pending since 2019— there have been countless depositions, two trials, and an appeal, and Armadillo cannot cite to one piece of evidence to support its sweeping proposition that yet again another jury got it wrong because others (not Gibson) developed the market for Gibson's Flying V® and Explorer® Body Shapes. [*See* Renewed Motion at Dkt. # 826 at p. 10.] In this regard, Armadillo makes sweeping statements in its brief that Gibson abandoned its Flying V® and Explorer® marks from 1958-1977.  [Renewed Motion at pp. 9-10.] Not only do they not cite to any evidence, they fail to mention that Gibson testified the Flying V® and Explorer® never went out of production and were back in regular

---

[3] *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d 614 (E.D. Tex. 2023), rev'd and remanded sub nom. *Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 107 F.4th 441 (5th Cir. 2024), as revised (Aug. 8, 2024).

[4] Although Armadillo did not specify the years of alleged "abandonment" (also not a defense or claim pled by Defendants), Gibson assumes *arguendo* that Armadillo is referring to the period between the Flying V and Explorer's debuts, 1958 through 1977.

production by 1963 (Flying V) and 1975 (the Explorer). [*See* Tr. 500:7-20; 502:25-503:2; *see also* Plaintiff Exhibit 62 Flying V, Explorer, Firebird: An Odd-Shaped History of Gibson's Weird Electric Guitars, pp. 12-91 discussing the history of the Flying V® and Explorer® Marks in the 50-80s.]  Nor does Armadillo cite to the testimony at trial that Ibanez and others stopped copying Gibson's Flying V® and Explorer® in the 1970s after Gibson sued Ibanez in the 1970s and these guitars are known as lawsuit guitars.  [Tr. 456:2-21.]

Armadillo's next main factual premise is that Gibson must prove secondary meaning from 1977 because the jury identified 1976 and 1977 as the earliest possible years Gibson should have known of Armadillo's use of the Explorer Body Shape® and Flying V Body Shape®, respectively, in response to the jury's laches questions.  [*See* Verdict Form Section 2, Laches, Question 8 at Dkt # 754, p. 6.]  Armadillo, however, fails to point out that it is factually impossible that Armadillo itself infringed on the Flying V® and Explorer Body Shapes® in 1976/1977 because Armadillo did not exist at that point, would not exist as an entity for another 16 years, and would not begin to manufacture guitars for another 20 years. To clear that gaping chasm, Armadillo assumes it was a successor-in-interest to Dean Guitars, Inc., a company long since defunct but then-owned by Dean Zelensky. As addressed below, Armadillo is wrong in this assertion legally and factually and is not entitled to JMOL under the jury verdict.

**A.     Armadillo is NOT Entitled to JMOL of No Infringement of the Flying V Body Shape Design, the Explorer Body Shape Design, the Hummingbird Word Mark or the Flying V word mark.**

**1.     Armadillo is Not Entitled to JMOL of NO Infringement by its DEAN V or DEAN Z guitars Based on Lack of Evidence of Secondary Meaning for Gibson's Unregistered Marks in 1977.**

In its Renewed Motion, Armadillo argues that the "Court correctly instructed the jury that *if* the jury determined:

> Armadillo, including its predecessors **first used** its Dean V and Dean Z body shapes before Gibson received its federal trademark registrations **before 1997** for the Flying V Body Shape Design and the Explorer Body Shape Design, then you must determine whether Gibson's asserted Flying V and Explorer shapes had **acquired secondary meaning as of the date** you determined that Armadillo or its predecessor in interest **first used** its Dean V and Dean Z body shapes.

[*See* Motion at Dkt. # 826 at p. 9 (citing Tr. 1781:12-21.) (emphasis in original other than "if.").]  Based on that jury instruction, Armadillo argues "the jury determined that Gibson should have known that Armadillo was using its Flying V and Explorer body shapes by 1977."  [*See* Motion at Dkt. # 826 at p. 9 (citing Dkt. #754 at 5-6 (Question No. 8 related to Laches).]  Armadillo then argues "Gibson offered no evidence proving secondary meaning in 1977, and Armadillo is entitled to JMOL of no infringement by its Dean V and Dean Z body shapes." [*See Id.*]

### a. Armadillo is not a Successor-in-Interest to any alleged First-Use Rights held by Dean Guitars.

Armadillo's argument, however, skips over the most important point. Even under the mistaken idea that Armadillo can challenge the validity of Gibson's incontestable registration for lack of secondary meaning, the Court made clear that Dean Zelensky's activities had relevance only *if* the jury determined his company was a predecessor-in-interest to Armadillo. *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F. Supp. 3d 614, 644 (E.D. Tex. 2023).  Whether Armadillo was a successor-in-interest to Dean Guitars (either version) or Tropical Music was hotly debated at both trials. [*See Id.*] Armadillo relies on a vague, informal relationship between the various entities.

As to the precise issue, there was evidence from Elliott Rubinson, the person who structured the transaction, that the only things he purchased from Tropical were the Dean house marks and other Dean guitar-shape trademarks unrelated to the dispute. [*See* Pl. Exs. 330, 332; *see also* Tr. 1578-1581.] Rubinson further indicated that at the time he purchased the Dean-related assets, the company was dormant.  [*See Id.*] To put it simply, the jury's answer to the infringement question means it believed Elliot Rubinson.

For good reason—there was no credible evidence to the contrary. In six years of constant fighting about the issue, Armadillo has never explained how the purchase of Dean house marks and Dean guitar shape trademarks would make Armadillo a successor-in-interest to the "first use rights" of Dean Guitars. Armadillo's renewed motion carries on that tradition, bereft of any record cites or legal analysis supporting its conclusion.

Armadillo was on clear notice of this defect from the Court's post-trial ruling from the first trial:

> Defendants have not asked the Court to treat Dean Zelinsky's company as a predecessor-in-interest at trial or in their motion here. In any event, the record is far from clear on whether it would be proper to do so. . . . Furthermore, the Court has not found a single case, and Defendants have cited none, where a defendant successfully tacked its date of first infringement to that of another company's without a showing that the latter company was a predecessor-in-interest. Similarly, the Court cannot find a case where a defendant successfully tacked its own infringement onto that of another company's when the defendant essentially restarted production on an infringing product.

*See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d 614, 644 (E.D. Tex. 2023).

To put it simply, the jury believed Elliot Rubinson, who was the person best situated to explain the transaction and who was unequivocal in his description. In the absence of either overwhelming evidence to the contrary and a legal rationale to create a "chain of title" for the alleged first use rights, this Court must accept the jury's answer as a reasonable one. While Gibson is unaware of any case addressing the precise issue (the transfer of first-use rights), it is clear that the transfer of trademarks is not the same as the transfer of all trademark-related rights. *See Blue Mountain Holdings, LTD. v. Bliss Nutraceuticals, LLC*, 2022 WL 2316386, * 1(N.D. Ga., June 27, 2022.)

In *Blue Mountain*, the plaintiff claimed the defendant was an assignee who was barred from asserting an abandonment defense to an infringement claim because the alleged assignor has failed in a cancellation action asserting the same grounds. *Id.* at 7-8. The court rejected the plaintiff's motion for summary judgment on the issue because it could not prove an actual assignment. In doing so, the

court noted that general business arrangements or the use of shared trademarks did not create privity between the alleged assignor and assignee as to a defense to a trademark infringement claim. The Court cited as contrast cases in which the full rights of the assignee were detailed, which is exactly what we do not have in this case. *Id.* at 8 (citing *Axiom Worldwide, Inc. v. Excite Med. Corp.*, 591 F.App'x 767, 768-70, 773 (11th Cir. 2014) and *Peter Coppola Beauty, LLC v. Casaro Labs, Ltd.*, 108 F.Supp.3d 1323, 1333 (S.D. Fla. 2015)).

Although Armadillo does not explicitly make the argument, it must base its assumption that Armadillo succeeded to Dean Guitar's alleged first-use rights based on the jury's answer to the laches question asking when was the earliest date Gibson should have known Armadillo was using Gibson's trademarks, to which the answers for the Flying V® and Explorer® Body shapes were 1977/1976. [*See* Dkt. # 754, Jury Verdict From, Question No. 8.] Gibson's knowledge that a shape was in use, however, is not the same as Armadillo being a successor-in-interest to the use of that shape. To that end, the instruction for calculating the length of delay does not mention any particular infringer: "The period of delay begins when the trademark holder knew or should have known of the infringement and generally ends when the trademark owner files suit." [Dkt. # 746, Jury Instructions, p. 29.] Thus, the best explanation for the jury's laches date answer is that it believed the laches period started when Dean Guitars began producing its copies of the shapes. There is no reason to extrapolate that finding into Armadillo being a successor-in-interest to Dean Guitar's alleged first-use rights.[5]

---

[5] A separate issue is whether, even if somehow the jury and court found that Armadillo was a successor to Dean Guitars alleged first-use rights, the issue then becomes did those rights continue to exist after Dean Guitars and then Tropical abandoned use of the marks on the way to the Dean brand being "dormant." *See Jim Hneson Productions, Inc. v. John T. Brady & Assoc.*, 867 F.Supp 175, 182-83 (abandonment of trademark rights by assignee through non-use of in commerce ends those rights). The point being that there exists a variety of reasons why "first use by an infringer" cannot serve as a proxy for "Armadillo is a successor-in-interest to Dean Guitars' first use rights.").

Doing so comports with Fifth Circuit precedent on handling potentially conflicting jury answers. *Team Contractors, LLC v. Waypoint NOLA, LLC,* 976 F.3d 509 (5th Cir. 2020).[6] *Team Contractors* makes two important points. First, if the jury resolves an issue by way of a general verdict question, any conflicting answer must be brought immediately to the Court's attention while the jury is still empaneled, or the issue is waived. *Id.* at 515. Second, even if all the issues are resolved as special verdicts, if there is a theory that harmonizes the answers, that is the theory the Court must apply. *Id.* at 514 (citing *Atlantic & Gulf Stevedores v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364. 82 S.Ct. 780, 7 L. Ed. 2d 798 (1962)). Importantly, that analysis includes looking at the relevant instructions, as Gibson has done. *Id.* (citing *Alverez v. J. Ray McDermott & Co.,* 674 F.2d 11037, 1040 (5th Cir. 1982).

Both concepts apply here. While the original conception of a general verdict questions was "Who do you find for?" *Team Contractors* makes clear that "general verdicts" include any question that require the jury to apply the legal instructions to reach a result, as opposed to specifically stating only what the jury believed happened as a factual matter. *See* 976 F.3d a t 515-21, direct holding at 520-21. As this was a general verdict charge under *Team Contractors,* Armadillo waived any argument that relies on the answer to another question to defeat the infringement finding. Alternatively, as the answers can be harmonized even if viewed as a special verdict form, the result is the same.

      **b.**    **Even if Armadillo was a successor-in-interest to Dean Guitar's alleged first-use rights, 1976/1977 are not the appropriate measurement dates.**

Armadillo's argument regarding the relevant date to measure secondary meaning in this case raises both legal and factual issues.  First, this Court submitted this instruction at both trials based on "the Federal Circuit's decision in *Converse, Inc. v. Int'l Trade Commission Skechers U.S.A., Inc.,* 909 F.3d

---

[6] While Armadillo engages in no analysis of the jury findings, it is clear that there is evidence to support the jury's finding on infringement based on Armadillo's failure to prove it was a successor-in interest to Dean Guitar's alleged first use rights. Thus, Armadillo's best case would be that the jury's answers for infringement and laches date conflict, for which the remedy would be a new trial, not a Judgment as a Matter of Law.  As demonstrated, however, the jury's answers can be read consistently.

1110, 1115–19 (Fed. Cir. 2018)." *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d 614, 642 (E.D. Tex. 2023), *rev'd and remanded sub nom. Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 107 F.4th 441 (5th Cir. 2024), *as revised* (Aug. 8, 2024).

Armadillo has much maligned the *Converse* decision since the first trial. Armadillo argued on appeal that the "fact that genericness is not a transient quality bears directly on Appellee's convoluted efforts to salvage the District Court's misplaced reliance on *Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d 1110 (Fed. Cir. 2010)." [*See* Armadillo's Reply Brief on Appeal attached at Ex. A to Schuettinger Dec. at p. 10.] The gist of Armadillo's argument on appeal was that genericness, unlike secondary meaning, is not transient. Rather, genericness is absolute (once generic, always generic); thus, *Converse, Inc. v. Int'l Trade Comm'n* did not apply because that case dealt with the transient issue of secondary meaning. *See Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 107 F.4th 441, 447 (5th Cir. 2024), *as revised* (Aug. 8, 2024) ("Armadillo explains that *Converse* is inapposite because that case concerns secondary meaning and not genericness; thus, according to Armadillo, *Converse* cannot support the proposition that only certain temporal evidence is relevant to a genericness defense or counterclaim.").

In its Renewed Motion, Armadillo now argues that the date for secondary meaning is absolute. [*See* Dkt. # 826 at pp. 9-10.] It is so absolute that Gibson must establish its Flying V Body Shape® and Explorer Body Shape®s had absolute secondary meaning in 1977 when Dean Zelinsky first made the Dean Z and V; otherwise, the jury verdict in the second trial must be thrown out, and Armadillo is free to continue infringing forever. [*See* Dkt. # 826 at p. 9.] After the first trial, however, the date for secondary meaning was so absolute that Armadillo argued Gibson must have proved its Flying V Body Shape® and Explorer Body Shapes® had absolute secondary meaning *in 1996* when Armadillo first began making the Dean Z and V; otherwise, the first jury verdict must be thrown out, Armadillo is free to continue infringing forever. *Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d 614, 643 (E.D. Tex. 2023) ("Throughout their briefing, Defendants argue that the jury had

13

to find secondary meaning because Armadillo actively sold its Dean V and Dean Z guitars in 1996.") (citing Dkt. #561 at p. 35 n.14).

On the other hand, the date for secondary meaning on appeal was so absolute Armadillo argued it must be established as of the date Gibson received its registrations for the Flying V Body Shape® and Explorer Body Shape® in 1997. [*See* Reply Brief at pp. 10 ("The District Court misconstrued *Converse*, which considered only whether a party's use of trade dress had acquired secondary meaning prior to registration, as justifying the wholesale exclusion of decades of third-party use evidence.*); see also Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 107 F.4th at 447 ("Armadillo contends that the district court abused its discretion by excluding decades of third-party-use evidence predating the registration of the Gibson Trademarks."). In short, the only absolute thing we know about Armadillo's position about the relevancy of *Converse* and the date Gibson must establish secondary meaning is that its position is a moving target set atop a moving bus that Armadillo is ready to run Gibson and this Court over with on appeal.

Importantly, the Fifth Circuit has yet to hold what is the relevant date for proving secondary meaning at trial and did not seem to care so much for the *Converse* decision on the first appeal. *Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 107 F.4th at 450 (revising this Court's exclusion order based on *Converse*.). The Federal Circuit's Opinion in *Converse* does not mention the Supreme Court's decision in *Park N' Fly*, and it seems to be at odds with *Park N' Fly*'s holding that an incontestable trademark cannot be challenged for secondary meaning. 469 U.S. at 189 ("This function of the incontestability provisions would be utterly frustrated if the holder of an incontestable mark could not enjoin infringement by others so long as they established that the mark would not be registrable but for its incontestable status.").

As addressed below, the Fourth Circuit and USPTO disagree with *Converse* that the relevant date to prove secondary meaning is when the defendant entered the market.

14

### i.    *The Fourth Circuit and TTAB disagree with Converse.*

Three years after the Federal Circuit's *Converse* decision, the Fourth Circuit Court of Appeals addressed head on the issue of when to measure secondary meaning in an infringement action in *RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361 (4th Cir. 2021). There, Apple sought to stop Defendant RXD's use of a similar iPad mark, but there was a twist:  RXD began using ipad.mobi in 2007 for a limited time, and then later launched "ipadtoday.com" in October 2016.  In between those two events, Apple released its "iPad" device in 2010. *Id.* at 371. The lower court granted summary judgment to Apple.  *Id.*  On appeal, RXD argued Apple had to establish secondary meaning for iPad mark in 2007 when RXD first used ipad.mobi, while Apple argued that it should be able to show secondary meaning in October 2016 when RXD's infringement because more pronounced with the launch of ipadtoday.com. *Id.*  The relevant date to measure secondary had the potential to be dispositive given that Apple first used the iPad mark in between to the two different dates.  *Id.*

On appeal, the Court reiterated "[t]he guarding of 'a trademark against use by others' serves to 'protect the ability of consumers to distinguish among competing producers.'" *RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361, 372 (4th Cir. 2021); (citing *U.S. Pat. & Trademark Office v. Booking.com B.V.*, 591 U.S. 549, 140 S. Ct. 2298, 2302, 207 L.Ed.2d 738 (2020) (referencing S. Rep. No. 79-1333 at 3 (1946) (noting that "trademark statutes aim to 'protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get.'")).

In resolving the relevant date inquiry, the Court stated, "[w]e also observe that Apple's claim of trademark infringement against RXD was based on the assertion that Apple had achieved secondary meaning in the descriptive mark before October 2016, when RXD developed its 'ipadtoday.com' website." *Id.* at 371. The Court concluded: "Thus, Apple was not required to prove that it had established secondary meaning in the mark before RXD's use of ipad.mobi in 2007 but could succeed

on its claim by establishing secondary meaning status before October 2016." *Id.* (citing 6 J. McCarthy, M̲c̲C̲a̲r̲t̲h̲y̲ ̲o̲n̲ ̲T̲r̲a̲d̲e̲m̲a̲r̲k̲s̲ ̲a̲n̲d̲ ̲U̲n̲f̲a̲i̲r̲ ̲C̲o̲m̲p̲e̲t̲i̲t̲i̲o̲n̲ § 31:20 (5th ed. 2020) (explaining that an entity seeking trademark protection is not required to sue an infringing user "until the likelihood of confusion caused by the accused use presents a significant danger to the mark").

The Fourth Circuit's holding in *RXD Media, LLC* is in line with the caselaw from the USPTO on the issue as well. *See Perma Ceram Enters. Inc. v. Preco Indus. Ltd.*, 23 U.S.P.Q.2d 1134 (T.T.A.B. 1992)(The rule the senior user must prove secondary meaning existed prior to the junior user's first use has never been applied to PTO priority determinations involving the right to register "nor do we see any reason in law or in equity why it should be."); *see also Henry Siegel Co. v. M & R International Mfg. Co.*, 4 USPQ2d 1154, 1160 (TTAB 1987) ("Respondent's argument that petitioner must prove 'priority of secondary meaning' (that is, that petitioner's mark 'CHIC' had acquired secondary meaning as applied to its goods prior to respondent's first use of its mark) in order to establish its prior rights herein is not persuasive.'").

Here, Gibson only sought to recover against Armadillo related to *its* infringement from **October *2017*** and beyond after Armadillo received a cease-and-desist letter from Gibson. *See Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 2025 WL 2698115, at *2. In this regard, the parties stipulated the amount of damages Gibson would be entitled to if the jury found infringement using sales figures from 2017 and beyond. *See Id.* As Gibson argued at trial, Armadillo's infringement became more pronounced and extensive over the years, prompting Gibson to send a cease-and-desist letter in 2017 and filing suit in 2019. [*See* Complaint at Dkt. #1.]

Thus, the Fourth Circuit's holding in *RXD Media, LLC* supports using **October *2017*** as the relevant date because that is the date from which Gibson sought damages for a likelihood of confusion that the parties stipulated to at trial. *Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 2025 WL 2698115,

at *7 ("the parties stipulated to the amount of profits Armadillo earned from the sales of the five infringing products from October 1, 2017, to the present.") (citing Dkt. # 754 at pp. 9-10).

It contrast, it makes no practical sense to use 1977 as the date when two different juries found a likelihood of confusion existed in 2022 and 2025. [*See* Verdict Form at Dkt. #s 498, 754, Question 1.] This is especially true given the goal of the trademark law is to prevent consumers being confused not to decide arbitrary dates in the past to establish the validity of the mark. *See Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008) (A likelihood of confusion exists when "the defendant's use of the mark 'creates a likelihood of confusion **in the minds of potential customers** as to the source, affiliation, or sponsorship' of the product at issue.").

The October 2017 date is in line with Armadillo's argument on appeal that secondary meaning (unlike genericness) is transient. [*See* Armadillo's Reply Brief on Appeal attached at Ex. A at p. 10 (The "fact that genericness is not a transient quality bears directly on Appellee's convoluted efforts to salvage the District Court's misplaced reliance on *Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d 1110 (Fed. Cir. 2010).").] With respect to this, *"*trademark rights are not static and . . . the strength of a mark may change over time." *See Safer, Inc. v. Oms Invs., Inc.*, 94 U.S.P.Q.2d 1031 (T.T.A.B. 2010)*; see also Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008) (A mark is protectable if it is "distinctive, either inherently or by achieving secondary meaning in the mind of the public."); *see also Jones v. Am. Council on Exercise*, No. CV H-15-3270, 2016 WL 6084636, at *4 (S.D. Tex. Oct. 18, 2016) ("As to the dates, ACE contends that trademark rights are not static… The court is not convinced that the fact that some of the exhibits are dated after ACE began using the term makes the community's perception of the term any less important to the trademark analysis, and the community's perception of the mark is highly relevant to the analysis.").

Third, as shown below, Gibson provided evidence of secondary meaning in 1977 at trial.

ii.    **There was more than a scintilla of evidence to show secondary meaning in 1977.**

Gibson can establish secondary meaning from the (new) absolute date that Armadillo argues: 1977. [*See* Renewed Motion at p. 9.] In this respect, Armadillo incorrectly argues that "Gibson's 30(b)(6) witness conceded Gibson did not know whether customers associated V-style or Explorer-style shapes with anyone." [*See* Renewed Motion at p. 4 (citing Tr. 984:22-25, 985:1-13, 988:15-989:5.] The cited transcript does not say this. [*See* Tr. 984:22-25 (asking what percentage of consumers in 1976 associated the V shape with Ibanez v Gibson); *see also* Tr. 985:1-13 (asking what percentage of consumers in 1977 associated the V shape with Dean/Gibson and Electra/Gibson); *see also* Tr. 988:15-989:5 (asking what percentage of consumers in 1977 associated the Explorer shape with Ibanez/Gibson, Hamer/Gibson, and Dean/Gibson). Gibson did not concede it did not know whether consumers in 1977 associated its Flying V® and Explorer® guitar with it (or anyone); rather, it was asked at trial specific questions to speculate on the fly regarding the breakdown that consumers associated the marks with Gibson vs other companies. [*See Id.*]

Gibson presented more than a scintilla of evidence supporting the assertion that the Flying V® and Explorer® body shape marks had acquired secondary meaning by the time Dean Zelinsky's company, Dean Guitars, Inc., entered the market in 1977. Gibson presented fact and expert witness testimony and other evidence showing that the invention of the Flying V and Explorer body shapes signified a revolutionary and significant departure in guitar making at the time. [*See* Tr. 621:10-20 (Gibson's expert, Mike Rock, emphasizing that when the Flying V and Explorer debuted there was not anything else like it").]

Gibson's then-president, Ted McCarty, invented the futuristic Flying V body shape® design in 1958 as a response to the Space Race, intending the Flying V body shape® to mimic the design of a space rocket. [Tr. 125:25-126:2; 126:16-127:7.] The Flying V®'s invention was unprecedented in the guitar industry—there were no guitars anywhere close to the Flying V® in terms of look and shape

18

when it was invented.  [*Id.* 127:8-11.]  Too ahead of its time, the Flying V® was initially a "commercial flop," but in the 60s and 70s, different famous guitarists in various adopted the Flying V guitar.  [*Id.* 127:15-128:22.]

McCarty also invented the Explorer in 1958 as part of Gibson's futuristic design response to the Space Race.  [*Id.* 137:18-138:4.]  While the Flying V® mimicked a rocket, the Explorer evoked a mid-century, futuristic, modern, and angular design.  [*Id.* 138:5-9.]  The Explorer design was also completely unique with no other precedent of any kind of model for that year. [*Id.*]  While the Explorer also saw modest sales in the beginning, the rarity of these early productions are so highly collectible now that they sell at auction in the *millions*.  [*Id.* 138:19-139:10.]

Gibson's witnesses testified that while the Flying V® and Explorer® were not immediately popular upon their 1958 debut, the guitars gained popularity, fame, and iconic status due to their adoption from some of the world's most prolific musicians in the decades that followed.  For example, during the 60s, one of the three, "Kings of the Blues," Albert King, as well as Jimi Hendrix and Dave Davies of the Kinks all adopted the Flying V®; during the 70s, members of heavier rock bands and metal bands all adopted the Flying V® guitars.  [Tr. 128:23-129:15.]  Gibson's head of product development at its brand Epiphone, Aljon Go, explained the family tree of the Flying V®, crediting artists such as Albert King, Eddie Van Halen, and Jimi Hendrix as catapulting the Flying V® into the public consciousness in the 60s and 70s.  [Tr. 259:16-260:22.]

Like the Flying V®, the Explorer®'s popularity grew in the decades since its debut thanks to popular musicians like Matthias Jabs from the Scorpions and Allen Collins from Lynyrd Skynyrd adopting the guitar and playing it on stage.  [Tr. 139:21-140:8.]  Gibson's head luthier, Jim DeCola, and Gibson's historian, Jason Davidson, both testified about the iconic "Free Bird" performance by Lynyrd Skynyrd featuring guitarist Allen Collins playing the Explorer guitar and showed an example

of a live performance before a crowd of thousands featuring several of Gibson's guitars. [*Id.* 141:3-144:3; 436:2-12.] Gibson's historian, Jason Davidson, went into further detail about the "family tree" of famous artists that helped make the Explorer more popular and instantly recognizable in the decades after its debut. [*Id.* 436:2-437:20.]

Gibson presented books to the jury written specifically about the Flying V® and Explorer®, their invention, and the importance of their history from 1958 through the present. [*See e.g.* Pl. Exs. 62, 63.] Gibson presented to the jury voluminous evidence through a Fed. R. Evid. 1006 summary chart including *tens of thousands of* examples of Gibson's Flying V® and Explorer® in guitar magazines dating from the 1970s-2020s, including advertisements run by Gibson or dealers, photos of famous artists playing the guitars, or articles written about the guitars. [*See* Pl. Ex. 748.] Even though the Flying V and Explorer were not hugely popular at the time of their debuts in 1958, Gibson continued to offer these guitars for sale as part of Gibson's core offering, appearing in Gibson's product catalogues and available for special order from artists and dealers. [Tr. 140:9-18.]

Perhaps most importantly, Gibson's expert, Mike Rock, emphasized that while third party manufacturers have made copies of the Flying V® and Explorer® guitars over the years, these third party manufacturers would not have made these copies unless the originals—Gibson's Flying V® and Explorer®—*meant something* to guitar consumers. [Tr. 631:12-633:4.] In other words, evidence of Flying V® and Explorer® copies, like Dean Zelinsky's original Dean V and Z guitars, respectively, are evidence of the secondary meaning the Flying V and Explorer guitars had at that time. [*Id.*] After all, these guitars were widely recognized to be completely unique, unprecedented designs—it is not as though Dean Zelinsky came up with them independently (and Defendants certainly are not arguing that).

In fact, Dean Zelinsky testified that he created the Dean V and Z specifically to "one-up" Gibson.  [*See* Tr. 761:22-766:25; *see also* Pl. Ex. 391 (Zelinsky Blog detailing creation of Dean V and Z guitars).]  Zelinsky went through great efforts to replicate Gibson's Flying V and Explorer guitars, from sneaking into the Gibson factory to study how the guitars were made to "infiltrating Gibson" by running an ad in the Kalamazoo newspaper looking for Gibson's former employees who could shed light on the most minute details for the Flying V® and Explorer® including "lacquer, ebony blanks, buffing compound, binding plastics, as well as processors."  [Tr. 757:1-759:25; 768:13-771:8.] Zelinsky even admits that the reason he even looked at Ibanez guitars in the 70s—the ones Defendants are adamant prove Gibson's Flying V and Explorer did not have secondary meaning at that time— was because Zelinsky knew "**Ibanez was really good at copying Gibsons.**"  [Tr. 765: 22-23 (emphasis added).]

The evidence that showed Dean Zelinsky (and Ibanez) initially copied Gibson in the 1970s is strong evidence of secondary meaning.  *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F.Supp.1513, 1540 (S.D. Tex. 1996), aff'd as modified, 155 F.3d 526 (5th Cir. 1998) ("Tour 18's intentional copying of the HARBOUR TOWN mark and use of the mark prominently in its advertisements and promotional brochures is strong evidence of secondary meaning."); *see also Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 639, 61 U.S.P.Q.2d 1769, 2002 FED App. 0060P (6th Cir. 2002) ("This court has long held that evidence of intentional copying shows the strong secondary meaning of [a product] because '[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'").

Accordingly, the Court should deny the JMOL on this point.

## 2.  JMOL is Not Warranted for the Two Marks Based on No Likelihood of Confusion.

Armadillo's JMOL argument regarding the jury finding it infringed Gibson's Flying V® word mark and Hummingbird® word mark is just a re-hash on its "one-off manner" argument that this

Court already rejected.  *See Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 2025 WL 2698115, at *4. "Armadillo's argument seems to suggest that because it did not infringe that much, Gibson is not entitled to injunctive relief." *Id.* "That argument rings hollow because injunctive relief in trademark law is designed to prevent *any* future trademark infringement by a defendant pursuant to 15 U.S.C. § 1116." *Id.* (emphasis in original.)

Armadillo argues that "Gibson's website identifies 'Flying V®' as a body style, not a brand." [*See* Renewed Motion at p. 5 (citing Tr. 933:21-940:5.).] The cited transcript does not say that. [*See* Tr. 939:24-940:6 ("Q. Do you agree with Mr. Davidson that Gibson's Web page lists guitars by body style? A. Yes.  Q. For example, the body style listed on Gibson's website for the ES Body style lists it as the ES Body style; is that right?  A. Yes.").]

Armadillo's arguments regarding the Flying V® word mark and Hummingbird® word mark are largely the same.  [*See* Renewed Motion at pp. 11-12.] Armadillo only used it on one place; Gibson's has no evidence of actual confusion or consumer survey; and Gibson's 2017 cease-and-desist letter did not mention the word marks. [*Id.*] Evidence of actual confusion or a consumer survey on confusion are not required; thus, Armadillo's argument that the lack of those two things proves there was no substantial evidence to support jury's confusion finding is without merit.  *See Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 483 (5th Cir. 2008)("It is well established, however, that evidence of actual confusion is not necessary for a finding of a likelihood of confusion."). In any event, Gibson's witness Aljon Go did testify regarding confusion concerning Armadillo's use of Gibson's Flying V.  [*See* Tr. 279:3-280:22.]

Armadillo's argument that Gibson did not include the word marks in Gibson's 2017 cease-and-desist letter has no legal relevance to the likelihood of confusion factors. [*See* Jury Instruction at Tr. 1793-1794 (use after receiving a cease-and-desist letter is not evidence of intent to confuse.).] In short, Armadillo has not shown that "the evidence points so strongly and overwhelmingly in favor of

one party that … reasonable jurors could not arrive at any contrary conclusion." *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d at 629.

### B.     The Court Should Not Alter or Amend the Final Judgment to Deny Injunctive Relief because of Gibson's Expired Patents.

Try as it might, Armadillo has been unable to conjure any case that says an expired design patent automatically **limits** a trademark owner of the same design to **only** passing off claims. As described previously and below, there are several cases that say the opposite. Nor does Armadillo's extension of the logic in its lead case, *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), make sense. *Dastar* was a dispute over copyright, not trademark, and its clear and limited inquiry focused only on whether the defendant could be liable for not properly creating the "originator" of the by then uncopyrighted work. Here, the subject work is trademarked, and the jury found the trademark to be valid; moreover, the claim is far more than Armadillo claiming to be the originator as false claims of sponsorship, affiliation, or approval are a part of the action.

The Fifth Circuit recognizes that Rule 59(e) "favor[s] the denial of motions to alter or amend a judgment." *S. Constructors Grp., Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993). The rule does not exist to be a vehicle for re-litigating old issues, presenting the case under new theories, obtaining a rehearing on the merits, or taking a "second bite at the apple." *Cabalcante v. United States*, No. 4:16-cv-964, 2021 WL 2894086, at *1 (E.D. Tex. July 9, 2021) (internal citation omitted.). It allows, however, a party to "question the correctness of a judgment." *Templet*, 367 F.3d at 478. The rule for reconsideration of a final judgment allows a court to alter or amend a judgment because of (1) an intervening change in controlling law, (2) the availability of new evidence not available previously, (3) the need to correct a clear error of law or fact, or (4) to prevent a manifest injustice. *Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 567 (5th Cir. 2003).

In its Renewed Motion, Armadillo does not explicitly say which one of the four bases it is seeking to amend the final judgment:  Armadillo makes no argument regarding factors 1-2, and 4, and

it does not argue this Court committed clear error of law.  [*See* Dkt. # 826 at p 7.]  Rather, this Court already ruled that Armadillo's argument that Gibson's expired design patents prohibit injunctive relief to prevent consumer confusion "meritless," stating:

> [T]he expiration of the design patents does not preclude Gibson from enforcing its shape trademarks under the Lanham Act. *See Bonito Boats, Inc. v. Thuder Craft Boats, Inc.*, 489 U.S. 141 (1989); *Fuji Kogyo Co., Ltd. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 683 (6th Cir. 2006) ("The existence of design patents does not preclude the same product from protection as a trademark under the Lanham Act either simultaneously or successively."); *see also Kohler Co. v. Moen Inc.*, 12 F.3d 632, 636–37 (7th Cir. 1993).

[*See* September 22, 2025 Memorandum and Opinion at Dkt. # 812 pp. 9-10.]

Rule 59(e) "does not exist to be a vehicle for re-litigating old issues, presenting the case under new theories, obtaining a rehearing on the merits, or taking a second bite at the apple." *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d at 630.

Armadillo is seeking to relitigate the issue by arguing "controlling precedent does limit the injunctive relief **remedy** available after design patents expired to bar only future palming off or selling unlabeled confusingly-similar products," citing *Dastar Corp.*  [*See* Motion at Dkt. # 826 p. 14.]  *Dastar Corp.*, however, has nothing to do with the interplay between patent and trademark rights.  The case is about an expired copyright, and the Supreme Court held: The "Lanham Act does not prevent unaccredited copying of uncopyrighted work." *See Dastar Corp.*, 539 U.S. 23.

Armadillo argues that "*Dastar* instructs that Congress cannot use the Lanham Act to create a type of perpetual patent."  [*See* Dkt. # 826 at p. 14.]  *Dastar*, however, does not say what Defendants want it to say: A party cannot get trademark protection on something that an expired design patent was covered. This is because this is not the law.  *See Fuji Kogyo Co. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 683 (6th Cir. 2006) ("The existence of design patent does not preclude the same product from protection as a trademark under the Lanham Act either simultaneously or successively."); *see also Kohler Co. v. Moen Inc.*, 12 F.3d 632, 638 (7th Cir.1993) (noting that a trademark owner has an indefinite term

of protection and must also prove secondary meaning and likelihood of confusion in an infringement suit, which the owner of a design patent need not do).

As the Supreme Court acknowledged in, *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 23, 121 S.Ct. 1255, 1257(2001), a party can receive trademark protection for an expired utility patent if they show the trademark is nonfunctional. In this regard, Gibson had expired design patents not utility patents. *See Fuji Kogyo Co,* 461 F.3d at 683 ("A design patent, counter to a utility patent, is presumptive evidence of nonfunctionality, evidence that may support a similar trademark claim.").

Armadillo largely ignores *Fuji Kogyo Co., Ltd. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 683 and *Kohler Co. v. Moen Inc.*, 12 F.3d 632, 636–37 in its Motion, referring to them as "two cases from other circuits." [*See* Motion at Dkt. # 826 p. 13.] Armadillo attacks *Fuji Kogyo* as *dicta* and "moreover the quote in *Fuji Kogyo* was based on a decision from the Seventh Circuit ["Kohler"] that predated *Dastar* and *TrafFix*. [*See* Motion at Dkt. # 826 p. 16-17 (bracket language added).] In contrast, Armadillo argues the Supreme Court's Opinion in *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234 (1964), *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 153, 109 S.Ct. 971, 979, 103 L. Ed. 2d 118 (1989) and *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L. Ed. 2d 661 (1964) prove Armadillo's point. [*See* Renewed Motion at pp. 16-17.] *Kohler*m is still good law and analyzed and disregard all Armadillo's arguments on this matter:

> We disagree with Kohler's sweeping conclusion that the Supreme Court's holdings in *Sears, Compco,* and *Bonito Boats* preclude trademark protection for product configurations.
> …
>
> As described earlier in this opinion, the underlying policies of federal trademark law, and the nature of the protection afforded, do not approximate the sweeping, perpetual patent-like state statutes that the Supreme Court found impermissible in *Sears, Compco,* and *Bonito Boats.*

*See Kohler Co. v. Moen Inc.*, 12 F.3d 632, 641–42 (7th Cir. 1993).

Lastly, Armadillo argues that "the Fifth Circuit follows the line of demarcation drawn in *Dastar* limiting the scope of protection available after patentable or copyrightable ideas have gone into the public domain." [*See* Dkt. # 826 at p. 17 (citing *General Universal Systems, Inc. v. Lee*, 379 F.3d 131, 149 (5th Cir. 2004)).] Here again, *General Universal Systems, Inc. v. Lee*, does not stand for the proposition a party cannot receive trademark rights in a product that was once covered by now expired design patent. The Court in *General Universal Systems* held that, "in sum and substance, GUS's claim is simply a claim that HAL has infringed its copyright in LOPEZ COBOL. *Dastar* makes clear that such claims are not actionable under § 43(a) (as reversing passing off claims)." *See Id.* 379 F.3d at 149.

Conversely, Gibson's trademark infringement claims against Armadillo are not, in sum and substance, copyright infringement claims brought as reverse passing off claims. This fact is no more evident than Armadillo's first argument in its Renewed Motion is that Gibson failed to prove secondary meaning related its Flying V® Body Shape and Explorer Body Shape®. Secondary meaning is purely a requirement of trademark law and has nothing to do with a copyright infringement. *See Moore Bus. Forms, Inc. v. Seidenburg*, 619 F.Supp. 1173, 1181 (W.D. La. 1985) ("The concept of 'secondary meaning' was first developed as part of the common-law of trademarks.") (citing *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 702 (5th Cir. 1981)).

As this is a trademark case and Gibson's Flying V® Body Shape, Explorer® Body Shape, and SG® Body Shape are incontestable, 15 U.S.C.A. § 1115(b) and the Supreme Court precedent in *Park N' Fly* limit Armadillo's potential challenges to the Gibson Trademarks to one of the nine defenses listed in 15 U.S.C.A. § 1115(b) and expired patent is not one of them. *See* 15 U.S.C.A. § 1115(b)(1)-(9). Armadillo's argument is essentially that Gibson's incontestable trademarks are functional under 15 U.S.C.A. § 1115(b)(8), but Armadillo never pled this nor sought to prove it at trial. [*See* Answer and Affirmative Defenses at Dkt # 77, pp. 21-22.]

In short, Armadillo failed to demonstrate this Court committed a "clear error of law" and is impermissibly seeking to relitigate the issue. *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d at 630. Accordingly, this Court should not set aside the injunction prohibiting Armadillo's infringing and counterfeit Dean V, Dean Z, and Gran Sport.

### C. The Court Should Not Alter or Amend the Final Judgment or Grant a New Trial Related to Gibson's Flying V®, Explorer®, and SG® Body Shapes.

Continuing down the argument as the prior section, Armadillo argues that the Court committed a clear error of law or a manifest injustice happened at trial because the Court did not instruct the jury: "Others are free to copy the design, subject only to the obligation to identify the product as their own." [*See* Renewed Motion at p. 18 (citing Defendants' Bench Brief Regarding Need for Additional Jury Instruction at Dkt # 741 at 2.] Concerning this, Armadillo argues that "the Court should alter or amend the Final Judgment to state that Armadillo has not manufactured, advertised [or] sold products in the United States that infringe any of Gibson's body shape trademarks." [*See* Dkt # 826 at p. 18.] Here again, Armadillo is seeking to use Rule 59(3) as a vehicle for re-litigating old issues. *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d at 630; *see also* Order at Dkt. # 812 at p. 9. Conversely, Armadillo's proposed jury instruction is a clear error of law. *See Id.*; *see also* 15 U.S.C.A. § 1115(b)(expired patent not one of the nine defenses to incontestable trademarks).

Alternatively, Armadillo argues it is "entitled to a new trial on infringement by the V, Z and Gran Sport guitars under a jury charge that accurately reflects the law." [Renewed Motion at p.18.]. "To be entitled to a new trial, the movant must show that the verdict was against the great weight of the evidence, not merely against the preponderance of the evidence." *Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d at 630. On this point, Armadillo's argument is circular: "The verdict (based on a legally incorrect instruction) is against the great weight of the evidence." [*See* Renewed Motion at Dkt # 826, p. 20.] Armadillo's argument that a jury in a trademark dispute should

be instructed that—"Others are free to copy the design, subject only to the obligation to identify the product as their own"—simply has no basis in trademark law. [*See* above.]

Armadillo's position that *Dastar* and other precedent stands for the proposition that others can copy incontestable trademarks as long as they label the product their own is meritless, as this Court previously found and as addressed herein. [*See* Order at Dkt. # 812 at p. 9.] Thus, Armadillo is not entitled to either amend the judgment or for a new trial based on the fact the jury should have received an incorrect statement of law.

> **D.    This Court Should Not Amend the Judgment to Hold No Counterfeiting nor Should the Court Grant a JMOL or New Trial on Counterfeiting.**

Armadillo's argument to avoid the consequences of the counterfeit finding ignores the structure of the statute and the instruction the Court gave. The gravamen of Armadillo's complaint is that the "Counterfeiting instruction did not require any intent." [*See* Renewed Motion at p. 14.] The explanation for the harm is that counterfeiting requires passing off, and the absence of the intent requirement allows a counterfeit finding despite the application of Dean's house marks, which according to Armadillo, is impossible.

15 U.S.C.A. § 1117 defines the damages for any type of infringing *good or service*. Subsection b provides enhanced damages and the award of attorneys' fees as additional remedies if the infringer intentionally uses a counterfeit *mark* within the infringing *product or service*. *See* 15 U.S.C.A. § 1117(b). Subsection c provides for the award of statutory damages for use of a counterfeit mark even without a finding of intentionality. *See* 15 U.S.C.A. § 1117(c). The jury here answered that the marks used in Armadillo's Dean V, Dean Z, and Gran Sport guitars, as well as the use of two word marks were counterfeits of Gibson's Flying V®, Explorer®, and SG® registered body shapes and the two Gibson word marks, and that the infringement was intentional. [*See* Verdict Form at Dkt. # 754.] Despite these findings, Armadillo complains as to the absence of "spurious" in the definition of counterfeit in the jury instructions under the argument that the exclusion of the word misled the jury into believing

it did not need to find intentionality to conclude that Armadillo had counterfeited. [Renewed Motion at p. 19.]

The glaring common-sense problem with Armadillo's argument was that the jury was asked directly whether Armadillo had acted intentionally and answered yes. [*See* Dkt. # 754, Question 3.] For good measure, the jury also answered that Armadillo's actions were in bad faith. [*Id.* at Question 9.] Most importantly, in defining whether Armadillo's use of a mark qualified as a counterfeit, the Court included the element of intentionality:

> These facts are relevant to whether Armadillo is liable for: …
> Counterfeiting the Gibson trademarks, excluding the ES Body Shape design, by ***intentionally*** using a counterfeit that is identical to, or substantially indistinguishable from, Gibson's Trademarks in a manner that is likely to cause confusion among ordinary consumers…

[Dkt. # 746, Jury Instructions, p. 13 (emphasis added).]

And later…

> To find intentional counterfeiting, you must find that a preponderance of the evidence demonstrates that Armadillo meant to include within its product or advertising a shape, word, or phrase that Armadillo knew to be identical to or substantially indistinguishable from a Gibson trademark.

*Id.* at 14.

Armadillo's contention that the counterfeiting instruction did not contain an intent element is just wrong. Because it is so wrong, there is no explanation in Armadillo's Renewed Motion as to how inserting the word spurious is necessary when the Court twice instructed the jury on what constituted counterfeiting to include intention by Armadillo. Given the presence of the intentional instructions, Gibson can see no error, let alone harmful error.

Whatever answer Armadillo gives in reply, it will likely be tethered to their oft-argued idea that counterfeiting can only be through passing off by labeling a good in a way that contributes to the deception, for instance selling a "Ghibson" guitar while using the same shapes. The statute, however, is not written that way. The counterfeit definition is only that the mark, not the good or service, is

identical to, or substantially indistinguishable from, the registered mark. 15 U.S.C.A. § 1127. If Congress wished the statute to read as Armadillo argues, then the enhanced remedies for counterfeiting would not address the use of a counterfeit mark; instead, it would address the use of a counterfeit good or service. *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d at 656 ("Again, the section defines a counterfeit by comparing the *marks* at issue, not the products on which they appear.").

Congress knew the difference because it used the different terms in 15 U.S.C.A. §1125 (liability for infringement requires *good or service* to be confusing) and 15 U.S.C.A. §1117 (enhanced remedies of use of a counterfeit *mark*). There is simply nothing in the plain language of the statute that requires the infringing product to be a "Ghibson" to qualify as a counterfeit. *See Id.* at 656.

Where a party argues on appeal that the district court erred in refusing to give a proffered jury instruction, that party must "show as a threshold matter that the proposed instruction incorrectly stated the law." *Federal Deposit Ins. Corp. v. Mijalis,* 15 F.3d 1314, 1318 (5th Cir. 1994). Once that threshold is met, the party challenging the instructions must "demonstrate that the charge as a whole creates substantial and ineradicable doubt as to whether the jury has been properly guided in its deliberations." *Russell v. Plano Bank & Tr.*, 130 F.3d 715, 719 (5th Cir. 1997) (internal citation omitted).

Second, even where a jury instruction was erroneous, the Fifth Circuit will not reverse if it determines, based upon the entire record, that the challenged instruction could not have affected the outcome of the case. *Id.* Moreover, in determining whether the instruction was erroneous, the Fifth Circuit gives substantial deference to the decisions of the district court. *Id.* A prerequisite to the Fifth Circuit's review of the instructions in this manner, however, is that the objection must have been brought to the attention of the district court at trial.

On this point, Armadillo only objected to the final jury charge as it didn't include the entire definition the Court gave in its preliminary instructions, including the word spurious. [*See* Tr. 1649-

1651.] Armadillo never objected that the final jury charge must include "fake" or "deceptively suggests an erroneous origin." [*See* Tr. 1649-1651.] Thus, Armadillo has waived those arguments. *See Russell v. Plano Bank & Tr.*, 130 F.3d 715, 719 (5th Cir. 1997) ("We have repeatedly held that a general objection to the district court's jury instructions is insufficient to satisfy Rule 51.").

Furthermore, it is clear that Armadillo's marks found to be counterfeit here were "fake" or "deceptively suggest an erroneous origin." They were duplicates of the Gibson marks.  While Armadillo erroneously argues that the presence of the Dean house marks eliminates any possibility of counterfeiting, it does not and cannot argue that the marks by themselves do not suggest Gibson as the originating source.  In this regard, Armadillo incorrectly argues this Court's 2023 "Order also held that 'the plaining meaning of a 'spurious' mark is one that is 'fake' and 'deceptively suggests an erroneous origin.'" [*See* Renewed Motion at p. 20.]  This Court did not hold that; it was merely explaining what the Second Circuit said in *Tiffany. Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d 614, 656 (E.D. Tex. 2023) (noting the Second Circuit in *Tiffany* said "the plain meaning of a 'spurious' mark is one that is 'fake' and 'deceptively suggests an erroneous origin.'") (*quoting Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 95 n. 18. (2d Cir. 2020)) (quoting *Spurious*, BLACK'S LAW DICTIONARY (11th ed. 2019)).  Furthermore, the entire footnote 18 in *Tiffany* is *dicta* as the footnote begins: "We cannot conclude on the record here that no reasonable jury could find in favor of Tiffany on the counterfeiting claim, and we therefore affirm the district court's denial of Costco's motion for summary judgment as to this claim," The rest of the footnote then discusses when it might not be appropriate to find counterfeiting.  *See Id.* ("We do note that it is likely inappropriate to impose liability for trademark counterfeiting when a defendant is able to establish—with or without the other two elements of the fair use defense—that it used a term identical to the registered mark otherwise than as a mark.").

31

In this note, Armadillo argued throughout closing that counterfeit required passing off and being a cheap fake. [*See* Tr. 1723-1725 ("Armadillo is not trying to sell a Prada bag for 12 bucks on Broadway in New York City. . . . To be a counterfeit, you take a bag that you got for $3 in China and you put a Prada label on it and you sell it for $200 in Times Square. That's counterfeiting.". Thus, there is no error in the Court not including the word spurious again in the final instructions, as Armadillo got a full opportunity to argue its point again. *See Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 578 (5th Cir. 2004) ("Although failing to give a requested permissive pretext instruction courts reversal, based upon our consideration of the record, we conclude that this error did not seriously impair Kanida's ability to present her claim in this case.").

In short, two separate juries have found Armadillo liable for counterfeiting, and any additional definition would not help Armadillo. *See Am. Registry of Radiologic Technologists v. Garza*, 512 F.Supp.2d 902, 910 (S.D. Tex. 2007)("'Spurious' is defined as 'outwardly similar or corresponding to something without having its genuine qualities: false.' Merriam Webster's Collegiate Dictionary 1140 (10th ed. 1997) . . . . None of these definitions creates a substantive difference from the ordinary meanings of the terms at issue, however.'").

**E.    Defendants are Not Entitled to JMOL on Laches, thus Barring Any Monetary Award or Injunctive Relief.**

"A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d at 629. Here, the law is clear that the jury's finding of Armadillo's unclean hands allows the Court to award injunctive and monetary relief despite the laches findings, and that even absent the unclean hands finding, injunctive relief is still appropriate.  *See Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 2025 WL 2698115, at *4 ("the jury found that Armadillo had unclean hands and intentionally infringed on

the five trademarks the Court noted above (Dkt. #754 at pp. 2–3, 6). Accordingly, Armadillo cannot assert the equitable defense of laches.").

As an initial matter, Armadillo claims it preserved its Rule 50(a) JMOL during trial. [*See* Renewed Motion at p. 7 citing Tr. 1644-47.] Gibson disagrees. At trial, Armadillo moved for judgment as a matter of law, stating: "Third, unclean hands. Defendants move for judgment as a matter of law that they are not liable for unclean hands. **Gibson failed to offer legally sufficient evidence for this Court to find defendants liable for false designation of origin**." [*See* Jury Trial, Volume 7, Tr. 1646:21-25 (emphasis added).] This appears to be a reiteration of Armadillo's theme throughout that in trademark disputes involving expired patents: "Others are free to copy the design, subject only to the obligation to identify the product as their own." [*See* Renewed Motion throughout.] Armadillo, however, argues in its Renewed Motion that there was not substantial evidence to support a finding of bad faith. *See* Renewed Motion at 21 ("The jury finding of no willful infringement in Question No. 4 means there is no substantial evidence supporting the bad faith intent required to foreclose the equitable defenses of laches."); *see also Id.* at 22 ("There is no evidence, let alone substantial evidence, that Armadillo acted with the requisite bad faith as to any of the three extant body shape trademarks or the two word marks."). These are separate things. A lack of evidence to demonstrate a false designation of origin is different than a lack of evidence to prove bad faith. Thus, Armadillo waived this argument. *TGIP, Inc. v. AT&T Corp.*, 527 F.Supp.2d 561, 570 (E.D. Tex. 2007) ("Therefore, any arguments made which were not asserted at the close of the evidence are deemed waived.").

Moreover, Armadillo is incorrect that "laches also bars injunctive relief." [*See* Renewed Motion at p. 22 (citing *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 626 (5th Cir. 2013) ("[A] finding of laches . . . . may bar injunctive relief if the trademark owner conducted itself in a way that induced the infringer's reliance or if an injunction would result in 'substantial prejudice' to the infringer."). First,

it is black letter law in the Fifth Circuit that a "finding of laches alone ordinarily will not bar . . . injunctive relief, although it typically will foreclose a demand for an accounting or damages." *See Abraham v. Alpha Chi Omega*, 708 F.3d at 625 (quoting *Conan Properties,* 752 F.2d at 152).

Second, Armadillo is still making the same argument this Court rejected after the first trial. *Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 2022 WL 3008501, at *4 ("The jury's finding alone does not persuade the Court that Gibson acted in such a way as to either induce Defendants' reliance, or that an injunction would cause substantial prejudice to Defendants . . . .The jury's finding of laches alone does not bar Gibson's request for permanent injunction.").

Here, Armadillo argues the evidence at trial showed Gibson's implicit or explicit acts induced Armadillo to infringe.  [*See* Renewed Motion at p. 22 ("Here, laches also bars injunctive relief . . . . Injunctive relief is not appropriate because of affirmative acts by Gibson that implicitly, if not explicitly, authorized Rubinson and, through him, Armadillo to continue selling Dean guitars."] As for the induced reliance prong, Armadillo recited much of Armadillo and Gibson's early history together, *i.e.*, Armadillo was once a Gibson dealer; Gibson asked Armadillo to stop copying the Flying V and Explorer; and Armadillo started to work on redesigns.  [Renewed Motion at p. 23.] Armadillo then concludes: "Particularly, in view of his prior experience selling both DEAN and GIBSON guitars without complaint from Gibson, despite being prepared to change the DEAN V design, Gibson's silence gave Elliott Rubinson every reason to believe Gibson had decided not to further trouble Armadillo." [*See* Renewed Motion at 23.]

Armadillo cites no evidence that Gibson decided not to further trouble Armadillo and that Armadillo relied on that. *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 2022 WL 3008501, at *5 ("Defendants have not pointed to any affirmative acts on Gibson's part which would constitute authorization of continued infringement, presumably because no such conduct exists."). Furthermore, Armadillo argument here is essentially the jury had to accept their version of events, and as explained

34

below, Gibson presented its side of the story regarding Armadillo's bad faith—the Jury decided who it believed. *Affordable Care, L.L.C. v. JNM Off. Prop., L.L.C.*, No. 22-60498, 2024 WL 1234928, at *13 (5th Cir. Mar. 22, 2024) ("The jury is 'free to choose among reasonable constructions of the evidence.'").

As for the substantial evidence prong, Armadillo admits "the DEAN Z and DEAN V guitars may represent only a fraction of Armadillo's profits." [*See* Renewed Motion at p. 22.] Armadillo argues, however, that "they are the tie that connects Armadillo and history of DEAN guitars to loyal fans and customers of the DEAN brand," and "[f]ans and customers of DEAN Z and DEAN V would be upset if Armadillo did not continue to offer the same body shapes as when Dean Zelinsky first introduced those guitars." [*Id.* citing Tr. 1316:5-21.] Tr. 1316:5-21 does not say any of that; rather, it pertains to Josh Maloney's testimony regarding Dean artist not fans or customers of Dean. [*See* Tr. 1316:5-21.]

Given that it has admitted the lost sales would account for a fraction of its profits, Armadillo cannot show substantial prejudice. *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 2022 WL 3008501, at *6 ("Because the majority of the infringing products account for only a small percentage of Armadillo's total production and sales, it does not appear Defendants would suffer.").

Next, Armadillo argues that, while the jury found Armadillo had unclean hands and intentional infringement, Armadillo is entitled to prevail on its laches defenses because the jury did not find Armadillo willfully infringed the Gibson trademarks. [*See* Dkt. # 826 at p. 21.] Armadillo then appears to treat willfulness and bad faith as one in the same, arguing: "The jury finding of no willful infringement in Question No. 4 means there is no substantial evidence supporting the bad faith intent required to foreclose the equitable defense of laches." [*See Id.*] To the extent Armadillo is arguing bad faith and willfulness are the same, they are mistaken, as explained below.

It is blackletter law that "A laches defense cannot be asserted by a party with unclean hands because it is equitable." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013). "A defendant who intentionally infringes a trademark with the bad faith intent to capitalize on the markholder's good will lacks the clean hands necessary to assert the equitable defense." *Rolex Watch USA, Inc. v. BeckerTime, L.L.C.*, 96 F.4th 715, 723 (5th Cir. 2024) (quoting *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 490 (5th Cir. 2008)).

Thus, the jury was not required to find willfulness to find unclean hands. *See Radiator Specialty Co. v. Pennzoil-Quaker State Co.*, 207 F. App'x 361, 362 (5th Cir. 2004) ("The district court determined that the undisputed facts did not demonstrate any "willful, egregious, or unconscionable conduct or bad faith" on the part of Defendants, as discussed in *Hot Wax*, so as to constitute unclean hands. We agree with that assessment."). The jury was instructed Armadillo acted "willfully if it knew that it was infringing Gibson's trademark or if it acted with deliberate indifference to Gibson's trademark rights" but was also instructed continued use after a cease-and-desist letter is not evidence of intent to confuse because a party may believe it had a valid defense.  [*See* Tr. 1796:15-22; 1793-1974.]

Conversely, the jury was instructed that Gibson must prove Armadillo knowingly and intentionally used Gibson's trademarks "with the bad faith intent to benefit or capitalize on the mark owner's goodwill."  [*See* Tr. 1801:20-25.] Thus, the jury was free to conclude that Armadillo *believed* it had a legitimate defense to infringement—*i.e.*, laches or genericness—, but that it knowingly used Gibson's trademarks with the bad faith intent to capitalize off them.  *See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d at 643 ("Of course, the jury is 'free to choose between reasonable constructions of the evidence.") (internal citation omitted.).

Furthermore, it appears that Armadillo is making combined a factual and legal based on the wrong premise that willfulness and palming off are required to find unclean hands. [*See* Dkt. # 826 at p. 22 ("There is no evidence, let alone substantial evidence, that Armadillo acted with the requisite

bad faith . . . . the jury finding of no willful infringement, taken together with the admitted absence of any passing off by Armadillo, negates unclean hands."). Again, from a legal perspective, neither passing off nor willfulness are required to demonstrate unclean hands, and this Court was correct to cite *Rolex Watch USA, Inc. v. BeckerTime, L.L.C.*, 96 F.4th 715, 723 (5th Cir. 2024) for the proposition that the jury's finding of unclean hands and intentional trademark infringement negates their laches defenses. [*See* Order at Dkt. # 812 at p. 10.]

From a factual perspective, there was ample evidence for the jury to find unclean hands, including facts related to Dean Zelinsky going to Gibson factory to copy Gibson; Elliot Rubinson refusing to change bad shapes (after saying he would) when Gibson complained; Armadillo copying Gibson's SG and joking in emails "don't be scared" to call it the GS; Armadillo using the Gran Sport to go after Gibson's endorsers Volbeat; and Evan Rubinson calling the lawsuit the "silver lining of a lifetime if we leverage it properly" and refusing to stop. [761:22-766:25; Pl. Ex. 391; 788:10-789:12; Pl. Exs. 73 and 570; 761:22-766:25; Pl. Ex. 391; 788:10-789:12; Pl. Exs. 73 and 570.] Accordingly, this Court should deny the JMOL on laches.

## F.   The *eBay* Factors Are Not Divided or Favor Armadillo.

It is unclear under what Federal Rule Armadillo is seeking to undue this Court's Permanent Injunction Order under the *eBay* factors. [*See* Renewed Motion at p. 24.] The intro to this section states "Armadillo shows below that the *eBay* factors, when considered under controlling law and the evidence of record, warrants denial of a permanent injunction as to any of Gibson's three body shape marks or two word works (sic)." [*See Id.*]. Considering controlling law and evidence of record is not a standard the Court can alter or amend its judgment under.  Rather, under Rule 59(e), a court can alter or amend a judgment if there is an "intervening change in controlling law" or "the availability of new evidence not available previously." *Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). Armadillo does not argue there is intervening change in controlling law or newly discovered evidence.

[*See* Renewed Motion at p. 24.] Rule 59(e) prohibits Armadillo from seeking a second bite at the apple or re-litigating old issues, which it appears that Armadillo is trying to do. *See Cabalcante v. United* States, No. 4:16-cv-964, 2021 WL 2894086, at *1 (E.D. Tex. July 9, 2021) (citing *Sequa Corp v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)).

Later in the argument section, Armadillo argues there is no substantial evidence to support Gibson.  [*See* Renewed Motion at pp. 25-26 ("[T]here is no substantial evidence of loss of control of Gibson's reputation . . . Gibson's argument is not supported by substantial evidence[.]") No substantial evidence, however, is the standard for granting a new trial under Rule 59(a), but Armadillo is not asking for a new trial in section only the denial of the permanent injunction.  This appears to be the same kitchen sink that Armadillo threw at the permanent injunction after the first trial that this Court summarily denied:

> Lastly, Defendants ask the Court to revisit its permanent injunction because, in essence, it did not adequately balance the parties' interests based on the facts of this case. After reviewing the record, the Court disagrees, and it will not stray from its prior decision with regards to the permanent injunction. Moreover, the Court's opinion is not changed by the fact that Defendants moved under multiple other Federal Rules of Civil Procedure besides Rule 59(e), including Rule 60 and Rule 52(b).

*See Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 668 F.Supp.3d at 661.

In sum, the Federal Rules do not allow Armadillo to re-litigate whether the Court correctly decided that the loss of control, balance of hardship, and public interest factors favor Gibson. *See Cabalcante v. United* States, 2021 WL 2894086, at *1.

### G.    The Court Should Not Grant JMOL that Disgorgement is Limited to $1.00 nor Should the Court Alter or Amend the Judgment to only $1.00 in Disgorgement.

Here, Armadillo moves to change this Court's Order on damages based on two different legal standards:  JMOL and Motion to Alter and Amend under Rule 59(e). [*See* Renewed Motion at 27.] Again, the substantial evidence standard applies to JMOL, and the clear error of law standard applies to Motion to Alter and Amend.  *See Gibson Brands, Inc.*, 668 F.Supp.3d at 629.

Armadillo's arguments, however, appear to conflate the different standards: [*See* Renewed Motion at p. 29 ("The Order did not correctly apply several of the *Pebble Beach* factors, resulting in an inaccurate outcome not supported by substantial evidence."] First, Armadillo argues the Court should alter or amend the final judgment because the "Court committed legal error in assessing disgorgement in view of the jury's finding that Gibson was entitled to only $1.00 in the amount of the jury award." [Renewed Motion at 27.] The standard for the "extraordinary remedy" to alter or amend a judgment, however, is "clear legal error." *See Gibson Brands, Inc.* at 631. Armadillo makes no argument regarding how this Court committed a clear error of law.

Next, Armadillo argues the Court should alter or amend the final judgment because the amount of the Court's award, constituting 100% of the stipulated profits Armadillo earned from the five marks found to be infringed, is not supported by substantial evidence . . . .[t]he undisputed evidence is that purchasers considered other attributes and features of the guitar." [*See* Renewed Motion at p. 27.] Armadillo, however, cites no evidence to support its argument that the "undisputed" evidence shows purchasers considered other attributes and features of the guitar. [*Id.*]

Furthermore, this argument cuts against Armadillo's argument that it will suffer prejudice from the injunction: how can it suffer prejudice from not being able to use Gibson's body shapes if purchasers considered other attributes and features of the guitar? Moreover, it is hard to argue the amount of profits this Court awarded was not supported by substantial evidence when the parties stipulated to the amount. *Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, No. 4:19-CV-358, 2025 WL 2698115, at *7 (E.D. Tex. Sept. 22, 2025) ("The parties stipulated to the amount of profits Armadillo earned from the sales of the five infringing products from October 1, 2017, to the present.")

Armadillo's next point—the Jury findings are binding on the Court—is Armadillo impermissibly attempting under Rule 59(e) to relitigate the issues. *See Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 2025 WL 2698115, at *6 (As an initial matter, the Court will address Armadillo's

argument that the jury's finding on disgorgement binds the Court (*See* Dkt. #806 at pp. 31–32). The Lanham Act commits the calculation of disgorgement to the discretion of the Court." (citing *Boltex Mfg. Co., L.P. v. Ulma Piping USA Corp.*, No. 4:17-CV-1400, 2020 WL 598284, at *3 (S.D. Tex. Feb. 7, 2020); 15 U.S.C. § 1117(a) ("The court shall assess such profits and damages or cause the same to be assessed under its direction.")).

The same can be said for Armadillo's next point—the Court erred in assessing the six Pebble Beach Factors. [*See* Renewed Motion at p. 30.] Again, clear legal error (not just error) is the standard under Rule 59 (e), and Armadillo cites no case to demonstrate the Court committed clear legal error. *Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d at 567. Furthermore, Armadillo is impermissibly seeking to use the motion as a vehicle to relitigate issues. *See Id.*; *see also Gibson, Inc.*, 2025 WL 2698115, at *7 ("the *Pebble Beach* factors weigh in Gibson's favor.").

Armadillo's last argument—the Court did not determine the portion of Armadillo's profits attributable to its infringement—is meritless. First, Gibson only had the burden to prove Armadillo's profit (that were stipulated to); Armadillo (not the Court) had the burden to prove offset. *See* 15 U.S.C.A. § 1117 (a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."). Second, the Court did analysis the appropriate amount of apportionment when it explained why it would not treble damages. *Gibson, Inc.*, 2025 WL 2698115, at *7 ("By requiring Armadillo to disgorge the profits it earned through infringement, the Court places Gibson in roughly the same position as it would have been had the infringement never occurred.") (citing *Seatrax, Inc.*, 200 F.3d at 369 (noting that "the plaintiff is entitled to only those profits attributable to the unlawful use of its trademark.").

## H.    Defendants are not the Prevailing Party.

Armadillo's last argument is essentially that, if it wins its Renewed Motion, it would then be the prevailing party. For the reasons outlined herein, the Court should deny the Renewed Motion.

Respectfully submitted, this 12th day of November 2025.

/s/ *Andrea E. Bates*
Andrea E. Bates
*Pro Hac Vice*
Kurt Schuettinger *Pro Hac Vice* Johnathan M. Bates
*Pro Hac Vice*
Bates & Bates, LLC
1890 Marietta Boulevard NW
Atlanta, Georgia 30318
Telephone: (404) 228-7439
abates@bates-bates.com
kschuettinger@bates-bates.com
jbates@bates-bates.com

Stephen D. Howen
State Bar No. 10117800
Law Office of Steve Howen
7111 Bosque Blvd., Suite 305
Waco, TX 76710
Telephone: (254) 826-6526
steve@stevehowenlegal.com

Attorneys for Plaintiff GIBSON, INC.

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF electronic filing system on November 12 2025.

<u>/s/ *Andrea E. Bates*</u>
Andrea E. Bates